Stephanie M. Parent (OR Bar No. 925908)*
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
(503) 320-3235
sparent@biologicaldiversity.org

John William ("J.W.") Glass (DC Bar No. 1780210)*
Center for Biological Diversity
1411 K St. NW, Suite 1300
Washington, DC 20005
(813) 833-5301
JWGlass@biologicaldiversity.org

Jonathan Evans (CA Bar No. 247376)
Center for Biological Diversity
1212 Broadway Street, Suite 800
Oakland, CA 94612
jevans@biologicaldiversity.org

Counsel for Plaintiffs
*Admitted *pro hac vice*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| PESTICIDE ACTION NETWORK NORTH AMERICA, et al., | ) ) ) | Case No. 3:24-cv-06324-JSC |
| Plaintiffs, | ) ) ) | DECLARATION OF BRETT HARTL IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO SUPPLEMENT |
| v. | ) ) | |
| PAUL SOUZA, et al., | ) ) | |
| Defendants | ) ) | |
| and | ) ) | |
| CROPLIFE AMERICA, | ) ) | Honorable Jacqueline Scott Corley |
| Intervenor-Defendant. | ) ) ) | |

I, Brett Hartl, declare as follows:

1.      I am over 18 years of age, have personal knowledge of the matters asserted in this declaration, and if called upon to testify, would state the same.

2.      I have an undergraduate degree in conservation biology from Prescott College, Arizona, and a law degree from Lewis and Clark Law School.

3.      I have worked at the Center for Biological Diversity ("CBD") since 2013. From 2013 to 2016, I was CBD's Endangered Species Policy Director, and in 2017 was promoted to CBD's Government Affairs Director.

4.      Since 2014, I have taught as an adjunct professor at George Mason University, the American University Washington College of Law, and Prescott College. I have guest taught lectures at Harvard University, Columbia University, the University of Arizona and the Smithsonian Conservation Biology Institute. My classes have focused on environmental law and policy, wildlife management, international biodiversity conservation, ocean conservation, and ecological economics.

5.      I have previously worked on the issue of endangered species consultations for pesticides as early as 2011, when I was a National Oceanic and Atmospheric Administration Knauss Fellow in the U.S. House of Representatives Committee on Natural Resources, which has Congressional oversight responsibilities for the Endangered Species Act. I was the primary Minority staffer for an oversight hearing on May 3, 2011, that examined the issue of endangered species consultations for pesticides. This Congressional hearing helped precipitate a request from the Obama Administration to the National Academy of Sciences requesting that the Academy study the issue of pesticide consultations and prepare recommendations for the U.S. Fish and Wildlife Service, National Marine Fisheries Service, Environmental Protection Agency and U.S. Department of Agriculture to improve the consultation process.

6.      I closely followed the progress of the National Academy during my Knauss fellowship. I continued to follow the issue of pesticide endangered species consultations when I worked at the Society for Conservation Biology as a senior policy fellow and provided

comments on pesticide consultations to the Academy and the federal agencies in 2012. In 2013, the National Academy issued its report: *Assessing Risks to Endangered and Threatened Species from Pesticides (2013)* ("NAS Report").

7.      I have been deeply involved in the issue of endangered species pesticide consultations at CBD since 2013. In my prior role as Endangered Species Policy Director, I submitted over one hundred comment letters to the EPA and the Services regarding their endangered species obligations regarding new pesticide registrations, the registration review of pesticides, pesticide ecological risk assessments, and interim registration review decisions.

8.      I was a coauthor of a 2016 peer-reviewed paper entitled *Risk management decisions for pesticides and threatened and endangered species: The role of uncertainty analysis* IN HUMAN AND ECOLOGICAL RISK ASSESSMENT: AN INTERNATIONAL JOURNAL.[1] I have coauthored six other peer-reviewed papers on policy issues related to the Endangered Species Act, and was an author-chapter for the American Bar Association's Third Edition of ENDANGERED SPECIES ACT: LAW, POLICY AND PERSPECTIVES (Don Baur & Ya-Wei Li eds. 2021) wherein I authored the chapter: *Rebuilding the Endangered Species Act: An Environmental Perspective.*

9.      As part of my current job duties, I monitor both the U.S. Fish and Wildlife Service's ("FWS") and National Marine Fisheries Service's ("NMFS") (together the "Services") implementation of Section 7 of the Endangered Species Act. I have drafted many of CBD's comment letters on policies and regulatory proposals relating to all aspects of Section 7 since 2013. I have also reviewed many biological opinions completed either individually or jointly by the Services, including complex and national consultations on agency actions that

---

[1] Fairbrother, A., Hartl, B., Hope, B. K., Jenkins, J. J., Li, Y. W., & Moore, D. R. (2016). *Risk management decisions for pesticides and threatened and endangered species: The role of uncertainty analysis*. Human and Ecological Risk Assessment: An International Journal, 22(2), 502-518.

have nationwide implications, such as the EPA's regulatory program under Clean Water Act Section 316(b), the U.S. Army Corps' nationwide Clean Water Act Section 404 general permits, the EPA's implementation of the renewable fuel standard under the Clean Air Act, and the federal land management agencies' national plan for ariel applications of fire retardant. I have reviewed each of the nine Pacific Northwest regional biological opinions and the two national biological opinions completed by the NMFS on various groups of pesticides since 2008. I have also reviewed the FWS's 1993 national biological opinions on rodenticides and its 2012 regional biological opinion on the rodenticide Rozol. Beyond pesticide consultations, as part of my work I have also reviewed many dozens of discrete, geographically limited biological opinions covering agency actions for other federal agencies whose actions impact smaller subsets of listed species compared to nationwide consultations.

