# Exhibit 1

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC



**United States Department of Agriculture**
National Agricultural Statistics Service
Office of the Administrator



June 1, 2018

Mr. Brett Hartl
Government Affairs Director
Center for Biological Diversity
1411K St. NW, Suite 1300
Washington, D.C. 20005

Dear Mr. Hartl:

Thank you for your participation in the teleconference on May 17, 2018 regarding the National Agriculture Statistics Service's (NASS) chemical use data. As we discussed on the call Title 7, U.S. Code, Section 2276 and the Confidential Information Protection and Statistical Efficiency Act prohibit public disclosure of individual information. Personal information, including reported data, is protected from legal subpoena and Freedom of Information Act requests. Based on these regulations, NASS is unable to provide any record-level data. However, some additional data is available through special tabulations. These tabulations go through the same disclosure review and are available to the public upon request. A listing of these requests can be found on the NASS website under Data and Statistics.

An example of a recent special tabulation is farm counts for selected pesticides and crops requested by CAREX Canada in May 2018. Due to the small sample sizes for the chemical use surveys NASS only provides data to the agricultural district within a state. Finer geographic levels, such as county level, do not allow NASS to protect individual producer information as required by law. NASS strives to publish as much data as possible while still protecting individual producer information. NASS also conducts frequent reviews of its programs to update data products i.e. frequently requested special tabulations often become part of the initial data release, no longer requiring a special tabulation request.

The second topic of discussion involved an interest in who was requesting special tabulation of data related to chlorpyrifos, malathion, or diazinon. Two request have been made to NASS for the reference period that contain the items of interest, both of which are detailed below. If needed, NASS is happy to provide you with a copy of the datasets produced from these requests.

1. Elizabeth Hill, USDA/ARS – file labeled Pesticide Data
   Completed 3/12/2018
   Requested chemical usage data sorted by active ingredient for Vegetable Chemical Usage Survey (VCUS) 2010, 2014, 2016; Fruit Chemical Usage Survey (FCUS) 2011, 2015; and Agricultural Resource Management Survey Phase II (ARMS II) 2010 – 2016

Room 5041A-South Building · 1400 Independence Avenue, SW · Washington, D.C. 20250-2001
(202) 720-2707 · (202) 720-9013 FAX · www.nass.usda.gov

USDA is an equal opportunity provider and employer.

2. Elizabeth Rydz, CAREX Canada – file labeled Chemical Usage Counts
   Completed 5/23/2018
   Requested counts of positive reports by commodity by state for all active ingredients
   for ARMS II 2007, 2009-2017; VCUS 2010, 2014, 2016; and FCUS 2011, 2015

We appreciate you taking the time to understand our survey process and available data products. If you should have additional questions, please feel free to contact me at (202) 720-9354.

Sincerely,

*Bryan Combs*

Bryan Combs
Special Assistant

CC:  Ann Brown

# Exhibit 2

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000

www.wileyrein.com

April 13, 2017

David B. Weinberg
202.719.7102
DWeinberg@wileyrein.com

The Honorable Wilbur Ross
Secretary
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230

Re:    "Final" Chlorpyrifos, Diazinon, and Malathion Biological Evaluations Sent
       by EPA to National Marine Fisheries Service on January 18, 2017

Dear Secretary Ross:

        We are writing on behalf of our clients Dow AgroSciences, LLC ("DAS"),
Makhteshim Agan of North America, Inc., d/b/a ADAMA ("ADAMA"), and FMC
Corporation ("FMC") (together, the "OP Registrants"), to request that you (1)
instruct the Acting Assistant Administrator for the National Marine Fisheries
Service ("NMFS") to return to the U.S. Environmental Protection Agency ("EPA")
three Biological Evaluations ("BEs") that EPA transmitted to NMFS on January 18,
2017; (2) direct that any effort to prepare biological opinions based on them be set
aside; and (3) as soon as is reasonably possible (as explained further below), direct
legal counsel representing NMFS in *NW Coalition for Alternatives to Pesticides, et
al. v. National Marine Fisheries Service*, No. 07-cv-01791 (W.D. Wash.) ("*NCAP
v. NMFS*"), to file a motion requesting modification of the existing stipulated
settlement agreement to extend the deadline for NMFS to complete nationwide
organophosphate ("OP") biological opinions.

        Our clients and their affiliates hold EPA registrations for products
containing one or more of the OP pesticide active ingredients that are the subject of
the BEs (chlorpyrifos, diazinon, and malathion).  The BEs are documents from EPA
required by the "Interim Approaches" adopted during the Obama Administration in
an effort to resolve controversies regarding the relationship between pesticide
registration activities under the Federal Insecticide, Fungicide, and Rodenticide Act
("FIFRA") and activities of EPA and the Departments of Commerce and the
Interior under the Endangered Species Act ("ESA").[1]

---

[1] Interim Approaches for National-Level Pesticide Endangered Species Act Assessments Based on
the Recommendations of the National Academy of Sciences April 2013 Report, *available at*
https://www.epa.gov/sites/production/files/2015-07/documents/interagency.pdf.



April 13, 2017
Page 2

Our clients believe that the Interim Approaches are fundamentally flawed and should be set aside. Drafts of the BEs were released for public review in April, 2016. Substantial comments submitted on those drafts explained the reasons for our clients' view and demonstrated the many flaws in the draft documents.

When EPA sent final versions of the BEs to NMFS, the Agency conceded that it had not responded to most of the comments it had received. This is confirmed in the three reports from expert consultants to our clients that are enclosed with this letter. Those comments also demonstrate that EPA has not even correctly applied in the BEs the processes described as the Interim Approaches.

We will not belabor here the matters addressed in the enclosed reports. But representative examples of the BEs' flaws include the following:

- A major lack of transparency necessary for evaluation and reproduction of results.

- Inclusion of proposed and candidate species that are not afforded protection under ESA.

- Many studies selected by EPA as sources of information on effects and exposure were not evaluated for data quality and relevance. When evaluated, many evaluations did not follow EPA's own study quality criteria. In addition, many scientifically valid, registrant-submitted studies were not evaluated by the Agency, with no explanation. This is not justified and is contrary to EPA's own guidance and the recommendations made by the National Academy of Sciences.

- Effects determinations were made assuming that product may be applied anywhere in the United States, without consideration of distinctions between use patterns, timing of applications, locations of use, and presence of listed species and critical habitats.

- Compounding of conservatism in the assessment of exposure, resulting in unrealistically high and sometimes physically impossible estimates.



April 13, 2017
Page 3

> • Failure to consider appropriate lines of evidence, as recommended by the National Academy of Sciences, in order to determine the likelihood of an effect occurring.

EPA sought to excuse its failure to properly revise the drafts or otherwise respond to comments by asserting that the revisions were precluded by a legal obligation to complete biological opinions based upon the BEs by December 31, 2017.[2]  That position is incorrect.  EPA is not bound by any such obligation.

EPA presumably based its assertion on stipulations entered in court cases by NMFS and the U.S. Fish and Wildlife Service ("FWS").  The one of those stipulations to which NMFS was a party did commit NMFS to complete a nationwide OP biological opinion by December 31, 2017.  Stipulation and Order to Amend the Stipulated Settlement Agreement Affirmed by this Court on August 1, 2008, *NCAP v. NMFS* (W.D. Wash., May 21, 2014), Dkt. No. 50, at 6.[3]  But a party to a settlement agreement may request, by motion, that the court modify the settlement agreement for any "reason that justifies relief."  Fed. R. Civ. P. 60.  Thus, rather than issue flawed BEs, EPA could have asked NMFS to seek to modify the *NCAP v. NMFS* settlement agreement deadline so EPA could adequately fulfill its own statutory obligations.

---

[2] Office of Chemical Safety and Pollution Prevention's Response to Comments on the Draft Biological Evaluations for Chlorpyrifos, Diazinon, and Malathion, at 2 (Jan. 17, 2017), *available at* https://www3.epa.gov/pesticides/nas/final/response-to-comments.pdf.  In failing to "explain or support several assumptions critical to its conclusions," EPA violated the Fourth Circuit Court of Appeals' direction that an agency acting to implement the ESA must explain its analysis "with sufficient clarity" to allow stakeholders to determine whether the analysis is "the product of reasoned decisionmaking." *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 464, 475 (4th Cir. 2013).  For example, EPA relied on several data sets that it does not dispute are incomplete and/or inaccessible.  But it never "cogently explain[ed] why." *Id.* at 473.

[3] The FWS entered into an analogous stipulation in *Center for Biological Diversity v. U.S. Fish and Wildlife Service et al.  See* Stipulation Amending Original Stipulated Settlement and Order, No. 11-cv-5108 (N.D. Cal. July 28, 2014), Dkt. No. 87 ("Amended Stipulated Settlement").  But that stipulation expressly states that FWS "is not obligated to" complete OP consultations by December 31, 2017, and it provides that if there were to be a delay the parties would meet and confer to discuss appropriate actions and, if necessary, petition the Court to resolve any dispute.  Amended Stipulated Settlement at 4-5.  We recently have written to Secretary Zinke about the need to address the issues raised by that settlement.



April 13, 2017
Page 4

        We recently have written to EPA Administrator Pruitt asking that he withdraw from NMFS the three BEs at issue.  However, we urge that you not await that action.  Instead, our clients respectfully request that you promptly return the BEs to EPA and direct that any effort to prepare biological opinions based on them be set aside.  Our clients similarly request that once you, FWS, EPA, and presumably the U.S. Department of Agriculture (which was a party to the development of the "Interim Approaches") have determined how the new Administration is going to address the "Interim Approaches" and, more broadly, the issue of FIFRA-ESA integration, you direct the legal counsel representing NMFS to file a motion to modify the *NCAP v. NMFS* settlement agreement to extend the deadline for nationwide OP biological opinions and take any other appropriate action, and provide EPA with additional time to prepare the BEs.

        Thank you for your prompt attention to these requests.

                                Sincerely,

                                David B. Weinberg

                                Counsel to Dow AgroSciences, LLC;
                                Makhteshim Agan of North America,
                                Inc., d/b/a "ADAMA"; and FMC
                                Corporation

Enclosures



April 13, 2017
Page 5

cc (without attachments except as noted):

    The Honorable Scott Pruitt, Administrator of the United States Environmental
        Protection Agency
    The Honorable Ryan Zinke, Secretary of the United States Department of the
        Interior
    The Honorable Michael Young, Acting Deputy Secretary of the United States
        Department of Agriculture
    The Honorable Jim Kurth, Acting Director of the Fish and Wildlife Service
        (with attachments)
    The Honorable Samuel D. Rauch, III, Acting Assistant Administrator for the
        National Marine Fisheries Service
    The Honorable John Barrasso, Chairman, Senate EPW Committee
    The Honorable Tom Carper, Ranking Member, Senate EPW Committee
    The Honorable Rob Bishop, Chairman, House Committee on Natural Resources
    The Honorable Raul Grijalva, Ranking Member, House Committee on Natural
        Resources
    The Honorable Pat Roberts, Chairman, Senate Committee on Agriculture,
        Nutrition and Forestry
    The Honorable Debbie Stabenow, Ranking Member, Senate Committee on
        Agriculture, Nutrition and Forestry
    The Honorable Michael Conaway, Chairman, House Committee on Agriculture
    The Honorable Collin Peterson, Ranking Member, House Committee on
        Agriculture
    Dr. Sheryl H. Kunickis, Director, Office of Pest Management Policy, United
        States Department of Agriculture
    Mr. Ray Starling, Special Assistant to the President for Agriculture, Trade and
        Food Assistance (with attachments)
    Mr. Richard Keigwin, EPA OPP (with attachments)
    Mr. George Oliver, DAS
    Ms. Laura Phelps, ADAMA
    Mr. Paul Whatling, FMC



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000

www.wileyrein.com

April 13, 2017

David B. Weinberg
202.719.7102
DWeinberg@wileyrein.com

The Honorable Ryan Zinke
Secretary
U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Re:  "Final" Chlorpyrifos, Diazinon, and Malathion Biological Evaluations Sent
by EPA to Fish and Wildlife Service on January 18, 2017

Dear Secretary Zinke:

We are writing on behalf of our clients Dow AgroSciences, LLC ("DAS"),
Makhteshim Agan of North America, Inc., d/b/a ADAMA ("ADAMA"), and FMC
Corporation ("FMC") (together, the "OP Registrants"), to request that you (1)
instruct the Acting Director of the Fish and Wildlife Service ("FWS") to return to
the U.S. Environmental Protection Agency ("EPA") three Biological Evaluations
("BEs") that EPA transmitted to FWS on January 18, 2017; (2) direct that any effort
to prepare biological opinions based on them be set aside; and (3) direct legal
counsel representing FWS in *Center for Biological Diversity v. U.S. Fish and
Wildlife Service et al.*, No. 11-cv-5108 (N.D. Cal.) ("*CBD v. FWS*"), to meet and
confer on a timely basis with counsel for the other parties to that case, as required
by Paragraph 4(c)(1) of the Stipulation Amending Original Stipulated Settlement
and Order approved by the Court on July 28, 2014 (the "Stipulated Settlement"), to
discuss further activity in that case. *See* Stipulated Settlement, *CBD v. FWS*, Dkt.
No. 87.

Our clients and their affiliates hold EPA registrations for products
containing one or more of the organophosphate ("OP") pesticide active ingredients
that are the subject of the BEs (chlorpyrifos, diazinon, and malathion). The BEs are
documents from EPA required by the "Interim Approaches" adopted during the
Obama Administration in an effort to resolve controversies regarding the
relationship between pesticide registration activities under the Federal Insecticide,
Fungicide, and Rodenticide Act ("FIFRA") and activities of EPA and the



April 13, 2017
Page 2

Departments of the Interior and Commerce under the Endangered Species Act ("ESA").[1]

Our clients believe that the Interim Approaches are fundamentally flawed and should be set aside. Drafts of the BEs were released for public review in April, 2016, and substantial comments submitted on those drafts explained the reasons for our clients' view and demonstrated the many flaws in the draft documents.

When EPA sent final versions of the BEs to FWS, the Agency conceded that it had not responded to most of the comments it had received. This is confirmed in the three reports from expert consultants to our clients that are enclosed with this letter. Those comments also demonstrate that EPA has not even correctly applied in the BEs the processes described as the Interim Approaches.

We will not belabor here the matters addressed in the enclosed reports. But some representative examples of the BEs' flaws include the following:

- A major lack of transparency necessary for evaluation and reproduction of results.

- Inclusion of proposed and candidate species that are not afforded protection under ESA.

- Many studies selected by EPA as sources of information on effects and exposure were not evaluated for data quality and relevance. When evaluated, many evaluations did not follow EPA's own study quality criteria. In addition, many scientifically valid, registrant-submitted studies were not evaluated by the Agency, with no explanation. This is not justified and is contrary to EPA's own guidance and the recommendations made by the National Academy of Sciences.

- Effects determinations were made assuming that product may be applied anywhere in the United States, without consideration of

---

[1] Interim Approaches for National-Level Pesticide Endangered Species Act Assessments Based on the Recommendations of the National Academy of Sciences April 2013 Report, *available at* https://www.epa.gov/sites/production/files/2015-07/documents/interagency.pdf.



April 13, 2017
Page 3

        distinctions between use patterns, timing of applications, locations of use, and presence of listed species and critical habitats.

- Compounding of conservatism in the assessment of exposure, resulting in unrealistically high and sometimes physically impossible estimates.

- Failure to consider appropriate lines of evidence, as recommended by the National Academy of Sciences in order to determine the likelihood of an effect occurring.

EPA sought to excuse its failure to properly revise the drafts or otherwise respond to comments by asserting that the revisions were precluded by a legal obligation to complete biological opinions based upon the BEs by December 31, 2017.[2]  That position is incorrect.  EPA is not bound by any such obligation.

EPA presumably based its assertion on stipulations entered in court cases by FWS and the National Marine Fisheries Service ("NMFS").  The one of those stipulations to which FWS was a party did express an intent to complete a nationwide OP biological opinion by December 31, 2017.  *See CBD v. FWS* Stipulated Settlement at 3.[3]  But it also expressly stated that FWS "is not obligated to" complete OP consultations by then, and provided that if there were to be a delay

---

[2] Office of Chemical Safety and Pollution Prevention's Response to Comments on the Draft Biological Evaluations for Chlorpyrifos, Diazinon, and Malathion, at 2 (Jan. 17, 2017), *available at* https://www3.epa.gov/pesticides/nas/final/response-to-comments.pdf.  In failing to "explain or support several assumptions critical to its conclusions," EPA violated the Fourth Circuit Court of Appeals' direction that an agency acting to implement the ESA must explain its analysis "with sufficient clarity" to allow stakeholders to determine whether the analysis is "the product of reasoned decisionmaking."  *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 464, 475 (4th Cir. 2013).  For example, EPA relied on several data sets that it does not dispute are incomplete and/or inaccessible.  But it never "cogently explain[ed] why." *Id.* at 473.

[3] The National Marine Fisheries Service entered into an analogous stipulation in May 2014 in which it agreed to complete an OP biological opinion by December 31, 2017.  *See* Stipulation and Order to Amend the Stipulated Settlement Agreement Affirmed by this Court on August 1, 2008, *NW Coalition for Alternatives to Pesticides, et al. v. Nat'l Marine Fisheries Serv.*, No. 07-cv-01791 (W.D. Wash., May 21, 2014), Dkt. No. 50, at 6.



April 13, 2017
Page 4

parties would meet and confer to discuss appropriate actions and, if necessary, petition the Court to resolve any dispute. *Id.* at 4-5.

  We recently have written to EPA Administrator Pruitt asking that he withdraw from FWS the three BEs at issue. However, we urge that you not await that action. Instead, our clients respectfully request that you promptly return the BEs to EPA and direct that any effort to prepare biological opinions based on them be set aside. Our clients similarly request that once you, NMFS, EPA, and presumably the U.S. Department of Agriculture (which was a party to development of the "Interim Approaches") have determined how the new Administration is going to address the "Interim Approaches" and, more broadly, the issue of FIFRA-ESA integration, you direct the legal counsel representing FWS in *CBD v. FWS* to meet and confer on a timely basis with counsel for the other parties to that case to discuss appropriate further actions.

  Thank you for your prompt attention to these requests.

Sincerely,

David B. Weinberg

Counsel to Dow AgroSciences, LLC;
Makhteshim Agan of North America,
Inc., d/b/a "ADAMA"; and FMC
Corporation

Enclosures



April 13, 2017
Page 5

cc (without attachments except as noted):

  The Honorable Scott Pruitt, Administrator of the United States Environmental
    Protection Agency
  The Honorable Wilbur Ross, Secretary of the United States Department of
    Commerce
  The Honorable Michael Young, Acting Deputy Secretary of the United States
    Department of Agriculture
  The Honorable Jim Kurth, Acting Director of the Fish and Wildlife Service
    (with attachments)
  The Honorable Samuel D. Rauch, III, Acting Assistant Administrator for the
    National Marine Fisheries Service
  The Honorable John Barrasso, Chairman, Senate EPW Committee
  The Honorable Tom Carper, Ranking Member, Senate EPW Committee
  The Honorable Rob Bishop, Chairman, House Committee on Natural Resources
  The Honorable Raul Grijalva, Ranking Member, House Committee on Natural
    Resources
  The Honorable Pat Roberts, Chairman, Senate Committee on Agriculture,
    Nutrition and Forestry
  The Honorable Debbie Stabenow, Ranking Member, Senate Committee on
    Agriculture, Nutrition and Forestry
  The Honorable Michael Conaway, Chairman, House Committee on Agriculture
  The Honorable Collin Peterson, Ranking Member, House Committee on
    Agriculture
  Dr. Sheryl H. Kunickis, Director, Office of Pest Management Policy, United
    States Department of Agriculture
  Mr. Ray Starling, Special Assistant to the President for Agriculture, Trade and
    Food Assistance (with attachments)
  Mr. Richard Keigwin, EPA OPP (with attachments)
  Mr. George Oliver, DAS
  Ms. Laura Phelps, ADAMA
  Mr. Paul Whatling, FMC

# Exhibit 3

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC



# Overview of the National Pesticide Biological Opinions on Chlorpyrifos, Malathion and Diazinon

October, 2017




# Chlorpyrifos, Diazinon and Malathion







— Broad spectrum insecticides (i.e., kill all insects)

— Organophosphates, work by inhibiting the enzyme acetylcholinesterase (AChE)

— All animals have this enzyme, so effects are not limited to target species

— Highly toxic across taxa

— Few limits on labels for when and where these pesticides can be used so exposure can be widespread (some restrictions for use near residential areas for human health concerns)

— These pesticides have been found far from sites of application, indicating transport via air







# Diazinon Action Area - Labeled Uses



Blue indicates use areas

Action area for diazinon (this figure does not include the parts of the action area associated with Alaska, Hawaii, or the U.S. territories).







# Biological Opinions – Our Approach

The proposed action is the registration of the labels "*the label is the law,*" and currently the labels allow for:

- multiple to numerous repeat applications seasonally or annually per use (e.g., mosquito adulticide up to biweekly throughout year)

- broad-scale use - geographic exclusions are extremely rare

For determining "may affect," we assumed that if a species' range overlapped with a pesticide use site, it would be exposed to that use (i.e., did not consider probability of use/probability of individuals encountering pesticide).

For many vulnerable species, a single exposure could be catastrophic (particularly narrow endemics).   Repeated use (such as mosquito adulticide) could eliminate a segment of a population or an entire population in a given area.







# Tools used for the Effects Analysis

We used two tools to estimate the magnitude of effects for species EPA had determined would be adversely affected by the re-registration of these chemicals. They combined the following information to predict the percent of the population affected:

1. toxicity data for a taxa group
2. predicted concentrations in the aquatic and terrestrial environments
3. percent overlap of pesticide use sites with the species range

<u>MagTool</u> - created by EPA. Used for all terrestrial species and a subset aquatic species.

<u>R Plots</u> - created by NMFS. Used for most aquatic species.






# Island and Alaskan Species

Pesticide use site data for Alaska and the U.S. islands lack the spatial refinement for the overlap analysis we used for the lower 48, so the approach to the analysis was qualitative.

➢ <u>Alaska</u> = 5 species (1 plant, 3 birds, 1 mammal). All NLAA due to reduced overlap of use (less agriculture and adulticide) with species' ranges.

➢ <u>Pacific Islands</u> (includes Hawaii, Guam, CNMI) = 522 species
  Mammals = 4; Birds = 32; Invertebrates = 45; Plants = 440

  Assessments included label use, incorporating concerns such as many endemic species and few individuals.

➢ <u>Puerto Rico</u> (includes the Virgin Islands) = 72 species
  Birds = 7    Invertebrates = 1   Herpifauna = 11    Plants = 53

  As with the Pacific Islands, assessments based on allowable label uses and highly endemic, restricted species.







# Critical Habitat Assessments

Steps for our assessment of the action to CH:

1) We reviewed the Primary Constituent Elements (PCE) or Physical and Biological Features (PBF) for every proposed and designated CH

2) We determined whether the PCE or PBF could be directly or indirectly effected due to the use of pesticides

3) If there was no direct or indirect link between the use of the pesticide and the PCE/PBF, we determined likely no destruction or adverse modification of critical habitat

4) If the PCE/PBF was directly or indirectly affected, then we looked at the percent overlap of the chemical use within the critical habitat.  From there, we determined if destruction or adverse modification was likely based upon status of the habitat, percent overlap of the pesticide use, and causal link of the impact to the PCE/PBF.







# Chemical Overview – Chlorpyrifos and Malathion

- Various agricultural and non-agricultural uses including: crops, orchards and vineyards, pasture, managed forests, right of ways, and developed areas (e.g. public parks,  golf courses, home use).
- Also used for the following with no geographic  and few temporal restrictions
    - mosquito adulticide control
    - wide area use (ant bait and foliar spray)
- Other uses: cattle ear tags, seed treatment, granular formation, bait
- Can remain in the environment for weeks to months after application, resulting in potential effects to species after application







# Chlorpyrifos and Malathion - Effects

- High overlap between uses and species' ranges

- High toxicity for all animal taxa.  In general, regardless of use site, exposure from chlorpyrifos and malathion to listed animal species could result in:

  - direct mortality (vertebrates and invertebrates)
  - impacts to growth, reproduction and behavior (vertebrates)
  - indirect effects to food sources

- Similarly, listed plants would experience indirect effects from loss of pollinators.

- For mosquito adulticide and wide area use applications, potential for direct and/or indirect effects to all species over 100% of range based on lack of  label restrictions.







# Chemical Overview – Diazinon

- Due to risk to human health and the environment, use of diazinon was severely restricted in 2004

- Remaining uses are limited to select crops, orchards, vineyards and nurseries

- Can also be used in cattle ear tags

- Can remain in the environment for weeks to months after application, resulting in potential effects to species post application







# Diazinon  - Effects

- Compared to the other two chemicals, less overlap between diazinon use and species' ranges

- High toxicity for all taxa.  In general, regardless of use site, exposure from diazinon to listed animal species often resulted in mortality and indirect effects to food sources.

- Similarly, listed plants would experience indirect effects from loss of pollinators.

- Due to high toxicity, effects predicted from spray drift onto adjacent use sites for many terrestrial species







# Draft Biological Opinion Conclusions

| | Species | | | Critical Habitat | | |
|---|---|---|---|---|---|---|
| | Jeopardy | No Jeopardy | NLAA | Ad Mod | No Ad Mod | NLAA |
| Chlorpyrifos | 1399 (88%) | 130 (8%) | 56 (4%) | 169 (23%) | 562 (76%) | 11 (1%) |
| Malathion | 1284 (81%) | 192 (12%) | 108 (7%) | 163 (22%) | 546 (74%) | 31 (4%) |
| Diazinon | 175 (12%) | 843 (57%) | 473 (32%) | 20 (3%) | 267 (41%) | 372 (56%) |

*Notes:*
*Does not include no effect call determinations or determinations for experimental populations.*







# Effects for Plants

Indirect effects to plants most significant – loss of pollinators

- Vast majority of listed plants are pollinated by insects
- Substantial overlap for chlorpyrifos and malathion uses, especially 100% overlap for adulticide and wide area use
- Many species have low resiliency, redundancy, and representation in addition to declining population trends
- These factors led to numerous jeopardy determinations for insect-pollinated plants for chlorpyrifos and malathion (less for diazinon)



Contra Costa Goldfields







Photo credit: Lori Oberhofer, NPS

# *Example: Birds*
## <u>Cape Sable seaside sparrow -</u> chlorpyrifos



Habitat specific (marl prairies) so able to eliminate most exposure on pesticide use sites such as orchards and vineyards and developed areas. Diet mainly aquatic and terrestrial invertebrates.

May be susceptible to exposure from contaminated invertebrates and direct dermal exposure:

- 6% mortality each year (1% from overlap with pasture, 5% from spray drift from all adjacent use sites)

- Decline in food resources (6%)

- From adulticide, there will be 20% mortality and 100% decline in food resources

- From wide area use, there will be 100% mortality and 100% decline in food resources

<u>Draft Jeopardy</u>







# *Example: Mammals*
## <u>San Joaquin kit fox-</u> Diazinon

Photo credit: USFWS



Occurs on fragmented grassland habitat surrounded by intensive agriculture. Diet consists of small mammals such as mice, kangaroo rats, squirrels and rabbits, as well as ground-nesting birds, insects, broadleaf plants, and grasses.

Susceptible to diazinon exposure from consumption of contaminated dietary items and direct dermal exposure.

