UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PESTICIDE ACTION NETWORK NORTH AMERICA,, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PAUL SOUZA, et al.,<br><br>Defendants. | Case No. 24-cv-06324-JSC<br><br>**ORDER RE: MOTION TO ADMIT EXTRA-RECORD EVIDENCE**<br><br>Re: Dkt. No. 59 |

Pesticide Action Network North America, Center for Biological Diversity, and Center for Food Safety ("Plaintiffs") challenge a 2022 biological opinion issued by U.S. Fish and Wildlife Service ("FWS") regarding malathion, a pesticide active ingredient. In May 2025, Plaintiffs moved for summary judgment, arguing FWS's biological opinion is arbitrary and capricious. (Dkt. No. 59.)[1] That motion will be argued in January 2026. Plaintiffs simultaneously moved to admit extra-record evidence to supplement the administrative record (Dkt. No. 59), which is now pending before the Court. FWS and Paul Souza ("Federal Defendants") oppose admission of certain exhibits, and CropLife America—who intervened in this action—"opposes admission of the same documents that are opposed by" Federal Defendants. (Dkt. No. 63 at 2.) Having carefully considered the parties' submissions, and with the benefit of oral argument on July 10, 2025, the Court DENIES Plaintiffs' motion. For some exhibits, Plaintiffs' motion is moot because the exhibits are already part of the administrative record. For other exhibits, Plaintiffs fail to satisfy the narrow criteria for admission of extra-record evidence. For the exhibits that are

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents. Citations to the administrative record are labeled "AR," followed by the document number.

inadmissible as extra-record evidence but may be relevant to remedy, the Court's denial is without prejudice to Plaintiffs seeking their admission during the remedy phase in this matter.

## LEGAL STANDARD

Cases challenging biological opinions are reviewed under the Administrative Procedures Act ("APA"). *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). Generally, "courts reviewing an agency decision are limited to the administrative record." *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005) (quoting *Lorion*, 470 U.S. at 743-44). "This rule ensures that the reviewing court affords sufficient deference to the agency's action." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014). There are "narrow exceptions to this general rule." *Id.* at 1030. A district court may permit admission of extra-record evidence:

> (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision,
> (2) if the agency has relied on documents not in the record,
> (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or
> (4) when plaintiffs make a showing of agency bad faith.

*Id.* (quotation marks omitted). Under the first exception—called the "relevant factors" exception—a district court may "consider extra-record evidence to develop a background against which it can evaluate the integrity of the agency's analysis." *Locke*, 776 F.3d at 993. That is, the district court may consider evidence "to help [it] understand whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious." *Id.* But under this exception, the district court cannot admit extra-record evidence for the purpose of "judg[ing] the wisdom of the agency's action" or "questioning the agency's scientific analyses or conclusions." *Id.*

The four exceptions—which "operate to identify and plug holes in the administrative record"—are "narrowly construed and applied." *Id.* "[T]he party seeking to admit extra-record evidence initially bears the burden of demonstrating that a relevant exception applies." *Locke*, 776

2

F.3d at 993.

## DISCUSSION

Plaintiffs seek to admit 19 documents and portions of the declaration of Brett Hartl under the "relevant factors" exception. (Dkt. No. 59.) The Court begins with the exhibits on which the parties agree, then turns to the disputed exhibits. Finally, the Court addresses Federal Defendants' request to disregard the declaration of Kara Clauser, which Plaintiffs submitted with their summary judgment motion.

### I. NON-DISPUTED EXHIBITS

Federal Defendants contend 12 of the exhibits Plaintiffs seek to admit are already part of the administrative record. Specifically, Federal Defendants state Exhibits 8-14 and 16-19 were directly referenced in the biological opinion and therefore incorporated by reference. Federal Defendants also state Exhibit 3 was included in the record. CropLife agrees Plaintiffs' motion "should be denied as moot with respect to these documents." (Dkt. No. 63 at 2.) Given the parties' agreement that Exhibits 3, 8-14, and 16-19 are part of the administrative record, the Court DENIES as moot Plaintiffs' request to admit these 12 exhibits.