10.     The EPA's registration and approval of pesticide products for use on the landscape have been among the most complex Section 7 agency actions that the Services have attempted to assess in the Endangered Species Act's 50-year history. When the EPA registers a new pesticide for its initial use or reviews the registration of an existing chemical that may have been previously authorized, EPA must assess the "active ingredient" – the chemical compound that achieves the pest control outcome being sought – as well as any end-use product that is applied by individual entities across the country. End-use products contain the active ingredient, plus additional "inert" ingredients such as emulsifiers, surfactants and stabilizers. End-use products also can include multiple active ingredients and can also be mixed in tanks with other end-use products by applicators. The overwhelming majority of pesticide products that have been approved by the EPA can be applied virtually anywhere in the nation. As a result, there can be hundreds, or even thousands, of permutations of pesticide use patterns on different crops with different products in different amounts at different times of year and in different locations where a pesticide active ingredient can be applied to the landscape, all of which must be assessed during the consultation process.

11.     All pesticide applicators must follow the label instructions on the specific pesticide product they wish to apply. The label of the pesticide product sets forth how often a product can be applied, how much can be applied to a particular amount of land, and what times of day or what seasons a product can be applied, while also enumerating other restrictions and safety requirements designed to protect the environment, the pesticide applicator, and other individuals from harm caused by pesticides. As shorthand, the EPA itself states that the "label is the law" as the pesticide product label sets forth all limits on how any pesticide product can be used. Any application of a pesticide that is inconsistent with the use directions on the label, or does not abide by all requirements of the label is a violation of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA").[2]

12.     One of the first joint actions taken by EPA and the Services following the NAS Report was the finalization of a joint policy that provides stakeholders with additional opportunities to provide comments and input to the federal agencies during the pesticide consultation process ("Policy on Enhancing Stakeholder Engagement").[3] This policy provides for 60-day comment periods on every draft biological evaluation prepared by the EPA and every draft biological opinion proposed by the Services. The policy also provides for the possibility of additional input during any informal consultation periods. The federal agencies also began to host and organize stakeholder workshops wherein the public could provide input and ideas on how to make future pesticide consultations more efficacious. Since 2014, I participated in nearly every pesticide consultations stakeholder meeting hosted by the federal agencies. As an example, in 2015 I presented to the federal agencies on the importance of

_____

[2] *See*, EPA Ways to Obtain Assistance on Pesticide Labeling Issues,  https://www.epa.gov/pesticide-labels/ways-obtain-assistance-pesticide-labeling-issues (last accessed May 14, 2025).
[3] *See* Enhancing Stakeholder Input in the Pesticide Registration Review and ESA Consultation Processes and Development of Economically and Technologically Feasible Reasonable and Prudent Alternatives ("Policy on Enhancing Stakeholder Engagement"), https://www.regulations.gov/document/EPA-HQ-OPP-2012-0442-0038 (last accessed May 15, 2025).

ensuring that future pesticide consultations fully assessed the varied conservation statuses of each listed species, as the harm to each listed species from pesticides could vary greatly, even if such species were from the same taxonomic group of organisms. See AR-0051842 to AR-0051864. Below is a slide from this presentation (found at AR- 0051852):



### CHALLENGES "REFINING" PESTICIDE USAGE DATA AND SPECIES' RANGE

13.     Given the nationwide scope of these pesticide consultations, it was clear as far back as the NAS Report itself that there would be significant challenges in incorporating pesticide usage data into the consultation process. In its discussions of pesticide usage data (found at AR-249) the NAS Report explained:

> Despite a label's explicit application specifications, such as 1 lb of material per acre for corn fields, users commonly apply lower quantities according to the severity of their weed or pest infestation. However, Steps 1 and 2 of the ESA process…should ensure that no potentially unsafe pesticide applications are

ignored….Furthermore, in Step 3 of the process…the Services cannot reasonably be expected to use information that suggests that substantially lower application rates are used unless supporting data are available. Such data must include statistical descriptions of the spatially and temporally distributed application rates. Moreover, some measures would have to be taken to ensure that a use pattern could not dramatically increase in any particular season or locale (for example, because of crop shifts). Only then could exposure modelers use such knowledge to obtain EECs with associated uncertainties. For now, pesticide use is probably an inaccurate input for exposure analysis; registration and labeling are not well suited for solving this exposure-analysis bias.

14.     Early stakeholder meetings reinforced that among the many challenges facing the federal agencies in completing pesticide consultations, two of the largest challenges were likely to be (1) obtaining accurate and useful data on where and when pesticides are used (generally shorthanded as "usage data") and (2) refining where threatened and endangered species live (generally shorthanded as "refining range").

15.     At a stakeholder meeting I attended on April 15, 2015, EPA staff presented on *Geospatial Data for Mapping Pesticide Use Patterns* to demonstrate the challenge of incorporating pesticide usage data. As the agency staff demonstrated, over the span of five annual growing seasons, a particular parcel of land might be used to grow a variety of crops, meaning that the use of a particular pesticide to address a particular pest threat for a particular crop could vary substantially. See AR-051883 to AR-051931. The slide below (found at AR-0051897) illustrated that over a five-year period of time from 2010 to 2014 (with each color representing a different year), corn was planted on the vast majority of land in a particular region of North Dakota that EPA assessed even though in any given year, the land planted for corn was more limited:

1
2
3
4
5
6
7
8
9
10
11
12
13



14     16.     Another longstanding challenge in obtaining usage data on pesticides is that the

15 U.S. Department of Agriculture is highly constrained with respect to the granularity of pesticide

16 usage data it is permitted to collect under the law. For example, in 2018, I sought to obtain

17 pesticide usage data via the Freedom of Information Act from the Department's National

18 Agriculture Statistics Service to ascertain the most recent usage data for malathion, diazinon

19 and chlorpyrifos. However, because of limitations found at primarily at 7 U.S.C. § 2276, the

20 USDA was not permitted to collect or release such data. In a letter that the National Agriculture

21 Statistics Service sent to me, the Department explained that it did not collect large sample sizes

22 of data, and that the data they collected regarding pesticide applications by growers could not be

23 summarized or analyzed below the level of state-aggregated data. As they explained in a letter

24 to me: "Finer geographic levels, such as county level, do not allow NASS to protect individual

25 producer information as required by law." A true and correct copy of this letter is attached

26 hereto Exhibit 1.