- 10-13% mortality each year from consumption of contaminated arthropods, birds, grasses, leaves, and mammals

- Decline in food resources [mammals (2%), birds (16%), terrestrial invertebrates (16%)]

- Effects to growth,  reproduction , behavior (16%)

<u>Draft Jeopardy</u>







# *Example: Fish*
## Moapa dace



Illustration by Joseph R. Tomelleri

If exposures to chlorpyrifos and malathion were to occur, there would be adverse effects to dace and their aquatic invertebrate prey. However, most of the species' range is on a Refuge and the Warm Springs Natural Area, both of which are managed in part for the dace. Therefore, we were able to eliminate most exposure from pesticide use sites in our analysis.

- Draft No Jeopardy for chlorpyrifos and malathion
  - Some adverse effects from drift and from exposure in the range outside of the protected areas
  - Buffers and other conservation measures related to pesticides are specified in the stewardship plan
  - Refuge manages for the dace

- Draft not likely to adversely affect for diazinon – the only overlap is cattle ear tag use (we considered the effect from ear tags discountable for the dace)







# Path Forward

- We are coordinating with EPA to ensure they accept our analytical process and conclusions as scientifically sound.

- Transmit the draft biological opinions to EPA

- Work with EPA, NMFS, USDA, registrants, and grower groups to:

  1. refine our effects analyses between the draft and final biological opinions; and

  2. identify measures to avoid jeopardy and destruction or adverse modification determinations.



# Questions?

# Exhibit 4

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OFFICE OF CHEMICAL SAFETY
AND POLLUTION PREVENTION

February 21, 2018

Donna S. Wieting
Director, Office of Protected Resources
NOAA National Marine Fisheries Service
1315 East-West Highway
Silver Spring, MD 20910

Subject: Request for Reinitiation of Section 7 Consultation Addressing the Registration Review
of Pesticides Containing Chlorpyrifos, Diazinon, and Malathion

Dear Ms. Wieting:

The purpose of this letter is to initiate voluntary, informal consultation with the National Marine
Fisheries Service (NMFS), as provided for under Section 7 of the Endangered Species Act
(ESA), on the registration review of pesticides containing chlorpyrifos, diazinon, and malathion
under Section 3 of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA).
As you are aware, NMFS transmitted the final Biological Opinion ("BiOp") to EPA after the
U.S. District Court for the Western District of Washington did not to act on NMFS's motion for
a two-year extension to complete its consultation with EPA. The BiOp addressed the effects of
these three organophosphate pesticides on 77 listed species and 50 designated critical habitats
and, in sum, reached "jeopardy" and "adverse modification" conclusions regarding 38 different
species and 37 critical habitat units. On January 8, 2018, I confirmed receipt of the BiOp and
informed you of EPA's intention to reinitiate consultation on the BiOp so that the consultation
on these pesticides could be informed by (1) input from stakeholders, (2) further interagency
discussion and agreement on the Step 3 (jeopardy determination) interim methods, and (3)
additional data and analysis, including consideration of the best scientific and commercial data
available on use and usage information that EPA is providing to the Services for each of these
pesticides.

At this stage, EPA requests voluntary, informal consultation. During the course of this informal consultation, the information provided to NMFS may, consistent with Service regulations at 50 CFR 402.16(b), reveal effects of these actions not previously considered in the consultation. If that is the case, EPA will request that formal consultation be reinitiated.

EPA believes that initiating informal consultation on these pesticides is consistent with our interagency agreement to use this pilot consultation as a basis for developing improved methodologies for the consultation process. As I mention earlier, the consultation process was truncated when the district court did not act on NMFS's motion for a two-year extension prior to the court-ordered December 31, 2017, deadline. As a result, the agencies were unable to fully engage on all consultation methodologies – a fact that NMFS itself admitted to the court. In addition, because of that deadline, NMFS was also unable to provide a draft BiOp for public and stakeholder input and, therefore, did not complete a critical element of the agreed-upon consultation process on pesticides. As acknowledged in NMFS Deputy Assistant Administrator Samuel Rauch's declaration to the court, because stakeholders – including governments, universities and growers/users – have significant amounts of relevant information and are the ultimate implementers of pesticide labels in the field, EPA and the Services have jointly concluded that it is critical that stakeholders have a chance to provide input to help the agencies determine whether risk reduction measures are technologically and economically feasible. Accordingly, in the coming weeks, EPA intends to open a public comment period on the recently issued BiOp. Once that public comment period closes, EPA will provide the input received to NMFS, consistent with the stakeholder engagement process jointly developed in 2013 by EPA, the Services, and USDA.

At the request of the U.S. Fish and Wildlife Service (FWS) , EPA has recently agreed to provide the Services with use and usage information on all three pesticides that has not previously been considered which will allow the Services to further refine their conclusions regarding jeopardy and adverse modification for chlorpyrifos, diazinon, and malathion. Indeed, FWS has made clear that it believes these data are necessary to fully inform formal consultation. Given that FWS and NMFS operate under the same statutory and regulatory standards and implementation policies, these data should likewise be of critical value to EPA's informal consultation with NMFS. In furtherance of the FWS request, my staff has already provided use and usage data to both NMFS and FWS, specifically providing the Services with updated information on diazinon. EPA expects to compile the use and usage information for chlorpyrifos by April 30, 2018, and malathion by May 31, 2018. Additionally, EPA had already begun compiling use and usage data for methomyl and carbaryl in anticipation of upcoming consultations. If discussions with the Services result in a change in the scope of data collection or a change in the analyses of the data needed to support reinitiation of consultation, then it is important to note that this could impact the aforementioned schedule.

I have asked my staff to participate in discussions between EPA, FWS, and NMFS regarding how this information can be used to inform our consultations with FWS and NMFS. Those discussions should also be used for the purposes of further developing and agreeing upon the methodologies used by FWS and NMFS for Step 3 of the consultation process on pesticides. These discussions will inform whether EPA should re-initiate formal consultation on the December 2017 BiOp. The Step 3 methodologies used in the BiOp were not fully vetted in

interagency discussions and if this consultation is to serve the goal of ensuring that the agencies each understand and agree with the methodologies used in the consultation process, it is critical that the agencies complete those discussions and determine whether a revision to the methodologies used in the December 2017 BiOp is warranted.

EPA has performed a cursory review of the BiOp and finds that there is a general lack of transparency and reproducibility, which makes it difficult to either understand or fully evaluate the Step 3 methods used in the BiOp. One example is that there is not enough information provided in the R-Plots, which are graphs used to inform the jeopardy determinations, to allow for replication of the results. In addition, based upon our preliminary review of the BiOp, EPA has identified several technical concerns, which have been discussed previously with NMFS including: (1) the lack of a clear relationship between how effects at the individual level change species demographic rates and, by extension, have population level impacts; (2) that no quantitative thresholds underpinning the definition of "jeopardy" (*i.e.*, the exposure level or level of effect results in "jeopardy") have been articulated, without which there is no way to tie the mitigation options to levels that would no longer result in "jeopardy"; (3) the criteria used to evaluate the likelihood of exposure appears to be inconsistent (*e.g.*, some of the criteria, such as persistence and multiple applications, are accounted for twice in the process); and (4) assumptions of all pesticide applications occurring at the same time at the highest maximum use rate across all potential use sites are unrealistic. Furthermore, an element of the reasonable and prudent alternatives (RPAs) is based on a European system (MagPIE), which EPA has not evaluated for use in the U.S. pesticide regulatory context. Moreover, the reasonable and prudent measures (RPMs) do not address EPA's concerns previously raised in comments on earlier salmonid BiOps regarding the impracticability and the resource challenge of monitoring programs, in addition to duplicative incident reporting. As we continue our thorough review and gain more familiarity with the contents of the BiOp, we will engage with your staff to discuss these issues in detail.

We look forward to working with NMFS on these matters and will be reaching out to NMFS staff shortly to begin scheduling discussions for informal consultation on chlorpyrifos, diazinon, and malathion.

Sincerely,

Richard P. Keigwin, Jr.
Director, Office of Pesticide Programs

3



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OFFICE OF CHEMICAL SAFETY
AND POLLUTION PREVENTION

July 19, 2019

Donna S. Wieting
Director, Office of Protected Resources
NOAA National Marine Fisheries Service
1315 East-West Highway
Silver Spring, MD 20910

Subject:    Reinitiation of Formal Section 7 Consultation Addressing the Registration
            Review of Pesticides Containing Chlorpyrifos, Diazinon, and Malathion

Dear Ms. Wieting:

The purpose of this letter is to reinitiate formal consultation with the National Marine Fisheries
Service (NMFS), pursuant to 50 CFR 402.16, on EPA's registration review of pesticides
containing the organophosphate active ingredients chlorpyrifos, diazinon, and malathion under
Section 3 of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA). This letter is a
follow-up to EPA's February 21, 2018, letter initiating voluntary, informal consultation under
Section 7 of the ESA. Specifically, we believe that new information on how these pesticides are
actually being used may reveal that the extent of the effects of the action may be different than
what was previously considered.

In December 2017, NMFS issued a final Biological Opinion (2017 BiOp) for these three
pesticide active ingredients. In the BiOp, NMFS reached jeopardy and adverse modification
conclusions regarding 38 different species and 37 critical habitat units. In EPA's February 21,
2018, letter, EPA initiated voluntary, informal consultation to continue to work collaboratively
with NMFS, as well as the U.S. Fish and Wildlife Service (FWS) and the U.S. Department of
Agriculture (USDA), to develop improved methodologies for pesticide consultations.

Since EPA's February 2018 letter, several new developments have occurred that make it
appropriate for EPA to reinitiate formal consultation at this time. For one, subsequent to
receiving NMFS' 2017 BiOp, in March 2018, EPA opened a public comment period on the
BiOp, specifically asking stakeholders for input on NMFS's jeopardy findings, Reasonable and

Prudent Measures (RPMs), and Reasonable and Prudent Alternatives (RPAs). In particular, EPA solicited feedback on: 1) the scientific approaches and data sources used to support the BiOp and reach determinations for the listed species and critical habitat; 2) the RPAs and RPMs and whether they could be reasonably implemented; and 3) national- and state-level use and usage data and information, in particular, information for non-agricultural use sites (e.g., nurseries, managed forests, pasture, rights-of-way, golf courses, and wide-area mosquito control). After a 4-month public comment period, EPA received over 19,000 comments from stakeholders, of which approximately 125 were unique.[1] A majority of the 125 sets of comments contained analyses, data, or other substantive information. We believe it is critical that EPA and NMFS consider this stakeholder feedback to ensure that the BiOp reflects the best available information and that RPAs and RPMs can be readily adopted and implemented by those using these products to meet their pest management needs. This dialogue is a continuation of the several conversations between our staffs since EPA's request to initiate informal consultation last February.

In addition, in December 2018, the President signed the Agriculture Improvement Act of 2018, also known as the "Farm Bill." A key provision in the Farm Bill amended FIFRA to require the establishment of a FIFRA Interagency Working Group "to provide recommendations regarding, and to implement a strategy for improving, the consultation process required under section 7 of the Endangered Species Act for pesticide registration and registration review." This group includes representation from EPA, NMFS, FWS, USDA, and the Council on Environmental Quality (CEQ). Among several responsibilities, the working group is statutorily required to provide advice regarding the methods for defining the scope of the actions that are subject to the section 7 consultation obligation, review the current consultation process and identify and implement improvements, and develop scientific and policy approaches to increase the accuracy and timeliness of the consultation process. Another key requirement in the provision is to significantly increase opportunities for stakeholder input throughout the working group's activities. Given this new legislation and that this first nationwide pesticide consultation with NMFS was envisioned as a pilot, the agencies need to continue to work collaboratively on this BiOp consistent with the congressional intent of this new statutory provision.

Finally, since NMFS issued the 2017 BiOp, our staffs, together with colleagues from FWS and USDA, have been working collaboratively and productively to develop approaches for better integration of pesticide use and usage data throughout all three steps of the consultation process. Significant efforts are underway to better refine these methodologies to incorporate the usage data, the importance of which is underscored by a number of public comments.

The additional usage data that was compiled and submitted to the Services after the 2017 BiOp was completed will likely allow NMFS to further refine its conclusions regarding jeopardy and adverse modification for chlorpyrifos, diazinon, and malathion, and to better focus the RPAs and RPMs to more effectively protect listed species and their critical habitat(s).

Although we believe additional discussion is warranted regarding the steps and scope of what would be needed to develop a monitoring plan, EPA has gathered additional use and usage data on these three pesticides and provided these data to the Services. We plan to coordinate with

---

[1]See EPA's docket at https://www.regulations.gov/docket?D=EPA-HQ-OPP-2018-0141.

NMFS to identify information gaps related to monitoring and usage. We also plan to develop materials to inform the public and pesticide applicators about relevant endangered species and critical habitats associated with the findings in the BiOp. These materials are expected to include information on possible risk reduction measures (e.g., best management practices) that the public and pesticide applicators could employ to reduce pesticide exposures and impacts to listed species. These materials may be provided through webinars and/or other means of providing information to the public and pesticide applicators.

We look forward to working with NMFS in these efforts.

Sincerely,

Richard P. Keigwin, Jr.
Director, Office of Pesticide Programs

3

# Exhibit 5

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

# 31 APPENDIX D: CONSIDERATION OF USAGE INFORMATION

**Introduction**

The revised Opinion takes into consideration information submitted to NMFS including: 1) comments from the 2018 public review; 2) additional submissions by applicants per the Applicant Engagement Plan; and 3) material submitted by EPA. NMFS has also performed its own searches for new information. Although the submissions span a variety of topics, EPA has cited the usage data, specifically, as information that should further inform the reinitiation.

It is the policy of NMFS to evaluate all scientific and other information used in its biological Opinions to ensure that it is reliable, credible, and represents the best scientific and commercial data available. In addition to usage information, NMFS must consider all relevant factors relating to the nature of all the available data and the inferences it can support to evaluate effects to ESA-listed species over the 15 year duration of the action. Based on the data quality considerations (e.g. NOAA's Information Quality Guidelines) and the standards of the Administrative Procedure Act (APA), NMFS considers the uncertainty and reliability of all the available information.

Other sources of information, and uncertainties associated with them, are discussed elsewhere in the Opinion. For example, NMFS' assessment of the toxicity information (e.g. LC50 data) included evaluating the extent and quality of available toxicity studies and their ability to serve as surrogate data for ESA-listed species. Assessing exposure information (e.g. EECs) included evaluating the available models (e.g. PWC), their inputs, and how well they modeled specific habitats. The degree to which the revised Opinion relied on specific information depended on NMFS's assessment of it's uncertainty and reliability. A summary of NMFS' assessment of the available usage information is presented below.

The term "use" describes the authorized parameters (e.g. application rate, frequency, crop type, etc.) of pesticide application as described on the FIFRA label. EPA authorizes the FIFRA label that describes when, where, and how pesticide products can legally be applied. Therefore, the label defines the Federal action and is the subject of the analysis in the "Effects of the Action" portion of this Opinion. "Usage" describes parameters (e.g. rate, frequency, percent treated) related to the ways in which a particular pesticide is applied.  In short, use describes how pesticides are authorized to be applied whereas usage describes how pesticides have been applied in the past or predictions of how they might be applied in the future. Usage can change over time. When we assess whether the registration is likely to jeopardize species, we consider the effects of the registration action over the duration of the action (15-year registration review period).

The primary source of information we base our assessment of the effects of the action on is the FIFRA label. We consider the potential applications that the label allows, and whether or not the labels contain directions that are sufficient to insure that species will not be jeopardized by the allowed uses over the duration of the action. Other sources of information that inform our effects analysis take into consideration questions about future usage including regulatory actions (e.g. bans by state regulators), monitoring data and available reports on past usage (e.g. California DPR Pesticide Use Reporting and market research estimates by Kynetec).

Following issuance of the 2017 Opinion, the NMFS, FWS, and EPA formed a pesticide usage workgroup to identify sources of usage data and to evaluate their utility for making forward-looking ESA risk assessments. The current draft Opinion provides a more robust evaluation and application of the available usage data. NMFS evaluated many sources of information regarding usage (e.g. use reports, survey based estimates, state bans, food tolerance revocations, and pesticide detections in water quality monitoring) in the development of this draft Opinion. NMFS evaluated the data sources using the following four criteria:

- Transparency

- Accuracy

- Spatial precision, and

- Predictive/representative of future usage.

We applied these criteria taking into account the specific context of NMFS species and their aquatic habitats and life histories. For example, spatial precision is important because risk is driven by the proximity of pesticide application to individuals of the species.

Below we briefly describe sources of usage information considered, provide an assessment based on the criteria we use to evaluate them, and describe the application of usage information in the Opinion.

**Sources of usage data**
In assessing whether EPA's action is likely to jeopardize a species or adversely modifies critical habitats, NMFS considered a number of sources of information potentially relevant to past or future usage. Many sources were summarized in EPA's Revised National and State Use and Usage Summary Reports (SUUMs; Attachment 1). Additional potential information was provided by registrants as part of the reinitiation (Attachment 3). Overall, the available information fell into several forms discussed briefly below (e.g. use restrictions and past usage) that inform their limitations in understanding future usage.

The available FIFRA labels define where, how, and when pesticides are authorized to be applied, so the labels must inform assessment of future pesticide usage. Use Data Layers discussed in the Opinion (e.g. CDL and other non-agricultural GIS information) define where use sites are located and inform where future usage could occur within a species range. Detections of a pesticide in water quality monitoring data provides evidence of past usage that can inform predictions or assumptions about future usage. State and national regulatory pesticide bans can also serve to predictably limit future usage, as would regulatory revocations of food tolerances for a pesticide.

Other sources considered by NMFS provide information on past usage, with EPA's SUUM reports being the primary summary of several sources. Broadly, the information on past usage consists of three categories.

1) Sales of pesticide products - NMFS received information on past sales of pesticide products by manufacturers or retailers. For non-agricultural applications, the information was reported at either a national or state-level (e.g. data provided in EPA SUUM reports). For mosquito applications, data was reported at a county-level (e.g. county-level sales data provided by malathion registrant FMC for the years 2012 to 2018). In both cases, the information does not include whether the pesticide was used in the year it was purchased, and if so, how much and at what application rate.

2) Survey estimates of pesticide usage - NMFS received estimates of pesticide usage that were based on surveys of end-user applications at the state level for some pesticide uses, almost exclusively agricultural (e.g. Kynetec data provided in EPA SUUM reports). The extent and methods of the surveys informs the likelihood that estimates of past usage are accurate, and influences the reliability that they will be predictive of future pesticide usage. Important questions include; how many uses were surveyed and what percent of total growers responded to surveys.

3) Required reporting of pesticide usage - NMFS reviewed several sources of pesticide usage reports that are required for certain uses and locations. Perhaps the best example of this is the California Department of Pesticide Regulations Pesticide Use Reporting (PUR). The PUR data consists of publicly available reporting by most commercial applicators in California of each use of a pesticide every year. Unfortunately, comparable data is not available elsewhere.

**Analyses of usage data**

NMFS considered available usage data using the four criteria mentioned above in the context of NMFS species and their habitats and life histories. For each criterion some analyses and conclusions are presented below.

   *1. Transparency: how transparent are the usage data?*

NOAA's Information Quality Guidelines and the standards of the APA direct us to assess the utility of the information we rely on and to be transparent about the uncertainties and limitations. Almost all of the usage data are proprietary estimates of usage. Where the data and methods are classified as proprietary, how these estimates are derived is not fully transparent. To the extent possible, we conduct rigorous robustness checks when we rely on confidential information. This entails considering the precision of the estimates and characterization of the robustness for scientific use in ecological risk assessment. Without further information on the sources of usage data (e.g. the margin of error associated with specific usage estimates), such characterization of the usage data is not currently possible.

The majority of the usage data provided for states outside of California are from proprietary sources. An example for agricultural uses is Kynetec. According to materials provided by the company, Kynetec data is "designed to address market questions asked most often by senior executives, and those involved in product development, sales, and marketing." Surveys are

designed to reach a particular percentage of the total crop grown at a national level, though statistics are reported at the state and Crop Reporting District (CRD) level when sample size is adequate. The data provided is lacking the statistical foundation to understand the robustness at the state level or any geographic specificity at the sub-state level. NMFS has not received any detailed information (e.g., how many applicators responded to the survey, how many acres are represented by the survey at the state level), nor any standards used to determine an adequate sample size at these levels, nor the minimum threshold required for reporting these values. Our understanding is that this varied on a case-by-case basis, according to the surveyor, crop, and state. Usage estimates for non-agricultural applications (e.g., nurseries, ornamentals, mosquito adulticide) were based on sales information (manufacturer and retail) and end-user surveys, though neither sources nor methodologies were identified for individual estimates.

### 2. Accuracy: how accurate are the usage data?

NMFS recognizes that the usage estimates may be sufficiently accurate for use in other contexts (e.g. marketing decisions). However, the available sources of usage data were not designed for the purpose of assessing risk to threatened and endangered species. To determine if they are robust enough to characterize exposure in the context of a section 7 ESA consultation, NMFS must consider the accuracy and completeness of the available usage estimates. In doing so, NMFS identified several concerns that include:

- Few states require reporting of actual pesticide usage (with California as a notable exception).
- National-level data are estimates based on surveys and do not cover many non-ag uses; do not cover all authorized crop uses; and do not cover all states. Extrapolating to fill these data gaps would introduce substantial uncertainties.
- Usage data are at geographic scales that limit their utility for our biological Opinions. In assessing risks to NMFS species, the primary concern is a pesticide application in direct proximity to species habitat; the existing data and methods do not presently allow for an assessment at this scale.
- Comparisons of available usage data to other sources (e.g. water quality monitoring) suggests that usage estimates can fail to detect actual past usage.

As an example of the last point, prometryn was detected in water samples from rivers and streams in Oregon and Western Washington but no use was reported in those regions (Figure 1). Prometryn has no non-agricultural uses and is only registered for use on several vegetables known to be grown in Oregon and Washington (e.g. carrots). Similar detections exist in other states (e.g. Nebraska) where registered uses are presumably also present.

1347



**Figure 440. From Figure 15 of Prometryn Case Study, Syngenta Crop Protection, LLC. Minor Crop Farmer Alliance (MCFA) Endangered Species Assessment Workshop Denver, CO May 24 – 25, 2011. https://ccqc.org/wp-content/uploads/2011/07/Prometryncasestudy.pdf.**

Commenters on the 2017 Opinion recommended incorporation of estimates of usage to characterize the probability of exposure (e.g. Kynetec data). With respect to survey-based usage data such as the Kynetec data, reports of actual use of pesticides in California reveal that the survey estimates sometimes fail to detect actual use. In the case of cotton, EPA's summary of Kynetec estimates indicated that malathion use was surveyed but no usage was reported. However, on average, actual use reported for the state averaged over 22,000 pounds annually, with annual applications averaging more than 10,000 acres.

**Table 1. Comparisons of the Kynetec survey-based data for CA (EPA 2018 Malathion Report) to CA DPR required use reporting shows that the surveys can frequently fail to detect use that may be small but still consequential. For 2011-2015, the majority of malathion uses for which surveys reported no use had actual use reported to CA DPR.**

| Kynetec AMRD | | CA DPR | min lbs | max lbs | avg lbs |
|---|---|---|---|---|---|
| Beans (succulent) | surveyed but no usage reported | BEAN, SUCCULENT | 3.2 | 718.2 | 175.1 |
| Cotton | surveyed but no usage reported | COTTON | 707.1 | 54826.5 | 22410.7 |
| Cucumbers | surveyed but no usage reported | CUCUMBER | 37.1 | 133.6 | 93.1 |

1348

| Peaches | surveyed but no usage reported | PEACH | 0.0 | 72.0 | 14.7 |
| Pears | surveyed but no usage reported | PEAR | 0.0 | 45.1 | 10.2 |
| Potatoes | surveyed but no usage reported | POTATO | 0.0 | 774.7 | 352.7 |
| Rice | surveyed but no usage reported | RICE | 0.0 | 3384.1 | 720.4 |
| Watermelons | surveyed but no usage reported | WATERMELON | 0.0 | 473.0 | 144.1 |
| Lima Beans | surveyed but no usage reported | Not Found | -- | -- | -- |
| Corn, Field | surveyed but no usage reported | CORN (FORAGE - FODDER) | 362.2 | 1122.0 | 602.2 |

An approach taken by EPA and FWS to addressing the uncertainty associated with uses where no usage was reported or no surveys were conducted is to assume a non-zero area treated (e.g. a 2.5 percent acres treated).

NMFS considered the accuracy associated with all usage estimates. For example, how accurate is any given estimate of percent acres treated for a specific crop, state, and year? If an estimate of 0 percent treated could be off by as much as 2.5 percent, could an estimate of 3 percent actually represent 5.5 percent? Due to the lack of transparency discussed above, for most usage data NMFS lacks the information with which to assess the accuracy of a usage estimate, e.g. the magnitude of the uncertainties. The degree to which these estimates can be relied on for conclusions that are conservative and protective for a species depends on understanding the magnitude of these uncertainties.

### 3. Spatial precision: how spatially precise are the usage data?

Specifically, are the existing usage data available at a geographic scale that is useful for ESA assessments? In assessing risks to NMFS species, the primary concern is a pesticide application in direct proximity to aquatic species habitat (i.e. within 300m of ESA-listed species aquatic habitats). However, the existing usage data and methods do not currently allow for an assessment at this scale. This is because most usage estimates are only available at the state-level (with the California (PUR) data a notable exception). For some non-agricultural applications, the information was reported at a national scale. While informative, state-based usage estimates do not allow us to evaluate whether or not pesticide applications are likely to occur within direct proximity to species habitat, an event which occurs at the scale of an individual operation or application. The usage data for a crop may provide information on the percent of a crop's area that has been treated in the past, but it does not provide information on specifically where application occurred. Many of NMFS' species occupy large areas with individuals moving around over the entire area during their life history. Even small areas of pesticide application may have biological significance to a large portion of the population (e.g. salmon juveniles rearing and out-migrating past application sites). Because of this, NMFS does not equate a low percent of the species range treated (whether by use overlap or use plus usage) with a low precent of the individuals exposed. The degree to which a small area of application impacts a

population will depend on precisely where that application occurs within the range of the species. The usage data does not provide the spatial precision to inform whether specific small areas of a species range will be treated in the future.

4. *Predictive/representative of future usage: how well are the usage data able to represent use over the next 15 years?*

Pesticide labels tell us exactly how these compounds are authorized to be used. Data on how pesticides were used in the past do not necessarily provide a complete picture of future usage unless we assume that future usage will follow known past usage. However, other evidence indicates that usage is often highly variable over time. Variables that influence usage include:

- Changing pest pressures
- Emergence of new pests
- Development of pest resistance
- Regulatory changes to products
- Market changes

To evaluate the degree to which pesticide use can change over a long period of time, NMFS evaluated California PUR data for 1990 to 2017 (https://www.cdpr.ca.gov/docs/pur/purmain.htm). Whereas most usage data sets are merely estimates based on surveys, California PUR data represents the most comprehensive, locally scaled, reliable usage information available, as the state requires reporting for all agricultural applications, and all applications by certified applicators, in California. Therefore, there is greater certainty that this data reflects actual usage across a wide range of application sites. The analysis performed here suggests that past usage would underestimate actual future use of pesticides by more than 100 percent, approximately 29 percent of the time (see below).