### II. DISPUTED EXHIBITS

#### A. Exhibit 6

Exhibit 6 is a National Wildlife Health Center report about the death of a whooping crane chick and related emails, (Dkt. No. 60-1 at 59-64), which Plaintiffs obtained through a FOIA request. While "predation [was] the suspected cause of death" of the chick, the report notes exposure to organophosphates, which are "broadly used as insecticides for agricultural or pest control purposes" and "can be ingested or topically absorbed by birds causing severe neuromuscular and cardiovascular signs." (*Id.* at 62.) The report continues: "The levels of inhibition were close to those considered lethal for birds (50% or higher) and therefore should be considered as a potential contributor to the death of this crane." (*Id.*) In an email discussing the report, an FWS employee states "I understand that this is not an isolated case either." (*Id.* at 59.)

Plaintiffs assert Exhibit 6 "is necessary to evaluate whether FWS adequately explained its decision with respect to effects of pesticides on whooping cranes." (Dkt. No. 64 at 5; Dkt. No. 59

3

1   at 8 (that a whooping crane was "suspected to have been poisoned by an organophosphate like

2   malathion shows that FWS's conclusion that it did not anticipate mortality from malathion use is

3   off base").) Federal Defendants respond "FWS expressly considered this mortality event in the

4   [biological opinion]." (Dkt. No. 62 at 11.) Federal Defendants refer to the opinion's species-

5   specific analysis:

> There is no evidence that pesticide contamination has ever been a significant threat to whooping cranes. Whooping crane egg and tissue specimens examined for pesticide residues have shown concentrations well below those encountered in most other migratory birds (Robinson et al. 1965, Lamont and Reichel 1970, Anderson and Kreitzer 1971, Lewis et al. 1992b). Eggshell thickness, a measure of contaminant exposure, has been measured in eggs taken from the wild and those in captivity from the 1970s to the present; no evidence of shell thinning has been detected. In recent years, one confirmed whooping crane chick and potentially other cases of acetylcholinesterase inhibition were associated with the experimental Eastern Migratory Population on Necedah National Wildlife Refuge. Acetylcholinesterase inhibition is suggestive of organophosphate exposure, though pesticides were not tested for in these cases. The refuge is downstream of cranberry bogs, and runoff from these sites is a suspected cause of any pesticide exposure. As malathion is not registered for use on cranberry bogs, we do not suspect malathion exposure in these cases (Pers. comm. 2020 with Sarah Warner, USFWS).

16  AR-27648.

17  The Court DENIES Plaintiffs' request to admit Exhibit 6 under the "relevant factors"

18  exception. The discussion of the death of a whooping crane in Exhibit 6—including the email

19  stating "this is not an isolated case," (Dkt. No. 60-1 at 59, 62)—is consistent with the biological

20  opinion's discussion of "one confirmed whooping crane chick and potentially other cases of

21  acetylcholinesterase inhibition," *see* AR-27648. So, Exhibit 6 does not contain a relevant factor

22  FWS failed to consider. And while Plaintiffs asserted at oral argument that Exhibit 6 shows FWS

23  didn't explain its decision "well enough," the standard for admitting extra-record evidence does

24  not turn on how well the agency explained its decision. The question is whether the agency "has

25  explained its decision" about the threat of pesticide contamination to whooping cranes—and as the

26  excerpt above illustrates, it has. *See Locke*, 776 F.3d at 992. Plaintiffs disagree with FWS's

27  conclusion "[t]here is no evidence that pesticide contamination has ever been a significant threat to

28  whooping cranes" and its conclusion "we do not suspect malathion exposure in the[] [whooping

4

crane] cases." *See* AR-27648. But in requesting admission of Exhibit 6 to challenge these conclusions, Plaintiffs seek to do what Ninth Circuit precedent prohibits: "questioning the agency's scientific analyses or conclusions." *See Locke*, 776 F.3d at 993; *see also Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013) ("[T]he document in question must do more than raise nuanced points about a particular issue; it must point out an entirely new general subject matter that the defendant agency failed to consider.") (cleaned up).

### B.     Exhibits 2 and 5

Plaintiffs assert Exhibits 2 and 5 illustrate FWS's change in position with respect to using pesticide "usage data." As context, pursuant to 16 U.S.C. § 1536, the EPA was required to consult with FWS to ensure its authorization of malathion for distribution and sale was "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." Plaintiffs' summary judgment motion contends FWS adopted a position in 2013 with respect to these consultations, which it changed in late 2017. That is, in 2013, "FWS, EPA, and the National Marine Fisheries Service ('NMFS') agreed to work on a 'shared' consultation approach" involving a "weight-of-evidence" approach in which "pesticide 'usage data' was rarely mentioned." (Dkt. No. 58 at 15.) This approach was informed by a 2013 National Academy of Sciences report stating "FWS cannot reasonably rely on usage data to assume sub-maximum rates of malathion use without 'supporting data.'" (Dkt. No. 64 at 3 (quoting AR-249).) According to Plaintiffs, FWS changed this position by collecting and relying on usage data for purposes of the malathion biological opinion.