27     17.     Stakeholder presentations by agency staff illustrated that there were challenges in

28

narrowing or refining the range of listed species based on different amounts of data and knowledge regarding each listed species. The goal of these refinement efforts were to identify approaches that could delineate suitable habitat within range (as listed species are not likely to be found outside of suitable habitat), incorporate the life history of each species (e.g. will individuals use agricultural landscapes), assess the distribution of individuals of such species within their range, identify the temporal overlap of species and pesticide applications (especially for migratory species), and determine the percent overlap of species range with use sites. A 2014 stakeholder presentation illustrated that the FWS still needed to potentially refine the range of over 1400 listed species.

18.     Importantly, the EPA and Services explained that the goal and purpose of refining both pesticide usage data and refining the range of listed species ultimately was to "identify the best mitigation measures." This goal generally aligned with similar agency statements in their Policy on Enhancing Stakeholder Engagement that usage data joint stakeholder process policy to identify risk reduction measures and identify where stricter and pesticide product label language was needed. As the policy explained, the goals of refining usage data were to:

> refine the label and/or identify typical use rates for risk characterization, to define the uses that will be supported for registration review, and to facilitate the potential adoption of any additional needed risk reduction measures with the possibility of reducing, or eliminating the number of "may affect, likely to adversely affect" determinations under the ESA. These data can also be used to describe the situations in which rates higher than "typical" rates are needed and under what conditions, allowing more prescriptive label language to be developed. Ultimately, these data should result in a refined preliminary (ecological) risk assessment.[4]

19.     During the following four years, from 2013 to 2017, the EPA and the Services

---

[4] Policy on Enhancing Stakeholder Engagement at 7. https://www.regulations.gov/document/EPA-HQ-OPP-2012-0442-0038  (last accessed May 15, 2025)

worked together to develop methods and approaches for these consultations at every step of the process, rather than EPA completing a Biological Evaluation without significant collaborative input from the Services (the normal approach when an agency has experience completing a sufficient biological evaluation).

20.    EPA completed its final biological evaluation for malathion, diazinon and chlorpyrifos on January 18, 2017, concluding that 97% of all endangered species were likely to be adversely affected, thereby triggering the requirements to initiate formal consultations with the FWS and NMFS. In completing its assessment, EPA assessed exposure of pesticides on endangered species up to the maximum use authorized by pesticide product labels in all areas where a pesticide could be applied, an approach that followed the recommendations of the National Academy of Sciences.

21.    The NMFS completed a 3750 page final biological opinion for malathion, diazinon and chlorpyrifos on December 19th, 2017. With respect to malathion, the NMFS concluded that registration of pesticides containing malathion was likely to jeopardize 38 of 77 listed species in its jurisdiction and adversely modify 37 of the 50 designated critical habitats. The NMFS also concurred with EPA that 19 species were "Not Likely to be Adversely Affected" by malathion. In completing its assessment, the NMFS defined the "Description of the Proposed Action" as the "(1) approved product labels containing chlorpyrifos, diazinon and malathion, (2) degradates and metabolites of chlorpyrifos, diazinon and malathion, (3) formulations, including other ingredients within formulations, (4) adjuvants, and (5) tank mixtures. EPA's is required to reassess each registered pesticide at least every 15 years."[5] In the narrative description of the proposed action, the NMFS biological opinion does not discuss

_____

[5] NMFS, 2018. Biological Opinion for Pesticides: Chlorpyrifos, Diazinon, and Malathion https://www.fisheries.noaa.gov/resource/document/biological-opinion-pesticides-chlorpyrifos-diazinon-and-malathion at 4-2 (last accessed May 15, 2025).

pesticide use or usage data.

**THE NEAR COMPLETION AND REDO OF THE FWS MALATHION BIOLOGICAL OPINION**

22.     Through numerous Freedom of Information Act requests that I had submitted between 2017 and 2019, CBD was able to determine that in early 2017, the registrants of malathion had requested the first Trump administration for the EPA to withdraw its biological evaluation of malathion. Specifically, registrants sent letters to the Secretary of the Interior and the Secretary of Commerce requesting that they "direct that any effort to prepare biological opinions based on [the biological evaluations] be set aside. A true and correct copy of these letters is attached as Exhibit 2.

23.     CBD was also able to determine that by approximately October 27, 2017, the FWS had likely completed or nearly completed a draft biological opinion for malathion and was preparing to brief then-Deputy Secretary David Bernhardt on the draft biological opinion. Career staff at the FWS presented the findings of the biological opinion in a PowerPoint presentation summarizing that malathion was likely to jeopardize 1,284 of the total species analyzed and adversely modify or destroy the critical habitat of 163 listed species. The PowerPoint explained that there was a large amount of overlap between where malathion is authorized to be used and the ranges of listed species, that malathion is highly toxic to all animal taxa, that a "single exposure [to Malathion] could be catastrophic," and that "Repeated use could eliminate a segment of a population or an entire population in a given area." The presentation summarized the analytical approach used in the 2017 draft malathion biological opinion that the proposed action is "the registration of the labels" and that the FWS "did not consider probability of use/probability of individuals encountering pesticide." A true and correct copy of this PowerPoint presentation is attached hereto as Exhibit 3.



**Biological Opinions – Our Approach**

The proposed action is the registration of the labels "*the label is the law*," and currently the labels allow for:

- multiple to numerous repeat applications seasonally or annually per use (e.g., mosquito adulticide up to biweekly throughout year)

- broad-scale use - geographic exclusions are extremely rare

For determining "may affect," we assumed that if a species' range overlapped with a pesticide use site, it would be exposed to that use (i.e., did not consider probability of use/probability of individuals encountering pesticide).