This analysis is not meant to be a risk assessment for any specific pesticide or application site. Every pesticide and site will present a unique situation of the various factors driving changes in usage. Assessing trends for every specific pesticide or site would be highly complex and introduce numerous other uncertainties (e.g. potentially pesticide-specific changes in pest pressures). Similarly, the selection of criteria below (e.g. a 2-fold increase) is not meant to represent a level of change that represents an unacceptable risk to ESA-listed species. Rather, the analysis below is meant to capture and describe trends in usage across a broad range of pesticides and sites.

Custom code was used to import the data and perform the analyses in R (https://www.r-project.org). EPA's SUUM reports summarize pesticide usage on the 5 most recent years of data available. We implemented methods to select pesticides that were used over a 20-year duration to evaluate how usage changes over time and to evaluate how well 5-years in usage data may

1350

predict 15-years of future usage (the duration of the action). The pesticides were selected based primarily on their frequency of use in either 1998 or 2017 (for 2017, see https://www.cdpr.ca.gov/docs/pur/pur17rep/top_100_ais_acres_2017.htm). Additional neurotoxic pesticides were included (the organophosphates, carbamates, neonicotinoids, and pyrethroids) if they weren't already on the list. We excluded adjuvants and oils from the list because these ingredients are generally not considered active ingredients. All sites for which there was at least one use of any of the pesticides were included. In all, NMFS selected 153 pesticides and 248 use sites to examine (see Attachment 2).

We assessed all possible combinations of a pesticide and a site, focusing on those with at least 20 years of data. A site:pesticide combination (e.g. use on almonds of diazinon) needed to have a recorded use 1) on or before 1998 to make sure the pesticide was in use at the start of the 20-yr period and 2) used at least once in the last 5 years (2013-2017) to make sure that the pesticide was still in use at the end of the 20-yr period. The procedure netted a large number of samples for evaluation; a total of 3269 site:pesticide combinations met these criteria. Preliminary analyzes of these combinations are shown below. This analysis is only for California, due to the source of information. However, NMFS assumes that the various factors influencing usage will lead to similar changes in usage over time in other states. California, like many of the coastal states where NMFS species occur, cultivates a large number of "minor crops." Use on these crops will appear in the CA DPR PUR data, but estimates of usage on minor crops are frequently not available elsewhere.

NMFS chose to use total acres treated for this analysis of trends. Acres treated is a reliable value provided for every recorded use in the CalDPR PUR data. NMFS recognizes this is not the same metric as Percent Crop Treated (PCT) reported in the SUUM. This analysis is not meant to evaluate trends in PCT. Unlike PCT, total acres treated will additionally include repeat applications to the same field and is subject to change if total acres grown changes. Nonetheless, changes in total acres treated also are a measure of changes in usage and an appropriate, while different, indicator of changes in risk to ESA-listed species over time. For example, regardless of the reason for an increase in total acres treated, the change represents an increase in risk to ESA-listed species. An increase in the number of applications to the same field is an increase in risk.

Figure 441 shows annual data on total acres treated for three combinations of a single use site and a single pesticide. For example, the first graph shows the application of diazinon to almonds with each point representing the total acres of almonds in California treated by diazinon in a given year. For some years, no use may have been reported, but given the required nature of the California PUR reporting NMFS represented that year's use with a zero (e.g. the open circles on the tangerine:imidacloprid graph). The dashed lines represent the median of all of the years of data. Solid black lines represent the mean of the data for the years spanned by the line (e.g. 1998-2002 and 2002-2017). Gray lines show the minimum and maximum use for the 1998-2002 period.

As seen, application of a pesticide to a site can vary quite dramatically over a 20-yr period and in different ways. For treatment of almonds with diazinon there was a marked decline in use, while for treatment of tangerines with imidacloprid there was a dramatic increase. Finally, treatment of carrots with the insecticide esfenvalerate was variable, but did not show an obvious shift up or down over the 20-yr period.



**Figure 441. Changes in usage over time.**

To quantify these changes in use over the 20-yr period for all 3269 site:pesticide combinations, NMFS calculated three metrics (shown above for the three specific combinations). First, the mean of the recent 15-yr period was compared to the previous 5-yr period. Second, we performed a t-test to determine if the mean of the 15-yr period was significantly different from the mean of the previous 5-yr period. Finally, the number of years for which the 15-yr period was above the maximum of the previous 5-yr period was calculated. This would assess how well the maximum of a 5-yr would protect from future increases in use.

Figure 3 compares the means for all 3269 combinations analyzed. Using a criterion of a 2-fold change in mean found that 29% of the combinations had an increase in mean use and 34% of the combinations had a decrease. Only 37% of the combinations showed a change in mean within 2-

1352

fold (up or down) of the 5-yr mean. As mentioned above, the selection of 2-fold is just meant to provide a summary of the distribution in magnitudes not a statement about risk. This summary does include 'minor' crops (e.g. with mean total acres treated <100 acres) that could be considered a source of bias. For these crops, a small absolute change in usage (e.g. from 10 to 20 acres) would be the same relative increase (2-fold increase) as a large absolute increase in a 'major' crop (e.g. from 3,000 to 6,000 acres). It is worth noting that changes in usage in the 'minor' crops could, nonetheless, collectively represent a consequential change in risk (e.g. they form an substantial contribution to the Vegetable and Ground Fruit UDL). NMFS did assess the extent of a 'minor' crop bias by performing an analysis omitting site:pesticide combinations with <100 mean total acres for both time periods (i.e. they were 'minor' crops during both periods). Of the 2303 combinations for which at least one period had ≥100 mean total acres treated, 25 percent of those combinations showed a 2-fold increase in mean.



**Figure 442. Mean of the first 5-yr period versus the mean of the subsequent 15-yr period for each site:pesticide combination.**

Figure 4 shows summary histograms of the results of the comparisons to the 5-yr max (left) and the t-tests (right). Both metrics show that a substantial percentage of the combinations of site and pesticide show a measurable change in use over a 20-yr period. For 27% of the combinations at least 5 years of the 15-yr period had more use than that of the maximum of the preceding 5-yr period. For 36.5% of the combinations there was a significant difference in the mean of the 15-yr period relative to the previous 5-yr period.

1354



**Figure 443. Histograms of the distributions of comparisons of the maximum of the 5-yr period to subsequent 15-years (left) and of t-tests comparing the means of the preceding 5-yr period to the subsequent 15-years (right). For example, every year of the 15-year period was greater than the maximum of the preceding 5-years for 87 of the site:pesticide combinations (left) and the t-test p value was ≤ 0.05 for 1193 of the combinations (right).**

NMFS evaluation of over 3200 combinations of pesticides and crop combinations in California indicate that usage patterns often undergo significant changes over time periods consistent with EPA's reregistration period (15-duration). If we assumed that the likelihood of exposure to ESA-listed species is primarily a function of the usage of pesticides within the species range and that usage will remain consistent with the most recent 5-year average over the 15 subsequent years of the action, then we would underestimate the actual usage of pesticide by more than 100%, approximately 29% of the time. Further, we found that using the maximum usage of the most recent five years would not be protective of approximately 27 percent of future pesticide use (see Figure 4). This analysis demonstrates that relying on the most recent 5 years of data does not accurately predict future pesticide use.

**Approach to incorporating usage data**

The analyses presented above represent specific examples of NMFS' consideration of available information to assess future usage of pesticides for the purposes of this Opinion. Based on the uncertainties in the available information discussed above, we incorporated usage data into the Opinion in three general areas: 1) the environmental baseline; 2) the effects analysis; and 3) the Reasonable and Prudent Alternative (RPA). Below is a brief description of each area.

1355

*Environmental Baseline*

In the environmental baseline we assess, among other things, the presence of pesticides within species aquatic habitats. This includes an evaluation of pesticide environmental mixtures, which may increase risk to listed-species because of additive or synergist effects. The three primary sources of information assessed for evidence of past pesticide contamination are usage data, land use categories, and surface water monitoring data. EPA has provided NMFS with national and state use and usage summaries for chlorpyrifos, malathion, and diazinon. The usage information within these reports comes from both direct pesticide usage reporting (e.g., California PUR) as well as usage estimates from proprietary surveys (e.g., from Kynetec USA, Inc). Land use categories were evaluated within each species range by performing an overlap analysis with the National Land Cover Database  information. The United States Geological Survey's  National Water-Quality Assessment  reports document trends between pesticide concentration and land use for both agricultural and urban applications. Monitoring data was accessed from national sources (e.g. EPA's Water Quality Portal, USGS National Water-Quality Assessment), as well as state programs (e.g. The Washington State Department of Agriculture – Natural Resources Assessment Section surface water monitoring).

*Effects Analysis*

In the effects analysis we assess the anticipated impacts to species and habitat associated with the stressors of the action, over the next 15-year duration. The primary source of information on which to base assumptions of future usage is the FIFRA label. The registration of an active ingredient creates a potential for exposure by authorizing application at certain rates, times, and locations (i.e. labeled directions for use). When we assess whether the registration is likely to jeopardize species, we consider the potential usage that the label allows, and whether or not the labels contain directions that are sufficient to insure species will not be jeopardized over the duration of the action.

The potential for exposure is realized when applications are made directly to aquatic habitats where listed-species are present, or pesticides are transported to these habitats from applications which occur in proximity. Many pesticides are authorized for use directly adjacent to aquatic habitats, and some are authorized for direct application to aquatic habitats. These situations can be problematic because pesticides are inherently toxic and therefore, exposure may result in take.

For a given chemical and species, whether or not these take scenarios are likely to result in jeopardy is a function of the extent and frequency of these scenarios over the entire range of the species. The extent and frequency of future usage is driven largely by market forces and the collective choices of individual end-users. Temporal variation in the extent and frequency is driven by variables such as: changing pest pressures, emergence of new pests, development of pest resistance, regulatory changes to products, market changes, and the choices of individual end-users. We did examine information on past use ("usage") available to NMFS (e.g. survey

1356

information on agricultural uses provided by EPA and use reporting from California PUR). Given the degree of uncertainty and speculation associated with these factors, and usage information generally, we determined that in most cases we cannot rely on them to construct assumptions about the exposure potential and at the same time insure ESA-listed species will not be jeopardized. We were, however, able to utilize usage information of some kinds to incorporate into our risk assessment a degree of confidence regarding whether future usage would be minimal.

In the effects analysis, we assess the potential for take that is created by the label authorization, in order to assess whether the action agency can insure that the species is not likely to be jeopardized over the 15-year duration of the action. The likelihood of exposure assessment allows us to consider this potential by taking into consideration the extent of authorized use, species locations and movement, chemical properties, potential for repeated application, as well as the proximity of use sites to known areas of importance to the species. We distinguish between the extent of a use site within areas important to the species (e.g. overlap of species range with a Cropland Data Layer) from the extent and frequency of pesticide applications to that use site (e.g. usage). Over the 15-year duration of the action the former is subject to much less uncertainty, while the later has substantial uncertainties and limitations.

The following describes our method for considering certain usage information as informing the confidence in our effect determinations. We consider and track the underlying uncertainties when evaluating the risk hypotheses by describing levels of confidence in our effect of exposure, likelihood of exposure, and in our overall risk determination for each risk hypothesis. When assessing the confidence we have in the likelihood of exposure characterization, one factor considered is the evidence we have that future usage of the a.i. to the use category being assessed will be minimal over the next 15 years. By minimal, we mean that the amount of acres treated or pounds applied are such that even if application is made in proximity to species habitat we would anticipate the exposure level to be minimal in terms of number of individuals exposed or in relation to the PBFs of designated critical habitat. To make an assessment that usage will be minimal, we seek sufficient evidence, by which we mean that there is enough certainty in the evidence that we can rely on it as part of an analysis that ultimately is required by the ESA to insure that the species is not likely to be jeopardized over the 15-year duration of the action.

Recall that to "jeopardize the continued existence of" is to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a ESA-listed species in the wild by reducing the reproduction, numbers, or distribution of that species. Such reductions are not only possible via large-scale impacts across the entire species range, but could occur via smaller scale impacts to essential sub-populations, or essential life stages.

Information used to assess whether future usage is likely to be minimal include regulatory actions (e.g. state regulatory bans), monitoring data and available usage data. In determining

whether the evidence available was sufficient or not to find that future usage will be minimal, we considered criteria including those discussed above. Examples of evidence that we found sufficient for this purpose include the chlorpyrifos tolerance revocation, state-based chlorpyrifos bans, and mandatory, long-term, geographically specific usage reporting (e.g. California PUR data). For the latter information type, we determined there was sufficient evidence that future usage would be minimal if there had been no usage reported in the previous 15 years for the relevant use. Examples of evidence that we found were not sufficient for this purpose include usage estimates based on existing market survey data, and water quality monitoring data. In this way we were able to utilize usage information of some kinds to incorporate into our risk assessment a degree of confidence regarding whether future usage would be minimal. The confidence levels associated with all use categories were then used to inform our overall risk characterization.

*Mitigations*

In developing the conservation measures with EPA and the registrants, NMFS incorporated usage information for two purposes: first, the conservation measures include an option for mitigation based on actual use rate and method applied (pesticide usage) rather than assuming application at the maximum-labeled rate (pesticide use). The process involves three steps which will be specified on EPA's Bulletin's Live website:

> Step 1. The end-user determines whether any mitigation is needed based on the location of the application. Is pesticide application to be made within 300 meters of ESA-listed species habitat? If yes, go to step 2.

> Step 2. The end-user determines the number of drift and runoff mitigation points needed for the pesticide application based on the application rate and method employed.

> Step 3. The end user chooses mitigation options to implement from a pick-list of options. Mitigation options can be added together, based on their point values.

Second, the conservation measures include an effectiveness monitoring element that relies on usage reporting and adaptive management associated with wide-area mosquito applications. The purpose of this element is to maximize flexibility for mosquito control operations while reducing risk to ESA-listed species. Chlorpyrifos and malathion labels authorize application for mosquito control. While these products cannot be directly applied to water they otherwise lack any geographic restrictions for outdoor applications. Additionally, risk estimates based on the existing label requirements suggest they can cause adverse effects where applications occur. While mosquito applications can legally be made almost anywhere, we do not expect them to be made everywhere within the species range. Rather, we expect that most applications will occur near residential or developed areas. If we can assume that relatively few applications occur in close proximity to ESA-listed species habitats then geographic restrictions on mosquito usage

1358

may not be necessary. However, comprehensive reporting of product usage is needed to verify these assumptions, to monitor the effectiveness of current labeling to address the risk of these to ESA-listed species, and to apply adaptive mitigation if these assumptions are incorrect. Therefore the conservation measures specifie that EPA shall, in close coordination with NMFS Office of Protected Resources, develop and implement an effectiveness monitoring plan to ensure that current product labeling does not result in an unanticipated level of mosquito control sprays in close proximity to ESA-listed species habitats.

# Exhibit 6

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

From:         Thompson, Jennifer
To:            Golden, Nancy
Subject:     Re: NWHC Case 28183 Final Report
Date:         Wednesday, October 25, 2017 7:49:03 AM

---

Interesting, and sad.  They report levels that were close to those believed to cause lethal effects; perhaps sublethal effects were a factor that lead to predation?  Or maybe the direct effect was lethal, especially since it was a chick.  Either way, the result was death.  Thanks for sharing - it's helpful to hear about incidents like this.
Jennifer

On Tue, Oct 24, 2017 at 1:30 PM, Golden, Nancy <nancy_golden@fws.gov> wrote:
> Necropsy report from a whooping crane with suspected organophosphate intoxication, from July of this year. I thought whooping crane was one of the harder birds to assess, so interesting to see this evidence of exposure/effects.  I understand that this is not an isolated case either.
>
>
> ---------- Forwarded message ----------
> From: **Warner, Sarah** <sarah_warner@fws.gov>
> Date: Tue, Oct 24, 2017 at 10:52 AM
> Subject: Fwd: NWHC Case 28183 Final Report
> To: Nancy Golden <nancy_golden@fws.gov>
>
>
> I need to take another look at this.....
>
> ---------- Forwarded message ----------
> From: **Shull, Alisa** <alisa_shull@fws.gov>
> Date: Fri, Oct 6, 2017 at 12:42 PM
> Subject: Fwd: NWHC Case 28183 Final Report
> To: Peter Fasbender <peter_fasbender@fws.gov>, Sarah Warner <sarah_warner@fws.gov>
>
>
> FYI - note potential exposure to high levels of organophosphate of this whooper.
>
> Alisa
> ---------- Forwarded message ----------
> From: **Buckner, Jennifer** <jbuckner@usgs.gov>
> Date: Thu, Aug 10, 2017 at 1:36 PM
> Subject: NWHC Case 28183 Final Report
> To: Wade Harrell <wade_harrell@fws.gov>
> Cc: Barry Hartup <hartup@savingcranes.org>, Brad Strobel <brad_strobel@fws.gov>, "Davin.Lopez@wisconsin.gov" <Davin.Lopez@wisconsin.gov>, Glenn Olsen <golsen@usgs.gov>, GS NWHC EPI <nwhc-epi@usgs.gov>, Hillary Thompson <hthompson@savingcranes.org>, Kimberli Miller <kjmiller@usgs.gov>, Leann Wilkins <Leann_Wilkins@fws.gov>, Lee Jones <lee_c_jones@fws.gov>, "lindsey. long" <Lindsey.Long@wisconsin.gov>, Samantha Gibbs <samantha_gibbs@fws.gov>, Marcos Isidoro Ayza <misidoroayza@usgs.gov>, Alisa Shull <alisa_shull@fws.gov>, Sean Kelly <sean_kelly@fws.gov>

Attached please find a Final Report for your submission to the National Wildlife Health Center.

The pathologist assigned to your case is <u>Marcos Isidoro Ayza</u>

The epidemiologist assigned to your case is <u>Barb Bodenstein</u>

For consultation regarding diagnostic findings, laboratory testing and results, or the report, please contact the pathologist. Contact information can be found on the attached report.

For consultation on the significance of this disease to wildlife populations in your area, assistance with disease control and response, or to report field updates (numbers and species affected, geographical distribution, end date, etc.), please contact the epidemiologist at <u>NWHC-epi@usgs.gov</u> or 608-270-2480.

All best,

Jennifer

Jennifer Buckner
Biologist / Diagnostic Case Manager
Wildlife Disease Diagnostic Laboratories
USGS National Wildlife Health Center
6006 Schroeder Rd.
Madison, WI 53711
Phone (608) 270-2443
Fax (608) 270-2415
Please visit our website at: <u>www.nwhc.usgs.gov</u>

--
Alisa Shull

Chief, Division of Endangered Species
Region 3, U.S. Fish & Wildlife Service
5600 American Blvd. West, Suite 990
Bloomington, MN  55437-1458

612-713-5334

<u>Alisa_Shull@fws.gov</u>

--

--------------------------------------------
Sarah Warner
U.S. Fish and Wildlife Service
505 Science Drive
Madison, WI 53711
Office: 608-238-9333 ext. 130
Cell: 608-301-6475


--
Jennifer Thompson
U.S. Fish & Wildlife Service
Ecological Services, MS: ES
5275 Leesburg Pike
Falls Church, VA 22041-3803
(703) 358-2566

**NATIONAL WILDLIFE HEALTH CENTER**

**6006 Schroeder Road**
**Madison, Wisconsin 53711-6223**
**608-270-2400 (FAX 608-270-2415)**

## DIAGNOSTIC SERVICES CASE REPORT
### Final Report                                                         8/10/2017

**Case:** 28183
**Epizoo:**

**Legal** ☐  **Declassified** ☐  **INV#:**

**Submitter:**

Wade Harrell

USFWS Whooping Crane Coordinator

Aransas NWR

1 Wildlife Circle

Austwell, TX 77950

**Date Submitted:**   7/17/2017

**Specimen description/Identification/Location:**

| ACC | SPECIES | SPECIMEN TYPE | BAND NUMBER | SUBMITTER's ID | COUNTY | STATE |
|-----|---------|---------------|-------------|----------------|--------|-------|
| 001 | Crane, Whooping | CARCASS | W14-17 | | Juneau | WI |

**Diagnosis:**

   Trauma/Predation

   Suspect organophosphate intoxication

**Event History:**

One Whooping Crane chick (W14-17) was found dead on 7/17. Last radio signal heard on 7/16 indicated it was moving and with its parent, likely at the roost site. The parents were observed walking without the colt and no colt signal was detected on 7/17. Punctures were observed on the lower back of the carcass and predation is the suspected cause of death.

The area it was found is wetlands west of Pool 1. There are dense sedges but relatively dry substrate. The carcass was found near a small pool with open water in between patches of willows.  Temperatures ranged from a low of 65 degrees F overnight & partly cloudy, with a high of 81 degrees F during the afternoon prior to collection. There was no rain.

**Comment:**

A hatchling whooping crane (*Grus americana*) was received for determination of cause of death. Postmortem examination was hampered by the poor preservation of the carcass, which presented postmortem changes associated with autolysis and putrefaction as well as most of the body surface covered with maggots. The radio-transmitter devise was properly attached to the skin of the left lumbar area (saved frozen). Multiple 0.4-0.5 cm puncture wounds with laceration and hemorrhage of the underlying soft tissues (muscles, tendons…) were observed in different parts of the body:  Three in the left tempo-occipital area with associated fracture of the skull; one in the right caudal mandibular area underneath the left ear; two in the left leg, 5 cm apart (one in the dorsal aspect of the coxofemoral area and the other in the lateral side of the mid-diaphyseal femoral area); one in the caudal aspect of the ventral abdomen, 3 cm cranial to the base of the tail; two in both sides of the neck about 6 cm cranial to the clavicle; and one in the cranial part of the left pectoral area. These lesions were the most likely cause of death. The size, depth, distribution and separation of these puncture wounds indicate that these injuries were most likely inflicted by a small to medium size mammalian predator (e.g. fox, raccoon, etc.). In addition to these fatal injuries, quantification of acetylcholinesterase in brain showed 47% irreversible inhibition of this enzyme. This result suggests exposure (25% or higher) to cholinesterase-inhibitor compounds and particularly to organophosphates. These chemicals are broadly used as insecticides for agricultural or pest control purposes and can be ingested or topically absorbed by birds causing severe neuromuscular and cardiovascular signs. The levels of inhibition were close to those considered lethal for birds (50% or higher) and therefore should be considered as a potential contributor to the death of this crane. The histopathological study was unremarkable. Avian Influenza Virus matrix RT-PCR screen from trachea and cloaca were negative. West Nile Virus testing (viral isolation in Vero cells) from pin feathers was negative. Unspecific mixed bacterial growth resulted from the routine bacterial culture from both liver and intestine. Salmonella culture from intestinal tract was negative. No lead was detected in liver (<0.25ppm/wet weight). Viral culture and isolation from bursa was negative. Parasitological study from blood, lung, liver, kidney and gastrointestinal tract showed normal parasitic burdens. Viral culture and isolation from liver is pending. The result of that latter test will be sent in a supplemental report. A large set of tissues and stomach content were saved frozen and will remain indefinitely stored in this conditions in case needed for future studies. Feathers for ulterior mercury testing were also collected and saved frozen.

**Final Report**

8/10/2017

Legal ☐    Declassified ☐    INV#:

*Marcos Isidoro Ayza*
_____
Marcos Isidoro Ayza    DVM, DECVP

Staff Pathologist

**Phone:** 608-270-2400    **Email:**    misidoroayza@usgs.gov

**Diagnostic findings may not be used for publication without the pathologist's knowledge and consent.**

Copies To:

DR. BARRY HARTUP
International Crane Foundation, P.O. Box 477, E-11376 Shady Lane Road, Baraboo, WI   53913

DR GLENN OLSEN
Patuxent Wildlife Research Center /Laurel, 12302 Beech Forest Road, Laurel, MD   20708-4022

LEANN WILKINS
Necedah NWR, N11385 Headquarters Rd, Necedah, WI   54646-7531

BRAD STROBEL
Necedah NWR, N11385 Headquarters Rd, Necedah, WI   54646-7531

DR LINDSEY LONG
Wisconsin Dept of Natural Resources/Science Operations, 2801 Progress Road, Madison, WI   53716

HILLARY THOMPSON
International Crane Foundation, P.O. Box 477, E-11376 Shady Lane Road, Baraboo, WI   53913

DAVIN LOPEZ
Wisconsin Dept of Natural Resources HQ/Madison, BOX 7921, 101 Webster Street, Madison, WI   53707

KIM MILLER
National Wildlife Health Center/Madison, , 6006 Schroeder Road, Madison, WI   53711

MIGRATORY BIRD COORDINATOR (R3)
USFWS Regional Office (RO3), 5600 American Blvd, Suite 990, Bloomington, MN   55437

ENDANGERED SPECIES (RO3)
USFWS Regional Office (RO3), 5600 American Blvd, Suite 990, Bloomington, MN   55437

SAMANTHA GIBBS
USFWS Migratory Bird Management/Arlington VA, 4401 North Fairfax Drive, Mail Stop 4107, Arlington, VA   22203-1610

LEE C. JONES
USFWS Regional Wildlife Health Program/Bozeman MT, 1400 S. 19th St., Bozeman, MT   59718-5496

This is a Report for your submission to the National Wildlife Health Center.

For consultation regarding diagnostic findings or laboratory testing and results, please contact the pathologist. Contact information can be found underneath the signature line on this report.

For consultation on the significance of this disease to wildlife populations in your area, assistance with disease control and response, or to report field updates (numbers and species affected, geographical distribution, end date, etc.), please contact an NWHC epidemiologist at NWHC-epi@usgs.gov or 608-270-2480.

# Exhibit 7

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

## OFFICE OF CHEMICAL SAFETY AND POLLUTION PREVENTION

WASHINGTON, D.C. 20460

May 7, 2025

Tony Hawkes, PhD
Office of Protected Resources
National Marine Fisheries Service (NMFS)
1315 East-West Highway, SSMC 3, 13th Floor/Rm 13701
Silver Spring, MD 20910-3226

RE: Memorandum to Address Mosquito Adulticide Reporting Requirements Stated in the 2022
NMFS Biological Opinion

Dear Dr. Hawkes,

In 2017, the National Marine Fisheries Service (NMFS) issued an Opinion on the Environmental
Protection Agency (EPA)'s registration of chlorpyrifos, diazinon and malathion (Biological
Opinion). In 2019, EPA requested re-initiation of formal consultation on the registration of
chlorpyrifos, diazinon, and malathion in part to consider ongoing interagency work to develop
procedures for the incorporation of usage data into the consultation process. A revised Biological
Opinion was issued by NMFS in 2022 which provided a more robust evaluation and application
of the available usage data. For malathion, conservation measure number one of the revised
Biological Opinion outlines an effectiveness monitoring plan to ensure that current product
labeling does not result in an unanticipated level of wide-area mosquito control application in
close proximity to ESA-listed species habitats. The measure is intended to ensure that the
assumptions resulting from the consideration of the usage data, which contributed to the NMFS's
finding that the continued registration of malathion is not likely to jeopardize the continued
existence nor destroy or adversely modify the designated critical habitat of ESA-listed species
under NMFS' jurisdiction, remain valid. Staff at EPA, NMFS, USDA and USFWS as well as
stakeholders including American Mosquito Control Association (AMCA), and registrant FMC
Corporation have met on several occasions to discuss implementation of the conservation
measure including availability, collection and incorporation of usage data and the use of
quantitative thresholds.