In the present motion, Plaintiffs seek to admit Exhibits 2 and 5 as extra-record evidence to "show, in part, how this change in position unfolded." (Dkt. No. 59 at 9.) Exhibit 2 is an April 2017 letter sent by registrants of products containing malathion to the Secretaries of Interior and Commerce "asking them to direct FWS and [National Marine Fisheries Service] to set aside their efforts to prepare biological opinions on the effects of malathion." (Dkt. No. 60-1 at 5-14.) Exhibit 5 is part of National Marine Fisheries Service's biological opinion. (Dkt. No. 60-1 at 41-57.)

The Court DENIES Plaintiffs' request to admit Exhibit 2. Plaintiffs contend its letters are

"crucial to understand and evaluate FWS's subsequent decisions to delay the [biological opinion] for years while seeking usage data from the EPA." (Dkt. No. 64 at 4.) But the administrative record contains documents explaining FWS's decision to delay the biological opinion while seeking usage data. For example, a January 2020 memo on the malathion consultation states:

> Specific to the extension the [Fish and Wildlife] Service sought and obtained in 2017-2018, the Service sought additional information on "use" and "usage" of malathion. In our analyses, "use" refers to allowable malathion uses as described on its label (e.g., agricultural, mosquito control, home and garden). By mapping where these uses may occur on the landscape, we form the basis of the geographic extent of the effects of the action. "Usage" refers to the likelihood of application within these use sites. When the Service relies on more refined information for each of these factors, its determination of the effects to listed species and critical habitat that are reasonably certain to occur is likely to be more accurate.
>
> One of the difficulties with consulting on EPA's registration review of malathion is that the uses authorized on the label do not necessarily reflect how and where the product will be used on the landscape. As a result, the Service determined it was necessary to search for, gather, and compile data to inform both use and usage from a variety of different sources throughout the country and territories. The Service lacked data for several types of uses (e.g., mosquito control, home and garden), as well as data for certain geographic regions (e.g., Pacific and Caribbean Islands). These data gaps are significant, and without such information, the Service has found it difficult to adequately estimate usage in our analyses and determine usage that is reasonably certain to occur. Furthermore, while agricultural (as opposed to other uses, such as residential) usage data was available at the state-level, more refined data was needed for our analyses. Thus, the Service has worked to identify additional available data at a more refined spatial scale that will meaningfully inform our analysis of exposure to listed species, which generally occur in more narrow geographic ranges.
>
> Thus, from approximately February 2018 through November 2018, and in coordination with EPA, NMFS, and the USDA, the Service compiled a list of numerous sources of potential data, creating a "Usage Data Catalogue" based on the expertise of the four agencies and including consideration of any uncertainties and limitations associated with the data. After a thorough review of the suitability, availability, and robustness of each potential source, the scope was narrowed to those the Service believes could meaningfully inform the malathion consultation, and serve as the best available scientific and commercial data for our analyses.

AR-1522-23. Because the record describes FWS's decision to use and collect usage data, Plaintiffs "fail[] to show any . . . gaps or holes" on this issue that need plugging. *See Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010). Put another way, because the

1   record explains FWS's decision to use usage data, Exhibit 2 neither demonstrates FWS's failure to

2   consider a relevant factor nor demonstrate FWS's failure to explain its decision.

3       On reply, Plaintiffs argue they "are not objecting to FWS's efforts to collect and consider

4   relevant usage data altogether" but instead are objecting "to how FWS relied on those usage data

5   despite their lack of the necessary statistical support, in contravention of its established scientific

6   approach." (Dkt. No. 64 at 3.) The letters from registrants do not bear on the reliability of usage

7   data, so Exhibit 2 does not fulfill the purpose for which Plaintiffs seek to admit it.