For many vulnerable species, a single exposure could be catastrophic (particularly narrow endemics). Repeated use (such as mosquito adulticide) could eliminate a segment of a population or an entire population in a given area.

24.     Shortly after this briefing, Deputy Secretary Bernhardt directed the FWS to change its approach for the consultation and incorporate information regarding the usage of pesticides into the analysis for the biological opinion. Based on additional documents received through Freedom of Information Act requests that I submitted, CBD determined that the FWS sent a letter to the EPA on November 14, 2017 seeking an undefined extension of time to complete the malathion biological opinion. In its request for additional time, the FWS requested that EPA provide a revised effects analysis that assessed "regarding actual use, including extrapolation to areas where actual use data does not exist or cannot be obtained." The FWS asked EPA to "predict effects from future usage that is reasonably certain to occur during the time period of the label authorization but is not reflected in current actual use data." And finally, the FWS requested that EPA eliminate from its analysis "geographic areas identified by EPA where these pesticides are not used and where such use is not likely during the time period of the label authorization, or where listed species or designated critical habitats would not

1  otherwise be exposed to use of the pesticide." AR-00356-00357.

2       25.     During the same general time period, the EPA sent a letter to the NMFS on

3  February 21, 2018 requesting to "initiate voluntary, informal consultation" on the NMFS

4  already-completed final biological opinion. The EPA justified this request to reinitiate

5  consultation to allow a revised biological opinion to incorporate "(1) input from stakeholders,

6  (2) further interagency discussion and agreement on the Step 3 (jeopardy determination) interim

7  methods, and (3) additional data and analysis, including consideration of the best scientific and

8  commercial data available on use and usage information that EPA is providing to the Services."

9  A true and correct copy of this letter is attached hereto as Exhibit 4.

10      26.     On July 19, 2019, the EPA sent a letter to the NMFS requesting to reinitiate

11  formal consultations on malathion, diazinon and chlorpyrifos, stating that "we believe that new

12  information on how these pesticides are actually being used may reveal that the extent of the

13  effects of the action may be different than what was previously considered." *Id*.

14      27.     Thus, as a result of the change in presidential administrations, between 2017 and

15  2021, both FWS and NMFS were required to substantially, if not nearly entirely, scrap and redo

16  their draft and final biological opinions for malathion. Because of the overall delay and

17  requirement to effectively complete entirely new opinions, both the FWS and NMFS did not

18  produce final biological opinions until 2022. On February 28, 2022, the FWS completed its 331

19  page biological opinion (with an additional 13 appendices and numerous supporting files). On

20  June 30, 2022, the NMFS completed a 1385 page biological opinion (with an additional 5

21  appendices and numerous supporting files).

22      28.     The primary issue that both FWS and NMFS were directed to reexamine

23  between 2017 and 2020 was to what extent pesticide usage data should be incorporated into

24  pesticide biological opinions and where it was appropriate to incorporate that data.

25      29.     While every biological opinion is somewhat different, since the late 1990s after

26

27

28

the publication of the Services' 1998 Joint Consultation Handbook[6], each ESA consultation generally follows the same organization as follows: (1) Description of the proposed action; (2) Status of the species/critical habitat; (3) Environmental baseline; (4) Effects of the action; (5) Cumulative effects; (6) Integration & Synthesis (the analysis of jeopardy and adverse modification); (7) Reasonable and prudent alternatives (if a jeopardy determination is made); (8) an incidental take statement and mandatory reasonable and prudent measures to minimize take; (9) Conservation Recommendations to implement Section 7(a)(1); and (10) a Reinitiation Notice setting forth the conditions when consultations must be reinitiated with the Services. Handbook at 4-11 to 4-60.

30.     The "Description of the Proposed Action" is one of the most important and foundational portions of any biological opinion because it sets forth the scope of all analyses that follow for all aspects of the opinion. As the Handbook explains, this portion of the biological opinion includes both a "descriptions of the proposed action and the action area (area including all direct and indirect effects)." Handbook at 4-15. While the action agency and the Services often agree as to the scope of the analysis, the Handbook notes that there are sometimes disagreements and that "ultimately the Services are responsible for this biological determination." Handbook at 4-15. All subsequent analyses of the environmental baseline, effects of the action, and levels of incidental take are based upon — and limited by the scope of — the "Description of the Proposed Action" as determined by the Services. Handbook at 4-11 to 4-50.

31.     Refining pesticide usage data and range to achieve more targeted conservation measures and to clarify labels can potentially align with the approaches set forth in the

---

[6] U.S. Fish and Wildlife Service and National Marine Fisheries Service. 1998. Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act (hereafter "Handbook") available at: https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

Handbook, which explains in some detail how positive or proactive conservation measures should be considered in a biological opinion. The Handbook explains that if conservation measure are "pledged and the action agency or applicant will implement them," then those measures should be included as part of the "Description of the Proposed Action" because they are guaranteed to occur. However, if conservation measures are not guaranteed, the benefits of such measures can be considered in the jeopardy analysis but are not part of the "Description of the Proposed Action." Handbook at 4-19.

32.    For example, in September 2020, the registrants of the herbicide atrazine voluntarily changed product labels to prohibit the use of atrazine in Hawaii, Puerto Rico and other U.S. territories.[7] As a result of these binding, voluntary changes to all pesticide labels for atrazine products, the EPA was no longer obligated to consider the impacts of atrazine on listed species found in Hawaii and the U.S. territories. Label restrictions that are implemented by the pesticide registrant therefore qualify as conservation measures that can be included in the "Description of the Proposed Action."