On June 8, 2023, NMFS sent correspondence to EPA summarizing elements of the conservation
measures including comprehensive monitoring data as described in the 2022 Biological Opinion
for the registration review of malathion that NMFS recommends to avoid the need for re-
initiation. More specifically, NMFS requests annual comprehensive reporting summarizing all
wide-area mosquito adulticide applications within each species range with regard to the number

of applications, location of each application identified by latitudinal and longitudinal coordinates, and area of each treatment. The correspondence acknowledged that the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) does not permit labels to contain language requiring pesticide applicators to report their applications. Furthermore, voluntary means of collecting data (e.g., data collected by the American Mosquito Control Association) are less comprehensive than previously understood. NMFS also suggested some alternatives and requested continued conversations with EPA on this issue.

In a subsequent July 11, 2023 meeting between EPA and NMFS, EPA discussed how a combination of publicly available adulticide usage data maintained by state regulators with adulticide use or reporting data required by state and EPA-issued Clean Water Act pesticide general permits would provide some of the data needed for the conservation measure and where such information is available. During this meeting, EPA presented a review of the relative availability, quality, and consistency of adulticide usage data available in the states where NMFS has identified species of concern. To date, EPA's review of available information has revealed that there is adulticide usage data publicly available; however, the accessibility, format and specific data parameters of reports vary considerably from state to state, including those reports submitted to EPA Office of Water under the Clean Water Act.

The Office of Pesticide Programs has summarized non-agricultural malathion adulticide usage information sourced from mosquito control districts and collected by state programs where such information is available and provided to the public. Data were readily available from Florida, New York, California, Vermont, Washington, Massachusetts, New Hampshire, District of Columbia, Puerto Rico, Indian Country, and federally administered lands, territories and installations. The data are included in the appended excel spreadsheet and summarized in the pages below.

Please feel free to call if you have any questions. I can be reached at (202) 566-2425 or via email at overstreet.anne@epa.gov.

Sincerely,

*Anne Overstreet*

Anne Overstreet, Division Director
Pesticide Re-evaluation Division (7508M)
Office of Pesticide Programs

*Cc:*
*Amy Blankinship, Environmental Fate and Effects Division, OPP*
*Brian Anderson, Environmental Fate and Effects Division, OPP*
*Nancy Golden, US Fish and Wildlife Service*

**OPP Summary of Non-agricultural Malathion Adulticide Usage**

Florida

Usage information for Florida's mosquito control programs is available from the Florida Department of Agriculture and Consumer Services website. Data is available for 2020-2023 at the county level for aerial and ground application of mosquito adulticides. For malathion, statewide usage for aerial and ground malathion adulticide increased annually since 2020 (2020-21 74,849.051 pounds active ingredient (lbs a.i.), 2021-22 119,935.833 lbs a.i., 2022-23 148,207.248 lbs ai).

New York

Usage information for New York's mosquito control programs is available from the New York State Department of Environmental Conservation and Cornell Cooperative Extension Pesticides Sales and Use Reporting Program. Data are available for 2019-2022 at the county level for malathion adulticide use. There was no statewide trend in annual use for the years available (365.81 lbs a.i. in 2019, 1054.51 lbs a.i. in 2020, 845.91 lbs a.i. in 2021, 29.93 lbs a.i. in 2022).

California

Usage information for California's mosquito control programs is available from the California Department of Pesticide Regulation Pesticide Information Portal (CalPIP) database. Data are available from 2019-2022 at the county level for malathion adulticide use. System search parameters were "Non-Agricultural Areas (public health treatment), Public Health Pest Control, Regulatory Pest Control." There was no statewide trend in annual use for the years available (9,316.86 lbs a.i. in 2019, 21,349.66 lbs a.i. in 2020, 12,097.45 lbs a.i. in 2021, 161,914.4 lbs a.i. in 2022). The dataset appears to include some outlier points (for example, 98,985 lbs a.i. used in March 2022 in Fresno County when the 2021 total for May-October 2021 did not exceed 4,280 lbs a.i.).  Fresno Mosquito and Vector Control District could not confirm the veracity of the CalPIP data and clarified that they do not use the system.

Vermont

Usage information for Vermont's mosquito control programs is available from the Vermont Agency of Agriculture Food and Markets.  Data are available from 2019 to 2022. There was no statewide trend in annual use for the years available (636.2 lbs a.i. in 2019, 108.9 lbs a.i. in 2020, 619.74 lbs a.i. in 2021, 862.3 lbs a.i. in 2022).

Washington

Usage information for Washington's mosquito control programs is available from the Washington Department of Ecology Water Quality Permitting and Reporting System. Data are available from 2019 to 2023. Records are formatted as individual application record submissions and are not available pre-tabulated. There was no malathion usage reported for Washington for the years available.

<u>EPA Pesticide General Permit (PGP) (EPA Office of Water Data)</u>

The Pesticide General Permit issued by EPA covers wide-area mosquito control applications in Massachusetts, New Hampshire, District of Columbia, Puerto Rico, Indian Country, U.S. Territories as well as federal lands and military installations in most states. Data are available for mosquito control activities requiring permit coverage and annual reporting from 2019 to 2022. There was no malathion usage reported for EPA's PGP for the years available.



## OFFICE OF CHEMICAL SAFETY AND POLLUTION PREVENTION
WASHINGTON, D.C. 20460

June 24, 2024

**MEMORANDUM**

**SUBJECT:**     Malathion (PC # 057701) Overview of Use and Usage, and Description of Pest Management Benefits, and Impacts of Potential Risk Mitigation in Alfalfa, Pine Seed Orchards, Pine Seedling Propagation, and Residential Homeowner Use Sites

**FROM:**     Angela Myer, Biologist          *Monisha Kaul for* Angela Myer
Sergio Santiago, Biologist          *SSantiago*
Biological Analysis Branch

Andrew Lee, Economist          *Andy C. Lee*
Economic Analysis Branch

Rachel Fovargue, Biologist          *Rachel Fovargue*
Science Information and Analysis Branch
Biological and Economic Analysis Division (7503M)

**THRU:**     Monisha Kaul, Chief          *Monisha Kaul*
Biological Analysis Branch

T J Wyatt, Chief          *TJ Wyatt*
Economic Analysis Branch

Hope Johnson, Chief          *Hope Johnson*
Science Information and Analysis Branch
Biological and Economic Analysis Division (7503M)

**TO:**     Carolyn Smith, Chemical Review Manager
Jaclyn Pyne, Team Leader
Kelly Sherman, Chief
Risk Management and Implementation Branch III
Pesticide Re-evaluation Division (7508M)

**Product Review Panel Date:**  05/08/2024

**SUMMARY**

Malathion is a broad-spectrum organophosphate insecticide classified by the Insecticide Resistance Action Committee (IRAC) as a Group 1B Mode of Action insecticide. This memorandum provides an overview of the use and usage of malathion to all registered sites and assesses the benefits of malathion in alfalfa, pine seed orchards, pine seedlings, and residential homeowner use sites.

Malathion is registered on a broad range of agricultural and non-agricultural use sites. Usage data indicates that malathion is regularly used in a variety of fruit and vegetable crops, wide-area mosquito control, and residential homeowner uses. Many other registered use sites exhibit low usage; this suggests that users either have other cost-effective tools available to control pests which malathion is effective against, or that the pests which malathion is effective against are not problematic in these use sites.

In alfalfa production, where reported malathion usage is low (<1% PCT), BEAD finds that malathion offers low to moderate benefits to users due to its broad-spectrum activity against pests, including the ability to simultaneously treat against two of alfalfa's key pests (alfalfa weevil and aphids). This, in addition to malathion's 0-day pre-harvest interval (PHI), provides users increased flexibility and saves them the need of performing additional insecticide applications or tank mixing products.

In slash pine seed orchards, malathion provides low to moderate benefits in managing slash pine flower thrips during occasional outbreaks, as it is among one of few chemical control options available. For use on pine seedlings, BEAD concludes that malathion likely has low benefits due to the availability of multiple alternatives with different modes of action as well as non-chemical control methods against target pests.

In residential homeowner use products for the treatment of ornamentals, lawns, and gardens, BEAD finds that malathion provides moderate benefits due to its broad-spectrum activity, versatility across various settings within such, and by being the only organophosphate with such attributes available as a homeowner product.

Measures under consideration to mitigate potential ecological risks include adding mandatory spray drift language for boomless ground applications, and a 96-hour water holding time before releasing floodwaters after the treatment of rice. BEAD expects minimal impacts to users resulting from the mitigation measures under consideration across alfalfa, pine seed orchards, pine seedlings, and residential homeowner use sites.

**INTRODUCTION**

The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) Section 3(g) mandates that the Environmental Protection Agency (EPA or the Agency) periodically review the registrations of all pesticides to ensure that they do not pose unreasonable adverse effects to human health and

2

the environment. This periodic review is necessary in light of scientific advancements, changes in policy, and changes in use patterns that may alter the conditions underpinning previous registration decisions. In determining whether adverse effects are unreasonable, FIFRA requires that the Agency consider the risks and benefits of any use of the pesticide.

Although substantial mitigation on malathion use has been recently enacted based on Biological Opinions from the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, the Agency has identified ecological risks to non-target species associated with the use of malathion. The Agency is considering various mitigations to reduce such risks which may include mandatory spray drift language to product labels, and the addition of a 96-hour water holding time before releasing floodwaters after the treatment of rice. No human health risks were identified.

This document presents an overview of the registered uses and reported usage of malathion for all registered use sites and describes malathion's benefits and alternatives in alfalfa, pine seed orchards, pine seedlings, and residential homeowner use sites. This memo is one of four documents assessing the use, usage, benefits, and alternatives of malathion, as well as impacts of potential mitigation. Other related assessments by the Biological and Economic Analysis Division (BEAD) include 1) vegetable crops, 2) wide-area mosquito adulticides and other state and federal agricultural pest control programs 3) and commercial fruit production. These complementary memos are available in the malathion docket (EPA-HQ-OPP-2009-0317).

**METHODOLOGY**

BEAD defines the benefit of malathion as the extent to which it is important to users for the control of pests important to users in each use site. These benefits are based on various agronomic and biological factors, chemical characteristics of malathion, and alternative control strategies, which influence how a user chooses to manage pests and to what extent malathion is important. The unit of analysis is typically an acre of a crop that would normally be treated with malathion. Based on the available usage information and risks of concern, BEAD assesses benefits at this unit of analysis both because users make pest control decisions at the acre- or field-level, and because risks are usually measured at the same spatial levels (treated acres and treated fields).

BEAD first identifies how users apply malathion. BEAD provides information on the chemical characteristics of malathion in order to understand the physiological constraints on how the pesticide functions. BEAD then evaluates data on malathion usage to identify use patterns, including variations in regional usage. Next, BEAD determines use sites for which to conduct detailed benefits assessments through examination of available usage data, agronomic and economic information, and public comments from stakeholders on the uses of malathion.

BEAD then identifies why users apply malathion in sites selected for detailed assessment. BEAD reviews pesticide usage information and existing scientific and university extension publications to identify the important target pests and the attributes of malathion that make it useful in the

3

pest control system. The way or ways that users currently use malathion is the baseline scenario. Having identified why and how users use malathion, BEAD identifies the likely alternative control strategies by reviewing extension recommendations, grower surveys, and considering economic factors.

BEAD then assesses the magnitude of the benefits by assessing the biological and economic impacts that users might experience should they need to employ alternative pest control strategies in the absence of malathion. Economic and biological impacts to a user in the absence of a pesticide can include monetary costs as well as other lost advantages of the pesticide, such as simplicity of use, flexibility, and utility in resistance management and/or integrated pest management programs. Users may also face costs with respect to commodity damage resulting in yield or quality reductions related to diminished pest control. Physical and/or managerial effort may also increase.

A similar approach is followed to assess the impacts of possible mitigations on the use of malathion to reduce risks. BEAD considers how the restrictions would affect the ability of users to control pests or affect the costs of using malathion.

For these analyses, data are sourced from university extension services, United States Department of Agriculture (USDA) (e.g., publicly available crop production, pesticide usage, and cost data as well as information submitted directly to EPA), publicly and commercially available grower survey data, public comments submitted to the Agency from various stakeholders, the open literature and BEAD's professional knowledge. The most heavily used sources of data from surveys of pesticide usage are purchased from Kynetec USA Inc, a private research firm which provides proprietary pesticide usage data on approximately 60 crops collected annually through grower surveys using a statistically valid approach, and from Kline and Co. which provides non-agricultural market research data.

**CHEMICAL CHARACTERISTICS**

Malathion is an organophosphate, classified by the Insecticide Resistance Action Committee (IRAC) as a Group 1B Mode of Action (MOA) insecticide and is registered for use in a wide range of agricultural and non-agricultural use sites. Like most organophosphates, malathion acts via contact on and ingestion by the target pest, disrupting the normal transmission of nerve impulses, specifically by inhibiting acetylcholinesterase (Chong et al., 2017).

Malathion was introduced into the market in 1950 and is one of the oldest organophosphates still in use (ATSDR, 2003). Malathion has a broad spectrum of activity against many insects and insect life stages and as a contact insecticide, it can provide quick reductions in pest populations in a variety of agricultural and non-agricultural settings.

**USE AND USAGE OF MALATHION**

4

**Malathion Use**

Malathion is registered for use on both agricultural and non-agricultural sites. Agricultural food and feed sites are a wide variety of fruit (apricot, avocado, blackberry, blueberry, boysenberry, cantaloupe, cherry [sweet and tart], currant, dewberry, figs, gooseberry, grapefruit, grapes, guava, kumquat, lemon, lime, loganberry, mango, nectarine, orange, papaya, passion fruit, peach, pear, pineapple, raspberry, strawberry, tangelo, and tangerine), vegetables (amaranth, arugula, asparagus, beans [dry and succulent], beets [garden] , broccoli, broccoli [chinese], broccoli raab [rapini], Brussels sprouts, cabbage, cabbage [Chinese] , carrot [roots], cauliflower, cavalo broccolo, celery, celtuce, chayote, chervil, chrysanthemum [edible] , collards, corn salad, cucumber, dandelion, dock [sorrel] , eggplant, endive, Florence fennel, garlic, horseradish, kale, kohlrabi, leek, lettuce, melon, mizuna, mustard [Chinese], mustard greens, mustard spinach, okra, onion [bulb and green], orach, parsley, parsnip, peas, peppers, potato, pumpkins, purslane, radish, rutabaga, salsify, shallot, spinach, squash, sweet potatoes, sweet corn, Swiss chard, tomato, tomatillo, turnip, watercress, watermelons, and yams), and other crops including nuts and grains (alfalfa, barley, birdsfoot trefoil, chestnut, clover, corn [field and pop], cotton, flax, grass [forage/hay], hops, lespedeza, lupine, macadamia nut, mint, mushroom, oats, pastureland, pecan, peppermint, rangeland, rice, rye, sorghum, spearmint, vetch, walnuts, wheat, and wild rice).

Malathion is registered for non-agricultural and non-food agricultural uses on the following sites: Christmas tree plantations, ornamental/residental turf (i.e. lawns; spot treatment only), ornamental plants (herbaceous, woody shrubs/vines, and trees), grain storage facilities (e.g. silos, grain elevators), home gardens (including fruits and vegetables for consumption), perimeter of buildings (outdoors; including residential dwellings), pine seed orchards (only on slash pine in the southeastern U.S.), uncultivated areas (such as fence rows, hedge rows and rights-of-way along roadways or electrical utilities), and wide-area mosquito control.
Some labelled use sites and rates are limited to application by federal and state pest control programs, such as the Boll Weevil Eradication Program, or the California Beet Curly Top Virus Control Program.

Malathion-containing products are formulated as dust (for use on stored grain), emulsifiable concentrates, or ready-to-use concentrates (for ultra-low volume [ULV] applications).

Malathion products can be applied using ground, aerial, chemigation, and handheld equipment. Methods for both ULV and non-ULV applications are allowed on a subset of registered sites and maximum application rates vary across these methods.

**Malathion Usage**

<u>Agricultural Usage</u>

Usage values presented in this section are based on the most recent data available from each usage data source. The primary usage source is Kynetec USA, Inc., an agricultural market

research firm. These data are supplemented with USDA NASS Chemical Use Survey data and, for crops where at least 80% of national acreage is in California, CDPR Pesticide Use Reporting data. Usage data are available for a number of crops, but many small-acreage and non-crop sites are not surveyed at a nationally representative level. Because not all crops are surveyed, the calculations presented below may slightly underestimate total national usage. The values presented in this document may differ from those presented in other BEAD documents, such as the Screening Level Usage Analysis (SLUA) or Summary Use and Usage Matrix (SUUM), because different timeframes of usage are represented.

Nationally, users reported applying over 400,000 pounds of malathion active ingredient (lbs AI) to at least 270,000 total acres treated (TAT) annually between 2017 and 2021 (Kynetec, 2022a; Kynetec, 2022b; USDA NASS, 2022; CDPR, 2023). Although malathion usage has seen a decline in national agriculture usage in recent years when compared to the previous decade (annual average of at least 850,000 lbs AI on 700,000 acres during the years 2007-2016), usage remains high among a variety of agricultural sites (Table 1, Kynetec 2022a).

**Table 1.** National average agricultural usage for all surveyed crops reporting notable usage of malathion, 2017-2021.

| Crop | Percent Crop Treated (PCT)[a] | Annual Pounds AI Applied | Annual Total Acres Treated[b] | Single Application Rate (lbs AI/acre) | Annual Number of Applications |
|---|---|---|---|---|---|
| **Fruits** | | | | | |
| Raspberries | 60 | 20,000 | 14,000[c] | 1.38 | 1.5 |
| Blueberries | 34 | 57,000 | 53,000[c] | 1.10 | 2.0 |
| Blackberries | 18 | 2,300 | 1,400[c] | 1.68 | 1.2 |
| Pears | 16 | 15,000 | 11,000 | 1.39 | 1.4 |
| Strawberries | 16 | 26,000 | 14,000 | 1.92 | 2.0 |
| Figs | 11 | 1,300 | 800 | 1.72 | 1.1 |
| Cherries | 10 | 17,000 | 13,000 | 1.28 | 1.1 |
| Oranges | 8 | 53,000 | 45,000 | 1.18 | 1.0 |
| **Vegetables** | | | | | |
| Onions | 7 | 10,000 | 8,400 | 1.24 | 1.0 |
| Asparagus | 6 | 2,100 | 1,800 | 1.18 | 1.5 |
| Pumpkins | 3 | 2,000 | 2,700 | 0.74 | 1.2 |
| Peppers | 2 | 1,200 | 1,000 | 1.12 | 1.2 |
| Tomatoes | 2 | 18,000 | 12,000 | 1.50 | 2.6 |
| Cucumbers | 2 | 7,000 | 4,000 | 1.75 | 2.0 |
| Sweet Corn | 2 | 9,000 | 8,800 | 1.03 | 1.0 |
| Brussels sprouts | NC | 4,700 | 3,700 | 1.27 | 1.4 |
| **Field Crops** | | | | | |
| Rice | 1 | 31,000 | 25,000 | 1.25 | 1.0 |
| Alfalfa | <1 | 85,000 | 74,000 | 1.16 | 1.1 |

Sources: Kynetec 2022a, Kynetec 2022b; Blueberry, blackberry, and raspberry data from USDA NASS, 2023; Brussels sprout and fig data from CDPR 2023

NC: PCT inestimable due to a known reporting error for the crop area planted for some counties within the California Department of Pesticide Regulation (CDPR) dataset

[a] Percent Crop Treated is defined as Base Acres Treated, the number of acres treated at least once, divided by the number of crop acres grown.

[b] Total Acres Treated is defined as the number of acres treated, accounting for multiple treatments to the same physical acre.

[c] Total acres treated is not reported by USDA NASS; This value is calculated by dividing reported pounds of AI applied by the average single application rate.

Among crops that are surveyed for insecticide usage, malathion usage is not reported on a substantial percentage of national acreage of most crops for which it is registered (i.e., low PCT or no usage reported). Surveyed crops reporting little to no malathion usage (not listed in Table 1) include apricots, avocado, broccoli, cabbage, cantaloupes, carrots, cauliflower, celery, cotton, field corn, garlic, grapefruit, grapes (table and wine), lemons, lettuce, nectarines, peaches, pecans, potatoes, sorghum (milo), spinach, squash, walnuts, watermelons, wheat (spring and winter) (Kynetec, 2022a; Kynetec, 2022b; USDA NASS, 2022; CDPR, 2023). This suggests malathion is not used extensively in their production nationally. Additionally, honeydew melons and tangerines are surveyed for insecticide usage, but the data are withheld by USDA NASS to avoid disclosing information for individual operations. Therefore, BEAD is unable to estimate likely usage of malathion in the production of honeydew and tangerines.

While low average annual PCT with malathion was observed in alfalfa (Table 1), this high acreage site accounted for about one third of malathion agricultural crop usage in terms of treated acres from 2017 to 2021 (Kynetec, 2022a). Blueberries and oranges were the next highest usage crops in terms of treated acres (Kynetec, 2022a).

Average number of applications of malathion per year varied by crop. Between 2017-2021, growers of field crops tended to use less frequent applications: for example, in alfalfa, cotton, field corn, rice, sorghum, sweet corn, and wheat (spring and winter), malathion was applied only 1 or 1.1 times per year (Kynetec, 2022b). Specialty crop growers tended to apply malathion more frequently: for example, in blueberries and strawberries, acres treated with malathion were treated on average two times per year (Kynetec, 2022b).

Surveys targeting the industrial vegetation management market (survey years: 2019, 2022) reported on insecticide usage in rangeland and pasture (Kline and Co., 2020b; Non-agricultural Market Research Data [NMRD], 2023). These surveys reported an annual average of 170,000 pounds of malathion applied to 340,000 acres in the rangeland and pasture sector (Kline and Co., 2020b; NMRD, 2023b).  Malathion was the top insecticide in terms of acres treated in rangeland and pasture and represented about 20% of insecticide sales in terms of dollars in this market.

For post-harvest insecticide treatment of stored grain commodities, recent surveys (years 2017, 2020) indicate that approximately 920,000 pounds of malathion was sold annually in this

market. Reported usage of malathion was entirely on-farm treatments of stored grains (Kline and Co., 2018b; NMRD, 2022d).

Federal and state agricultural pest control programs such as the Boll Weevil Eradication Program, California's Beet Curly Top Virus Control Program, United States Department of Agriculture Animal and Plant Health Inspection Service (USDA-APHIS) Rangeland Grasshopper and Mormon cricket suppression program, and USDA-APHIS Fruit Fly Exclusion and Detection Program report using malathion for the control of target pests. However, there are no publicly available data sources to estimate the extent of malathion usage by these government programs. The absence of such data should not be interpreted as lack of usage.

Non-Agricultural Usage

Usage information across non-agricultural and non-food/feed agricultural sites is limited but provides some broad indication of sites in which malathion is used.

*Homeowner and residential malathion usage*

Recent market surveys (years: 2019, 2022) of residential consumer use of insecticides report approximately 480,000 lbs of malathion sold in this market annually (Kline and Co., 2020a; Non-agricultural Market Research Data [NMRD], 2023a). Regionally, almost half of national outdoor insecticide sales in the residential consumer market occur in the U.S. South (spanning from Texas to the mid-Atlantic).

Pest management professionals use both chemical and non-chemical control methods to control pests within and around the exterior of commercial and residential establishments (NMRD, 2022b). A 2021 survey of this market sector reported approximately 180,000 pounds of malathion sold (NMRD, 2022b). All reports of malathion usage within this survey were indicated as mosquito control. Malathion represented less than 10% of the market in terms of dollars for products used by professional applicators for localized mosquito control in yards and around the exteriors of buildings (NMRD, 2022b).

*Commercial malathion usage*

While insecticide usage in ornamental plant production was surveyed in 2021, no usage of malathion was reported, suggesting low levels of usage of the active ingredient in the production of ornamentals (NMRD, 2022c).

Surveys targeting the industrial vegetation management market (survey years: 2019, 2022) reported pesticidal usage in forestry, and rights-of-way sectors (specifically railroad, roadsides, electrical utilities, and pipelines) (Kline and Co., 2020b; NMRD, 2023b). About 11,000 acres treated with malathion were reported across the roadway and electric utility sectors (less than 5% of the acres treated with insecticides in these sectors). No usage was reported in the railway or forestry sectors. Regionally, over 75% of national insecticide sales in the industrial vegetation

8

management market occur in the U.S. South (spanning from Texas to the mid-Atlantic) (Kline and Co., 2020b; NMRD, 2023b).

Low levels of malathion were reported to be used in fly control for animal production (livestock) in a 2017 survey (Kline and Co., 2018a). A similar study in 2021 reported no malathion usage, further indicating low levels of malathion usage in this sector (NMRD, 2022a). No nationally representative usage data is available for pine seed orchards and Christmas tree production. A lack of data does not indicate a lack of usage. The U.S. Fish and wildlife service made an estimate of malathion usage on slash pine seed orchards in the 2022 Biological Opinion through expert elicitation and concluded that approximately 25 acres per year are treated (USFWS 2022).

*Public health usage - wide-area mosquito adulticide*

Wide-area mosquito control is performed by mosquito control districts managed by the state. Recent national surveys (years: 2018, 2020, 2022) of mosquito adulticide usage reported an annual average of 750,000 lbs of malathion being applied to 19 million acres of land (Kline and Co., 2019; NMRD, 2021, 2023c). This accounted for over 20% of total acres treated for mosquito adult control, including multiple treatments to the same acre. Nationally, malathion usage has been increasing over the last 5 years, with over five times the usage reported in 2022 as compared to 2018 in both the pounds of malathion applied and the acres treated with malathion (Kline and Co., 2019; NMRD, 2021, 2023c). Malathion was most commonly applied through ground applications (Kline and Co., 2019; NMRD, 2021, 2023c). Although the Agency does not have regionally specific usage data available at this time, approximately 70% of all mosquito adulticides were sold in the South, particularly in states bordering the Gulf of Mexico (Kline and Co., 2019; NMRD, 2021, 2023c).

**SCOPE OF THE ASSESSMENTS**

BEAD determined use sites for which to conduct detailed benefits assessments through examination of available usage data, agronomic and economic information, and comments submitted by United States Department of Agriculture (USDA) Office of Pest Management Policy (USDA OPMP, 2023) identifying both 'critically important' and 'important' uses of malathion.

Based on usage patterns for malathion (shown in Table 1), the main agricultural use sites of malathion are fruit crops. For example, high usage sites include blueberries, strawberries, caneberries, cherries, figs, pears, and oranges. Information submitted by USDA-OPMP (USDA OPMP, 2023) support this observation by stating that malathion is of critical importance for production of blueberries, caneberries, strawberries, cherries, and figs. OPMP also stated that malathion is important in the production of citrus and tropical fruits. Therefore, BEAD assesses benefits of malathion in commercial fruit production in the following complementary memo: *Assessment of Usage and Benefits of Malathion (PC # 057701) in Fruit Crops.*

Usage data indicates that malathion may also be important in production of some vegetables, such as onion and asparagus. Additionally, the USDA-OPMP comment stated that malathion is important in production of cucurbits, and vegetables broadly (USDA OPMP, 2023). Therefore, BEAD assesses benefits of malathion in commercial vegetable production in the following complementary memo: *Assessment of Usage and Benefits of Malathion for Vegetable Crops (PC # 057701).*

Comment from USDA-OPMP also indicated that malathion is of critical use within several state and federal pest management programs: wide-area mosquito control, APHIS Mormon crickets and grasshoppers, cotton boll weevil eradication, management of invasive fruit flies, and California's Beet Curly Top Virus Control program. Usage data supports the assertion that malathion is a leading mosquito adulticide for wide-area applications. Usage data identifying malathion as a leading insecticide used on pasture may also support the claim of importance for use against Mormon crickets and grasshoppers. BEAD assesses the benefits of malathion among these state and national programs in the complementary memorandum: *Assessment of Usage and Benefits of Malathion as a Mosquito Adulticide and Federal and State Insect Pest Management Programs (PC # 057701).*

All related memoranda for the assessment of benefits of malathion can be found in the malathion registration review docket (EPA-HQ-OPP-2009-0317).