8       The Court also DENIES Plaintiff's request to admit Exhibit 5. Exhibit 5 was issued after

9   the FWS biological opinion at issue and therefore cannot be admitted as extra-record evidence

10  under the "relevant factors" exception. *See Cachil Dehe Band of Wintun Indians of Colusa Indian*

11  *Cmty. v. Zinke*, 889 F.3d 584, 600 (9th Cir. 2018) (citation omitted) ("[E]xceptions to the normal

12  rule regarding consideration of extra-record materials only apply to information available at the

13  time, not post-decisional information."); *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d

14  1113, 1131 (9th Cir. 2012) ("[T]he post-decision bar may not be applied to require augmentation

15  of information used to rationalize, attack, or even analyze an agency decision post hoc.") (citation

16  omitted). Given the post-decision bar, Plaintiffs request admission of Exhibit 5 "for the narrow

17  proposition that it establishes the pre-decisional fact that, at the time FWS published its [biological

18  opinion], it knew [National Marine Fisheries Service's] did not share its view that the usage data

19  could bear the weight FWS placed on them." (Dkt. No. 64 at 5.) Even accepting the inference

20  Plaintiffs ask the Court to draw—that FWS knew of National Marine Fisheries Service's

21  position—Plaintiffs fail to demonstrate such knowledge falls within the narrow "relevant factors"

22  exception. That FWS knew of another agency's position regarding usage data does not

23  demonstrate FWS failed to consider a relevant factor or failed to explain its decision—particularly

24  when, as discussed above, the administrative record explains FWS's decision to collect and use

25  usage data.

26      **C.   Exhibit 7**

27      Exhibit 7 contains June 2024 and May 2025 malathion usage reports, which Plaintiffs

28  contend "show that usage data is not reliable to predict future use of malathion." (Dkt. No. 59 at

7

1  10; Dkt. No. 60-1 at 65-89.) It is undisputed both reports postdate the biological opinion at issue.
2  So, the Court cannot admit Exhibit 7 under the "relevant factors" exception. *See Zinke*, 889 F.3d
3  at 600.

4  Plaintiffs assert "Exhibit 7 is properly before the Court for purposes of remedy." (Dkt. No.
5  64 at 6.) Specifically, Plaintiffs argue the Exhibit 7 reports are relevant to the requested remedy—
6  tailored vacatur of the malathion incidental take statement—because they demonstrate that usage
7  data does not reliably predict future malathion use and thus the "incidental take statement, which
8  relies heavily on such data for its predictions of harm, may put species at grave risk if left in
9  place." (Dkt. No. 64 at 7.) "Plaintiffs submitted Exhibit 7 with the motion to admit extra-record
10 evidence in an abundance of caution to ensure against any party arguing that Plaintiffs had waived
11 any argument that it should be admitted for remedy purposes." (*Id.*)

12 Given the post-decision bar, the Court DENIES without prejudice Plaintiffs' request to
13 admit Exhibit 7 as extra-record evidence. If the Court determines it is appropriate to set aside the
14 biological opinion as arbitrary or capricious, it will proceed to consideration of the proper remedy,
15 and at that time, Plaintiffs may move to admit Exhibit 7. As Federal Defendants acknowledge
16 "[t]he Court's consideration of the proper remedy is not limited to the administrative record."
17 (Dkt. No. 62 at 14.) And while CropLife "does not concede that there is an unqualified exception
18 permitting submission of extra-record documents allegedly relevant to remedy," it acknowledges a
19 "small number of cases" in which courts permitted extra-record evidence in considering whether
20 an unlawful agency decision should be vacated. (Dkt. No. 63 at 2.) So, the parties agree (1)
21 Exhibit 7 is not relevant for the merits of Plaintiffs' summary judgment motion, and (2) there is
22 precedent for admitting extra-record exhibits for remedy purposes. Plaintiffs have not waived
23 their argument that Exhibit 7 should be admitted for remedy purposes, should the Court reach the
24 issue.

25 Paragraphs 53 and 54 of the Hartl declaration describe the Exhibit 7 reports, (Dkt. No. 60
26 ¶¶ 53-54), so the same conclusion applies. The Court declines to admit these paragraphs for
27 purposes of determining whether FWS's biological opinion is arbitrary and capricious. If the
28 Court reaches the remedy phase, Plaintiffs may move for their admission at that time.

### D. Exhibit 15

Exhibit 15 is a 5-Year Review of a species analyzed in the biological opinion. (Dkt. No. 60-1 at 118-121.) Because is undisputed Exhibit 15, issued in August 2024, postdates the biological opinion at issue, the post-decision bar applies. On reply, "Plaintiffs agree that Exhibit 15 should not be considered on the merits because it was a post-decisional document that was not cited to show pre-decisional information." (Dkt. No. 64 at 9.) However, Plaintiffs "believe it may be used to evaluate the consequences of vacatur in considering remedy." (*Id.*)

Given the post-decision bar, the Court DENIES without prejudice Plaintiffs' request to admit Exhibit 15 as extra-record evidence. *See Zinke*, 889 F.3d at 600. Plaintiffs may move for admission of Exhibit 15 if the Court reaches the remedy phase.