33.    After October 2017, the FWS took a new approach in the malathion biological opinion wherein pesticides usage data were directly incorporated into the "Description of the Proposed Action," effectively constraining all aspects of the analysis within the biological opinion at the outset to what the FWS predicted would be the likely use of malathion across the nation in the future based on data regarding past pesticide usage patterns. AR-12297–12298. FWS effectively eliminated analysis of any scenarios involving multiple exposures of a pesticide to a particular endangered species within a year, or any scenarios involving exposure to pesticides up to the legal limit of what pesticide product labels contemplate. In other words, FWS no longer utilized only the pesticide label registrations themselves as the "Description of

---

[7] *See* EPA 2020 Atrazine Interim Registration Review Decision Case Number 0062, available at: https://www.regulations.gov/document/EPA-HQ-OPP-2013-0266-1605 (last accessed May 15, 2025).

the Proposed Action" and instead modified the scope of all analyses in the biological opinion using pesticide usage data to reduce that scope.

34.     In contrast, the NMFS biological opinion on malathion, diazinon and chlorpyrifos reaffirmed the 2017 biological opinion's original "Description of the Proposed Action" and expressly rejected the incorporation of usage data into the "Description of the Proposed Action." The NMFS provided a 16 page explanation (Appendix D) why usage data were not appropriate to be incorporated into the "Description of the Proposed Action" portion of a biological opinion. In this Appendix, the NMFS wrote: "Based on the uncertainties in the available information discussed above, we incorporated usage data into the Opinion in three general areas: 1) the environmental baseline; 2) the effects analysis; and 3) the Reasonable and Prudent Alternative (RPA)." A true and correct copy of NMFS malathion biological opinion Appendix D is attached hereto as Exhibit 5.

35.     The NMFS has consistently used the registration of pesticide labels as its "Description of the Proposed Action" in each regional and national biological opinion it has completed on pesticides since 2008. As a result, in every opinion the NMFS analyzed the full range of possible exposures to threatened and endangered species. In contrast, the FWS malathion final biological opinion limited the analysis in the opinion to only the likely usage of pesticides, and represented the first instance where the "Description of the Proposed Action" was narrowed at the outset by pesticide usage data.

**Harm to my Personal Interests in Threatened and Endangered Species**

36.     As a result of both my background and training in conservation, I consider myself an amateur naturalist. I look for, photograph, and record videos of birds, mammals and other wildlife, both in the United States and around the world. Watching wildlife is my deepest passion and my favorite personal pursuit, and I go looking for wildlife almost every week of the year. Thus far, I have observed 670 species of mammals and over 4,300 species of birds around the world. While I try to view new species, I also try to obtain photos and videos of species that I was unable to capture images of in the past. I view and share my photos and videos with my

friends, colleagues, and the general public in various ways, including through my YouTube channel, which has over 2,900 subscribers. Some of my videos have been used on CBS, NBC and other television channels, and have been viewed by millions of people.

37.   As someone that has dedicated his career to preserving wildlife, I also take great personal and professional satisfaction in observing the diversity of wildlife that remains present due in part to the efforts of those in the conservation community and am particularly interested in viewing threatened and endangered species in their natural habitats. I also enjoy bringing my students on field trips so that they can view and observe endangered species in their native habitats and discuss how to conserve threatened and endangered species with conservation professionals.

38.   Among the threatened and endangered birds that I have observed include the Whooping Crane (*Grus americana*), Yellow-billed Cuckoo (*Coccyzus americanus*), Least Bell's Vireo (*Vireo bellii pusillus*) and Southwest Willow Flycatcher (*Empidonax traillii extimus*) all of which are likely to be harmed by malathion.

39.   I have travelled numerous times to view Whooping Cranes on their wintering grounds in and around Aransas National Wildlife Refuge on the Texas coast and in Nebraska on the Platte River during their migration as far back as 2003. My most recent trips to observe Whooping Cranes were to Texas in late March 2024 and to Nebraska in March 2021. My next trip to see them is likely to be in March of 2026. Whooping Cranes remain one of the rarest birds in North America and the entire migratory population only numbers 700 or so individuals. At its lowest point, only 18 Whooping Cranes were left on the planet. Seeing these iconic birds, one of the great conservation success stories of the last century, is always an incredible experience for me, and one of my life goals is to view all 15 species of cranes around the world. Below is a photo of a pair of Whooping Cranes I observed in 2019:



40.     This pair of Whooping Cranes was observed just west of Aransas National Wildlife Refuge ("Aransas NWR") near the town of Lamar, Texas, which borders the critical habitat for this species. I have observed Whooping Cranes in the developed areas around Aransas NWR a number of times. I am concerned that both agricultural and non-agricultural spraying of malathion in developed areas for activities such as mosquito control around Aransas NWR may harm Whooping Cranes. I have personally observed pesticide spraying around Aransas NWR even though I could not determine which chemical was being sprayed.

41.     Freedom of Information Act requests by the CBD have identified records of organophosphate poisoning of Whooping Cranes. While the CBD only received partial records, FWS biologists, including biologists working on the malathion biological opinion, stated in email correspondence: "Necropsy report from a whooping crane with suspected organophosphate intoxication, from July of this year. I thought whooping crane was one of the harder birds to assess, so interesting to see this evidence of exposure/effects. I understand that this is not an isolated case either." A true and correct copy of this email is attached hereto as Exhibit 6.

42.     I am injured by the FWS's failure to properly assess the harm to Whooping Cranes and their critical habitat in the malathion biological opinion and its failure therein to

properly minimize take and harm to this species. Without meaningful conservation measures to protect whooping cranes both of their wintering grounds and their migration route, Whooping Crane are left unprotected with no specific conservation measures to protect them from pesticide exposure. Given that pesticides harm large birds like whooping cranes that can eat invertebrate prey species exposed and contaminated by pesticides, whooping cranes could be injured or killed from exposure to malathion. Fewer whooping cranes makes it less likely that I will be able to observe them in the future and could reverse the heroic conservation gains from the previous century. My recreational, aesthetic and professional interest in viewing and photographing cranes is injured by harmful malathion spraying and the FWS's failures to protect this species properly.