USDA-OPMP comments also indicate that malathion may be important in indoor mushroom production and usage data suggests that a major use for malathion is on the treatment of stored grain. However, BEAD does not assess either of these use sites because there are no identified risks of concern from indoor use of malathion.

In this memo, BEAD assesses the benefits of malathion in the following sites where malathion may be important:

- Alfalfa: USDA-OPMP comments state malathion is critical in alfalfa and hay forage. Additionally, alfalfa reported the highest number of acres treated with malathion among agricultural crops.
- Pine seed orchards: USDA-OPMP comments state that malathion is critically important for this use site.
- Pine seedlings: USDA-OPMP comments state that malathion is important for this use.
- Residential homeowner use products for treatment of ornamentals, lawns, and gardens: usage data indicates this as a major use of malathion nationally.

BEAD concludes that the benefits of malathion are low in other registered sites not already described in this section or assessed in accompanying memoranda, such as commercial ornamental production and field crops (e.g., rice, wheat, and field corn). Usage data for these sites, or similar sites, do not suggest that malathion is extensively utilized by growers or professional applicators in these sites—indicating that users either have other cost-effective tools available to control pests which malathion is effective against, or that the pests which

10

malathion is effective against are not problematic in these use sites—and comments from USDA-OPMP do not indicate that malathion has important benefits in sites beyond those listed above.

**BENEFITS OF MALATHION**

**Alfalfa**

Malathion has been used to treat a small fraction of alfalfa grown, with usage reported at less than 1 PCT (Table 1) (Kynetec, 2022b). Growers reported using malathion to target leafminers, though use was also reported against armyworm, aphids, lygus bug and other unspecified insect pests (Kynetec, 2022a).

Information submitted through public comment by the Arizona Pest Management Center (APMC) states that malathion is primarily used against aphids and the alfalfa weevil, where it is used as the standard application treatment for dual control of these pests when they occur at the same time in early spring (APMC, 2022). APMC also mentions that malathion's 0-day preharvest interval (PHI) in alfalfa is highly advantageous, as it can be necessary to treat insect pests prior to cutting or performing other field activities (APMC, 2022). Other secondary pests mentioned by APMC which are treated with malathion include armyworm and three-cornered alfalfa hoppers (APMC, 2022).

Alfalfa weevils[1] (*Hypera postica*) are reported as one of the primary defoliators in alfalfa, and heavy infestations can reduce tonnage and forage quality (ISU, 2023). Alfalfa weevil larvae and adults feed on leaves, causing defoliation and potentially delaying regrowth after the first cutting (KSU, 2013). Available and recommended chemical insecticides for alfalfa weevil control include indoxacarb, and spinosad (PUE, 2023; UCANR, 2017). Pyrethroids (e.g., lambda-cyhalothrin, beta-cyfluthrin, permethrin), which have been extensively used for alfalfa weevil control, may no longer represent an effective control option due to growing reports of resistance development (MSU, 2024; Rodbell et al., 2024).

There are four species of aphids considered to be economically important pests of alfalfa, the pea aphid (*Acyrthosiphon pisum*), cowpea aphid (*Aphis craccivora*), blue alfalfa aphid (*Acyrthosiphon kondoi*), and spotted alfalfa aphid (*Therioaphis maculata*) (CSU, 2011a; UA, 1998). The most damaging species are the blue and spotted alfalfa aphids, which can cause chlorosis and wilt, leading to eventual stunted growth and plant death (OSU, 2023). Available and recommended chemical insecticides for aphids include afidopyropen, dimethoate, chlorantraniliprole, flupyradifurone, flonicamid, methomyl, and pyrethroids (PUE, 2023; UCANR, 2023).

---

[1] In certain states west of the Rocky Mountains such as California and Arizona, a second species called the Egyptian alfalfa weevil *(Hypera brunnipennis*) is morphologically indistinguishable from the alfalfa weevil and causes similar damage (CSU, 2011b; UCANR, 2017)

The alfalfa blotch leafminer (*Agromyza frontella*) is an introduced pest from Europe first detected in the US in 1968, whose larvae tunnel and feed within leaf tissue, and adults cause pinholes in alfalfa leaves (Peairs, 2018; Venette et al., 2009). Leafminer feeding results in potential reduced yields of 7-20% and a reduction in protein content by 10-20% (Peairs, 2018). Available and recommended alternatives for this pest include carbaryl, pyrethroids, chlorantraniliprole and methomyl (Peairs, 2018).

Lygus bugs (*Lygus* spp.) feed on the leaves, buds, and flowers of alfalfa plants, leading to stunted growth and reduced seed yields (UI, 2023; USU, 2007). Lygus bugs are considered the top arthropod pest in alfalfa seed production (O'Neal, 20217). The larval stages of armyworms (*Spodoptera* spp.) have been reported to cause defoliation, with large populations resulting in stand destruction (OSU, 2017; UNL, 2020). Available and recommended alternatives for these pests include pyrethroids, chlorantraniliprole, carbaryl, dimethoate, sulfoxaflor, flonicamid (early life stages), chlorpyrifos[2], and indoxacarb (PSU, 2023; O'Neal, 2017). Methoxyfenozide is also available against armyworm (KSU, 2024; PSU, 2023).

In the absence of malathion, users would be able to switch to one or more of several alternatives, depending on target pest pressure and crop end use (seed, hay, fodder), and be able to maintain adequate control against target pests. At most, users might lose some flexibility in managing some target pests throughout the growing season, leading to some operational and/or material cost increases.

Therefore, even though reported malathion alfalfa usage is low (<1% PCT), BEAD finds that malathion offers low to moderate benefits to users due to its broad-spectrum activity against important insect pests. Benefits also include the ability to simultaneously treat against the alfalfa weevil and aphid complex with a single active ingredient, saving growers the need to preform additional applications against each individual pest or to tank mix active ingredients, which could elevate operational and material costs. Malathion's 0-day PHI also provides users increased flexibility in managing their operations when compared to other available alternatives which may have more extensive PHIs[3].

### Pine seed orchards

Pine seed orchards produce high-quality seed for downstream forestry operations. Malathion use on pine seed orchards is restricted to slash pine (*Pinus elliottii*) grown in Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Texas. Slash pines grown for commercial production are generally sourced from genetically improved stock (Moore & Wilson 2006).

---

[2] Chlorpyrifos is currently not allowed in crops grown and sold in California, Hawaii, Maryland, New York and Oregon.

[3] Several alternatives also have a 0-day PHI in alfalfa, but either do not control the same spectrum of target pests as malathion (e.g., afidopyropen), and/or can have extended PHIs depending on the crop end-use (seed, hay, fodder).

According to USDA-OPMP (2023), aerial applications of malathion is a critical need for the management of slash pine flower thrips (*Gnophothrips fuscus*, family Phlaeothripidae) in slash pine seed orchards, particularly during the January to February timing of flower opening in the southern U.S. However, the usage of malathion has declined in recent years, likely due to a decrease in thrips damage (USFWS 2022). Usage is estimated to be no more than 25 acres per year, based on a total of twenty-four counties across Alabama, Florida, and Georgia that were identified as the most likely to have slash pine seed orchards and malathion use (USFWS 2022). Pine seed orchards can range from hundreds to thousands of acres in size (Cloughesy, 2017; Fox et al., 2004; USFS, 2024ab), therefore estimated usage is low.

Slash pine flower thrips damages or kills females buds and flowers of only slash pines, leaving abrasions marked with beads of resin (Ebel et al. 1980). Buds can abort in cases of more severe damage, with historical reports of up to 45% flower mortality and more than 50% reductions in seed yield (Ebel et al. 1980). Malathion is the main insecticide registered for use against slash pine flower thrips (USFWS 2022), with applications typically timed in January through February for preventing thrips damage to flowers and conelets (DeBarr and Matthews 1971, Ebel et al. 1980, Fatzinger et al. 1992, Fatzinger & Dixon 1996). Acephate has historically been the main alternative to malathion for the management of slash pine flower thrips (Fatzinger et al. 1992, Fatzinger & Dixon 1996), but is restricted to use only in Florida, Georgia, North Carolina, and Virginia. While the usage of malathion is low, BEAD finds that malathion might provide low to moderate benefits in slash pine seed orchards, as it is among the few chemical control options available for managing slash pine flower thrips during occasional outbreaks.

**Pine seedlings**

USDA-OPMP (2023) also identified malathion as being of high importance for the control of pine sawflies in pine seedlings. Malathion is registered for use in Christmas tree plantations and in pine seed orchards and may be used to control sawflies on seedlings in these production systems.

In young pines (trees less than 15 feet tall), the redheaded pine sawfly (*Neodiprion lecontei*, family Diprionidae) is a pest that has the potential to completely defoliate trees in southern states where multiple generations occur annually (Wilson and Averill 1979, Mangini 2017). Severe outbreaks can result in the death or deformity of young pines (Salom and Day 2021), whereas sporadic outbreaks typically recede after a few years of heavy defoliation as populations are reduced by a wide range of natural enemies, including parasitoids, diseases, and mammals (Mangini 2017, Salom and Day 2021). Since newly emerged larvae feed on pine needles in large gregarious groups (DeBerry 2011), removal of sawfly infestations by hand is a non-chemical control option (Enebak et al. 2022). In general, sawflies are controlled during spraying for other pests in early spring and are considered secondary pests (Enebak et al. 2022).

Alternatives to malathion for sawfly control in young pine plantations (including Christmas trees) and pine tree nurseries include: carbaryl (Group 1A); bifenthrin, cyfluthrin, lambda-cyhalothrin, esfenvalerate, permethrin (Group 3A); spinosad (Group 5); and diflubenzuron (Group 15) (AFC, *undated*; Eneback et al., 2022; Mangini, 2017). BEAD concludes that malathion

likely has low benefits for use on pine seedlings due to the availability of multiple alternatives with different modes of action as well as a non-chemical method of control.

**Outdoor residential use**

Malathion is registered for outdoor use in residential areas for applications to vegetable gardens, fruit trees, building perimeters, and as a spot treatment on ornamentals.  Recent surveys of residential consumer pesticide usage reported approximately 480,000 lbs of malathion sold annually for outdoor use including use on gardens and to control nuisance insects around the outside of homes (Kline and Co., 2020a, NMRD, 2023a). This reported amount is greater than the total volume of malathion applied to outdoor agricultural sites annually (Kynetec, 2022a).

Malathion is available in homeowner products as a broad-spectrum insecticide, used to effectively target a variety of insect pests including beetles, flies, true bugs, aphids, wasps, and caterpillars (UAEX, 2021). It is also an effective knock-down insecticide against the invasive spotted lanternfly (*Lycorma delicatula*) (PSE, 2021).

Malathion is also labeled on residential homeowner products to control nuisance mosquitoes and adult flies, largely as a residual surface spot spray (Buckner *et al.,* 2019). Application areas include spot treatments on vegetation, lower parts of house foundations and fences, and around garbage cans to target mosquitoes and/or flies that land on the treated surfaces (US EPA, 2023a).

Effective control of a wide variety of pests across multiple residential settings, such as gardens, turf, ornamentals, and fruit trees, among others, benefits people in terms of enhanced recreation, well-being, and aesthetics.

Alternatives to control malathion target pests include products that contain carbaryl, spinosad, various pyrethroids, insecticidal soaps, horticultural oils, azadirachtin (neem oil) and trichlorfon (turf pests only) (Foster and Obermeyer, 2017; UF, 2021). However, malathion is the only organophosphate (IRAC group 1B) with registered products still available for homeowner use targeting a wide array of pests across various settings (e.g., gardens, ornamentals, fruit trees), and as such, might be providing benefits in the form of effective and flexible management of multiple target pests.

Therefore, BEAD finds it likely that malathion provides moderate benefits in residential use sites, due to its broad-spectrum activity, and being the only organophosphate available as a homeowner product with versatility across various settings.

**IMPACTS OF POTENTIAL MITIGATION**

Regarding potential mitigations to reduce risks to non-target organisms, substantial mitigation from the 2022 Biological Opinions has already been implemented on labels to provide

14

protection for species federally listed as threatened or endangered. Mitigation to further reduce potential ecological risks to listed and non-listed species may include adding mandatory spray drift language for boomless ground applications, and a 96-hour water holding time before releasing floodwaters after the treatment of rice.  The mandatory spray drift language for boomless sprayers is expected to have minimal impacts on the use sites discussed in this document, as boomless sprayers are not typically used within the use sites assessed in this document. Likewise, BEAD expects little impact to rice growers from the water holding requirement because malathion has low benefits for rice production and only about one percent of the rice acreage is treated with malathion (Table 1).

**CONCLUSION**

Malathion is a broad-spectrum organophosphate insecticide classified by the Insecticide Resistance Action Committee (IRAC) as a Group 1B Mode of Action insecticide. Malathion is registered on a broad range of agricultural and non-agricultural use sites. Usage data indicates that malathion is regularly used in a variety of fruit and vegetable crops, wide-area mosquito control, and residential homeowner uses.

Many registered use sites, such as rice and commercial ornamental production, exhibit low usage and therefore suggest that users either have other cost-effective tools available to control pests which malathion is effective against, or that the pests which malathion is effective against are not problematic in these use sites. BEAD concludes low benefits in many of these low usage sites.

Based on usage data and stakeholder comments, BEAD evaluated the benefits of malathion in alfalfa, pine seed orchards, pine seedlings, and residential homeowner uses.

In alfalfa production, where reported malathion usage is low (<1% PCT), BEAD finds that malathion offers low to moderate benefits to users due to its broad-spectrum activity against pests, including the ability to simultaneously treat against two of alfalfa's key pests (alfalfa weevil-aphid complex). This, in addition to malathion's 0-day PHI restrictions, provide users increased flexibility in managing their operations and saves them the need of performing additional applications or tank mixing.

In pine seed orchards, malathion provides low to moderate benefits in managing slash pine flower thrips during occasional outbreaks, as it is among one of few chemical control options available for their control.  On pine seedlings, where malathion is mainly used for the control of redheaded pin sawfly, malathion seems to provide low benefits due to the availability of multiple alternatives with different modes of action, as well as the availability of non-chemical control options.

In residential homeowner use products for the treatment of ornamentals, lawns, and gardens, BEAD finds that malathion provides moderate benefits due to its broad-spectrum activity,

versatility across various settings withing such, and by being the only organophosphate with such attributes available as a homeowner product.

Mitigation measures under consideration to reduce potential ecological risks include adding mandatory spray drift language for boomless ground applications, and a 96-hour water holding time before releasing floodwaters after the treatment of rice. BEAD expects minimal impacts to users resulting from proposed mitigation measures across all evaluated use sites.

**REFERENCES**

Agency for Toxic Substances and Disease Registry (ATSDR). 2003. Toxicological profile for Malathion. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service. Available at: https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=522&tid=92. [Accessed February 2024]

Alabama Forestry Commission (AFC). *Undated*. A Field Guide to Identifying The Most Common Forest Pests of Pine Plantations. Available at: https://www.forestry.alabama.gov/Pages/Informational/Images/Pine_Pest_Field_Guide.pdf

Arizona Pest Management Center (APMC). 2022. Response to EPA Notice: Petition to Revoke Tolerances and Cancel Registrations for Certain Organophosphate Uses. Available at: https://www.regulations.gov/comment/EPA-HQ-OPP-2022-0490-0175

Atwood, D. Biological and Economic Analysis Division (BEAD). Science Information and Analysis Branch (SIAB). 2018. Malathion (PC Code: 057701) National and State Summary Use and Usage Matrix dated: 08/23/2018. [Accessed February 2024]

Buckner E, Connelly CR, Bolles E, Culbert D, DeValerio J, Donahoe M, Gabel K, Jordi R, McLaughlin J, Neal A, Scalera S, Toro E, Walter J. 2019. Mosquitoes & Their Control Integrated Pest Management for Mosquito Reduction Around Homes and Neighborhoods. University of Florida, Institute of Food and Agricultural Sciences Available at: https://edis.ifas.ufl.edu/pdf%5CIN%5CIN104500.pdf. [Accessed February 2024]

California Department of Pesticide Regulation (CDPR). 2023. California Pesticide Information Portal (CalPIP). Database Subset: 2017-2021. Available at: https://www.cdpr.ca.gov/index.htm [Accessed January 2024].

Centers for Disease Control and Prevention (CDC). 2020. Malathion Frequently Asked Questions. US Department of Health & Human Services. Available at: https://www.cdc.gov/parasites/lice/head/gen_info/faqs_malathion.html. [Accessed February 2024]

Chong JH, Klingeman B, Hale F. 2017. The Insecticide and Miticide Mode of Action Field Guide. University of Tennessee Extension and Clemson University.

https://www.epa.gov/sites/production/files/2015-01/documents/rmpp_6thed_final_lowresopt.pdf. [Accessed March 2024]

Cloughesy M. 2017. Seed orchards produce our future forests. Oregon Forest Resources Institute. Available at: https://oregonforests.org/blog/Seed_Orchards_Produce_Our_Future_Forests.

Colorado State University (CSU). 2011a. Aphids in Alfalfa. Colorado State University Extension. Available at: https://extension.colostate.edu/topic-areas/insects/aphids-in-alfalfa-5-531/. [Accessed March 2024]

Colorado State University (CSU). 2011b. Alfalfa Weevil. Colorado State University Extension. Available at: https://extension.colostate.edu/topic-areas/insects/alfalfa-weevil-5-500/. [Accessed March 2024]

DeBarr, G. L., & Matthews, F. R. (1971). Mist-Blower Applications for Control of Flower Thrips and Southern Cone Rust in a Slash Pine Seed Orchard. *Journal of Economic Entomology, 64*(2), 520-522. doi:10.1093/jee/64.2.520. [Accessed January 2024]

DeBerry, S. 2011 (Latest revision 2014, reviewed 2021). Common name: redheaded pine sawfly, Scientific Name: *Neodiprion lecontei* (Fitch) (Insecta: Hymenoptera: Diprionidae). University of Florida, Department of Entomology and Nematology: Featured Creatures. Available at: https://entnemdept.ufl.edu/creatures/trees/sawfly/redheaded_pine_sawfly.htm [Accessed January 2024].

Ebel BH, Flavell TH, Drake LE, Yates HO, Debar (G). 1980. Seed and cone insects of southern pine. USDA Forest Service, SE Forest Experiment Station & SE Area, State and Private Forestry. General Technical Report SE-8. Available at: https://www.fs.usda.gov/research/treesearch/2359 [Accessed November 2023].

Enebak, S., Abrahams, A., Payne, N. (2022). 2021 PMSP for Pine Tree Nursery in the Southeastern United States. National IPM Database. Available at: https://ipmdata.ipmcenters.org/source_report.cfm?view=yes&sourceid=2475 [Accessed November 2023].

Fatzinger CW, Yates HO, Barber LR. (1992). Evaluation of Aerial Applications of Acephate and Other Insecticides for Control of Cone and Seed Insects in Southern Pine Seed Orchards. *Journal of Entomological Science, 27*(2), 172-184. doi:10.18474/0749-8004-27.2.172

Fatzinger CW, Dixon WN. 1996. User ' s Guide for SeedCalc:A Decision-Support System for Integrated Pest Management in Slash Pine Seed Orchards. US Department of Agriculture Forest Service, Southern Research Station. General Technical Report SE-95. Available at: https://www.srs.fs.usda.gov/pubs/gtr/gtr_se095.pdf [Accessed November 2023].

Foster RE, Obermeyer J. 2017. Managing Insects in the Home Vegetable Garden. Purdue University Extension. Available at: https://extension.entm.purdue.edu/publications/E-21/E-21.pdf

Fox TR, Jokela EJ, Allen HL. 2004. The Evolution of Pine Plantation Silviculture in the Southern United States. In: Southern forest science: past, present, and future. Available at: https://doi.org/10.2737/SRS-GTR-75.

IRAC (Insecticide Resistance Action Committee). 2021. The IRAC Mode of Action Classification Online. Available at: https://irac-online.org/modes-of-action/. [Accessed November 2023]

Kansas State University (KSU). 2024. Alfalfa Insect Pest Management. K-State Research and Extension. Available at: https://bookstore.ksre.ksu.edu/pubs/mf809.pdf.

Kline and Company. 2020a. Consumer Markets for Pesticides and Fertilizers 2019: U.S. Market Analysis and Opportunities. [Accessed January 2024].

Kline and Company. 2020b. Industrial Vegetation Management Markets 2019: United States Market Analysis and Opportunities. [Accessed January 2024].

Kline and Company. 2019. Mosquito Control 2018: United States Market Analysis and Opportunities. [Accessed January 2024].

Kline and Company. 2018a. Pest Control in Production Animal Health 2017: U.S. Market Analysis and Opportunities. [Accessed January 2024].

Kline and Company. 2018b. Stored Grain Insect Control 2017: United States Market Analysis and Opportunities. [Accessed January 2024].

Kynetec USA, Inc. 2022a. "The AgroTrak® Study from Kynetec USA, Inc." iMap Software. Database Subset: 2017-2021. [Accessed December 2023].

Kynetec USA, Inc. 2022b. "The AgroTrak® Study from Kynetec USA, Inc." Microsoft Access Database. Database Subset: 2017-2021. [Accessed December 2023].

Mangini AC. 2017. Regeneration insect pests: protecting southern pine seedlings after outplanting. *Tree Planters' Notes*, 60(2). Proceedings for the 2016 Joint Meeting of the Northeast Forest and Conservation Nursery Association and Southern Forest Nursery Association, Lake Charles, Louisiana. Available at: https://rngr.net/publications/tpn/60-2/regeneration-insect-pests-protecting-southern-pine-seedlings-after-outplanting [Accessed November 2023].

Moore LM, Walker Wilson JD. 2006. National Plant Data Center: Plant Guide: Slash Pine (*Pinus elliottii* Englm.). USDA Department of Agriculture Department Natural Resources Conservation

Service. Available at: https://plants.usda.gov/DocumentLibrary/plantguide/doc/pg_piel.docx [Accessed November 2023].

Montana State University (MSU). 2024. Resistant Alfalfa Weevil Project. Available at: https://www.montana.edu/resistantalfalfaweevil

Nonagricultural Market Research Data (NMRD). 2023a. Study of consumer markets for pesticides and fertilizers in 2022. [Accessed January 2024].

Nonagricultural Market Research Data (NMRD). 2023b. Study of industrial vegetation management in 2022. [Accessed January 2024].

Nonagricultural Market Research Data (NMRD). 2021. Study of mosquito control in 2020 (Excel Data File). [Accessed January 2024].

Nonagricultural Market Research Data (NMRD). 2023c. Study of mosquito control in 2022 (Excel Data File). [Accessed January 2024].

Nonagricultural Market Research Data (NMRD). 2022a. Study of production animal health in 2021. [Accessed January 2024].

Nonagricultural Market Research Data (NMRD). 2022b. Study of professional pest management in 2021. [Accessed January 2024].

Nonagricultural Market Research Data (NMRD). 2022c. Study of turf and ornamental usage in 2021. [Accessed January 2024].

Nonagricultural Market Research Data (NMRD). 2022d. Study of stored grain for insect control in 2020. [Accessed January 2024].

Oklahoma State University (OSU). 2023. Alfalfa Forage Insect Control. Oklahoma State University Extension. Available at: https://extension.okstate.edu/fact-sheets/alfalfa-forage-insect-control.html. [Accessed March 2024]O'neal S. 2017. Pest Management Strategic Plan – with a Special Focus on Pollinator Protection – for Alfalfa Seed Production in the Western United States. Western IPM Center. Available at: https://ipmdata.ipmcenters.org/documents/pmsps/AlfalfaSeedPMSP_FINAL.pdf

Peairs FB. 2018. Alfalfa Blotch Leafminer. In: High Plains Integrated Pest Management. Center for Invasive Species and Ecosystem Health at the University of Georgia. Available at: https://wiki.bugwood.org/HPIPM:Alfalfa_Blotch_Leafminer. [Accessed March 2024]

PSE (PennState Extension). 2021. Spotted Lanternfly Management for Residents. The Pennsylvania State University, College of Agricultural Sciences. Available at:

https://extension.psu.edu/spotted-lanternfly-management-for-residents. [Accessed March 2024]

Purdue University Extension. 2023. Field Crops: Alfalfa Insect Control Recommendations. Available at: https://www.extension.entm.purdue.edu/publications/E-220/E-220.html. [Accessed March 2024]

Rodbell EA, Caron CG, Rondon SI, Masood MU, Wanner KW. 2024. Alfalfa weevils (Coleoptera: Curculionidae) in the western United States are resistant to multiple type II pyrethroid insecticides. Journal of Economic Entomology 117(1): 280-292. Available at: https://doi.org/10.1093/jee/toad218

Salom S, Day E. 2021. Redheaded Sawfly. Virginia Cooperative Extension, ENTO-162NP (ENTO-429NP). Available at: https://www.pubs.ext.vt.edu/3006/3006-1453/3006-1453.html [Accessed November 2023].

United States Department of Agriculture National Agricultural Statistics Service (USDA NASS). 2023. QuickStats. Database Subset: 2017-2021. Available at: https://quickstats.nass.usda.gov/ [Accessed December 2023].

United States Department of Agriculture Office of Pest Management Policy (USDA OPMP). 2023. Information on Critical and High Benefit Uses for Three Organophosphate Insecticides: Malathion, Acephate, and Dimethoate; Response Date: September 14, 2023.  [Accessed November 2023]

United States Environmental Protection Agency (US EPA). 2023a. Biological Evaluation Chapters for Malathion ESA Assessment, Appendix 1-3: Master Use Summary Table for Malathion. Available at: https://https://www3.epa.gov/pesticides/nas/final/malathion/appendix-1-3.xlsx [Accessed January 2024].

United States Fish and Wildlife Service (USFWS), 2022. Biological and Conference Opinion on the Registration of Malathion Pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act, Available at: https://www.fws.gov/media/biological-and-conference-opinion-registration-malathion. [Accessed March 2024]

United States Forest Service (USFS). 2024a. Ouachita Seed Orchard. Available at: https://www.fs.usda.gov/recarea/ouachita/recreation/recarea/?actid=63&recid=83723

United States Forest Service (USFS). 2024b. Genetic Resource Management. Available at: https://www.fs.usda.gov/forestmanagement/vegetation-management/genetics/index.shtml.

University of Arizona (UA). 1998. Alfalfa Aphid Complex. The University of Arizona, College of Agriculture. Available at:

20

https://extension.arizona.edu/sites/extension.arizona.edu/files/pubs/az1044.pdf. [Accessed March 2024]

University of Arkansas, Research & Extension (UAEX). 2021. Insecticide Recommendations for Arkansas. University of Arkansas, Division of Agriculture, Research & Extension. Available at: https://www.uaex.uada.edu/publications/pdf/MP144_2021.pdf. [Accessed January 2024].