### E. Exhibits 1 and 4

Plaintiffs' motion seeks admission of Exhibits 1 and 4 as additional documents illustrating FWS's change in position with respect to usage data. Federal Defendants argue "Plaintiffs cannot show that Exhibits 1 and 4 are necessary for judicial review when they fail to even cite or rely on the exhibits in their summary judgment motion." (Dkt. No. 62 at 12.) *See Powell*, 395 F.3d at 1030 ("[D]istrict courts are permitted to admit extra-record evidence . . . *if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision.*") (emphasis added) (cleaned up). On reply, Plaintiffs "agree that Exhibits 1 and 4 . . . should not be considered on the merits but . . . maintain that they may be considered for other proper purposes such as standing, remedy, or authenticating documents." (Dkt. No. 64 at 2.)

Given Plaintiffs' admission, the Court DENIES the request to admit Exhibits 1 and 4 as extra-record evidence. Any consideration of these documents is limited to non-merit purposes.

### III. HARTL DECLARATION

Plaintiffs' motion seeks to admit "portions of the Declaration of Brett Hartl, specifically, paragraphs 13-35 and 53-54." (Dkt. No. 59 at 5.) As discussed above, Plaintiffs concede ¶¶ 53-54 are only relevant to remedy and therefore inadmissible as extra-record evidence. As to ¶¶10-35, Federal Defendants oppose admission because Plaintiffs "do not rely on any of these paragraphs in the merits portion of their summary judgment brief." (Dkt. No. 62 at 15.) On reply, Plaintiffs

9

"agree that . . . Hartl Declaration ¶¶ 10–35 should not be considered on the merits because they were not cited in support of Plaintiffs' merits arguments." (Dkt. No. 64 at 9.)  So, Plaintiffs' request to admit ¶¶10-35 and ¶¶ 53-54 as extra-record evidence is DENIED.  If the Court considers the remaining paragraphs in the Hartl declaration, such consideration will be limited to assessing standing.

### IV.   CLAUSER DECLARATION

Federal Defendants ask the Court to "strike or otherwise not consider the Clauser Declaration as extra-record evidence." (Dkt. No. 62 at 19.)  The declaration of Kara Clauser, "a Geographic Information System ('GIS') specialist at the Center for Biological Diversity," is among the declarations Plaintiffs submitted "demonstrating Plaintiffs' interests" for standing purposes.  (Dkt. No. 58 at 18 n.3; Dkt. No. 58-1 at 35.)  Ms. Clauser prepared maps "concerning the U.S. Fish and Wildlife Service's biological opinion assessing the insecticide Malathion and its products, and related data concerning ESA-protected species and the potential use of malathion." (Dkt. No. 58-1 at 35.)  Federal Defendants assert the Clauser declaration is irrelevant to establish standing and is instead used by Plaintiffs to support their merits arguments.  Plaintiffs disagree with this characterization and state the maps Ms. Clauser prepared "solely serve as visual aids for some declarants." (Dkt. No. 64 at 8.)  According to Plaintiffs, "given the parties' agreement that the maps are not necessary to demonstrate standing, the Court may . . . disregard them." (*Id.*; *id.* ("The Court should disregard the declaration for any purpose other than illustrative exhibits related to standing.").)

The Court therefore disregards the Clauser declaration for any purpose other than as an illustrative exhibit to assess standing.  That is, if the Court considers the Clauser declaration, it will do so only as part of reviewing the standing declarations at Docket No. 58-1.  Because the Court's consideration of the maps—if at all—will be limited to the issue of standing, Federal Defendants' request to submit a rebuttal declaration is denied.

### CONCLUSION

The Court DENIES as moot Plaintiffs' request to admit Exhibits 3, 8-14, and 16-19.  And the Court DENIES without prejudice Plaintiffs' request to admit Exhibits 1-2, 4-7, and 15.  For the

10

exhibits relevant to the remedy issue, Plaintiffs may move to admit those documents if the Court determines the biological opinion is arbitrary and capricious.

This Order disposes of Docket No. 59.

**IT IS SO ORDERED.**

Dated: July 11, 2025

JACQUELINE SCOTT CORLEY
United States District Judge