43.    I have observed Southwest Willow Flycatchers and Least Bell's Vireo many times, including when I worked as an endangered species biological technician for the U.S. Geological Survey in California in 2010. I observe and attempt to photograph Southwest Willow flycatchers each spring and summer in riparian areas of Arizona including the Hassayampa River and at the local lake close to Prescott where I live. I most recently observed Least Bell's Vireo in July 2024 in San Diego, and most recently observed Southwest Willow Flycatcher in May 2025.

44.    Each spring and summer I also observe a few breeding pairs of the threatened western yellow-billed cuckoo distinct population segment ("Cuckoo DPS") along the Verde River near Cottonwood, Arizona, most recently in June 2024. For each of these species, I intend to continue looking for them, photographing them and obtaining videos of them this year and into the future.

45.    While the Southwest Willow Flycatcher, Least Bell's Vireo and Cuckoo DPS are not commonly found near agriculture, they are very dependent on healthy riparian areas, which are often surrounded by development and communities, and can be harmed by mosquito, other pest control and other weed control activities. Because each of these species depend on healthy insect populations as their main sources of food, impacts of pesticides like malathion can be

very significant. I am injured by FWS's failure to properly minimize the impacts of non-agricultural uses malathion in Arizona to the Southwest Willow Flycatcher and Cuckoo DPS, and minimizing non-agricultural and agricultural uses of malathion in southern California. Fewer individuals of these species makes it less likely I will be able to observe and enjoy viewing them, diminishing my recreational, aesthetic and personal interests in these two riparian species.

46.     As an avid mammal watcher, I also search for rare mammal species, nearly all of which are harder to observe than most birds. The Black-footed Ferret (*Mustela nigripes*) was believed to be extinct until a tiny remnant population was discovered in Wyoming in 1981, which became the founding population of a captive breeding effort that has been the basis for all reintroductions of ferrets in North America. Today the Black-footed Ferret is one of the hardest mammals to observe in the world, and one only has a small chance to view them in, and only in, a few areas where the FWS and other conservation partners are attempting reintroductions. I first observed Black-footed Ferrets in 2019 at a release location close to Seligman, Arizona about an hour from where I live in an area where individuals were being reintroduced to the wild. I took several groups of students from my wildlife management class to learn about their conservation and participate in radio-telemetry tracking of the ferrets after dark as a learning opportunity. Since 2019, I have attempted to view Black-footed Ferrets every year in that area of Arizona, and have seen individual ferrets roughly half of my attempts. I have also tried to view Black-footed Ferrets in the Buffalo Gap National Grassland of South Dakota, and have plans to attempt to see them again in Arizona this spring and Colorado next year.

47.     Black-footed Ferrets face many severe threats to their conservation and recovery, such that any additional threat to them is likely to be significant. I am deeply concerned that the FWS has failed to take any meaningful actions to prevent Black-footed Ferrets from being exposed to pesticides including specifically around the release locations where captive-bred individuals are reintroduced to the wild. These small and isolated populations cannot expand or become self-sustaining if the FWS does not address threats to the ferrets including use of

malathion for grasshopper control and other rangeland pest control activities. While it may be unlikely that any one particular application of malathion to control rangeland pests would harm a Black-footed Ferret, the consequences to these few isolated populations would be substantial even if just one or a few individuals were harmed by exposure to authorized malathion use. Importantly, because Black-footed Ferrets are strictly nocturnal (most active between 10pm and 3am), and since this fact is not contemplated by FWS, pesticide applicators may be completely unaware that they are spraying malathion in ways that are harmful to the ferret since very few people ever see them, which is a threat and reality that distresses me greatly. The loss of even a single Black-footed Ferret is significant to the reintroduction and conservation of this species, and therefore any such losses would diminish my likelihood of seeing them in the wild, harming my aesthetic and recreational interests.

48.     I have also searched for several of the endangered subspecies of Beach Mouse (*Peromyscus polionotus*; also known as Oldfield Deermouse) along the Florida Gulf Coast, first in 2010, and then again 2014 and 2024. In particular, I have tried to see the Choctawhatchee Beach Mouse and St. Andrews Beach Mouse found in coastal dune beach ecosystems near Panama City, Florida. These species are very difficult to see, and I have to slowly look for heat sources using a thermal imaging device after dark, with the hope of then identifying in the mice with a flashlight, which is extremely difficult. I enjoy the challenge of identifying small, nocturnal mammal species, and have seen four other similar species of deermouse elsewhere in the United States, but so far have not had any luck with seeing a Beach Mouse. I will continue searching for the four endangered subspecies of Beach Mouse in the future and will likely return to the southeast in the spring of 2026 to look for them together with other rare mammals in that region.

49.     Of the nearly 7000 mammal species in the world, rodents make up nearly 40% of all known species, most of which are strictly nocturnal. Spending time outside after dark looking for mammal species that people never see is very rewarding even if it is somewhat of an obscure hobby. But it has also becomes very clear to me after spending large amounts of time

looking for mammals after dark that any harm to them or any nocturnal species that is caused by a pesticide will never be documented or recognized as these types of species are extraordinarily hard to find even when taking every effort to do so. Spraying of malathion into or nearby the few remaining habitats of the endangered subspecies of any Beach Mouse is extremely concerning to me because the harms of this activity will be extremely difficult to assess. Small mammals like beach mice are extremely vulnerable to pesticide spraying and I am very concerned that the failure to require specific conservation measures for these beach mice species will significantly impede their conservation.