University of California, Division of Agriculture and Natural Resources (UCANR). 2023. UC IPM Pest Management Guidelines: Alfalfa. UC ANR Publication 3430. Available at: https://ipm.ucanr.edu/agriculture/alfalfa/authors-and-credits/#gsc.tab=0. [Accessed March 2024]

University of California, Integrated Pest Management Program (UC-IPM). 2013. UC IPM Pest Management Guidelines: Floriculture & Ornamental Nurseries. UC ANR Publication 3392. Available at: ipm.ucanr.edu/PMG/selectnewpest.floriculture.html

University of Florida (UF). 2021. Florida Vegetable Gardening Guide. Institute of Food and Agricultural Sciences. Available at: https://edis.ifas.ufl.edu/publication/VH021. [Accessed March 2024]

Venette RC, Hutchison WD, Burkness EC, O'Rourke PK. 2009. Alfalfa Blotch Leafminer: Research Update. In: E. B. Radcliffe, W. D. Hutchison & R. E. Cancelado [eds.], Radcliffe's IPM World Textbook. University of Minnesota, St. Paul, MN. Available at: https://ipmworld.umn.edu/venette. [Accessed March 2024]

White TL, Duryea ML, Powell GL. 2018. Genetically improved pines for reforesting Florida's timberlands. University of Florida IFAS Extension, CIR1190/FR007. Available at: https://edis.ifas.ufl.edu/publication/FR007 [Accessed November 2023].

Wilson LF, Averill RD. 1978. Redheaded Pine Sawfly. US Department of Agriculture Forest Service. Forest Insect and Disease Leaflet 14. Available at: https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fsbdev2_043646.pdf [Accessed November 2023].

# Exhibit 8

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

## RECOVERY PLAN

for

**Cumberland Elktoe (*Alasmidonta atropurpurea*), Oyster Mussel (*Epioblasma capsaeformis*), Cumberlandian Combshell (*Epioblasma brevidens*), Purple Bean (*Villosa perpurpurea*), and Rough Rabbitsfoot (*Quadrula cylindrica strigillata*)**

Prepared by

Robert S. Butler
and
Richard G. Biggins

Asheville Field Office
U.S. Fish and Wildlife Service
Asheville, North Carolina

for

U.S. Fish and Wildlife Service
Southeast Region
Atlanta, Georgia

Approved: _____

Acting    Regional Director, U.S. Fish and Wildlife Service

Date: May 4, 2004

the cause of impairment in 37 stream segments.  Nonpoint sources, primarily agricultural inputs, accounted for the largest percentage of total nitrogen and total phosphorus in all streams tested in the study area.  Relatively high levels of nutrients were prevalent in the Duck River, where a large population of the oyster mussel occurs.  Nutrient levels were also analyzed in the upper Tennessee River system by Hampson et al. (2000).  Overall, nutrient concentrations were generally lower than national concentrations and were relatively high only on a localized scale.

Secondly, pesticides, primarily from row crops, are a major source of agricultural contaminants.  The occurrence of pesticides in stream sediments and aquatic biota was reviewed by Nowell et al. (1999).  Pesticide runoff that commonly ends up in streams may have effects (based on studies with laboratory-tested mussels) that are particularly profound (Fuller 1974, Havlik and Marking 1987, Moulton et al. 1996).  Commonly used pesticides have been directly implicated in a North Carolina mussel die-off (Fleming et al. 1995).  Once widely used in the Southeast, organochlorine pesticides are still detected in streams and aquatic organisms decades after their use has been banned and may still be found in streams at levels that often exceed the chronic exposure criteria for the protection of aquatic life (Buell and Couch 1995, Frick et al. 1998).  These highly toxic compounds are partitioned into both the sediment and the lipid reservoir of organisms (Day 1990, Burton 1992).  Erosion from areas of past use is a continuing source of organochlorine pesticides in some streams.  Cotton is raised extensively in parts of the middle and lower Tennessee River system.  One of the most important pesticides used in cotton farming, malathion, is known to inhibit the physiological activities of mussels (Kabeer et al. 1979) and may decrease the ability of a mussel to respire and obtain food.  This particular chemical may pose a continuing threat to the very localized population of the Cumberlandian combshell in the Bear Creek system.  Fertilizers and pesticides are also commonly used in developed areas.  Collectively, these contaminants have the potential to impact all extant populations of these five species.

*Toxic Spills*

Numerous Cumberlandian Region streams have experienced mussel kills from toxic chemical spills and other causes (Cairns et al. 1971, Crossman et al. 1973, Neves 1986, Wolcott and Neves 1994).  The high number of jeopardized species in the upper Tennessee River system make accidental spills a particular concern to conservationists and resource managers (Hampson et al. 2000).  The dramatic impact the chlor-alkali chemical plant in Saltville, Virginia, has had on the aquatic fauna in the North Fork Holston River is well documented (Adams 1915; Cairns et al. 1971; Stansbery and Clench 1974; Hill et al. 1975; Ahlstedt 1980, 1991c; Neves and Zale 1982; Sheehan et al. 1989; Hampson et al. 2000).  Although it is considered a chronic episode, and not an "event" like most other toxic spills, it is discussed in this section simply because of the tremendous impact it has had on the river.

# Exhibit 9

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

U.S. Fish & Wildlife Service

# Revised Recovery Plan for

## Valley Elderberry Longhorn Beetle
### (*Desmocerus californicus dimorphus*)



Photo courtesy of Jon Katz/USFWS

the plant is 2 years (Burke 1921, Linsley and Chemsak 1972), but laboratory observations have indicated that the beetle may develop into an adult in a 1-year cycle (Halstead and Oldham 1990). Arnold (1984) reported that females lay eggs singly on elderberry leaves and at the junction of leaf stalks and main stems, with all eggs laid on new growth at the outer tips of elderberry branches.

Because elderberry is the host plant for the beetle, environmental and habitat conditions that favor a robust elderberry community also benefit the beetle. Elderberry is an important component of riparian ecosystems in California (Vaghti et al. 2009). It can be found as an overstory plant or understory plant within these communities. Elderberry also occurs in upland communities such as oak woodland. Occupancy of elderberry by the Valley elderberry longhorn beetle is generally low but tends to be highest in riparian communities (Barr 1991, Collinge et al. 2001, Talley et al. 2007).

The Valley elderberry longhorn beetle is distributed throughout available habitat in a widely dispersed metapopulation (Collinge et al. 2001, Talley et al. 2006). Metapopulations are defined as a as a series of populations that are connected through movement of some individuals between these populations (Hanski 1997). At local scales, the Valley elderberry longhorn beetle occupies elderberry plants in clumps at scales that varied with the watershed (Talley 2007). Local aggregations generally covered 25-50 meter scales along the American River and Putah Creek, but were more spread out (200-300 meters) along the Cosumnes River (Talley 2007). Groups of local aggregations varied as well, but overall separate aggregations occurred at scales of 656 – 2,625 feet (200 – 800 meters) along all three river systems. These clumps of local aggregations appear more likely to represent discreet demographic units for the Valley elderberry longhorn beetle. Defining the population at landscape scales is more challenging, but the data suggest that the occupancy status of a particular area of suitable habitat (occupied or unoccupied) is spatially correlated across distances of 6.2-12.4 miles (10-20 kilometers) within the same drainage (Collinge et al 2001). That is, a patch of habitat is more likely to be occupied if there is other occupied habitat within 6.2-12.4 miles (10-20 kilometers). At landscape scales of 6.2 miles (10 kilometers) or less, occupancy appears random (Collinge et al. 2001).

## Recovery Strategy

The known historical range of the Valley elderberry longhorn beetle is closely linked to the Great Valley ecosystem (79 FR 55874) of the Sacramento Valley and northern San Joaquin Valley. Research suggests that the Valley elderberry longhorn beetle is further constrained by being naturally rare within its habitat. The main known cause of the decline of the species is the loss and degradation of its habitat; therefore, the recovery strategy focuses upon this threat. There has been a significant loss and degradation of riparian and other natural habitats in the presumed historical range of the Valley elderberry longhorn beetle, much of which occurred prior to the listing of the species. Katibah (1984) estimated approximately 102,000 acres (41,300 hectares) of riparian forest remained in the Central Valley in 1984, a reduction of about 89 percent from an estimated total of 921,600 acres (373,100 hectares) of pre-settlement riparian forest area. Much of this loss has been driven by agricultural and urban development, and flood control activities throughout the Central Valley. Present day losses of Valley elderberry longhorn beetle habitat are much more limited in extent and are often associated with urban development of agricultural areas and the maintenance of levees and other flood control structures. As noted in the *Withdrawal of the Proposed Rule To Remove the Valley Elderberry Longhorn Beetle From the Federal List of Endangered and Threatened Wildlife* (79 FR 55874, September 17, 2014), ongoing and future maintenance of these levees and other flood control structures may result in additional losses of riparian vegetation and elderberry shrubs. Long-term

2

# Exhibit 10

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 17

[Docket No. FWS–R3–ES–2013–0017; 4500030113]

RIN 1018–AZ58

### Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Dakota Skipper and Poweshiek Skipperling

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), designate critical habitat for the Dakota skipper (*Hesperia dacotae*) under the Endangered Species Act (Act). In total, approximately 19,903 acres (8,054 hectares) in Chippewa, Clay, Kittson, Lincoln, Murray, Norman, Pipestone, Polk, Pope, and Swift Counties, Minnesota; McHenry, McKenzie, Ransom, Richland, and Rolette Counties, North Dakota; and Brookings, Day, Deuel, Grant, Marshall, and Roberts Counties, South Dakota, fall within the boundaries of the critical habitat designation for Dakota skipper. We also designate critical habitat for the Poweshiek skipperling (*Oarisma poweshiek*). In total, approximately 25,888 acres (10,477 hectares) in Cerro Gordo, Dickinson, Emmet, Howard, Kossuth, and Osceola Counties, Iowa; Hilsdale, Jackson, Lenawee, Livingston, Oakland, and Washtenaw Counties, Michigan; Chippewa, Clay, Cottonwood, Douglas, Kittson, Lac Qui Parle, Lincoln, Lyon, Mahnomen, Murray, Norman, Pipestone, Polk, Pope, Swift, and Wilkin Counties, Minnesota; Richland County, North Dakota; Brookings, Day, Deuel, Grant, Marshall, Moody, and Roberts Counties, South Dakota; and Green Lake and Waukesha Counties, Wisconsin, fall within the boundaries of the critical habitat designation for Poweshiek skipperling. The effect of this regulation is to designate critical habitat for the Dakota skipper (*Hesperia dacotae*) and the Poweshiek skipperling (*Oarisma poweshiek*) under the Endangered Species Act.

**DATES:** This rule becomes effective on November 2, 2015.

**ADDRESSES:** This final rule is available on the internet at *http://www.regulations.gov* and *http://www.fws.gov/midwest/Endangered/*. Comments and materials we received, as well as some supporting documentation

we used in preparing this final rule, are available for public inspection at *http://www.regulations.gov*. All of the comments, materials, and documentation that we considered in this rulemaking are available by appointment, during normal business hours at: U.S. Fish and Wildlife Service, Twin Cities Field Office, 4101 American Boulevard East, Bloomington, Minnesota, 55425; (612) 725–3548; (612) 725–3609 (facsimile).

The coordinates or plot points or both from which the maps are generated are included in the administrative record for this critical habitat designation and are available at *http://www.regulations.gov* at Docket No. FWS–R3–ES–2013–0017, and at the Twin Cities Field Office (*http://www.fws.gov/midwest/Endangered/*) (see **FOR FURTHER INFORMATION CONTACT**). Any additional tools or supporting information that we developed for this critical habitat designation will also be available at the Fish and Wildlife Service Web site and Field Office set out above, and may also be included in the preamble and at *http://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** Peter Fasbender, Field Supervisor, U.S. Fish and Wildlife Service, Twin Cities Ecological Services Fish and Wildlife Office, 4101 American Boulevard East, Bloomington, Minnesota 55425; telephone (612) 725–3548; facsimile (612) 725–3609. If you use a telecommunications device for the deaf (TDD), call the Federal Information Relay Service (FIRS) at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### Executive Summary

*Why we need to publish a rule.* This is a final rule to designate critical habitat for the Dakota skipper and Poweshiek skipperling. Under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*) (Act), any species that is determined to be an endangered or threatened species requires critical habitat to be designated, to the maximum extent prudent and determinable. Designations and revisions of critical habitat can only be completed by issuing a rule.

We, the U.S. Fish and Wildlife Service (Service), listed the Dakota skipper as a threatened species and the Poweshiek skipperling as an endangered species on October 24, 2014 (79 FR 63672). On October 24, 2013, we published in the **Federal Register** a proposed critical habitat designation for the Dakota skipper and Poweshiek skipperling (78 FR 63625). Section 4(b)(2) of the Act states that the

Secretary shall designate critical habitat on the basis of the best available scientific data after taking into consideration the economic impact, national security impact, and any other relevant impact of specifying any particular area as critical habitat.

The critical habitat areas we are designating in this rule constitute our current best assessment of the areas that meet the definition of critical habitat for the Dakota skipper and Poweshiek skipperling. Here we are designating approximately 19,903 acres (8,054 hectares) of native prairies and connecting dispersal habitats for the Dakota skipper and approximately 25,888 acres (10,477 hectares) of native prairies and connecting dispersal habitats for the Poweshiek skipperling.

*This rule consists of:* A final designation of critical habitat for the Dakota skipper and the Poweshiek skipperling. The Dakota skipper and Poweshiek skipperling have been listed under the Act. This rule finalizes designation of critical habitat necessary for the conservation of the Dakota skipper and Poweshiek skipperling.

*We have prepared an economic analysis of the designation of critical habitat.* In order to consider economic impacts, we have prepared an analysis of the economic impacts of the critical habitat designations and related factors. We announced the availability of the draft economic analysis (DEA) in the **Federal Register** on September 23, 2014 (79 FR 56704), allowing the public to provide comments on our analysis. We have incorporated the comments and have completed the final economic analysis (FEA) concurrently with this final determination.

*Peer review and public comment.* We sought comments from independent specialists to ensure that our designation is based on scientifically sound data and analyses. We obtained opinions from seven knowledgeable individuals with scientific expertise to review our technical assumptions, analysis, and whether or not we had used the best available information. These peer reviewers generally concurred with our methods and conclusions and provided additional information, clarifications, and suggestions to improve this final rule. Information we received from peer review is incorporated in this final revised designation. We also considered all comments and information received from the public during the comment period.

### Previous Federal Actions

We, the U.S. Fish and Wildlife Service (Service), listed the Dakota

they contain the habitat that is conducive to the species and help capture the environmental variability across the range of the species.

In summary, representation, resiliency, and redundancy are the three conservation principles important to threatened and endangered species recovery (Shaffer and Stein 2000, p. 307; USFWS 2004, p. 89). Representation involves conserving the breadth of the genetic makeup of the species to conserve its adaptive capabilities; resiliency involves ensuring that each population is sufficiently large to withstand stochastic events; and redundancy involves ensuring a sufficient number of populations to provide a margin of safety for the species to withstand catastrophic events (USFWS 2004, p. 89). Both the occupied and unoccupied units are needed to satisfy the conservation principles of redundancy, resiliency, and representation for the Dakota skipper because there may be too few occupied areas remaining to ensure the species' conservation. The concepts of representation, resiliency, and redundancy are not mutually exclusive; populations that contribute to the resiliency of a species may also contribute to its redundancy or representation. Furthermore, it may not be necessary for a single population to contribute to all three conservation principles to be important for maintaining the species across its range in the long term—because the Dakota skipper is being evaluated across its range, a particular population may not meet the strictest test of one of the three conservation principles yet contribute to the others.

*Why Occupied Areas are not Sufficient for the Conservation of the Poweshiek Skipperling and why Unoccupied Areas are Essential for the Conservation of the Species*

The Poweshiek skipperling has experienced recent declines in large parts of its historical range. The species is now considered to be present at 9 sites in Michigan, 1 site in Minnesota, 1 site in Wisconsin, and 1 site in Manitoba. More than 1 site can be contained in a single proposed critical habitat unit; consequently, we are designating a total of 9 occupied units (*i.e.*, 7 occupied units in Michigan, 1 occupied unit in Minnesota, and 1 occupied unit in Wisconsin). Until relatively recently, Poweshiek skipperling was also present in native prairies in Iowa, Minnesota, North Dakota, and South Dakota—none of these areas are included in occupied areas.

The areas of unoccupied habitat that we are designating as critical habitat were recently occupied (had positive records in 1993 or more recently) and were within the historical range of the species. The areas of habitat where we were uncertain of the occupancy that we are designating as critical habitat were recently occupied (generally, a site with an unknown occupancy had positive records in 2002 or more recently but may have had 1 or 2 years of negative surveys or were determined by a species expert in the State to have an unknown occupancy), and are within the historical range of the species. We determined that these unoccupied areas are essential for the Poweshiek skipperling's conservation because the range of the species has been severely curtailed, occupied habitats are limited and isolated, population sizes are small, and additional lands will be necessary to recover the species.

Furthermore, the unoccupied units and units where we were uncertain of the occupancy are needed to satisfy the conservation principles of redundancy, resiliency, and representation for the Poweshiek skipperling, as there may be too few occupied areas remaining to ensure conservation of the species—the species having been extirpated from substantial portions of its range. The inclusion of unoccupied habitat and habitat where we were uncertain of the occupancy, as critical habitat, is essential for the species' conservation in three ways: (1) It would substantially increase the diversity of historically occupied habitats and geographic areas and increase the chances of the species persisting despite demographic and environmental stressors that are not uniformly distributed; (2) it would ensure that at least some populations may be sufficiently large to withstand stochastic events; and (3) it would help to ensure that geographic areas of recent importance to the species contain sufficient numbers of populations to maintain the species.

Specifically, we are designating unoccupied critical habitat units and units with uncertain occupancy to conserve habitat that may hold potential genetic representation of the species that is necessary for the species to conserve its adaptive capabilities across portions of its highly fragmented historical ranges. Poweshiek skipperling populations are small and fragmented, and thus are subject to genetic drift and inbreeding (Frankham *et al.* 2009, p. 309). Therefore, it is essential to conserve the range-wide genetic diversity we have for the species (and the habitats that may contain that diversity) to help safeguard the genetic

representation necessary for the species to maintain its adaptive capabilities. The reduction of the Poweshiek skipperling's genetic diversity and limited detectability during low population densities further argue for the conservation value of populations currently defined as unknown. We are certain of the species' presence at relatively few sites, and there remains some likelihood of Poweshiek skipperling presence at sites where they have not been detected during recent surveys. In light of the species' fragmentation and the need to preserve any remaining genetic diversity, we believe it is also essential to conserve Poweshiek skipperling at units where the occupancy of the species is unknown.

Since a species' genetics is shaped by its environment, successful conservation should aim to preserve a species across the array of environments in which it occurs (Shaffer and Stein 2000, p. 308), especially if much remains unknown about the nature and extent of its genetic diversity. Conservation of habitat and genetic material is vital in the core of the species' range, but it is also critical to preserve the species in less typical habitats on the periphery of its range, for example, prairie fens in Michigan, to preserve the adaptive capabilities of the species over the long term.

Genetic variation allows populations to tolerate a range of environmental stressors such as new infectious diseases, parasites, pollution, variable food sources, predators, and changes in climate. Fragmentation of a species' habitat across its range can "exacerbate genetic drift and random fluctuations in allele frequencies, causing the genetic variation originally present within a large population to become redistributed among the remaining subpopulations" (Redford *et al.* 2011, p. 41). Furthermore, a "fully representative sample of founders is required, if the population is to encompass the genetic diversity in the wild and minimize subsequent inbreeding" (Frankham *et al.* 2009, p. 434). Because there is evidence of range-wide genetic isolation and inbreeding, the species' historical genetic variation may be fragmented unevenly among the remaining subpopulations. As a basis of future reintroductions, a sample of founders representative of appropriate types and levels of genetic diversity (*e.g.*, to minimize inbreeding) is essential to conserve the genetic material at units where we are uncertain of the occupancy.

We are also designating critical habitat units with uncertain occupancy

# Exhibit 11

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC








# Recovery Plan

## for the

# Endangered and Threatened Species of Ash Meadows, Nevada

Prepared by Don W. Sada
U.S. Fish and Wildlife Service
Reno, Nevada

Speckled dace generally prefer flowing streams where they feed on drifting insects (Moyle 1976). Spawning occurs primarily during the spring and summer over stream riffles where eggs are broadcast by females and fertilized as they drift to the substrate (Mueller 1984). Body coloration varies widely within a population. Generally, the dorsum is olive-gray blending ventrally to golden. Black spots frequently cover the body and there may be one or two distinct, black lateral strips (Hubbs et al. 1974). It reaches a maximum length of approximately 3.9 inches and may live as long as four years (John 1964).

Factors threatening its livelihood include its limited distribution and the presence of introduced competing and predatory species (La Rivers 1962, Williams and Sada 1985).

Ash Meadows Naucorid (Ambrysus amargosus) --This aquatic insect is known to occupy an extremely restricted habitat where flowing water passes over rock and pebble substrates at Point of Rocks Springs (La Rivers 1953). Although little is known about its life history or habitat requirements, food for closely related naucorids includes aquatic insect larvae that are preyed upon while the bug swims over and through the substrate (La Rivers 1951, Polhemus 1979). Reproduction occurs during early spring and summer. Female naucorid bugs deposit demersal eggs that adhere to the substrate during incubation (Usinger 1946). The small size and vulnerability of its habitats makes the naucorid highly susceptible to extirpation. Approximately 10 acres at Point of Rocks Springs are designated critical habitat for this species (Appendix A, Figure V).

Spring-Loving Centaury (Centaurium namophilum) --This centaury is the only listed plant taxon within Ash Meadows that is not endemic to the area. Reveal et al. (1973) described the species from collections taken at Ash Meadows, Nevada, and Tecopa and Furnace

22

# Exhibit 12

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

# Species Status Assessment for the
# Blunt-nosed leopard lizard
# (*Gambelia sila*)
# Version 1.0



Photo credit: USFWS

July 2020
U.S. Fish and Wildlife Service
Region 10
Sacramento, California

above ground at all during drought years (*e.g.*, Germano *et al*. 1994, p. 16), which has obvious implications for reproduction. Surveys during the third year of an ongoing drought failed to detect hatchling blunt-nosed leopard lizards in the majority of sites across the range of the species (Westphal *et al*. 2016, pp. 3-5). Evidence of reproduction in some populations during this period highlight the importance of these populations as climate change refugia (Westphal *et al*. 2016, p. 6). In particular, reproduction in populations in the Panoche Valley region and Carrizo Plain National Monument in the coast ranges, the Tejon Ranch region in the southern Sierra Nevada foothills, and the eastern San Joaquin Valley (*e.g.*, Pixley National Wildlife Refuge) (Westphal *et al*. 2016, pp. 4-6), highlight the importance of these populations for species viability and maintaining connectivity between populations.

## Pesticide Use

The use of pesticides, specifically insecticides, may affect the blunt-nosed leopard lizard directly or indirectly (Montanucci 1965, p. 278). Because droughts already reduce the number of available insect prey, use of malathion or other insecticides during drought years may have a particularly strong effect. Insecticide use in the fall after hatchlings have emerged may also have strong impacts on populations because prey availability tends to be lower at this time of year, and because hatchlings need to grow as much as possible before going belowground for the winter.

The insecticide malathion has been used to control the sugar beet leafhopper (*Circulifer tenellus*), which spreads the plant pathogen curly-top virus (*Curtovirus* sp.) (Redak *et al.* 2009, abstract). California Department of Food and Agriculture (CDFA) began treatment using malathion in 1969, and sprays up to three times per year (fall, winter, spring; winter treatments were only conducted three times from 2005-2018). Up to 100,000 acres of rangeland and idle agricultural land are treated each year on the west side of the San Joaquin Valley from Merced to San Luis Obispo Counties (Figure 12), and CDFA notes that even larger areas may require treatment in drought years (CDFA 2007; CDFA 2008). Insecticides also drift outside of application areas. Windborne drift of non-volatilized pesticides such as malathion can be lethal to invertebrates at distances up to 200 m (656 ft.) from application (Newhart 2006, p. 5).



*Figure 12. Malathion use in 2017 across blunt-nosed leopard lizard habitat. Data shows application rates (pounds/acre) averaged over townships. Data from the California Environmental Health Tracking Pro.*

In a 2001 biological opinion, the Service authorized the renewal of a five-year pesticide use permit to CDFA for use of malathion which included measures to protect the blunt-nosed leopard lizard (Service 2001). The permit was again extended in a 2009 amendment (Service 2009). The biological opinion designated ten blunt-nosed leopard lizard conservation areas; of these, malathion application would not to be conducted in seven. The measures allowed the aerial application of malathion in some blunt-nosed leopard lizard conservation areas prior to April 15 and after October 15 in an effort to avoid the primary blunt-nosed leopard lizard activity period. In accordance with these opinions, from 2000 through 2009, over 65,000 acres per year were treated on average, in Kern, King, and Fresno Counties (CDFA 2009, p. 92).

Although the Recovery Plan cites a study that says acute administration was relatively non-toxic to another lizard in the Iguanidae family (Hall and Clark Jr. 1982 in Service 1998, p. 120), the National Pesticide Information Center lists malathion as moderately toxic to birds (the closest taxa reported; (Gervais *et al.* 2009). The most important effects of malathion on the blunt-nosed leopard lizard may be those associated with the reduction of insect prey populations. Although aerial application of malathion likely reduces the availability of food for lizards in the spring (Germano *et al.* 2007, p. 321), Redak *et al.* (2009, abstract) found that malathion treatment had little impact on arthropod abundance, and suggest that affects to the blunt-nosed leopard lizard would be minimal. These data suggest that arthropod communities may recover quickly after spray periods. Germano *et al.* (2007, p. 321) recommended research on effects of malathion to

47

*Land protection and conservation*

Protected Lands

We assessed the proportion of land owned by Federal, State, or other protected entities (*e.g.*, NGOs, Districts) verses land that is privately owned. We compared land protection within species historical range and within habitat mapped as suitable in Stewart *et al.* (2019) (Table 6). We note that some of the protected areas do not have suitable habitat and/or blunt-nosed leopard lizard occupancy. For example, Mendota Wildlife Area is 11,800 acres but is mostly floodplain or flatlands, with limited alkali scrub (CDFW 2019).

*Table 6. Blunt-nosed leopard lizard habitat acreage and land protections. We assessed the percent of protected habitat to the total IUCN range acreage and suitable habitat acreage (from Stewart et al. 2019).*

| County | IUCN Range (Acres) | Suitable Habitat (Acres) | Percent Suitable within IUCN Range | Percent Protected within Range | Percent Protected Suitable Habitat |
|---|---|---|---|---|---|
| Fresno | 1865885 | 171054 | 9 | 24 | 69 |
| Kern | 2318023 | 778677 | 34 | 16 | 24 |
| Kings | 890581 | 157663 | 18 | 3 | 7 |
| Madera | 360333 | 31049 | 9 | 0 | 0 |
| Merced | 948728 | 80861 | 9 | 27 | 56 |
| Monterey | 203883 | 0 | 0 | 12 | NA |
| San Benito | 563996 | 18873 | 3 | 37 | 55 |
| San Joaquin | 2555 | 0 | 0 | 11 | NA |
| San Luis Obispo | 666484 | 287763 | 43 | 52 | 70 |
| Santa Barbara | 411426 | 52299 | 13 | 75 | 18 |
| Santa Clara | 73229 | 0 | 0 | 29 | NA |
| Stanislaus | 541605 | 0 | 0 | 12 | NA |
| Tulare | 397271 | 22262 | 6 | 8 | 48 |
| Ventura | 100613 | 5598 | 6 | 91 | 85 |

The CPAD and CCED map existing land protections in California, and are a useful visual tool to assess contiguous blocks of land that support blunt-nosed leopard lizard populations, as well as potential land acquisitions that could help promote corridors between populations and genetic clusters. We mapped CPAD, CCED, and USGS PAD relative to blunt-nosed leopard lizard populations (Figure 13). Because large blocks of contiguous land are important for the resilience of blunt-nosed leopard lizard populations, conserving connected parcels of land is important for the health of the species.