50.     While not as obsessive compared to birds and mammals, I also enjoy looking for other wildlife in my travels including amphibians and reptiles. In Arizona I have searched on several occasions for the Chiricahua Leopard Frog (*Rana chiricahuensis*) in southern and central Arizona. I first observed a leopard frog in 2019 in the Las Cienegas National Conservation Area and took the picture below:



51.     I have observed Chiricahua Leopard Creek in Fossil Creek Wild and Scenic River on several occasions and have looked for them in the Verde River and Agua Fria River in

central Arizona. I will continue searching for them every spring and summer and hope to get better pictures of the frog in the future. Chiricahua Leopard Frog's depend on healthy aquatic ecosystems and enough invertebrate prey in the water to survive upon. Accordingly, these frogs are not only highly vulnerable to being exposed and harmed directly by malathion, but they are also harmed when malathion reduces the amount of insect and invertebrate prey which serves as their primary food source. In Arizona, healthy and intact rivers, streams and aquatic ecosystems are already extremely imperiled due to development and pollution, and the failure to require conservation measures to address non-agricultural uses of malathion is a very significant threat to the species.

52.     The Fish and Wildlife Service's failure to provide specific and targeted conservation measures to protect the species that I have aesthetic and recreational interests in observing injures me because these failures make it more likely that these species will be harmed by malathion, which in turn makes it harder for me to observe, photograph and take videos of them. By failing to minimize harm to these species and as a result allowing further environmental degradation contaminated by pesticide pollution, the FWS injured me. Furthermore, CBD's mission of preserving species from extinction is frustrated by FWS's failure to abide by the ESA consultation process and comply with the ESA's requirements. A court decision that requires the FWS to implement relevant, species-specific conservation measures for the species that I observe and enjoy would make it more likely that malathion will not be used in the places and in manners that would otherwise harm the threatened and endangered species I take enjoyment in viewing, thereby redressing the injuries caused by the FWS's failures in the malathion biological opinion.

### CBD'S MONITORING OF THE IMPLEMENTATION OF THE BIOLOGICAL OPINION

53.     Since 2022, CBD has submitted two Freedom of Information Act requests to the Environmental Protection Agency in an attempt to ascertain to what extent the agency has abided by the mandatory Reasonable and Prudent Measures set forth in the Incidental Take Statement of the biological opinion, including the annual meetings between EPA and FWS that

1    are required by the opinion, the evaluation of any additional pesticide usage data from the

2    National Agricultural Statistics Service census of agriculture updates, any additional pesticide

3    usage data regarding non-agricultural uses of malathion, and any efforts with stakeholders "to

4    better understand usage where malathion-specific usage information is not currently available."

5         54.    The CBD received records from the EPA in November 2024 and May 2025.

6    These records include summaries from the EPA's Biological and Economic Analysis Division

7    of the Office of Pesticide Programs that analyzed both data generated by the U.S. Department of

8    Agriculture and data generated and then purchased from Kynetec, a private company that

9    conducts surveys of pesticide usage. [8] A true and correct copy of this report is attached hereto as

10   Exhibit 7. The EPA summary illustrate that past malathion usage rarely predicts future use, with

11   some malathion usage lowering over time, while other malathion usage increasing over time.

12   For example, with respect to wide-area mosquito control, EPA states that: "malathion usage has

13   been increasing over the last 5 years, with over five times the usage reported in 2022 as

14   compared to 2018 in both the pounds of malathion applied and the acres treated with

15   malathion." Ex. 7 at 9. With respect to crops, alfalfa "accounted for about one third of

16   malathion agricultural crop usage in terms of treated acres from 2017 to 2021" with blueberries

17   and other fruits next highest in terms of treated acres. While the average number of applications

18   for some crops including alfalfa was "only 1 or 1.1 times per year" the number of applications

19   per year for specialty crops including "blueberries and strawberries, acres treated with

20   malathion were treated on average two times per year." *Id.*

21

22

23                          _____

24

25

26   [8] Letter from Angela Myer, USDA to Carolyn Smith, EPA. June 24, 2024. Malathion (PC #
     057701) Overview of Use and Usage, and Description of Pest Management Benefits, and
27   Impacts of Potential Risk Mitigation in Alfalfa, Pine Seed Orchards, Pine Seedling Propagation,
     and Residential Homeowner Use Sites.

28

SUPPLEMENTAL FWS MATERIALS CITED IN PLAINTIFFS' MOTION

55.     Plaintiffs relied upon documents that FWS authored and has in its possession to unravel its decisionmaking to arrive at its conclusions in the biological opinion. I obtained or had obtained these documents from the U.S. Fish and Wildlife Service Environmental Conservation Online System at: https://ecos.fws.gov/ecp/species-reports.The documents are described below.

56.     U.S. Fish and Wildlife Service. 2004. Recovery Plan for Cumberland Elktoe (*Alasmidonta Atropurpurea*), Oyster Mussel (*Epiblasma Capsaeformis*), Cumberlandian Combshell (*Epioblasma Brevidens*), Purple Bean (*Villosa Perpurpurea*) and Rough Rabbitsfood (*Quadrula Cylindrica Stringillata*). Southeast Region, 177pgs. A true and correct copy of an excerpt of this document is attached as Exhibit 8 of this declaration.

57.     U.S. Fish and Wildlife Service. 2019. Revised Recovery Plan for Valley Elderberry Longhorn Beetle (*Desmocerus californicus dimorphus*) Pacific Southwest Region, Sacramento, California. iii + 18 pp. A true and correct copy of an excerpt of this document is attached as Exhibit 9 of this declaration.

58.     U.S. Fish and Wildlife Service, 2015. *Designation of Critical Habitat for the Dakota Skipper and Poweshiek Skipperling*, 80 Fed. Reg. 59,248 (Oct. 1, 2015). A true and correct copy of an excerpt of this document is attached as Exhibit 10 of this declaration.

59.     U.S. Fish and Wildlife Service, 1990. Recovery plan for the endangered and threatened species of Ash Meadows, Nevada. U.S. Fish and Wildlife Service, Portland, Oregon. 123 pp. A true and correct copy of an excerpt of this document is attached as Exhibit 11 of this declaration.