# Exhibit 13

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

**The Niangua Darter**
**(*Etheostoma nianguae*)**
**5-Year Review:**
**Summary and Evaluation**



Glenn Chambers

**U.S. Fish and Wildlife Service**
**Columbia, Missouri Ecological Services Field Office**
**Columbia, Missouri**

to move freely into the streams, thereby contributing to streambank erosion and water pollution from their waste.

There are an estimated 50 low-water crossings within the range of the Niangua darter. These low-water crossings pose threats similar to that of reservoir construction, but on a smaller, more localized scale. Low-water crossings create barriers to the dispersal of Niangua darters between and among stream reaches of suitable habitat. Such crossings negatively affect populations of fish and other aquatic organisms by fragmenting populations, limiting movement to and from preferred habitat, restricting gene flow, and eliminating sources of recolonization when individuals become isolated. Poorly designed low-water crossings may also create degraded habitat conditions for some species by impounding water and sediment upstream, causing severe erosion and scouring downstream of these structures. Cumulatively, these problems represent a significant threat to benthic fishes such as darters that commonly inhabit small streams in the Ozarks and require moderately clear, flowing channels with clean substrates to persist.

Threats to Niangua darter, in addition to the threats described in the 1989 recovery plan, include:

- the destruction of habitat caused by the removal of sand and gravel from the stream channel
- degradation of stream quality caused by livestock grazing along stream banks and use of streams for livestock water sources
- barriers to the movement, including other aquatic life, created by poorly designed low-water crossings
- accumulating silt and gravel on the upstream side of low-water crossings and formation of plunge pools on the downstream side of bridges which changes the physical characteristics of streams
- fertilizer and pesticide run-off into streams from adjacent farm fields
- degraded water quality caused by waste from humans and livestock

The creation of reservoirs, which destroyed stream habitat and restricted movement of fish, led to the Niangua darter's initial decline. Continued deterioration of habitat due to low-water crossings, sand and gravel removal, loss of streamside vegetation, fertilizer and pesticide run-off, and waste from humans and livestock currently threatens the species existence. Over 95% of the Niangua darter's range is privately-owned, with cattle grazing being the predominant land use (Mattingly 1995).

**2.3.2.2 Overutilization for commercial, recreational, scientific, or educational purposes:** No new information has been received that would alter the findings made regarding overutilization at the time of listing. This threat factor was not an issue as concluded in the 1985 final rule listing (USFWS 1985).

**2.3.2.3 Disease or predation:** Non-native species such as rock bass, spotted bass (C. Fuller, pers. comm. 2009) and the largemouth bass (*Micropterus*

2.4   **Synthesis**

The adult Niangua darter is a slender, yellowish-olive colored percid fish that is approximately 3-4 inches long.  It displays eight prominent saddle bars along its back, orange spots scattered over the upper sides, a series of u-shaped greenish blotches alternating with narrow orange bars along its mid-side, and two small jet-black spots at the base of the caudal fin (which are distinguishable and significant to Niangua darters).  The brilliantly colored breeding male has an orange-red belly and a series of iridescent blue-green bars along its sides.  One of the bars crosses the base of the caudal fin, obscuring the two jet-black spots (USFWS 1989; MDC 2014b).

This darter inhabits clear, medium-sized streams draining hilly areas underlain by chert, dolomitic bedrocks in a few tributaries of the Osage River Basin of the Ozark Region in west-central Missouri (USFWS 1985).  It prefers the margins of shallow pools with silt-free gravel or rocky bottoms. Spawning occurs on swift, gravel riffles. The Niangua darter's diet consists of aquatic insect larvae, crustaceans and snails, which are probed from crevices from the stream bottom (MDC 2014b)**.**

Threats to the survival of the Niangua darter include dam construction which has created barriers in the darter's habitat, fragmentation of its range, and escape blockage from streams that become polluted or altered; the straightening and widening of streams through highway and bridge construction  which eliminates the small pools in which darters live; construction and other streamside activities such as clearing brush and gravel dredging which increases erosion and silt into the streams, disrupting the fish's habitat; and introduced predatory fish such as spotted bass and rock bass (USFWS 1997).

The recovery plan criteria which must be satisfied to ensure the Niangua darter no longer needs the protection of the Endangered Species Act have been partially met. Progress in removing threats is contributing towards securing the species in all eight populations, and the numbers of Niangua darters in the five major Osage River tributary watersheds remain stable overall under the first criterion -- *the eight known populations must be made secure by reducing existing and potential threats to the greatest extent possible and population size is stable or increasing*.  However, no viable populations have been established or discovered in four additional stream drainages as required under the second criterion -- *viable populations have been discovered or established in four additional stream drainages*.

Although progress has been made toward improving the habitat conditions and conservation of Niangua darter, threats have not significantly diminished, and climate change represents a new, unknown threat.  The conditions for achieving the recovery criteria have not been completely met.  Niangua darter is still a threatened species -- defined under the Endangered Species Act of 1973 as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  The listing classification of Niangua darter should remain as threatened under the Act.

# Exhibit 14

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

 



**Contents:**

*Executive Summary (220 KB)*
*Introduction (463 KB)*
*The South Florida Ecosystem (1.5MB)*
*The Ecological Communities (460KB)*
*The Species (51MB)*
*Implementation (2.3MB)(03/26/2007)*
*Appendices (1.2MB)*

All documents on these pages are available as .PDF files. PDF files can be downloaded and read using Adobe Acrobat Reader. This software is free and is available from Adobe Inc. at http://www.adobe.com/acrobat/

U.S. Fish & Wildlife Service

*South Florida Field Office*

**Multi-Species Recovery Plan**

The South Florida Multi-species Recovery Plan is one of the first and most far reaching ecosystem plans developed by the Service. It serves as a blueprint to recover 68 threatened and endangered species, and to restore and maintain biodiversity of native plants and animals in the 23 natural communities throughout about 26,000 square miles of the 19 southernmost counties in Florida.

The final document is available from electronically through the links to the sections (see Contents), or a printed copy is available through the Fish & Wildlife Service Reference Service. Please contact the Reference Service to determine applicable duplication and mailing charges. You can order your copy by calling their toll free number (800)582-3421 or mailing your request to:

Fish & Wildlife Service Reference Service
5430 Grosvenor Lane
Suite 110
Bethesda, MD 20814.

---

**U. S. Fish & Wildlife Service Unveils South Florida Multispecies Recovery Plan May 18, 1999**
Bruce Babbitt, Secretary, Department of the Interior and Sam Hamilton, Regional Director, U.S. Fish & Wildlife Service Southeast Region, presided over a landmark signing ceremony for the Multi-species Recovery Plan at the recent
South Florida Restoration Science Forum in Boca Raton Florida. This event marked a major step toward South Florida Ecosystem restoration and the recovery of threatened and endangered species in South Florida.
Department of Interior News Brief as a .pdf file

# Bluetail Mole Skink

*Eumeces egregius lividus*

| | |
|---|---|
| **Federal Status:** | **Threatened (November 6, 1987)** |
| **Critical Habitat:** | **None Designated** |
| **Florida Status:** | **Threatened** |
| **Recovery Plan Status:** | **Revision (May 18, 1999)** |
| **Geographic Coverage:** | **Rangewide** |

**Figure 1. County distribution of the bluetail mole skink.**



The bluetail mole skink is a small, slender lizard that occupies xeric upland habitats of the Central Ridge in peninsular Florida. It requires open, sandy patches interspersed with sclerophyllous vegetation. Much of the bluetail mole skink's habitat has been destroyed or degraded due to residential, commercial, and agricultural development. Habitat protection and management are essential for the survival of this species. Efforts to conserve the bluetail mole skink and other rare species dependent on xeric upland communities have been initiated; a number of private and public xeric upland preserves have been established or are proposed for acquisition. Recovery of the bluetail mole skink will require protection and management of occupied and potentially restorable habitat. Reintroduction of the bluetail mole skinks into restored habitat may also be a valuable recovery tool.

This account represents a revision of the existing recovery plan for the bluetail mole skink (FWS 1993).

## Description

The bluetail mole skink is a small, shiny, brownish to pink, cylindrical, lizard. Juveniles usually have a blue tail which makes up slightly more than half of the 13 cm length (Christman 1992; P. Moler, GFC, personal communication 1998). Regenerated tails and the tails of older individuals are typically pinkish. The legs are somewhat reduced in size and are used only during surface locomotion, not when the animal "swims" through the sand (Christman 1992). The coloration in the bluetail mole skink is brown with lighter paired dorsolateral stripes diverging posteriorly (Christman 1978). During the breeding season, males develop a colorful orange pattern on their sides.

## Taxonomy

The taxonomy of the species *Eumeces egregius,* and for *E. e. lividus* specifically, is discussed in detail by Mount (1965), who indicated that the species was first recognized by Baird

S2. **Protect and enhance existing populations**. If the proposed Federal and State purchase of scrub and associated xeric communities is achieved, the resulting network of publicly and privately owned and protected scrub will encompass about 16,200 ha on the Lake Wales Ridge. This mosaic of varying size scrub patches should prove adequate to protect this species indefinitely, provided that the communities are protected and suitable management practices favorable to skinks are identified and implemented. Site-specific management prescriptions that assure a mixture of successional stages and ecotonal areas required by skinks should be developed for tracts purchased in the Lake Wales Ridge NWR and Lake Wales Ridge Ecosystem Project initiatives.

S2.1. **Conduct section 7 consultations on Federal activities that may affect bluetail mole skinks.** Section 7 of the Endangered Species Act requires Federal agencies to consult with the FWS to ensure appropriate consideration of impacts to listed species from all Federal actions. The bluetail mole skink needs to be considered, along with other listed species in scrub habitat, in any proposed Federal actions (authorized, funded, or carried out by Federal agencies) that might adversely affect the species and their habitats. These could include but are not limited to road and facility construction, timber management practices, land clearing and conversion, wetland dredge and fill activities, and pesticide applications involving use of Federal funds.

S2.2. **Protect skinks on public and private lands.** Develop and implement land management techniques that maintain natural diversity. Periodic burning, cutting, mowing or other techniques are needed to maintain ecotonal areas between xeric habitats. Habitat must also be protected from off-road vehicle traffic and commercial forestry practices.

Where bluetail mole skinks are known to exist on private lands, efforts should be made to contact landowners, and information on the status and habitat requirements of the species provided. Recommendations should be provided for managing private lands. Long-term renewable leases and conservation agreements involving Federal, State, and local governmental agencies are options where outright acquisition is not acceptable to the landowner.

S2.3. **Control domestic animal predation.** Where domestic animals prey on bluetail mole skinks, it may be necessary to trap or develop deterrent programs to minimize mortality. Trapping efforts may be needed on public lands where free-ranging domestic animals threaten bluetail mole skinks or their habitat.

S2.4. **Control pesticide use in or adjacent to bluetail mole skink habitat**. Because pesticide use on adjacent agricultural and residential lands poses a potential risk to bluetail mole skinks, management plans should consider these risks and alleviate threats whenever possible.

S3. **Conduct research on life history and population ecology of bluetail mole skinks**. Adequate long-term protection of bluetail mole skinks depends on a thorough understanding of their life history. Many aspects of the life history of this species are poorly understood or remain entirely unstudied. Much of what is known about the bluetail mole skink's life history has been extrapolated from studies on the closely related *E. e. onocrepis*. While this may provide information about the basic biological strategies of mole skinks in general, more specific studies of the life history characteristics of *E. e. lividus* are needed to ensure that land management efforts are compatible with the habitat requirements of the bluetail mole skink.

# Sand Skink

## *Neoseps reynoldsi*

| | |
|---|---|
| **Federal Status:** | **Threatened (November 6, 1987)** |
| **Critical Habitat:** | **None Designated** |
| **Florida Status:** | **Threatened** |
| **Recovery Plan Status:** | **Revised (May 18, 1999)** |
| **Geographic Coverage:** | **Endangered** |

**Figure 1. County distribution of the sand skink.**



☑ Other Florida Counties
■ South Florida Counties

The sand skink is a small, fossorial lizard that occurs on the sandy ridges of interior central Florida from Marion County south to Highlands County. The sand skink is highly adapted for life in the sand; it spends the majority of time below the surface "swimming" in loose sand in search of food, shelter, and mates. The species is vulnerable because of habitat loss due to agricultural and residential uses and from habitat degradation due to fire exclusion. Efforts to protect the sand skink and other xeric upland species are underway and include the acquisition, protection, and management of a number of xeric upland sites. Recovery of the sand skink will require management of conservation lands, restoration of habitat and possible reintroduction of individuals into successfully-rehabilitated habitat.

This account represents a revision to the existing recovery plan for the sand skink (FWS 1993).

## Description

The sand skink (*Neoseps reynoldsi*) reaches about 13 cm, about half of which is tail. It is slender, shiny and usually gray to grayish-white, although it may occasionally be light tan. Hatchlings have a wide black band extending from the tip of the tail to the snout along each side. This band is reduced in adults and may only occur from the eye to snout on some individuals (Telford 1959). The sand skink's legs are vestigial and practically nonfunctional. Other adaptations to a fossorial existence include greatly reduced eyes, lack of external ear openings, a wedge-shaped snout, and a countersunk lower jaw.

## Taxonomy

The monotypic genus *Neoseps* was established by Stejneger (1910) in describing the uniquely fossorial sand skink of the central Florida sand ridges.

scrub and associated xeric communities is achieved, the resulting network of publicly and privately owned and protected scrub will encompass about 16,200 ha on the Lake Wales Ridge. This mosaic of varying size scrub patches should prove adequate to protect this species indefinitely provided that the communities are protected and that suitable management practices favorable to skinks are identified and implemented. Site-specific management prescriptions that assure a mixture of successional stages and ecotonal areas required by skinks should be developed for tracts purchased in the Lake Wales Ridge NWR and Lake Wales Ridge Ecosystem Project initiatives.

**S2.1.    Conduct section 7 consultations on Federal activities that may affect sand skinks.** Section 7 of the Endangered Species Act requires Federal agencies to consult with the FWS to ensure appropriate consideration of impacts to listed species from all Federal actions. The sand skink needs to be considered, along with other listed species in scrub habitat, in any proposed Federal actions (authorized, funded, or carried out by Federal agencies) that might adversely affect the species and their habitats. These could include but are not limited to road and facility construction, timber management practices, land clearing and conversion, wetland dredge and fill activities, and pesticide applications involving use of Federal funds.

**S2.2.    Protect skinks on public lands.** Develop and implement land management techniques that maintain natural diversity. Periodic burning, cutting, mowing or other techniques are needed to maintain ecotonal areas between xeric habitats. Habitat must also be protected from off-road  vehicle traffic and commercial forestry practices.

**S2.3.    Protect skinks on private lands.** Where sand skinks are known to exist on private lands, efforts should be made to contact landowners, and information on the status and habitat requirements of the species should be provided. Recommendations should be provided for managing private lands. Long-term renewable leases and conservation agreements involving Federal, State, and local government agencies are options where outright acquisition is not acceptable to the landowner.

**S2.4.    Control pesticide use in or adjacent to sand skink habitat.** Because pesticide use on adjacent agricultural and residential lands poses a potential risk to sand skinks, management plans should consider these risks and alleviate threats whenever possible.

**S3.    Conduct research on life history and population ecology of sand skinks**. Adequate long-term protection of the sand skink depends on a thorough understanding of its life history. Many aspects of the life history of this species are poorly understood or remain entirely unstudied, therefore more specific studies of the life history characteristics of the sand skink are needed to ensure that land management efforts are compatible with the habitat requirements of the sand skink.

**S3.1.    Develop standardized survey techniques**. Research specific habitat requirements in relation to vegetation structure.  Also, develop better survey methods to assess population levels and status of sand skinks. and their response to management prescriptions. Methods to determine home range size, age of dispersal and dispersal distance are needed to evaluate recolonization capabilities and susceptibility to local extirpation. Mark-recapture methodology and radiotelemetry may soon provide feasible approaches to the study of these small, semi-fossorial reptiles. There are

# Exhibit 15

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

**Poweshiek skipperling**
***Oarisma poweshiek***


**Status Review:**
**Summary and Evaluation**



Photo of male (L) and female (R) Poweshiek skipperling butterflies by Assiniboine Park Zoo


**U.S. Fish and Wildlife Service**
**Minnesota-Wisconsin Field Office**
**Bloomington, MN**
**August 6, 2024**

**Table 1**. Number of healthy populations distributed throughout each unit as of 2023.

| Conservation Unit | Target Number of Healthy Populations (per the Recovery Criteria) | Current Number of Extant Populations (not currently healthy) | Current Number of Healthy Populations |
|---|---|---|---|
| 1: Southeastern Manitoba, Northwestern Minnesota, and Northeastern North Dakota | 6 (At least 2 populations in Canada and 2 in the United States) | Canada: 2 U.S.: 0 | 0 |
| 2: Southeastern North Dakota, Central and Southwestern Minnesota, Northeastern South Dakota, and Central and Northern Iowa | 23 | 0 | 0 |
| 3: Southeastern Wisconsin and Northeastern Illinois | 2 | 0 | 0 |
| 4: Michigan | 5 | 2 | 0 |

**Updated Information Relevant to the Current Species' Status**

**Biology and Habitat:**
Substantive new information on the Poweshiek skipperling biology and habitat, abundance and population trends, genetics, spatial distribution, and habitat or ecosystem conditions published since the previous 5-year review (U.S. Fish and Wildlife Service 2019, entire) is summarized below.

**Range and distribution:**
Out of the 298 historically documented Poweshiek skipperling sites, there are currently 3 sites (Springfield Township (Michigan), Rose Valley (Michigan), and Tallgrass Prairie Reserve (Manitoba)) where the species is considered present[1] (Figure 1; at the time of listing, 12 sites

---

[1] We updated the years used for the status definitions from the listing rule (79 FR 63671); six years were added to the definitions since six years have passed since they were developed (in the proposed listing rule). We consider the Poweshiek skipperling to be "present" (extant) at sites where the species was detected during the most recent survey, if the survey was conducted in 2008 or more recently and there is no evidence to suggest the species is now

were considered to have Poweshiek skipperling present). The status of the species in one location in Wisconsin is unknown.

<u>Michigan</u>
Two Michigan sites are currently classified as present, out of the nine that had present status at the time of listing and 3 at the time of the last five-year status review. The numbers of individuals detected at these remaining present sites have been variable since the last status review, with high daily counts of 19 individuals in 2023 at Rose Valley site, which was higher than any count since listing. Two additional fens with relatively recent records were not surveyed in 2023, because no Poweshiek skipperlings were observed the previous three survey years. The stronghold of the Springfield Township site (3 sub-sites) has not had a high daily count above 76 since listing, with a high daily count of 58 in 2023 (compared to multiple counts in the hundreds in the five years preceding listing). Similarly, the maximum number of Poweshiek skipperlings observed per minute at these sites are down relative to the years just prior to listing, however there was a slight uptick in 2023 (Figure 2).

Furthermore, no additional sites have been found, even though a habitat model identified approximately 33 sites that may have significant potential to be inhabited by Poweshiek skipperling. Another similar habitat suitability model to find other potential sites, used species occurrence records combined with a larger set of environmental barriers (Belitz et al. 2020). Of the potential sites surveyed thus far (approximately 10 sites), no new Poweshiek skipperling sites have been found (D. Cuthrell, MNFI, pers.comm. 2024).

---

extirpated from the site. A status of "unknown" is assigned if the species was found in 1999 or more recently, but not in the most recent one to two sequential survey year(s) since 1999 and there is no evidence to suggest the species is now extirpated from the site. A species is considered to be "possibly extirpated" at sites where it was detected at least once prior to 1999, but not in the most recent one to two sequential survey years(s). "Possibly extirpated" is also assigned as a status to sites where Poweshiek skipperling was found prior to 1999 and no surveys have been conducted in 1999 or more recently. In order to be considered "extirpated" a site must have had at least three sequential years of negative surveys, because of the difficulty of detecting these species. A species is also considered "extirpated" at sites where habitat for the species is no longer present.



**Figure 2.** Maximum number of Poweshiek skipperling individuals observed per minute by year for the Michigan sites where the species is currently considered present. Note that 3 sub-sites are grouped within the Springfield Township site.

<u>Manitoba</u>

One prairie complex in Manitoba is still considered present. Since the last five-year review in 2019, distance sampling surveys have detected between 28 and 141 total Poweshiek skipperlings (28 in 2019, 57 in 2020, 117 in 2021, 41 in 2022, and 141 in 2023) within the North Block of the Tallgrass Prairie Preserve in Manitoba per year (Burns et al. 2021, 2022, 2024, Westphal et al. 2023, Figure 3). Population estimates ranged from 0 to 241.67 at the sub-sites within the prairie complex (Burns et al. 2024), with observations at one where the species hadn't been observed since 2014 (site 12). For the first time, reintroductions occurred at one of the sub-sites that had historical, but not recent, records of the species (Burns et al. 2024, see Conservation Measures section for more details).

# Exhibit 16

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

**U.S. Fish & Wildlife Service**

# Recovery Plan for the Prairie Species of Western Oregon and Southwestern Washington



*Willamette Daisy*



*Left: Fender's Blue Butterfly*
*Below: Bradshaw's Lomatium*





*Above: Nelson's Checker-mallow*
*Left: Kincaid's Lupine*

incidentally kill Fender's blue butterfly larvae when Btk is sprayed near a Fender's blue butterfly population.  There is evidence that Btk application in the Northwest has reduced populations of non-target butterflies (Black *et al.* 2002).

The application of mosquito adulticides to control the spread of West Nile Virus also poses the risk of incidental harm to Fender's blue butterflies.  The Oregon Department of Human Services' program to control West Nile Virus focuses on reduction of breeding habitat for the mosquito carriers of the disease and the use of larvicides to kill mosquito larvae (Oregon Department of Human Services 2006); however, the program recognizes that there are some instances in which the use of mosquito adulticides (*e.g.*, Malathion and pyrethrins) is justified (Oregon Department of Human Services 2003).  The pesticides used to kill adult mosquitoes are also lethal to other invertebrates, including Fender's blue butterflies.  The potential for pesticide drift in lethal concentrations is of concern when habitat for the Fender's blue butterfly is nearby.

The human population density and urban development in the Willamette Valley have resulted in increased recreational pressure and potential for vandalism in prairie habitat. Hikers, cyclists, horseback riders, and off-road vehicles can affect prairie species through trampling, erosion, and introduction of weed seeds.  The presence of nearby improvements and population centers also contributes to restrictions on the use of habitat management methods such as prescribed burning.

Most of the land in the Willamette Valley is privately owned, and many of the remaining populations of rare prairie species occur on private lands.  Plant populations occurring on private lands are particularly vulnerable to threats of development, because state and Federal plant protection laws have little effect on private lands.  Effective cooperation with private landowners, both those with property supporting prairie species and those on adjoining lands, is crucial for conservation and recovery of native prairie species.

The Recovery Team and a group of experts familiar with the rare species and habitats in the region reviewed the threats to the listed species at each known remaining site (Table III-1).  The threats most frequently identified as severe were:  (1) invasive species, (2) small population size / low genetic variability, (3) succession to native woody plants, (4) impaired ecological function, and (5) isolation / fragmentation.  These rankings reflect the general assessment by Altman *et al.* (2001) that alteration of the natural and historical disturbance regime and loss of prairie habitats to development have resulted in small, fragmented populations of increasingly rare species threatened by continued degradation of

# Exhibit 17

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

# Fender's Blue Butterfly

*(Icaricia icarioides fenderi)*

## Species Status Assessment Report



Photos courtesy of Cheryl Schultz.

## July 2020

*U.S. Fish and Wildlife Service*

*Interior Region 9, Columbia-Pacific Northwest*

*Portland, Oregon*



**Suggested reference**
U.S. Fish and Wildlife Service. 2020. Fender's Blue Butterfly (*Icaricia icarioides fenderi*)
Species Status Assessment Report. U.S. Fish and Wildlife Service, Oregon Fish and Wildlife
Office, Portland, Oregon.

Terms that appear in **bold** at first use are defined in the Glossary (Appendix A).

## Executive Summary

This species status assessment reports the results of the comprehensive status review for the
Fender's blue butterfly (*Icaricia icarioides fenderi*) and provides a thorough account of the
species' overall viability and extinction risk. The Fender's blue butterfly is a subspecies of
Boisduval's blue butterfly (*Icaricia icarioides*) found only in the upland prairie and oak savannah
habitats of the Willamette Valley in western Oregon. The U.S. Fish and Wildlife Service
(Service or USFWS) listed the Fender's blue butterfly as endangered, without critical habitat,
under the Endangered Species Act on January 25, 2000 (65 FR 3875). At the same time, the
Service listed one of the butterfly's primary host plants, the Kincaid's lupine (*Lupinus
sulphureus* ssp. *kincaidii*), as threatened (65 FR 3875). At the time of listing in 2000, Fender's
blue butterfly and Kincaid's lupine were confined almost exclusively on the western side of the
Willamette Valley in Oregon. Critical habitat for the Fender's blue butterfly was designated on
October 31, 2006, in Benton, Lane, Polk, and Yamhill Counties, Oregon (71 FR 63862) and a
recovery plan was published in May 2010, establishing three recovery zones as well as
population and habitat targets. In the case of Fender's blue butterfly, we have determined the
term metapopulation is most accurate to describe groups of sites occupied by Fender's blue
butterflies that are within 2 kilometers (km) (1.2 miles (mi)) of one another and not separated by
barriers.

To evaluate the biological status of the Fender's blue butterfly both currently and into the future,
we assessed a range of conditions to allow us to consider the species' resiliency, redundancy, and
representation (together, the 3Rs). Based on the biology of the species and the information
presented in the recovery plan, we determined that to be resilient, Fender's blue butterfly
metapopulations need an abundance of lupine host plants and nectar plants within prairie patches
at least 6 hectares (ha) (15 acres (ac)) in size, with habitat heterogeneity and minimal amounts of
invasive plants and woody vegetation. Resilient metapopulations would also contain a minimum
of 200 butterflies each year for at least 10 years distributed across multiple groups (within-
metapopulation redundancy) in lupine patches that are within 0.5 to 1.0 km (0.3 to 0.6 mi) of one
another. Ideally, at the species level, resilient metapopulations would be distributed across the
historical range of the species (redundancy and representation) and have a plethora of stepping
stones for connectivity across the landscape (redundancy and representation).

While we do not know the precise historical abundance or distribution of Fender's blue butterfly,
there were approximately 3,391 individuals on 32 sites at the time of listing in 2000. Those
numbers have grown across all three recovery zones as a result of metapopulation expansion,
metapopulation discovery, and metapopulation creation. There are currently 15 known Fender's
blue butterfly metapopulations distributed throughout the Willamette Valley in Benton, Lane,
Linn, Polk, Washington, and Yamhill Counties. There are 137 total sites containing

2

approximately 13,700 Fender's blue butterfly that occur over a broad range of land ownerships with varying degrees of land protection and management on an area totaling approximately 344 ha (825 ac)(Table ES-I).