60.     U.S. Fish and Wildlife Service. 2020. Species Status Assessment for the Blunt-nosed leopard lizard (*Gambelia sila*) Version 1.0. A true and correct copy of an excerpt of this document is attached as Exhibit 12 of this declaration.

61.    U.S. Fish and Wildlife Service, 2019. 5-Year Review, Niangua Darter (*Etheostoma nianguae*). Missouri Field Office, 5 pp. A true and correct copy of  and excerpt of this document is attached as Exhibit 13.

62.    U.S. Fish and Wildlife Service, 1999. *South Florida Multi-Species Recovery Plan)*. A true and correct copy of an excerpt of this document is attached as Exhibit 14 of this declaration.

63.    U.S. Fish and Wildlife Service, 2024. Poweshiek Skipperling (*Oarisma poweshiek*), Status Review: Summary and Evaluation. A true and correct copy of an excerpt of this document is attached as Exhibit 15 of this declaration.

64.    U.S. Fish and Wildlife Service, 2010. Recovery Plan for the Prairie Species of Western Oregon and Southwestern Washington. Portland, OR xi + 241 pp.  and U.S. Fish and Wildlife Service, 2020. Fender's Blue Butterfly (*Icaricia icarioides fenderi*) Species Status Assessment Report. Portland, OR, 203 pp. A true and correct copy of excerpts of these documents are attached as Exhibit 16 and Exhibit 17 of this declaration, respectively.

65.    U.S. Fish and Wildlife Service, 1985. *Determination of Threatened Status With Critical Habitat for Six Plants and One Insect in Ash Meadows*. 50 Fed. Reg. 2077. A true and correct copy of an excerpt of this document is attached as Exhibit 18 of this declaration.

66.    U.S. Fish and Wildlife Service, 2018. Dakota Skipper (*Hesperia dacotae*) Report on the Species Status Assessment Version 2. A true and correct copy of an excerpt of this document is attached as Exhibit 19 of this declaration.

67.    A list of all exhibits attached to this declaration follows my signature.

I declare under penalty of perjury that the foregoing is true and correct. Executed May 28, 2025, in Prescott, Arizona.

_____
Brett Hartl

**EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Letter from USDA NASS to Brett Hartl, June 1, 2018 |
| Exhibit 2 | Letters from Wiley Rein on behalf of registrants Dow, ADAMA, and FMC to Secretaries of the Interior and Commerce, April 13, 2017 |
| Exhibit 3 | FWS Presentation "Overview of the National Pesticide Biological Opinions on Chlorpyrifos, Malathion and Diazinon," October 2017 |
| Exhibit 4 | Letter from EPA to National Marine Fisheries Service, February 21, 2018 |
| Exhibit 5 | Appendix D of the National Marine Fisheries Service 2022 malathion biological opinion |
| Exhibit 6 | FWS email re: whooping crane necropsy report, October 2017 |
| Exhibit 7 | EPA biological opinion monitoring reports re: malathion usage data |
| Exhibit 8 | U.S. Fish and Wildlife Service. 2004. Recovery Plan for Cumberland Elktoe (*Alasmidonta Atropurpurea*), Oyster Mussel (*Epiblasma Capsaeformis*), Cumberlandian Combshell (*Epioblasma Brevidens*), Purple Bean (*Villosa Perpurpurea*) and Rough Rabbitsfood (*Quadrula Cylindrica Stringillata*). Southeast Region, 177pgs. Excerpt |
| Exhibit 9 | U.S. Fish and Wildlife Service. 2019. Revised Recovery Plan for Valley Elderberry Longhorn Beetle (*Desmocerus californicus dimorphus*) Pacific Southwest Region, Sacramento, California. iii + 18 pp. Excerpt |
| Exhibit 10 | U.S. Fish and Wildlife Service, 2015. *Designation of Critical Habitat for the Dakota Skipper and Poweshiek Skipperling*, 80 Fed. Reg. 59,248 (Oct. 1, 2015). Excerpt |
| Exhibit 11 | U.S. Fish and Wildlife Service, 1990. Recovery plan for the endangered and threatened species of Ash Meadows, Nevada. U.S. Fish and Wildlife Service, Portland, Oregon. 123 pp. Excerpt |
| Exhibit 12 | U.S. Fish and Wildlife Service. 2020. Species Status Assessment for the Blunt-nosed leopard lizard (*Gambelia sila*) Version 1.0. |
| Exhibit 13 | U.S. Fish and Wildlife Service, 2019. 5-Year Review, Niangua Darter (*Etheostoma nianguae*). Missouri Field Office, 5 pp. Excerpt |
| Exhibit 14 | U.S. Fish and Wildlife Service, 1999. *South Florida Multi-Species Recovery Plan)*. Excerpt |
| Exhibit 15 | U.S. Fish and Wildlife Service. 2024. Poweshiek Skipperling (*Oarisma poweshiek*), Status Review: Summary and Evaluation |
| Exhibit 16 | U.S. Fish and Wildlife Service, 2010. Recovery Plan for the Prairie Species of Western Oregon and Southwestern Washington. Portland, OR xi + 241 pp. Excerpt |
| Exhibit 17 | U.S. Fish and Wildlife Service, 2020. Fender's Blue Butterfly (*Icaricia icarioides fenderi*) Species Status Assessment Report. Portland, OR, 203 pp. Excerpt |
| Exhibit 18 | U.S. Fish and Wildlife Service, 1985. *Determination of Threatened Status With Critical Habitat for Six Plants and One Insect in Ash Meadows*. 50 Fed. Reg. 2077 |
| Exhibit 19 | U.S. Fish and Wildlife Service, 2018. Dakota Skipper (*Hesperia dacotae*) Report on the Species Status Assessment Version 2. Excerpt |

1

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel of record using the CM/ECF system on May 29, 2025.

*/s/ Stephanie M. Parent*