Table ES-I. Comparison in status of Fender's blue butterfly populations and distribution between time of listing in 2000 to survey results from 2018.

|  | Listed as endangered (2000) | As of 2018 |
|---|---|---|
| Number of metapopulations | 12 | 15 |
| Number of independent groups | 0 | 6 |
| Total abundance (# of individuals) | 3,391 | 13,700 |
| Number of sites | 32 | 137 |
| Area of prairie habitat known to be occupied (hectares/acres) | 165/408 | 344/825 |
| Counties known to be occupied | 4<br>Benton, Lane, Polk<br>Yamhill Counties | 6<br>additionally in Linn and<br>Washington Counties |

The presence of Fender's blue butterflies in new counties and the expansion of existing metapopulations increases both the geographic range of the species and connectivity throughout the landscape. An increased number of metapopulations, composed of a greater number of individuals and with expanded distribution and connectivity across the range of Fender's blue butterfly, means the species has a greater chance of withstanding stochastic events (resiliency), surviving potentially catastrophic events (redundancy), and adapting to changing environmental conditions (representation) over time.

Our analysis of the past, current, and future influences on what the Fender's blue butterfly needs for long-term viability revealed that there are four influences that pose the largest risk to future viability of the species. These influences are (1) habitat conversion (agricultural and residential); (2) alteration of natural and human-mediated disturbance processes (e.g., fire and flooding) resulting in habitat succession; (3) invasion by nonnative plants; and (4) insecticides and herbicides. Most of these influences are likely to be exacerbated by climate change due to changes in vegetation composition and management, as well as from changes in disturbance occurrences. These influences are being offset by continuing conservation efforts.

Based on our understanding of the life history of the species and guided by the recovery plan, we developed criteria to evaluate specific habitat and demographic factors contributing to the overall health or resiliency of metapopulations. We then included data from an upland prairie habitat calculator and a Fender's blue butterfly calculator to score the current condition of each metapopulation. These calculators were created as a rapid assessment tool by the Institute for Applied Ecology, in coordination with the Willamette Partnership and with guidance from a Prairie Technical Working Group comprised of local experts. They assess overall prairie habitat quality, evaluate and weight key aspects of site quality specifically for Fender's blue butterfly, and assess site quality for at-risk upland plant species, including Kincaid's lupine.



Figure 3.4. Annual rangewide Fender's blue butterfly population estimates. Greater confidence exists in estimates from 2012-2018 due to implementation of new survey methods in 2012 (blue line).

Surveys are now standardized; however, this was not the case in the past. Due to differences in survey methods, comparing Fender's blue butterfly estimates across years and across sites has proven challenging. Six different forms of monitoring have been used to estimate numbers of Fender's blue butterfly over the past 20 years: presence/absence surveys, peak counts, modified peak counts, distance sampling, Severns method, and Protocol 1. For all of these methods, surveys are limited to the time between 10:00 am to 6:00 pm on days with less than 50 percent cloud cover, greater than 60-65 degree Fahrenheit air temperature, and winds less than 12 mph. The surveys count only male butterflies because they are easier to find and identify. Numbers are then extrapolated by doubling that count to determine the total number of butterflies at a given site, assuming a 1:1 sex ratio of males to females.

- **Presence/absence surveys** are conducted to confirm occupancy in the larval or adult stage and to monitor persistence of Fender's blue butterfly sites. These surveys are the least intensive method of monitoring with the broadest temporal window of time for completion and do not provide a numerical estimate.
- **Peak** and **modified peak** counts are conducted to provide an estimate of the number of Fender's blue butterflies with a minimal amount of time invested in surveying. The

# Exhibit 18

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

## DEPARTMENT OF THE INTERIOR

**Fish and Wildlife Service**

**50 CFR Part 17**

**Endangered and Threatened Wildlife and Plants; Determination of Threatened Status With Critical Habitat for Six Plants and One Insect in Ash Meadows, Nevada and California; and Endangered Status With Critical Habitat for One Plant in Ash Meadows, Nevada and California**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** The Service determines the Ash Meadows blazing star, Ash Meadows gumplant, Ash Meadows milk-vetch, Ash Meadows ivesia, Ash Meadows sunray, spring-loving centaury, and Ash Meadows naucorid to be threatened and designates their critical habitat. The Service also determines the Amargosa niterwort to be an endangered species with critical habitat. These actions are being taken because these species are restricted to the Ash Meadows region and ground water basin in Nye County, Nevada, and Inyo County, California, where they are facing intensifying threats. The loss of habitat by recent agricultural and municipal development activities, the clearing of land for road construction, the removal of ground water and diversion of surface spring flow, and local mining activities threaten the integrity of the species' habitat and, therefore, their survival. The Service also announces in the "Proposed Rules" section of today's **Federal Register** the opening of a 60-day comment period of whether additional areas should be added to the designated critical habitat of two of the subject species.

**DATES:** The effective date of this rule is June 19, 1985.

**ADDRESSES:** The complete file for this rule is available for inspection during normal business hours at the U.S. Fish and Wildlife Service, Suite 1692, Lloyd 500 Building, 500 N.E. Multnomah Street, Portland, Oregon 97232.

**FOR FURTHER INFORMATION CONTACT:** Wayne S. White, Chief, Division of Endangered Species, at the above address (503/231–6131 or FTS 429–6131).

**SUPPLEMENTARY INFORMATION:**

### Background

The Ash Meadows region is a unique and diverse desert wetland located east of the Amargosa River in California and Nevada. This wetland is maintained by flow from several dozen springs and seeps which are fed by an extensive ground water system that extends more than 100 miles northwest of Ash Meadows. Hundreds of plant and animal species, many of them endemic, are associated with this wetland and depend upon it for survival. The eight species that are the subjects of this final rule occur only in Ash Meadows. These eight species are briefly described below:

1. The spring-loving centaury (*Centaurium namophilum* Reveal, Broome, & Beatley) was first recognized in 1973 (Reveal et el, 1973). Even though *Centaurium namophilum* was described in 1973, it had been collected as early as 1891 by Coville and Funston (Reveal et al. 1973). The spring-loving centaury is an erect annual reaching 4.5 decimeters (dm) in height, and has pink flowers. It is found on "moist to wet clay soils along the banks of streams or in seepage areas" (Mozingo and Williams 1980) and is often found with the Ash Meadows gumplant.

The Service originally proposed endangered status for the spring-loving centaury (48 FR 46590; October 13, 1983) under the scientific name *Centaurium namophilum* var. *namophilum* Broome. As discussed later in the summary of comments, the Service no longer accepts the validity of varietal designations for *Centaurium namophilum*. Further, *Centaurium namophilum* var. *nevadense* is now considered a synonym of *Centaurium exaltatum* (Griseb.) W. Wright. Populations of *Centaurium namophilum* formerly occurred outside Ash Meadows at Furnace Creek and Tecopa Springs, Inyo County, California. All known living populations of *Centaurium namophilum* are now restricted to Ash Meadows, Nevada.

2. The Ash Meadows gumplant (*Grindelia fraxino-pratensis* Reveal & Beatley) was described by Reveal and Beatley in 1971, although it had been collected as early as 1965 by Beatley (Reveal and Beatley 1971). It is an erect biennial or perennial reaching 7 to 10 dm in height with yellow flowers in heads measuring 8 to 10 millimeters (mm) in diameter (Mozingo and Williams 1980). Its primary habitat is saltgrass meadows along streams and pools, but it occasionally occurs in alkali clay soils in drier areas (Cochrane 1981). It is found in both Nevada and California.

3. The Ash Meadows ivesia (*Ivesia eremica* (Coville) Rydberg) was first described as *Potentilla eremica* in 1892. It is a perennial with a tuft of leaves emerging from a woody root crown. The inflorescences bear few flowers and these have petals about 7 mm long. The Ash Meadows ivesia occurs only in Nevada in saline seep areas of light-colored clay uplands (Mozingo and Williams 1980).

4. The Ash Meadows blazing star (*Mentzelia leucophylla* Brandegee) was described by Brandegee (1899) based on material collected by Purpus in 1898 (Reveal 1978a). It is a biennial or short-lived perennial with one to several white stems that reach a height of 5 dm, and its light yellow flowers occur in broad inflorescences (Mozingo and Williams 1980). It occurs only in Nevada on sandy or saline clay soils along canyon washes and on alkaline mounds. It is often found with the Ash Meadows milk-vetch and the Ash Meadows sunray (Mozingo and Williams 1980).

5. The Ash Meadows milk-vetch (*Astragalus phoenix* Barneby) was described in 1970, although it was collected as early as 1898 by Carl Anton Purpus (Barneby 1970). It is "a low matted perennial forming mounds 40 to 50 cm across" and its "pinkish to purple flowers are borne on short, erect stems in the mat and commonly number only one or two per inflorescence" (Mozingo and Williams 1980). The flowers are about 25 mm long. The Ash Meadows milk-vetch is found only in Nevada on "dry, hard, white, barren saline, clay flats, knolls, and slopes" (Mozingo and Williams 1980).

6. The Ash Meadows sunray (*Enceliopsis nudicaulis* (A. Gray) A. Nelson var. *corrugata* Cronquist) was described in 1972 from material collected by Cronquist in 1966 (Cronquist 1972), although Mozingo and Williams (1980) reported that earlier collections were made by others. This perennial plant occurs in clumps 1 to 4 dm high, and has flower heads borne singly on leafless stalks. The ray flowers have yellow corollas and the disk is 2 to 3.5 centimeters (cm) across. It occurs only in Nevada in dry washes on whitish saline soil associated with outcrops of pale, hard limestone.

7. The Amargosa niterwort (*Nitrophila mohavensis* Munz and Roos) was first collected by J. C. and A. R. Roos and then described by Munz and J. C. Roos in 1955. The plants are long lived and low (up to 8 cm high) with small bright green leaves and small, inconspicuous flowers (Reveal 1978b). It is found on salt-encrusted alkaline flats at the south end of Carson Slough on both sides of the Nevada/California border (Beatley 1977).

8. The Ash Meadows naucorid (*Ambrysus amargosus* La Rivers) is an insect (Order Hemiptera, Family Naucoride) that was described in 1953 based on material collected by Ira La Rivers and T. Frantz in 1951 (La Rivers 1953). It has been found only at Point of

Rocks Springs and their outflow streams. It is a small aquatic insect reaching about 6 mm in length that is apparently unable to fly.

Many other plant and animal species are endemic to Ash Meadows. The Service proposed the Ash Meadows turban snail (*Fluminicola erythropoma*) as threatened on April 28, 1976 (41 FR 17742); that proposal was withdrawn on December 10, 1979 (44 FR 70796) for administrative reasons as a result of the 1978 Amendments to the Endangered Species Act. Current evidence indicates that this species, as proposed, actually comprised more than one species. This area has an extraordinarily diverse freshwater molluscan fauna, which is currently being studied by Dr. Dwight Taylor of Tiburon, California. Of special interest is the presence of two species flocks or complexes of snails that are found within a 5-mile radius in Ash Meadows, and that give Ash Meadows the highest concentration of endemic species in an area of comparable size within the United States. Most of these mollusc species have not been scientifically described and named. Of the molluscs found in Ash Meadows, eight species are included in Category 1, and two species are in Category 2, of the May 22, 1984 (49 FR 21664), notice of review for invertebrate wildlife. One beetle, the Devils Hole warm spring riffle beetle (*Stenelmis calida calida*), is also included in this notice (Category 2) and is endemic to Ash Meadows.

Five endemic fishes have been recorded from Ash Meadows. The Devils Hole pupfish (*Cyprinodon diabolis*) was listed as endangered on March 11, 1967 (32 FR 4001), and the Warm Springs pupfish (*Cyprinodon nevadensis pectoralis*) was listed as endangered on October 13, 1970 (35 FR 16047). The Ash Meadows Amargosa pupfish (*Cyprinodon nevadensis mionectes*) and the Ash Meadows speckled dace (*Rhinichthys osculus nevadensis*) were listed as endangered with critical habitat on September 2, 1983 (48 FR 40178). A fifth endemic Ash Meadows fish species, the Ash Meadows poolfish (*Empetrichthys merriami*), is now extinct.

The Tecopa birds-beak (*Cordylanthus tecopensis*) is included in Category 2 of the November 28, 1983 (48 FR 53640), notice of review supplement for plant taxa. It is not endemic to Ash Meadows, but is a rare member of plant communities associated with desert aquatic ecosystems in Ash Meadows and elsewhere.

Much of Ash Meadows has been disturbed by past development and much of the habitat occupied by endemic plants and animals has been

eliminated. An extensive marsh in Carson Slough was destroyed when it was mined for peat in the early 1960's; roads were built through plant habitats; many thousands of acres were cleared and plowed for crop production; and aquatic environments were eliminated or severely altered by ground water pumping, water diversion, and/or impoundment.

Early homesteaders attempted to farm Ash Meadows, using the free flowing water from the springs for irrigation. These efforts failed because of the absence of adequate water and because the salty, clay soils were not suitable for crops. Agricultural practices in the late 1960's and early 1970's included the plowing of large tracts of land, and the installation of ground water pumps and diversion ditches to support a cattle feed operation. These practices resulted in the destruction of many populations of plants and animals and their wetland habitats by alteration of the land surface and lowering of the water table. In 1976, the Supreme Court limited the amount of ground water pumping in Ash Meadows to ensure sufficient water levels in the only known habitat of the endangered Devils Hole pupfish. The agricultural interests in Ash Meadows sold approximately 23 square miles of land to a real estate developer, Preferred Equities Corporation (PEC), in 1977.

While the U.S. Bureau of Land Management has jurisdiction over most of Ash Meadows, approximately 11,173 acres of land and all of the certified water rights previously owned by PEC were recently purchased by the U.S. Fish and Wildlife Service to establish the Ash Meadows National Wildlife Refuge (NWR). This purchase stopped the municipal and agricultural development of Calvada Lakes, which had been initiated by PEC and designed to support a population of 55,000 people. The purchase was undertaken to protect the large number of candidate, proposed, and listed plants and animals found in Ash Meadows.

The terrestrial habitats of the Ash Meadows ecosystem are as fragile as the aquatic habitats. The endemic plant species are dependent upon the unique hydrological characteristics of the basin and nearly all require undisturbed soils for sustenance and propagation.

Previous governmental actions affecting the subject species of this final rule began with section 12 of the Endangered Species Act of 1973, which directed the Secretary of the Smithsonian Institution to prepare a report on those plants considered to be endangered, threatened, or extinct. This report, designated as House Document

No. 94–51, was presented to Congress on January 9, 1975. On July 1, 1975, the Service published a notice in the **Federal Register** (40 FR 27823) of its acceptance of this report as a petition within the context of section 4(c)(2) of the Act (petition acceptance is now governed by section 4(b)(3) of the Act, as amended), and of its intention thereby to review the status of the plant taxa named within. These plant taxa included all the plant taxa included in the present rule.

On June 16, 1976, the Service published a proposed rule in the **Federal Register** (41 FR 24523) to determine approximately 1,700 vascular plant taxa to be endangered species pursuant to section 4 of the Act. These 1,700 plant taxa were selected on the basis of comments and data received by the Smithsonian Institution and the Service in response to House Document No. 94–51 and the July 1, 1975, **Federal Register** publication. The proposed rule included proposals of endangered status for the spring-loving centaury, Ash Meadows ivesia, Ash Meadows blazing star, Ash Meadows milk-vetch, and Amargosa niterwort. General comments on the proposal were summarized in an April 26, 1978, **Federal Register** publication (43 FR 17909).

The Endangered Species Act amendments of 1978 placed time limits for final action on proposed listings. On December 10, 1979 (44 FR 79796), the Service published a notice of the withdrawal of the June 16, 1976, proposal because the time period for final action on the proposal had expired.

On December 15, 1980, the Service published a notice of review of plant taxa (45 FR 82480). That notice identified the seven plant taxa that are subjects of the present proposal as taxa for which the Service had sufficient biological information to support their being proposed to be listed as endangered or threatened species.

On February 24, 1983, while a proposed rule was being prepared, the Service received a petition from the Northern Nevada Native Plant Society. This petition requested that the Amargosa niterwort, Ash Meadows milk-vetch, Ash Meadows blazing star, spring-loving centaury, and Ash Meadows sunray be listed as endangered and that the Ash Meadows gumplant be listed as threatened.

The Service proposed the above six species, as well as the Ash Meadows ivesia and Ash Meadows naucorid, as endangered species with critical habitat on October 13, 1983 (48 FR 46590). This proposal was to list all considered species as endangered because the development proposed by PEC would

have occurred as little as 15 years ago, by habitat disturbance during road construction, cropland development, and peat mining in Carson Slough. Threats to its existence include the alteration of storm drainage patterns through arroyos by road construction, habitat destruction in locations where road-construction activities are proposed, and the trampling by wild and free-roaming horses (Mozingo and Williams 1980). Approximately 37 percent of the habitat occupied by the Ash Meadows blazing star is located on lands the Service recently purchased for the Ash Meadows NWR.

The Ash Meadows ivesia is associated with highly alkaline, clay lowlands or depressions where soil moisture remains high from perched ground water maintained by springs and seeps (Mozingo and Williams 1980). Its presently existing populations are smaller and less numerous than those known historically, because of habitat eliminations during agricultural development, including cropland development, spring alteration, and stream channelization and diversion; and during road construction occurring with municipal development. Ground water depletion, drying ivesia habitat, poses the greatest threat to the existence of this species. Its dependence on perched ground water issuing from seeps and springs or their outflows makes it extremely vulnerable to decreases in spring discharge that result in less water seeping to areas distantly removed from water sources. Proposed road construction could eliminate populations by passing through habitat or interrupting drainage patterns and drying areas that are presently moist. Approximately 45 percent of the known populations occur on land recently purchased to establish the Ash Meadows NWR.

The Amargosa niterwort is confined to specific habitat that is restricted to extremely local areas within the Carson Slough in Nevada and California, where saline and alkaline sinks occur near the terminuses of seepage from springs that lie many miles to the north and east in Ash Meadows (Beatley 1977). Threats to this species in its extremely restricted habitat include off-road vehicle activity, nearby mining activity, and ground water depletion drying its habitat. All of the known populations occur on land managed by BLM; no populations are known to occur within land recently purchased by the Service to establish the Ash Meadows NWR.

The Ash Meadows naucorid is found only in flowing water associated with Point of Rocks Springs in east-central Ash Meadows. Its remaining habitat is greatly reduced from that known to have existed historically, because of channelization of the springs' outflow for agricultural diversion, and because of large-scale alteration at the Point of Rocks Springs area when PEC impounded approximately 90 percent of the flowing water. This species is now restricted to several stream channels less than 0.3 meters wide and 10 meters long. Threats to its livelihood include ground water depletion decreasing spring discharge, and extremely limited range making it susceptible to decline because of a single event disturbing its habitat or causing mortality. All of the remaining habitat of this species occurs within land purchased to established the Ash Meadows NWR.

B. *Overutilization for commercial, recreational, scientific, or educational purposes.* No threats from overutilization are presently known to exist that may adversely affect the plant species. The extremely small population size of the Ash Meadows naucorid makes this species vulnerable to collection for scientific purposes.

C. *Disease or predation.* The spring-loving centaury, Ash Meadows gumplant, and Ash Meadows ivesia are grazed by cattle and feral horses. The Ash Meadows gumplant has been found to be 90 percent depleted within a fenced area where cattle and horses graze near Ash Meadows Rancho. Introduced fishes and crayfish occur in Ash Meadows and are potential predators of the Ash Meadows naucorid.

D. *The inadequacy of existing regulatory mechanisms.* The State Forester Fire Warden of the Nevada Division of Forestry maintains a list of critically endangered plants. That list includes the spring-loving centaury, Ash Meadows gumplant, Ash Meadows milk-vetch, and Ash Meadows blazing star. Other than providing recognition of these species' status, inclusion on this list provides no legal protection of the individual plants or their habitats. The Amargosa niterwort is listed as endangered on the State of California list of rare and endangered species. That designation does not protect this species from the major threat to its existence, interruption of the water supply for its habitat.

E. *Other natural or manmade factors affecting its continued existence.* Trampling by cattle and/or feral horses is a threat to the native plants throughout Ash Meadows.

The Service has carefully assessed the best scientific and commercial information available regarding the past, present, and future threats faced by these species in determining to make this rule final. Based on this evaluation, the preferred action is to list the Ash Meadows sunray, Ash Meadows blazing star, Ash Meadows milk-vetch, Ash Meadows ivesia, Ash Meadows gumplant, spring-loving centaury, and Ash Meadows naucorid as threatened species, and to list the Amargosa niterwort as an endangered species. These listings are appropriate because of past disturbance to habitats has eliminated these species outside of a few relatively pristine areas. These areas may be adversely impacted by future ground water depletion, mining activities, road construction, and/or grazing activities of cattle and wild and free-roaming horses.

These species were proposed for endangered status on October 13, 1983 (48 FR 46590). The recognition of the Ash Meadows sunray, Ash Meadows blazing star, Ash Meadows milk-vetch, Ash Meadows gumplant, spring-loving centaury, Ash Meadows ivesia, and Ash Meadows naucorid as threatened species, rather than endangered species, reflects the recent acquisition of PEC lands to create the Ash Meadows NWR and thereby protect populations of these species. The threatened classification, in spite of this recent acquisition, is appropriate because the Ash Meadows NWR includes only a relatively small portion of the remaining populations of the subject plants, or in the case of the Ash Meadows naucorid, a single, extremely small population. The land recently purchased does not include adequate area to maintain the endemic plants and animals occurring in sharply defined and restricted habitats within the Ash Meadows ecosystem. Even the populations on this land remain vulnerable to a variety of problems.

The Amargosa niterwort is listed as endangered because none of its habitat is located within the area of management concern that will ultimately encompass all of the acreage proposed for the Ash Meadows NWR (Sada 1984). Its extremely localized distribution makes it vulnerable to extinction by single events such as mining, off-road vehicle activity, or ground water depletion.

An explanation of critical habitat designation is presented in the "Critical Habitat" section of this rule.

## Critical Habitat

Critical habitat, as defined by Section 3 of the Act means: (i) the specific areas within the geographical area occupied by a species, at the time it is listed in accordance with the Act, on which are

# Exhibit 19

Declaration of Brett Hartl

Case No. 3:24-cv-06324-JSC

Dakota Skipper (*Hesperia dacotae*)
Report on the Species Status Assessment
Version 2 - September 2018



Photo: Phil Delphey

## Executive Summary

U.S. Fish and Wildlife Service (Service) developed a species status assessment (SSA) for the Dakota skipper (*Hesperia dacotae*), which was listed as threatened under the Endangered Species Act in 2014.  The SSA process is intended to assess the viability of the species using the conservation biology principles 'the 3Rs' – resiliency, representation, and redundancy. We used the SSA analyses to provide a scientific basis for developing the recovery plan for Dakota skipper.  In this report we provide a summary of the species' biology at the individual, population, and species levels; describe the factors that have led to its current status and those that are likely to influence its status into the future; assess the current and future health of individual populations given these influences; and describe the implications of predicted health and distribution on the 3Rs.

The Dakota skipper inhabits remnants of tallgrass prairie and mixed-grass prairie in the north-central U.S. and into southern Saskatchewan and Manitoba Provinces of Canada. Within the native prairie patches where it persists, the species relies on high quality habitat conditions – diverse native grassland plant communities – and on natural or human disturbances that maintain the integrity of these plant communities while minimizing mortality to vulnerable life stages. Populations may also be positively or negatively influenced significantly at local, landscape, regional, and continental scales by other factors that include activities such as grazing, haying, burning, pesticide use, and climate change.

To evaluate the degree to which the Dakota skipper may be able to adapt to novel changes in its environment (representation), we delineated areas with potential sources of unique adaptive diversity (referred to as 'adaptive capacity units', ACU). We evaluated the Dakota skipper historical, current, and future distribution within the ACUs to assess the degree of genetic and environmental diversity that the species may have lost to date and is predicted to lose into the future.

As with many species, we were forced to infer some aspects of the species' historical distribution and population dynamics due to an incomplete record of its occurrence before massive conversion of its habitat took place.  At locations where its observation was recorded – between the early 1900s and 2017 – the species is gone from about half of the sites.  Proximate causes of its local extinction include the complete removal of its native prairie habitat and its replacement with row-crop agriculture, habitat degradation due to recurring intensive livestock grazing and invasive plant species, and unsustainable mortality caused by prescribed fire and insecticide use. The Dakota skipper is now extirpated entirely from one ACU, and in the remaining four ACUs where it has persisted, 17% to 64% of the metapopulations have been lost.

To assess the health of Dakota skipper populations within and among ACUs and, ultimately, the species' viability, we assumed a classical metapopulation structure for the species. Relative to historical conditions, the species' distribution is now fragmented among discrete remnants of native tallgrass and mixed-grass prairie and has been extirpated from major portions of its range, especially in the south and east.  Using input from several species experts, we developed a Bayesian Belief Network model to allow us to estimate the likelihood population persistence over 10 years.  The key variables, which were identified by expert input, included: (1)

management practices (burning, haying, grazing regimes); (2) pesticide use; (3) habitat patch size; and, (4) current population size. The model uses the effects that these factors would have on Dakota skipper populations – based on the expert opinion – and on our understanding of the current state of each factor and the likely condition of each factor over the next 10 years to predict the probability of persistence in 20 years. We estimated probability of persistence for each subpopulation under a range of plausible future scenarios for the state conditions: the best-case, worst-case, and the most likely-case scenarios.

Under current state conditions, the predicted probabilities of persistence were low, generally – less than 0.5 for more 56% of extant metapopulations – and may be even lower if dispersal among subpopulations is less than we assumed. Under the best-case and worst-case future scenarios, 72% and 63% show no change in the probability of persistence, respectively.  That is, populations in poor condition now were likely to have a similar poor health in 20 years. Our model assumed that dispersal would occur in metapopulations; if, however, dispersal does not occur among subpopulations, the estimated likelihoods of persistence may be lower than presented. More than half (57%) of the nominal metapopulations now consist of only one subpopulation and likely have almost no chance of recovery from a local extirpation.

The Dakota skipper is still widespread and persists in a variety of ecological settings, both of which confer resiliency, redundancy, and representation benefits. The frequency and intensity of droughts, for example, likely vary across the many different ecological settings and landscapes that the species still inhabits. The species' current widespread distribution thus provides some buffer against rangewide-scale catastrophes. Nonetheless, the number, health, and distribution of Dakota skipper populations have declined over time and are projected to continue to decline into the future. With these losses, the ability of the species to withstand normal environmental variation and stochastic disturbances (resiliency), catastrophes (redundancy), and its ability to adapt to novel changes such as diseases and climate (representation) have been diminished.

The status of the Dakota skipper will rely on protection of remaining habitat patches from conversion or degradation; grassland management practices that maintain and restore high quality habitat that facilitates population growth, dispersal, and minimizes inbreeding and other processes deleterious to the maintenance of adaptive capacity; low mortality caused by land management; minimization of threats from factors such as pesticide drift; restoration and maintenance of geographic distribution patterns that ensure that the species maintains its ability to persist in the face of stochastic variations in environmental and to adapt to novel environmental changes.  Novel environmental changes may include a shift to wetter and warmer conditions in all or a large portion of the species' range that could increase the threat posed by invasive cool-season grasses.

Of note, we were unable to quantitatively assess the current and future vulnerability of Dakota skipper populations to catastrophes; nor have we fully assessed the implications of climate change. Further, our model was predicated upon several assumptions which in totality likely yield an underestimate of risk.  In the synthesis portion of the report, we discuss the key uncertainties that should be addressed to increase our ability to predict population trends and to identify, prioritize, and implement important recovery actions.