ADAM R.F. GUSTAFSON, Acting Assistant Attorney General
MEREDITH FLAX, Deputy Section Chief
ELIZABETH KIRBY (TX Bar # 24104199)
JOSEPH W. CRUSHAM (CA Bar # 324764)
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Tel | (202) 307-1145; (202) 305-0339; Fax | (202) 305-0275
Email: joseph.crusham@usdoj.gov; elizabeth.kirby@usdoj.gov

*Counsel for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| PESTICIDE ACTION NETWORK NORTH AMERICA; CENTER FOR BIOLOGICAL DIVERSITY; and CENTER FOR FOOD SAFETY, | Case No. 3:24-cv-6324-JSC |
| *Plaintiffs,* | **FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| PAUL SOUZA, Regional Director, Region 8, exercising the delegated authority of the Director of the Fish and Wildlife Service; and UNITED STATES FISH AND WILDLIFE SERVICE, | Date: January 8, 2026
Time: 10:00 AM
Place: Courtroom 8
    450 Golden Gate Ave.
    San Francisco, California |
| *Federal Defendants,* | |
| and | Honorable Jacqueline Scott Corley |
| CROPLIFE AMERICA, Inc., | |
| *Defendant-Intervenors.* | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on January 8, 2026, at 10:00 a.m., or as soon thereafter as the parties may be heard, in the courtroom of the Honorable Jacqueline Scott Corley, located in the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, California, Courtroom 8, Federal Defendants will and hereby does move the Court to issue an order granting judgment in Federal Defendants' favor, and denying Plaintiffs' Motion for Summary Judgment, ECF No. 58.

As explained in detail below, Federal Defendants' Cross-Motion is brought on the basis that the U.S. Fish and Wildlife Service's biological opinion complies with the Administrative Procedure Act and the Endangered Species Act.

1

## TABLE OF CONTENTS

2
                                                                                        **PAGE**

3   STATEMENT OF THE ISSUES TO BE DECIDED.......................................................... 1

4   LEGAL BACKGROUND ........................................................................................... 1

5   FACTUAL Background.............................................................................................. 2

6
    I. Genesis of the malathion consultation......................................................................... 3
7

8   II. FWS requests additional data to improve reliability and EPA publishes draft
       BiOp for public comment. ....................................................................................... 4
9

10  III. FWS releases final BiOp.......................................................................................... 5

11
       a. Proposed Action ................................................................................................... 6
12
       b. Status of the Species/Critical Habitat, Action Area, and Environmental Baseline ........... 7
13
       c. Effects of the Action ............................................................................................. 8
14
          i. FWS considered effects to listed species........................................................... 8
15
          ii. FWS considered effects to critical habitat. ...................................................... 10
16
       d. Jeopardy and Destruction or Adverse Modification Determinations ............................ 11
17
    IV. FWS also issued an incidental take statement for listed animal species. ......................... 13
18

19  STANDARD OF REVIEW .......................................................................................... 15

20  ARGUMENT ............................................................................................................ 16

21  I. FWS's BiOp complied with the ESA. ......................................................................... 16

22     a. FWS adequately assessed malathion's effects to the species at issue............................. 16

23        i. Plaintiffs misinterpret FWS's range determinations.............................................. 16

24        ii. Plaintiffs fail to rebut FWS's determination that usage data is part of the best
              available science for assessing effects, nor do they show FWS must explain a
25            change in position regarding usage data. ......................................................... 19

26
          iii. FWS adequately explained its consideration of usage data...................................... 21
27
          iv. Usage data rationally assisted in specific species analyses. ................................... 23
28

b. The BiOp's jeopardy determinations are rational and supported by the record. .............. 26

c. The record supports the BiOp's rational critical habitat analysis and conclusions .......... 30

II. FWS's ITS rationally minimizes the impact of incidental take to listed animals. ............... 34

a. The ITS is separate from the jeopardy analysis and FWS has significant discretion in deciding which RPMs and terms and conditions are necessary and appropriate to minimize the impact of incidental take. ........................................................................... 34

b. Plaintiffs' focus on the proposed action's incorporated label changes is misplaced. ....... 36

c. Consistent with the ESA, FWS included an RPM and terms and conditions that it found "necessary and appropriate" to minimize the impact of incidental take. .............. 38

III. No remedy is warranted, and consideration of remedy is premature at this stage.............. 40

CONCLUSION .................................................................................................................... 40

# TABLE OF AUTHORITIES

**CASE**                                                                          **PAGE(S)**

*All. for the Wild Rockies v. Savage,*
   375 F. Supp. 3d 1152 (D. Mont. 2019) ................................................................. 40

*Ariz. Cattle Growers' Ass'n v. Salazar,*
   606 F.3d 1160 (9th Cir. 2010) .............................................................................. 17

*Bear Lake Watch, Inc. v. FERC,*
   324 F.3d 1071 (9th Cir. 2003) .............................................................................. 35

*Bennett v. Spear,*
   520 U.S. 154 (1997)................................................................................................ 2

*CBD v. BLM,*
   833 F.3d 1136 (9th Cir. 2016) .............................................................................. 36

*CBD v. Bureau of Land Mgmt.,*
   422 F. Supp. 2d 1115 (N.D. Cal. 2006) ............................................................... 35

*CBD v. Bureau of Land Mgmt.,*
   746 F. Supp. 2d 1055 (N.D. Cal. 2009) ............................................................... 34

*CBD v. Culver,*
   2024 WL 4505468 (N.D. Cal. Oct. 15, 2024)....................................................... 35

*CBD v. FWS,*
   No. CV 18-0342-ABJ, 2021 WL 1209221 (D.D.C. Mar. 31, 2021) .................. 4, 20

*CBD v. Haaland,*
   998 F.3d 1061 (9th Cir. 2021) .............................................................................. 20

*CBD v. Kempthorne,*
   588 F.3d 701 (9th Cir. 2009) ................................................................................ 15

*CBD v. Regan,*
   734 F. Supp. 3d 1 (D.D.C. 2024).............................................................. 27, 30, 31

*CBD v. Salazar,*
   695 F.3d 893 (9th Cir. 2012) ................................................................................ 34

*Conner v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) .............................................................................. 20

*Ctr. for Food Safety v. EPA*,
   757 F. Supp. 3d 997 (N.D. Cal. 2024) ................................................................. 1

*Defs. of Wildlife v. Jewell*,
   176 F. Supp. 3d 975 (D. Mont. 2016) ................................................................. 30

*Defs. of Wildlife v. Zinke*,
   856 F.3d 1248 (9th Cir. 2017) ............................................................. 26, 27, 30, 31

*Frontier State Bank Oklahoma City, Okla. v. FDIC*,
   702 F.3d 588 (10th Cir. 2012) ............................................................................ 35

*FWS v. Sierra Club, Inc.*,
   592 U.S. 261 (2021) ........................................................................................... 20

*Gifford Pinchot Task Force v. FWS*,
   378 F.3d 1059 (9th Cir. 2004) ............................................................................ 28

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. (2024) ................................................................................................... 35

*Nat. Res. Def. Council v. Haaland*,
   102 F.4th 1045 (9th Cir. 2024) ..................................................................... 19, 37

*Nat'l Fam. Farm Coal. v. EPA*,
   966 F.3d 893 (9th Cir. 2020) ................................................................................ 1

*Nat'l Wildlife Fed'n v. NMFS*,
   524 F.3d 917 (9th Cir. 2008) ........................................................................ 26, 27

*Native Ecosystems Council v. Marten*,
   No. CV 17-47-M-DLC-JCL, 2018 WL 3630132 (D. Mont. July 31, 2018) ............ 29

*Nw. Ecosystem All. v. FWS*,
   475 F.3d 1136 (9th Cir. 2007) ............................................................................ 15

*Nw. Env't Advocs. v. EPA*,
   855 F. Supp. 2d 1199 (D. Or. 2012) ................................................................... 30

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
   957 F.3d 1024 (9th Cir. 2020) ............................................................................ 15

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
   426 F.3d 1082 (9th Cir. 2005) ............................................................................ 31

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ............................................................ 2, 15, 20

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) ................................................................ 19, 20

*Trout Unlimited v. Lohn*,
   559 F.3d 946 (9th Cir. 2009) ................................................................ 15, 21

**STATUTES**

5 U.S.C. § 706(2)(A) ............................................................................... 15

16 U.S.C. § 1532(5)(A) .......................................................................... 18

16 U.S.C. § 1532(5)(C) .......................................................................... 18

16 U.S.C. § 1532(5)(A)(ii) ..................................................................... 30

16 U.S.C. § 1536(a)(2) ................................................................ 1, 2, 30, 34

16 U.S.C. § 1536(b)(3)(A) ...................................................................... 34

16 U.S.C. § 1536(b)(4) ...................................................................... 2, 34

16 U.S.C. § 1536(b)(4)(i–iv) .................................................................. 34

16 U.S.C. § 1536(b)(4)(B) ...................................................................... 34

16 U.S.C. § 1536(o)(2) ...................................................................... 2, 35

**REGULATIONS**

50 C.F.R. § 402.02 ........................................................................... passim

50 C.F.R. § 402.14(g)(2)–(3) .................................................................. 27

50 C.F.R. § 402.14(g)(4) ......................................................................... 2

50 C.F.R. § 402.14(g)(8) ..................................................................... 2, 36

50 C.F.R. § 402.14(h) ............................................................................. 2

50 C.F.R. § 402.14(i)(1)(i) ................................................................... 2, 13

50 C.F.R. § 402.14(i)(1)(ii) ..................................................................... 2

50 C.F.R. § 402.14(i)(1)(iv) ..................................................................... 2

50 C.F.R. § 402.14(i)(2) ......................................................................... 37

50 C.F.R. § 402.14(i)(5) ......................................................................... 35

50 C.F.R. § 402.16 ............................................................................... 35

50 C.F.R. § 424.12(b) ........................................................................... 30

**FEDERAL REGISTER**

50 Fed. Reg. 24,653 (June 12, 1985) ........................................................ 32

66 Fed. Reg. 22,938 (May 7, 2001) .......................................................... 32

66 Fed. Reg. 36,038 (July 10, 2001) ........................................................ 32

67 Fed. Reg. 57, 638 (Sept. 11, 2002) ...................................................... 32

81 Fed. Reg. 7214-01 (Feb. 11, 2016) ...................................................... 30

1

**STATEMENT OF THE ISSUES TO BE DECIDED**

2      This case concerns the U.S. Fish and Wildlife Service's ("FWS") biological opinion

3 ("BiOp") on the U.S. Environmental Protection Agency's ("EPA") registration of malathion

4 under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). As Plaintiffs concede,

5 the BiOp was the result of one of the "most complex" consultations undertaken under the

6 Endangered Species Act ("ESA"). Plaintiffs' Motion, ECF No. 58 ("Pls. Mot.") at 11.[1] The BiOp

7 features FWS's expert analysis of the effects of EPA's nationwide registration of malathion over

8 15 years based on the best available science. FWS's analyses and conclusions made within the

9 scope of its technical expertise warrant significant deference under the Administrative Procedure

10 Act ("APA"). Plaintiffs' chief complaint—that the BiOp omits species-specific analyses—is

11 belied by the record, which features exhaustive, tailored analyses for each species and critical

12 habitat at issue. Beyond that, Plaintiffs improperly seek to substitute FWS's expert opinions with

13 their own by second-guessing FWS's methodologies and weighing of data. As explained more

14 fully below, because FWS's BiOp complies with the ESA and APA, the Court should grant

15 Federal Defendants' motion for summary judgment and deny Plaintiffs' motion.

16

**LEGAL BACKGROUND**

17      FIFRA prohibits the distribution or sale of pesticides unless they are registered, with

18 certain exceptions. *Ctr. for Food Safety v. EPA*, 757 F. Supp. 3d 997, 1003 (N.D. Cal. 2024)

19 (citing 7 U.S.C. § 136a(a)). "Before any pesticide can be sold or used in the United States, EPA

20 must register the pesticide—that is, provide a license that establishes the terms and conditions

21 under which a pesticide may be lawfully sold, distributed, and used within the United States."

22 *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 912 (9th Cir. 2020).

23      EPA must ensure that its registration is not likely to jeopardize the continued existence of

24 listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2).

25 To this end, "[t]he ESA and its implementing regulations delineate a process—known as Section

26 7 consultation—for determining the biological impacts of a proposed action." *Nat'l Fam. Farm*

27 _____

28 [1] Federal Defendants cite the ECF generated page numbers throughout this brief.

1   *Coal.*, 966 F.3d at 922. During consultation, FWS evaluates the current status, environmental

2   baseline, and the effects of the proposed action on the listed species and critical habitat to

3   determine whether the proposed action is "likely to jeopardize the continued existence of listed

4   species or result in the destruction or adverse modification of critical habitat." 50 C.F.R.

5   § 402.14(g)(4). "Effects of the action" include all consequences that are "reasonably certain to

6   occur" but for the proposed action. *Id.* § 402.02. The resulting BiOp must summarize the basis

7   for FWS's opinion. *Id.* § 402.14(h).

8          Section 7(a)(2) of the ESA requires FWS to "base its actions on evidence supported by

9   'the best scientific and commercial data available.'" *San Luis & Delta-Mendota Water Auth. v.*

10  *Jewell*, 747 F.3d 581, 601–02 (9th Cir. 2014) (quoting 50 C.F.R. § 402.14(g)(8); 16 U.S.C. §

11  1536(a)(2)); *see Bennett v. Spear*, 520 U.S. 154, 176 (1997) (best available science requirement

12  "ensures" the ESA is not implemented "on the basis of speculation or surmise").

13         A jeopardy determination requires an appreciable reduction in "the survival and recovery

14  of a listed species in the wild." 50 C.F.R. § 402.02. Destruction or adverse modification means a

15  "direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole

16  for the conservation of a listed species." *Id.* If FWS determines jeopardy is unlikely, but the action

17  will result in "take" of a listed wildlife or fish species, FWS issues an incidental take statement

18  ("ITS"). 16 U.S.C. § 1536(b)(4). The ITS generally specifies the "amount or extent" of incidental

19  take, but if FWS determines it is "not practical" to numerically quantify take, FWS may use a

20  "surrogate" in certain circumstances. 50 C.F.R. § 402.14(i)(1)(i). The ITS includes reasonable

21  and prudent measures ("RPM") that FWS "considers necessary or appropriate to minimize [the]

22  impact of incidental taking on the species," along with terms and conditions to implement any

23  RPMs. *Id.* § 402.14(i)(1)(ii), (iv). Any taking in compliance with the ITS is exempt from liability

24  under ESA Section 9. 16 U.S.C. § 1536(o)(2).

25                                  **FACTUAL BACKGROUND**

26         Malathion is an "organophosphate used as an insecticide on a wide variety of terrestrial

27  food and feed crops, terrestrial non-food crops, aquatic food, non-agricultural indoor, outdoor

28  sites, and for wide area public health uses." AR-12293. It can be applied in "dust, liquid or

1   encapsulated form," via aerial or ground application methods commercially and in personal
2   households. AR-12293–94, AR-12310. EPA and FWS spent over a decade working to develop
3   methodologies, acquire data, and evaluate effects of malathion on a nationwide basis, which
4   culminated in the February 28, 2022 BiOp. Incredible care and expertise went into developing
5   this BiOp, which—including appendices—spans over 21,000 pages and covers 1,614 species and
6   782 designated critical habitats. FWS's detailed, deliberate approach to this consultation is
7   summarized here at only a high level.

8   **I.      Genesis of the malathion consultation.**

9          The BiOp explains the background and history of consultation with EPA in detail.
10  AR-12285–92. In 2010, EPA, FWS, the National Marine Fisheries Service ("NMFS"), and the
11  U.S. Department of Agriculture ("USDA") jointly sought guidance from the National Academies
12  of Science ("NAS") on the "scientific and technical issues associated with determining the risk
13  of pesticide registration and use to endangered and threatened species." AR-12286. NAS's 2013
14  report included recommendations on scientific and technical issues related to pesticide
15  consultations. AR-162–355. Based on the NAS report, the agencies decided that—rather than
16  consult on only one or a few species at a time—it would be better to evaluate the effects of
17  pesticides on all species and their critical habitats on a nationwide scale. AR-12286.

18         Among the many issues the agencies discussed in the early days of consultation was
19  considering usage data. A 2014 report from the agencies to Congress explained USDA's role as
20  "provid[ing] pesticide use and usage data as well as information on agricultural production
21  practices." AR-51156.[2] As early as 2013, EPA, FWS, and NMFS discussed considering "pesticide
22  use and usage data" in ESA consultations on pesticides, based on EPA's "long history of using
23  these data in making pesticide safety determinations." AR-16. When beginning to prepare its
24  biological evaluation ("BE") in 2015, EPA acknowledged that "[u]sage data can inform risk
25  characterization." AR-51700. A 2016 presentation at a stakeholder workshop noted the option of

26
27  _____
28  [2] "Use data" refers to "all the uses as they are authorized by EPA," whereas "usage data" refers
    to how a pesticide is "actually applied on the landscape." AR-12408.

harnessing usage data for a "probabilistic approach" to assessing effects. AR-52105. Later that year, a presentation from EPA, FWS, and NMFS identified "pesticide usage data" as relevant to risk characterization, noted it "can provide some information about how a pesticide has been used in the past," and discussed the data's limitations. AR-1455, AR-1472. The presentation identified usage data as one of a "number of factors" that FWS and NMFS planned to consider "to determine the proportion of a population that may be exposed to a pesticide." AR-1473.

After several years of joint meetings, stakeholder presentations, and EPA sharing drafts of its BE with FWS and NMFS (and the public), EPA submitted its final BE to NMFS and FWS on January 18, 2017. AR-1288–89; AR-42672–43022. The BE determined that malathion's registration was likely to adversely affect 1,778 listed, proposed, and candidate species, was not likely to adversely affect 41 species, and would not affect 16 species. AR-43022. EPA also determined that designated or proposed critical habitats for 784 species would be adversely affected, while 10 were unlikely to be adversely affected. *Id.*

## II. FWS requests additional data to improve reliability and EPA publishes draft BiOp for public comment.

After receiving EPA's BE and conducting an internal review of pre-decisional, draft analyses,[3] FWS determined it needed to collect additional data to "inform both use and usage from a variety of different sources," and "began this effort with EPA, NMFS, and USDA." AR-12289. To this end, in 2017, FWS requested EPA prepare a "revised effects analysis" reflecting the "best scientific and commercial data" as to "actual use." AR-356. FWS explained that it made this request in part to ensure that—consistent with ESA regulations—the consultation focused on effects that are "reasonably certain to occur." AR-357; *see* 50 C.F.R. § 402.02 ("effects of the action"); AR-1522 (explaining usage data was sought in 2017–2018 because "[o]ne of the difficulties with consulting on EPA's registration review of malathion is that the uses authorized

---

[3] Plaintiffs focus on an internal 2017 presentation summarizing the initial findings in these draft analyses. Pls. Mot. at 16; *see* SUPP-AR-52525. The non-public, draft analyses had not undergone full agency review. In fact, a district court denied Plaintiff Center for Biological Diversity's ("CBD") request for these draft analyses because they were "predecisional and deliberative." *CBD v. FWS*, No. CV 18-0342-ABJ, 2021 WL 1209221, at *11 (D.D.C. Mar. 31, 2021).

1    on the label do not necessarily reflect how and where the product will be used on the landscape").

2    EPA agreed to provide additional use and usage data. AR-358–59.

3        Between 2018 and 2019, EPA, FWS, and NMFS held numerous meetings on how to

4    consider EPA's usage data. AR-12289–90. And, in late 2019, FWS formulated new approaches

5    for analyzing effects to listed plants and creating a quantitative tool to "better demonstrate the

6    intersection of effects, use and usage." AR-12290. In April 2021, FWS transmitted a draft BiOp

7    to EPA, and EPA published it for public comment. *Id.*; AR-1568–11915. The draft BiOp

8    preliminarily concluded that EPA's registration of malathion was likely to jeopardize 78 species

9    and destroy or adversely modify critical habitat of 23 species. AR-2124. FWS spent about six

10   months reviewing and—as appropriate—addressing comments submitted by EPA, registrants,

11   and other stakeholders. AR-12290. In discussing potential reasonable and prudent alternatives

12   ("RPAs")[4] for a BiOp finding jeopardy likely for certain species, EPA and the registrants agreed

13   to incorporate the proposed conservation measures directly into the proposed action through

14   changes to malathion's labels, which would avoid jeopardy and destruction/adverse modification

15   for *all* listed species and designated critical habitat. *Id.*; *see also* AR-12299 n.5; AR-12293

16   (explaining that "product labels" form the basis for the proposed action consulted upon). Thus,

17   with the registrants' agreement, EPA modified its proposed action during Section 7 consultation,

18   in response to concerns identified by FWS. EPA confirmed these measures on February 23, 2022,

19   along with letters of commitment from the registrants. AR-12290-91; AR-12625–78.

20   **III.    FWS releases final BiOp.**

21       On February 28, 2022, FWS released its final BiOp. AR-12259–32247. The BiOp

22   concludes that EPA's registration of malathion—as modified by label changes—is not likely to

23   jeopardize any species or destroy or adversely modify critical habitat. AR-12259; AR-12580.[5]

24

25   ---

     [4] RPAs are "alternative actions" that "would avoid the likelihood" of jeopardizing species or

26   destroying or adversely modifying critical habitat. *See* 50 C.F.R. § 402.02.

27   [5] FWS concurred with EPA that several species and designated critical habitat were "not likely to
     be adversely affected," AR-12291–92, AR-12683–91, and provided a conference report on

28   proposed/candidate species and proposed critical habitat, AR-12590. Plaintiffs do not challenge
     these conclusions.

1          a.   Proposed Action

2          The BiOp begins by defining the proposed action. AR-12293. Under FIFRA, before a

3    pesticide can be sold or distributed, it must be exempted or registered with a label identifying

4    approved uses by EPA. *Id.* Once registered, a pesticide cannot be used unless it is consistent with

5    directions on its approved labels. *Id.* Because FIFRA requires re-registration every 15 years, FWS

6    considered the proposed action—registration of malathion—to span 15 years. *Id.*

7          Pursuant to current labels, malathion is registered for agricultural and nonagricultural

8    uses, including for homeowner gardens and outdoor nuisance insects. AR-12296–97. EPA's BE

9    identified several conditions added to malathion labels in late 2021–2022 to reduce effects to

10   species and critical habitat: buffer zones from water bodies; restrictions on droplet size; rules for

11   wind direction and speed; prohibitions on use in areas of temperature inversion; and requisites on

12   ground application. AR-12298–99. FWS's analysis in its draft BiOp helped EPA develop targeted

13   conservation measures, which were "incorporated into the labels," modifying the proposed action.

14   AR-12299. The registrants' agreement to incorporate conservation measures into product labels

15   significantly reduced potential effects to species and their critical habitat.

16         First, there are a set of "general conservation measures" that will "appear on all malathion

17   labels within a use type category" and "apply to any use of malathion authorized by those labels,

18   regardless of whether a listed species or critical habitat is likely to be found near the area of use."

19   AR-12462. Aquatic measures are intended to "reduce run-off exposure into aquatic habitat," such

20   as restrictions related to usage before or after rain, and buffer surrounding aquatic habitat. AR-

21   12299. Residential label language changes—limiting applications to spot treatments, prohibiting

22   more than two applications per year, and setting treatment intervals—are intended to "limit the

23   extent of malathion usage and prevent spray drift and run-off to non-target terrestrial and aquatic

24   habitats." AR-12300. There is also a prohibition on using malathion on crops in bloom, timing

25   restrictions on mosquito applications to reduce effects to diurnal insect pollinators, and minimal

26   treatment intervals. *Id.* And there are reductions in the number of applications, as well as rate

27   changes intended to reduce concentrations to one-third of values previously modeled, thereby

28   reducing adverse effects. AR-12300–01. FWS found that these generally applicable measures are

1   "likely to reduce the amount of malathion entering non-target habitats and lower the amount of

2   malathion in the environment overall," thereby reducing "malathion exposure to many listed

3   species and their critical habitats." AR-12462–63; *see also* AR-12638–68 (Appendix A-C,

4   summarizing in detail generally applicable label changes). These sweeping, generally applicable

5   label changes significantly reduced adverse effects to nearly all species and critical habitat.

6          Second, there are "species-specific conservation measures . . . confined to a geographic

7   area within or near a species' range or critical habitat." AR-12463. The registrants added a

8   statement to agriculture and mosquito control labels directing users to access EPA's *Bulletins*

9   *Live! Two* website to determine if additional requirements apply within their application area. *Id.*

10  These additional measures were developed to avoid the likelihood of jeopardy or

11  destruction/adverse modification "where general conservation measures were not adequately

12  protective of certain listed species or their critical habitats." AR-12266. The numerous measures

13  differ across species and habitats—a full list is in Appendix A-D, AR-12670–78, and the BiOp

14  provides a table summarizing them, AR-12302.

15          b.   Status of the Species/Critical Habitat, Action Area, and Environmental Baseline

16          FWS compiled and analyzed detailed information on each listed, proposed, and candidate

17  species and any proposed or designated critical habitat for that species. This information is

18  included within Appendix C, which spans over 14,000 pages. *See* AR-12694–26706.

19          Based on the action and its effects, FWS defined those areas directly or indirectly affected

20  by the agency action (the "action area"). 50 C.F.R. § 402.02. FWS defined the action area to

21  include "the entire United States and its territories." AR-12303. While FWS did "not necessarily

22  expect use of this pesticide [to] occur in all the areas included in the action area," FWS could not

23  eliminate any listed species or designated critical habitat from the area, given the difficulty in

24  determining "where all labeled uses might occur over the duration of the Action." AR-12305.

25          FWS also assessed the environmental baseline, which includes the past and present

26  impacts of all Federal, State, or private actions and other human activities in the action area.

27  50 C.F.R. § 402.02. Detailed information concerning stressors to each species/habitat are found

28  in Appendix C. *See* AR-12694–26706. The BiOp itself also discusses the major categories of

1    stressors, including ongoing use of malathion and other pesticides, habitat degradation, invasive

2    species, pollution, harvesting, water-related issues, and climate change. *See* AR-12309–44.

3            c.    Effects of the Action

4    FWS employed an ecological risk assessment framework to determine effects to species

5    and their critical habitat, harnessing quantitative and qualitative analyses.

6                    i.   *FWS considered effects to listed species.*

7    First, FWS used the best available science from EPA's BE, the open literature, and data

8    submitted by stakeholders regarding pesticide exposure estimates and toxicological response data

9    to predict resulting effects to listed species. FWS catalogued the toxicity of malathion by

10    taxonomic group as measured by numerous endpoints including lethal and sublethal effects. *See*

11    AR-12345–407. The bulk of the data for this analysis comes from EPA's BE, which assumed that

12    malathion would be used to the full extent authorized by product labels. But FWS recognized that

13    it "is not realistic to assume the chemical will be used in every location in the action area where

14    labeled uses allow." AR-12297. Thus, in accordance with ESA Section 7 and its implementing

15    regulations, FWS considered usage information to "refine the scope of the analysis undertaken in

16    the BE from any area where malathion is authorized to be applied, to those areas where

17    applications are reasonably certain to occur." AR-12408–31; 50 C.F.R. § 402.02. FWS recognized

18    that usage data "may not fully predict future usage," but it would "better inform where [FWS]

19    would expect usage to occur in the future and provide more context for our assumptions related

20    to uncertainty." *Id.*; AR-12297–98 (explaining that, despite data usage's limitations, it is aptly

21    considered to ensure rational conclusions); *see* AR-12506 (same). Usage data was only a "portion

22    of the best scientific and commercial data available" on which FWS relied, and just "one of many

23    factors and points of data" FWS considered in assessing effects of the action. AR-12298.

24    Second, FWS quantitatively considered the direct and indirect effects to species. To assess

25    different lines of evidence, FWS "determined what percentage of the individuals were anticipated

26    to be exposed to malathion at concentrations that may cause adverse effects, and when possible,

27    the expected magnitude of those effects." AR-12432. For example, as to terrestrial vertebrates,

28    FWS employed EPA's "Magnitude of Effect Tool," or MagTool, to "integrate species exposure

(i.e., modeled exposure concentrations), the overlap of the species' range with potential use sites, and effects data (i.e., dose-response relationships) to assist in the determination of the magnitude of the effect of potential pesticide use to the species on a population scale." AR-12434. For terrestrial invertebrates, aquatic species, and plants, FWS employed the R-Plot tool, developed by NMFS, which "overlay[s] toxicity data (i.e., values at which adverse effects are detected) with exposure information," i.e., estimated environmental concentrations of malathion for listed species, and their dietary items or pollinators, as applicable. AR-12440. FWS's narrative explanation of this quantitative, technical work spans about 30 pages in the BiOp, AR-12431–61; the full, raw results of R-Plot and MagTool analyses are in Appendix M, AR-31314–32247.

Third, FWS took the foregoing quantitative measures of harm and qualitatively considered how the generally applicable and species-specific measures incorporated into the proposed action would reduce exposure to and adverse effects from malathion. AR-12461–63; AR-12431 (explaining that reductions "are not reflected in the MagTool and R-Plot outputs, but are qualitatively considered"). FWS's analysis of the conservation measures was "specific to each species," as it considered which measures applied based on "overlap with crop types, habitat features, and which species or element of its habitat will be exposed." AR-12462. FWS evaluated the effects of the measures "with a level of specificity that is not captured by EPA's quantitative modeling, considering factors such as weather, soil properties, density of vegetation, proximity to use sites, and behavior, as appropriate for each species." *Id.* Many species had "several conservation measures" that applied, and FWS considered their combined effects in its "individual analyses of these species and their critical habitats." *Id.* While the BiOp includes a detailed overview of measures' ameliorative effects, AR-12463–70, their impact at a species-specific level is in the nearly 4,000 page-long Appendix K, AR-26819–30762.

Fourth, FWS explained the various assumptions and uncertainties inherent to "an analysis of this size and scope." AR-12470. While some of these assumptions could "under-predict effects," FWS noted that other "conservative" assumptions could "overestimate effects." *Id.* FWS thus expected that it was "capturing the overall breadth of effects to species and critical habitat." *Id.* For example, FWS assumed that species "will be exposed to modeled annual maximum

1     pesticide concentrations" based on scenarios "that generate the highest [estimated environmental

2     concentrations]." AR-12471. FWS also assumed that "all use sites will be treated at the same

3     time, and all individual members of a listed species within the use overlap will be exposed to peak

4     applications, once a year." AR-12472. Each of these assumptions may overestimate effects. AR-

5     12471–72. At the same time, the modeled effects are "limited to a single exposure of malathion,"

6     which may also underestimate effects since multiple exposures are possible. *Id.*

7        FWS acknowledged that "[o]ne of the main uncertainties" of its effects analysis was its

8     "reliance on current ranges for each species that may not accurately reflect the species' actual

9     distribution within those mapped ranges." AR-12473. FWS requested "refined current range maps

10    if available" from its Field Offices, and internally refined and improved many range maps "based

11    on the best scientific and commercial data available." *Id.* FWS generally assumed that a species

12    was "uniformly distributed within its range," unless FWS had information indicating more

13    specified distribution or a higher importance of an area to a species or habitat. *Id.* FWS considered

14    these specifics, where appropriate, in the species-specific analyses found in Appendix K.

15        Finally, FWS conducted detailed risk characterization analyses broken down by

16    taxonomic group. Generally, FWS expected that, if exposed to malathion, most species would

17    "experience mortality sublethal effects; or loss of forage, prey base, insect pollinators (and in

18    some cases, seed dispersers), or host fish following exposure to malathion." AR-12475–88.

19                *ii.  FWS considered effects to critical habitat.*

20        To analyze the effects on proposed and designated critical habitats at issue, FWS identified

21    four types of physical or biological features ("PBF") that it "anticipate[d] may be negatively

22    affected by the Action." AR-12490–91. These were "(1) water quality for aquatic or water-

23    dependent species, or conditions related to pollution-levels for terrestrial habitats to function for

24    the species (i.e., habitat function); (2) arthropods as prey (e.g., for insectivorous species); (3) non-

25    arthropods, including as prey for omnivorous or carnivorous animal species, as pollinators/seed

26    dispersers for plants, and as host fish for mussels; and (4) insect pollinators/seed dispersers for

27    plants." AR-12491. FWS based its analyses "on the specific PBFs identified for the critical habitat

28    that are susceptible to effects from malathion, the overlap of critical habitat with labeled uses, the

anticipated malathion usage in critical habitat areas over the duration of the Action, and our assessment of the impacts to the critical habitat as a whole for the conservation of the species." *Id.* FWS analyzed critical habitat "separately from effects to the species," but "often use[d] [its] understanding about certain types of effects to listed species" to aid its analysis. *Id.* FWS's approach is detailed within the BiOp, AR-12491–504, and its specific conclusions and rationales for each proposed or designated critical habitat—including the impact of the conservation measures—are in Appendices L-A and L-B, AR-30764–31308.

d. Jeopardy and Destruction or Adverse Modification Determinations

Within its "Integration and Synthesis" section, the BiOp considered whether malathion's registration was "likely to jeopardize" any species, or "likely to destroy or adversely modify" any designated critical habitat. AR-12505.

FWS's jeopardy analysis was built on the quantitative and qualitative effects analyses described above, initially considering three factors. First, vulnerability, wherein FWS ranked species "according to their status, environmental baseline and cumulative effects." AR-12511. Second, risk, which was based "on the integration of exposure and effects across its range, per the MagTool and R-Plots analyses" described above. *Id.* And third, usage, wherein FWS ranked "the amount of anticipated usage within the species range" by analyzing "the degree of overlap of the species range (refined where feasible) with the most likely use sites (based on use category and sites) and associated usage data." *Id.* FWS ranked each factor as high, medium, or low. These rankings "were used as a starting point" from which FWS conducted individual assessments for each species and critical habitat "for determining the consequences of the Action." *See id.*

As to the vulnerability factor's consideration of a species' distribution, FWS generally considered species with smaller or confined ranges to be more vulnerable to malathion. AR-12512. That said, FWS recognized that migrating species can be considered "wide-ranging" based on the extent of their migrations, but that parts of their range used seasonally—such as for breeding or overwintering—may be much smaller. *Id.* Thus, FWS's "vulnerability rankings [took] into consideration how vulnerable the species may be across its range as well as in seasonally used portions of its range within the U.S." *Id.* For the risk factor, FWS included a "risk modifier"

1    to adjust rankings "based on additional information that was not fully captured in the MagTool

2    and R-Plot outputs." AR-12513. This included "pesticide information specific to the species" and

3    whether a species' range was "limited to protected areas where exposure would not be expected

4    to occur." *Id.* As to the usage factor, FWS specified the source of the usage data as either "standard

5    data" or "CalPUR data." AR-12514. As explained in the Approach to Usage Analysis portion of

6    the BiOp, "annual reporting of pesticide usage is required for all agricultural and certain non-

7    agricultural uses" in California. AR-12417. Because this data is more robust than other forms of

8    usage data available, *see id.*, FWS has a "higher level of confidence" in CalPUR data and

9    considered this in the jeopardy analysis. AR-12514.

10        After considering the vulnerability, risk, and usage factors, as detailed above in the effects

11    analysis, FWS qualitatively analyzed the impact of the generally applicable and species-specific

12    label changes. *Id.* Because the label changes "were incorporated into the Action later in the

13    consultation process" to address effects described in the BE and draft BiOp, FWS assessed how

14    the measures "would avoid, minimize, or reduce exposure and effects." *Id.*

15        The BiOp summarizes FWS's analyses and conclusions for animals by taxon. AR-12518–

16    47. For plants, FWS summarized its analysis and conclusions by 11 assessment groups comprised

17    of species "sharing characteristics similar enough that a broad starting-point for the rationale

18    could be written to cover all of the species within the group." AR-12548–63.[6] Considering the

19    status of the species, environmental baseline, cumulative effects, and the effects of the action as

20    modified by the label changes, FWS concluded that the registration of malathion is not likely to

21    jeopardize the continued existence of any of the species analyzed. AR-12580. Species-specific

22    analyses and conclusions are found within Appendix K.

23        Likewise, as to the critical habitats at issue, FWS concluded the action would likely not

24    destroy or adversely modify critical habitat. AR-12580. Each determination is in Appendix L.

25    _____

26    [6] Pacific and Caribbean Island species were generally analyzed in the same manner as species in
      the continental U.S., but FWS was "less reliant on the mapped overlap of the species range with

27    malathion use sites to understand exposure" because there was more uncertainty with landcover,
      usage, and species range data for these species. AR-12564–79. Plaintiffs do not challenge FWS's

28    slightly modified approach for analyzing effects to these species or habitats.

DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDG.                                    12
CASE NO. 3:24-CV-6324-JSC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### IV.    FWS also issued an incidental take statement for listed animal species.

Along with the BiOp, FWS included an ITS. AR-12581–90. First, FWS explained that it could not quantify incidental take. AR-12581. Among other reasons, this is because it would "often be difficult to detect" take given the small, cryptic, wide-ranging, or difficult to monitor species involved. *Id.* Aside from the difficulty in "finding a dead or impaired specimen," identifying "sublethal effects" would be even harder. *Id.* Indeed, FWS found that "entire taxa groups" have characteristics "that render precise quantification of individual losses *impossible*." *Id.* (emphasis added). And the nature of the action—registration of a pesticide "used in a variety of ways across the entire country"—made "it difficult to detect and measure incidental take." *Id.* This uncertainty is compounded by knowledge gaps "concerning various species' toxicity levels and estimated environmental concentrations." *Id.* In short, FWS found that "even the best scientific and commercial data available are not sufficient to enable [FWS] to estimate the specific quantity of individuals anticipated to be incidentally taken for each affected species." *Id.*

That said, within the BiOp itself, FWS describes the types of incidental take reasonably certain to occur, and this is also outlined in species-specific analyses within Appendix K. *See* AR-12581. Also, in Appendix K-E, FWS indicated in a table that "low levels of individuals" would experience mortality, sublethal effects, or impacts to fitness. AR-12582; AR-30700–62.

Since it was "not practical" to quantify numerically, FWS relied on usage data as a "surrogate" measure for take, consistent with 50 C.F.R. § 402.14(i)(1)(i). AR-12582–83. Because the "expected level of incidental take" for each species is partially linked to the "level of usage" anticipated for each species, certain usage data can be "appropriately used" to help inform whether the ITS has been exceeded and reinitiation of consultation required. AR-12583. FWS explained that while changes in usage do not "necessarily correlate to an exceedance of incidental take," monitoring changes in this data "will help indicate when additional evaluation is needed to assess" whether exceedance has occurred. *Id.* FWS described the trigger for exceeding incidental take as "a two-part assessment of both the risk to the species based on our understanding of the toxicity of malathion and the level of exposure based upon the usage of malathion in the habitat of the species." *Id.* If data indicates more acres of actual usage than anticipated in Appendix K, this

1    triggers FWS and EPA to coordinate and determine whether reinitiation is required. AR-12584.

2        Aside from being a surrogate to assess take, collection and analysis of usage data also

3    serve to "monitor and test" FWS's "overarching assumptions" in the BiOp, including those related

4    to usage data. *Id.* As the BiOp explains repeatedly, despite being a portion of the best available

5    data relied on, FWS recognized that "there are significant gaps and a paucity of usage data." *Id.*

6    Thus, for example, if review of this data shows that malathion is affecting species in a manner or

7    to an extent not previously considered, reinitiation would be warranted. *See* AR-12593 (citing 50

8    C.F.R. § 402.16). The ITS includes an RPM requiring EPA to "use its authorities under FIFRA

9    to minimize impacts of incidental take to the listed species addressed" in the ITS. AR-12586. The

10   four terms and conditions make clear what this requires of EPA.

11       Term 1 requires EPA to provide annual reports to FWS summarizing "all information

12   collected and analyzed as a result of monitoring and reporting" the other three terms and

13   conditions require and to review these reports with FWS annually. *Id.* Term 2 requires EPA to

14   ensure that the generally applicable and species-specific label changes are implemented and to

15   confirm their implementation to FWS, on a specified timeline. AR-12586–87.

16       Term 3 requires EPA to "[c]ompile and evaluate available data to detect changes in

17   estimations of malathion exposure to ESA listed species and critical habitat designations"

18   analyzed in the BiOp related to water quality monitoring, ecological incidents, malathion use, and

19   malathion usage. AR-12587. For water quality, EPA must evaluate whether malathion

20   concentrations are increasing or decreasing from the values reported in its BE, including by

21   performing a trend analysis within one year to analyze water quality since the BE's issuance. *Id.*

22   For ecological incidents, EPA must "compile and evaluate available ecological incident data to

23   determine if those data suggest that labeled uses of malathion have caused unforeseen ecological

24   impacts" and also include on product labels instructions for registrations to report such incidents.

25   AR-12588. For use data, EPA must evaluate whether there are "meaningful changes that affect

26   the assumptions on geographic extent of use" and include its findings in the annual reports

27   required by Term 1. *Id.* For usage data, EPA is required to work with registrants, stakeholders,

28   and FWS to "improve monitoring and reporting of mosquito adulticide usage." AR-12588–89.

1    For example, EPA must obtain sales data from registrants such as the amount of products sold,

2    location of shipment, and location of intended use. *Id.* For usage data other than mosquito control,

3    EPA must provide an analysis of usage data within three years and then report "overall usage

4    trends in this data every 5 years" thereafter, and to "work with registrants and other stakeholders

5    to better understand usage where malathion-specific usage information is not currently available,"

6    such as the Pacific Islands and Caribbean. AR-12589.

7    Finally, Term 4 requires EPA to provide training for pesticide users and applicators, with

8    a particular focus on "new malathion requirements for listed species," and include a link to this

9    training within "specific malathion Bulletins." *Id.* EPA has to review these trainings and "work

10   to update them to improve understanding of ESA issues and compliance with ESA requirements

11   for malathion labels 5 years after the release" of the BiOp. AR-12590.

12                                    **STANDARD OF REVIEW**

13   Challenges to agency action are reviewed under the APA. A court may set aside an agency

14   action only if it determines that the action was "arbitrary, capricious, an abuse of discretion, or

15   otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and

16   capricious only where "the agency has relied on factors which Congress has not intended it to

17   consider," failed to consider important factors, offered an explanation inconsistent with the

18   record, or the decision "is so implausible that it could not be ascribed to a difference in view or

19   the product of agency expertise." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1033

20   (9th Cir. 2020) (citations omitted). This standard of review is "highly deferential, presuming the

21   agency action to be valid and affirming the agency action if a reasonable basis exists for its

22   decision." *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).

23   "[D]eference to agency determinations is at its greatest when that agency is choosing

24   between various scientific models." *Jewell*, 747 F.3d at 610. And an agency is afforded "great

25   deference" when making "scientific prediction[s] within the scope of its technical expertise."

26   *CBD v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009); *Trout Unlimited v. Lohn*, 559 F.3d 946,

27   959 (9th Cir. 2009) (judgments involving "a great deal of predictive judgment" are "entitled to

28   particularly deferential review"); *see Jewell*, 747 F.3d at 610 (affording FWS deference when

1  facing "great measurement uncertainty").

2  **ARGUMENT**[7]

3  **I.      FWS's BiOp complied with the ESA.**

4      As explained in detail above, FWS applied the best available science to determine whether

5  malathion's registration is likely to jeopardize any species' continued existence or adversely

6  modify or destroy any critical habitat. Plaintiffs make several scattered arguments trying to

7  undermine FWS's detailed work. Generally, Plaintiffs take issue with the BiOp's analysis of the

8  effects to listed species, the jeopardy determination, and the critical habitat analysis. Regarding

9  effects, Plaintiffs disagree with the range that FWS calculated for several species, condemn

10  FWS's consideration of usage data, and wrongly assert that FWS failed to make species-specific

11  analyses. The latter argument bleeds into Plaintiffs' challenges to FWS's determinations on

12  jeopardy and critical habitat. As discussed more fully below, these arguments all fail.

13  a.   <u>FWS adequately assessed malathion's effects to the species at issue.</u>

14  *i.  Plaintiffs misinterpret FWS's range determinations.*

15      Plaintiffs argue that FWS relied on "overbroad species' ranges" that conflict with other

16  available data, thereby reducing the percentage overlap and missing impacts to species. *See* Pls.

17  Mot. at 24. This lacks merit. FWS used larger range estimates from its Environmental

18  Conservation Online System ("ECOS"), then narrowed those down with more refined, current

19  maps from Field Offices where available. AR-12516, 12692, 26822, 29995–96, 30210, 30303,

20  42668; *see* AR-563, 580, 582, 1147, 1162; *see also* AR-12473. These broader ECOS maps, used

21  as a starting point, often identified full counties as a potential range. *Id.* Then FWS incorporated

22  more specific data to pinpoint a species' distribution within the range where possible. *Id.* For

23  example, where feasible, FWS used environmental variables like habitat and elevation to develop

24  species distribution models. *See* AR-1525 (refining "based on certain life history traits, such as

---

[7] The Court denied Plaintiffs' motion to supplement the record. ECF No. 69. Thus, Federal Defendants do not respond to Plaintiffs' arguments that rely on inadmissible evidence. *See* Pls. Mot. at 16:1–3 (relying on Ex. 2); *id.* at 23:11–24:6 (relying on Ex. 5); *id.* at 28:3–6 (relying on Ex. 6); *id.* at 41:25 (relying on Clauser Declaration); *id.* ¶ 41:4–9 (relying on Ex. 15).

1    fossorial behaviors (e.g., burrowing), location of important geographic areas (e.g., breeding sites

2    such as leks), and the likelihood of individuals entering pesticide usage sites."). FWS used its

3    range calculations to estimate percentage overlaps; then, importantly, FWS analyzed each specific

4    species, considering species' life histories and individual characteristics in each determination.

5    Thus, range calculations were just one piece of the best available data that informed FWS's

6    analysis, and Plaintiffs' effort to flyspeck FWS's range calculations is misplaced.

7         As discussed below, Plaintiffs' assertions on range are misleading at best, often cherry-

8    picking data that does not give the full picture or is based on historical information that no longer

9    serves as the best available data. In other instances, Plaintiffs conflate terms of art like critical

10   habitat and suitable habitat, with the full range of a species, which is what FWS considered.

11   "Often these ranges are defined as entire counties or smaller subunits . . . within which the species

12   is known to occur but do not identify actual areas of suitable habitat where the species is likely to

13   be found." AR-12473. This terminology is highly contextual and fact-dependent, warranting

14   deference. *See Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164–65 (9th Cir. 2010).

15        In any event, Plaintiffs' attempts to show that FWS used overbroad ranges "in conflict

16   with its own assessments" lack merit. Pls. Mot. at 24. They first focus on the valley elderberry

17   longhorn beetle and FWS's range calculation of 9.4 million acres. *Id.* Plaintiffs cite to the 2019

18   recovery plan to claim the beetle's "habitat" is "limited to 102,000 acres of remaining riparian

19   forest," and claim FWS failed to explain its departure from this datapoint. *Id.* Plaintiffs are

20   mistaken. Their citation states that "102,000 acres of riparian forest remained *in the Central*

21   *Valley in 1984*," Ex. A at 6 (emphasis added), but 2019 data shows that the species "continues to

22   persist throughout its historic range." *Id.* at 12. "Occupancy of the valley elderberry longhorn

23   beetle within the presumed historical range over the past 16 years has occurred in approximately

24   18 hydrologic units and 36 geographical locations in the Central Valley." AR-16864. And while

25   the species is generally restricted to the Central Valley, AR-16862, "[o]ne of the elderberry

26   species on which the beetle depends is well adapted to warm temperatures, and extends its range

27   into southern California and northern Mexico," AR-16866. In this way, FWS not only described

28   its calculation of range for the species, but it also described how the species' habitats and

1   populations are affected by qualitative factors including reproduction, feeding habits, population

2   trends, dispersal, redundancy, and responses to stressors. AR-16860–75.

3       Plaintiffs also argue that FWS overstated the range of the blunt-nosed leopard lizard,

4   comparing the 12,536,694 acres in the BiOp with "FWS's own Species Status Assessment

5   ("SSA") identif[ying] 1,606,099 acres of suitable habitat." Pls. Mot. at 25. But Plaintiffs conflate

6   "suitable habitat" with "range," which are distinct. The range total in the SSA table Plaintiffs cite

7   is 9,344,612 acres. Ex. B at 49. Those acres only account for "the proportion of land owned by

8   Federal, State, or other protected entities." *Id.* Plaintiffs also state that the SSA discusses the use

9   of pesticides within the species' range, which they suggest means that FWS failed to consider

10  harm from malathion use. Pls. Mot. at 25. But the next page of the SSA explains how this use has

11  been controlled, regulated, and monitored through a use permit since 2001, with subsequent

12  studies finding "that malathion treatment had little impact on arthropod abundance," and suggest

13  that affects to the blunt-nosed leopard lizard would be minimal. Ex. B at 46–47.

14      Plaintiffs similarly conflate "critical habitat" with "range" while discussing the Poweshiek

15  skipperling, arguing that "the species are only found in some portions of its 25,888 acres critical

16  habitat designation." Pls. Mot. at 25. "Critical habitat" is specifically designated as such and does

17  not include the full range of a listed species. *See* 16 U.S.C. § 1532(5)(A), (C). Likewise, Plaintiffs

18  assert that the Ohlone tiger beetle's range consists of "17 acres of habitat," Pls. Mot. at 25, but

19  that calculation omits other relevant portions of the range including suitable, unoccupied habitat

20  and historically occupied habitat, AR-16811. Had FWS only considered the limited areas

21  Plaintiffs identify, the analysis would not include other areas where the species occupy.

22      Overall, Plaintiffs' reliance on piecemeal portions of the underlying data that informed

23  FWS's range calculations is misplaced. While Plaintiffs rely on a 1990 recovery plan to assert

24  that FWS "irrationally inflated" the Ash Meadows naucorid's range, Pls. Mot. at 25, that recovery

25  plan did not factor in habitat enhancement and reintroduction projects conducted since 1990 to

26  aid in recovery. *See* AR-29128; *see also* Ex. C at 2 ("Since the time of listing, several studies

27  from 1993 to 2010 have helped scientist understand the biology and habitat requirements of the

28  Ash Meadow naucorid."). For example, land was purchased to establish the Ash Meadows

National Wildlife Refuge. *Id.* Thus, rather than use outdated range estimates Plaintiffs identify, FWS used the current, best available data. FWS determined that the likelihood of exposure would be relatively low, considering that 98% of the species' range is on these federal lands. AR-29133. Malathion usage on federal lands has been minimal, which Plaintiffs do not contest. AR-12428.

Thus, FWS's consideration of species' range was neither arbitrary nor capricious.

> ii.  *Plaintiffs fail to rebut FWS's determination that usage data is part of the best available science for assessing effects, nor do they show FWS must explain a change in position regarding usage data.*

Under ESA regulations, something is an "effect of the action" only if it would not occur "but for the proposed action and it is reasonably certain to occur." 50 C.F.R. § 402.02. Based on the best available data, FWS concluded it "is not realistic to assume [malathion] will be used in every location in the action area where labeled uses allow," nor that malathion will be used to the full extent of the labels. AR-12297. FWS thus considered usage data, which "represents historical patterns of how and where malathion is applied on the landscape." *Id.* FWS found that this data should be considered to assess only those "effects of the Action" that are "reasonably certain to occur." AR-12298. FWS thus "considered the best available scientific and commercial data available for usage data to better predict the consequences from the Action." AR-12506.

FWS's determination to rely on this usage data is "itself a scientific determination deserving of deference." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). Indeed, harnessing usage data to help predict where effects are reasonably certain to occur comports with the ESA's best available science requirements' very purpose—preventing "an agency from basing its action on speculation and surmise." *Id.* (citation omitted). Plaintiffs broadly assert that FWS's consideration of usage data is arbitrary. Pls. Mot. at 20–24. But— despite admitting that malathion will not actually be used to the full extent authorized by labels, *id.* at 20—Plaintiffs identify no better available data for predicting effects of the action, as required to "succeed on a best-available-science claim." *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1067 (9th Cir. 2024). Instead, they complain that the data on which FWS relied is not good enough. Pls. Mot. at 20–24. But the ESA does not require FWS to "conduct new tests or make decisions on data that does not yet exist," so even "if the only available data is weak, and

1    thus not dispositive, an agency's reliance on such data does not render the agency's determination

2    arbitrary and capricious." *Locke*, 776 F.3d at 995 (citation modified). Accordingly, Plaintiffs'

3    arguments—which essentially amount to asserting usage data is not good enough to rely on,

4    without identifying anything better—all fail. *See Jewell*, 747 F.3d at 602 ("The best scientific data

5    available does not mean the best scientific data possible." (cleaned up)).

6          Likely recognizing that they cannot point to any better information that FWS should have

7    relied on, Plaintiffs argue that FWS changed its policy on usage data and must present "good

8    reasons" for the change. Pls. Mot. at 19. But they do not point to a FWS policy rejecting

9    consideration of usage data in pesticide consultations, because one does not exist. Plaintiffs

10   suggest that FWS's pre-decisional, deliberative draft analyses from 2017—before FWS requested

11   additional usage data—reflect an earlier position against considering usage data. *Id.* But an

12   agency need only explain when it departs from final positions or policies. *CBD v. Haaland*, 998

13   F.3d 1061, 1067 (9th Cir. 2021) (examining alleged change in position between findings

14   published in the Federal Register). An internal "draft of a draft" BiOp is deliberative, and a "far

15   cry" from representing the agency's final views. *See FWS v. Sierra Club, Inc.*, 592 U.S. 261, 272

16   (2021). As part of denying Plaintiffs' attempt to compel production of the 2017 draft analyses, a

17   court applied *Sierra Club* to find them deliberative because they left "agency decisionmakers *free*

18   *to change their minds*." *See CBD*, 2021 WL 1209221, at *11 (emphasis added). And again, FWS

19   noted *in 2016* that it planned to use usage data to "determine the proportion of a population that

20   may be exposed to a pesticide." AR-1473. Thus, FWS neither changed its position in 2017 nor

21   was under any heightened obligation to explain a "change in position" on usage data.

22         Contrary to Plaintiffs' arguments, the question is whether the BiOp's analyses and

23   conclusions relying on usage data were arbitrary or capricious. They were not. Usage data

24   represented part of the best available science for predicting effects from malathion. And FWS

25   expressly grappled with the usage data's limitations and adopted conservative assumptions to

26   account for the very issues about which Plaintiffs complain. This is what the ESA requires. *See*

27   *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (finding an ESA violation where the

28   agency failed to consider available biological information or to develop projections of proposed

activities' effects to prepare a comprehensive biological opinion). The Court should defer to FWS's expertise in applying the best available science to make "predictive judgment[s]" about the effects from a pesticide across the entire United States over 15 years. *See Trout Unlimited*, 559 F.3d at 959 (predictive judgments "are entitled to particularly deferential review").

### iii.  FWS adequately explained its consideration of usage data.

FWS used many types of data to get the most fulsome view of the effects of EPA's proposed action. FWS addressed the multitude of uncertainties inherent with "an analysis of this size and scope" and explained the different measures taken to account for these limitations. AR-12470. The decision to rely on usage data was not made lightly, but with frequent interagency coordination. *See, e.g.*, AR-384–85; AR-50922–27; AR-51044; AR-51150–76; AR-51235–61.

The usage data that EPA provided to FWS included 5 years of survey data obtained from both commercial and public sources: the USDA, the state of California, and the proprietary source Kynetec. AR-12409; *see generally* Appendix G, AR-26761–97. To fill data gaps, FWS "identified, collected, and evaluated additional usage data for its utility in informing the consultation, in coordination with EPA, USDA, and NMFS." AR-12408. Additional data came from: State Departments of Agriculture; CalPUR, California's dataset of pesticide reporting usage; expert opinions from the U.S. Forest Service; sales data and state reporting data on mosquito adulticide;[8] the Residential Exposure Joint Venture database, which consisted of survey information from more than 8,700 households; the California Stormwater Quality Association; USDA's agricultural censuses; and usage data from other federal agencies. AR-12410–28; *see also* AR-824–29. State data gave FWS the number of acres per crop treated with malathion over a 5-year period. AR-12409. Acres reported as treated were "compared to the total number of acres

[8]

grown for each crop at the state level, to produce a 'percent crop treated (PCT)' value."[9] *Id.*

Factual errors and vague accusations plague Plaintiffs' usage arguments. Despite Plaintiffs' contentions, FWS looked at different ways that the malathion label permitted usage and considered potential elemental variables that may change over time. AR-12505. Plaintiffs' assertion that FWS "infer[red]" that the absence of usage "equates to no usage past or future" is wrong. Pls. Mot. at 21 (citation modified). Where FWS faced a lack of usage data for a particular state or crop, it conservatively assumed the highest value of usage from the most relevant data available. In other cases, where surveyed states reported a PCT up to 2.5%, FWS assumed that 2.5% of the area was treated even if zero usage was reported. AR-12416. As the BiOp notes, "particularly where there are informational gaps, [FWS] appl[ied] usage data in this Opinion using [its] best professional judgment to make assumptions that are not only reasonable but are appropriately conservative for the species and critical habitat to determine whether EPA's Action ensures against the likelihood of jeopardy or destruction and adverse modification." AR-12298.

In some cases, the approach favoring conservative analysis resulted in "the possibility that effects may be overestimated." AR-12430–31. For example, FWS assumed an increase in overlap areas due to spray drift. AR-12400. But it did not account for spray drift areas already considered, whether due to actual use or spray drift from another application use. *Id.* The overlay of areas already deemed to be affected with areas of supposed spray drift thus likely overestimates the total overlap with species' range. *Id.* Moreover, in considering sales reports of mosquito adulticide, FWS assumed that all pounds of malathion were used within the year and county that they were sold. AR-12422. Because it is unlikely that these pesticide applicators used the full amount of mosquito adulticide within the year and county of purchase, this assumption likely overestimated usage. This results in an inherent overestimation.

Still, usage data helped FWS inform its effect analysis. AR-12297–98 (noting usage data was only "a portion of the best scientific and commercial data available" and among "many factors and points of data" FWS considered). FWS acknowledged the same concerns about the

---

[9] Plaintiffs refer to the PCT value as "Percent Usage Overlap" in their opening brief.

uncertainties and limitations of usage data that Plaintiffs focus on and detailed the conservative methodologies used to account for them. AR-12408–27. FWS recognized "that past usage data may not fully predict future usage [but] would nonetheless better inform where we would expect usage to occur in the future and provide more context for our assumptions related to uncertainty." AR-12408. Plaintiffs do not engage with FWS's reasoned, conservative approach.

*iv.    Usage data rationally assisted in specific species analyses.*

In comparing the overlap of the species' range with pesticide use sites, FWS determined the estimated usage within each species' range or the "percent of range treated." AR-12418. FWS detailed the refinements and deviations it made to EPA's treatment methods based on interagency discussions. AR-12391–92. FWS considered different types of pesticide exposure (seasonal, drift), routes of exposure (dietary, dermal, inhalation, ingestion through drinking, preening, and grooming), and, where possible, the distribution of species within their range. AR-12392–401. Other species' specific factors of analyses included individuals' use of or proximity to a potential exposure site and their mobility within the area. AR-12401–08. FWS considered both indirect and direct effects to species and factors that could affect their magnitude. AR-12431–33. The detailed consideration given to each species led to the species-specific analyses in Appendix K.

Plaintiffs appear to misconstrue FWS's analyses as they assert FWS "overrode species-specific information." Pls. Mot. at 26. For example, Plaintiffs assert that "nothing in the record" shows that FWS considered distribution of the Fender's blue butterfly, "including the proximity of potential malathion use" near known populations. *Id.* In fact, FWS looked at both the species and specific populations found within designated critical habitat and occupied habitat. AR-17243–51. It weighed threats to the species against recovery plans implemented within the past decade, including habitat restoration and targeted maintenance. AR-17253–56. As of 2014, the species has been "found at an estimated 67 sites in Oregon with a total species abundance estimate of approximately 16,664 adults." AR-29198. The species "is known to travel through, reproduce, and nectar within right of way, agricultural areas, managed forested areas and pasture." AR-29199. Based on usage data, FWS expected that the estimated usage would cover 3.21 percent of the non-federal portion of the species' range. AR-29200–02. Thus, even though the species would

1    be highly vulnerable if exposed, the "likelihood of exposure to malathion is low because past

2    malathion usage overlaps a small portion of the non-Federal species range." AR-29202. Effects

3    would be further limited by the labels' restrictions to the method and frequency of application,

4    bloom restrictions, and restrictions for residential use. *Id.* Plaintiffs also claim the recovery plan

5    "specifically cites malathion as a threat." Pls. Mot. at 26. In fact, the recovery plan notes "concern

6    about the effects of pesticide application." Ex. D at 28. It also recommends developing guidelines

7    "to protect the butterfly and the essential components of its habitat." *Id.* at 146. The conservation

8    measures detailed in the BiOp provide such guidelines. AR-29197–207.

9        Similarly, Plaintiffs misconstrue the Dakota skipper analysis. Plaintiffs assert that the

10    species "has been extirpated from major portions of its range and now exists in fragments of

11    discrete remnants of grass prairies." Pls. Mot. at 26. They believe that FWS wrongly determined

12    the potential overlap and overall threat of malathion use to this species. *Id.* But "the Dakota

13    skipper is still widespread and persists in a variety of ecological settings, both of which confer

14    resiliency, redundancy, and representation benefits." Ex. E at 3. And FWS considered the effects

15    of pesticide exposure to the species during the primary growing season (spring through fall)

16    depending on the type and purpose of application and applicators' attentiveness to specific

17    conditions (wind, droplet size, spacing, etc.). *Id.* at 52. FWS considered these findings in its

18    species-specific analysis, noting the number of populations, the risks to the species, and factors

19    that exacerbate and alleviate such risks. AR-29288–93. To control application types, label

20    changes will restrict residential use to spot treatments only (rendering spray drift unlikely), the

21    extent of treatable areas, and the number of allowable applications. AR-29291–92.

22        Because FWS took a nuanced approach to its analysis for every species, its data and

23    analysis are more comprehensive and defined than Plaintiffs' claim. FWS's detailed analysis of

24    the whooping crane, for example, considered specific distribution and migratory habits of the

25    species in determining exposure; it did not only look at the county data, as Plaintiffs contend. The

26    best available scientific data showed that whooping cranes spend their time nesting in Canada,

27    wintering in federal lands in Texas, and migrating between. AR-27126. Major threats to whooping

28    cranes include land development, global warming, and associated climate changes. AR-27127.

1    This land development also limits the species' expansion, meaning 60% of wintering whooping
2    cranes use federal lands. *Id.* And malathion usage on federal lands has been minimal. AR-12428.
3    Considering food sources, migration patterns, and nesting habits, FWS determined that the
4    species' exposure and associated risks were low. AR-27128–31. FWS also found no evidence that
5    malathion contamination has ever been a significant threat to the species, AR-27217, and
6    Plaintiffs cite no contrary evidence. Indeed, wintering whooping cranes rarely visit agricultural
7    croplands where pesticides may be used and the potential for exposure would be limited to food
8    abundance during migration. AR-27131. And the species' varied diets likely further minimize
9    adverse effects. *Id.* Thus, FWS's analysis included considerations like historical data, species-
10   specific information, known distribution data, and potential threats to reach the reasoned
11   conclusion that the proposed action was not likely to jeopardize the species.

12           FWS's analysis of the yellow-billed cuckoo takes the same detailed approach. FWS
13   reviewed "the current status of the species, the environmental baseline for the action area, the
14   effects of the proposed registration of malathion, and the cumulative effects" before concluding
15   that "the registration of malathion, as proposed, is not likely to jeopardize the continued existence
16   of the" species. AR-27318–19. Plaintiffs contend that the species' range is limited to "narrow
17   blocks of riparian habitat with cottonwoods and willows." Pls. Mot. at 27 (citing AR-27839;
18   AR-13770). "However, there are also breeding sites that are supported by various types of
19   supplemental water including agricultural and urban runoff, treated water outflow, irrigation or
20   diversion ditches, reservoirs, and dam outflows." AR-13774. While Plaintiffs selected a small
21   portion of the species' range with no documented application or past exposure, the wider range
22   FWS considered included agricultural areas where malathion use is reasonably certain to occur.
23   *Id.* Had FWS omitted those agricultural areas of habitat, the PCT calculation would have likely
24   underestimated effects. In considering the broader range, FWS included areas with a history of
25   usage that may not have been accounted for using Plaintiffs' preferred limitations. While there is
26   little to no data available to know how often usage may affect prey availability, AR-13785,
27   yellow-billed cuckoos are more likely to forage near crop edges than within the crops included in
28   FWS's risk calculations, AR-27319. Moreover, a large portion of the species' range remains on

1    federal lands, providing further protection, and their use of riparian habitat will likely provide

2    protective cover from spray drift. *Id.* FWS anticipated a temporary reduction in the species' prey

3    base that would depend on the frequency of application on or near use sites. AR-27317.

4        Plaintiffs argue that the determination of "low" overlap is a "systematic assessment" that

5    "allows FWS to vastly underestimate the potential impacts to listed species." Pls. Mot. at 28. But

6    it should be no surprise that FWS found "low" overlap between the use of a 55-year-old

7    insecticide[10] and the range of species, especially given that many listed species are predominantly

8    found on federal or otherwise protected lands, as described throughout the BiOp in detail. And

9    Plaintiffs often discuss these protected habitats throughout their arguments, specifically

10   referencing wildlife refuges and land under the jurisdiction of agencies like the National Park

11   Service and the Forest Service, where malathion use is low and controlled. *See* AR-12304.

12   Moreover, this is far from the first time that malathion has been subject to consultation on these

13   federal lands or for activities carried out by federal agencies. AR-12310. Protection measures

14   from those actions have also contributed to lesser usage. *See* AR-12312; *see also* AR-12315

15   ("While human-induced impacts have occurred throughout history, some activities have also

16   included strategies and actions to reduce these impacts such as the establishment of protected

17   areas and reserves, and implementation of restoration or conservation activities to benefit listed

18   species."). FWS accounted for all these considerations and more in its robust analyses, which are

19   anything but "mechanistic" and "unvarying." *See* Pls. Mot. at 27.

20        b.   The BiOp's jeopardy determinations are rational and supported by the record.

21        Jeopardy "means to engage in an action that reasonably would be expected, directly or

22   indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species

23   in the wild by reducing the reproduction, numbers, or distribution of that species." *Defs. of*

24   *Wildlife v. Zinke*, 856 F.3d 1248, 1253 (9th Cir. 2017). In making its jeopardy determination,

25   FWS "evaluates 'the current status of the listed species or critical habitat,' the 'effects of the

26   action,' and 'cumulative effects.'" *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 924 (9th Cir.

27

28   [10] "Malathion was first registered as an insecticide in 1965." AR-42632.

1    2008) (quoting 50 C.F.R. § 402.14(g)(2)–(3)). "The ESA does not require perfect foresight—only

2    that the FWS use the best available information to create an assessment of jeopardy." *CBD v.*

3    *Regan*, 734 F. Supp. 3d 1, 46 (D.D.C. 2024); *see Zinke*, 856 F.3d at 1257–58 (no jeopardy

4    determination upheld where it relied on best available data despite uncertainty).

5          Plaintiffs' major arguments as to jeopardy revolve around species' distribution,

6    organizational groupings, and "overlap" rankings.[11] Each lacks merit.

7          First, Plaintiffs claim FWS did not explain how making "uniform distribution

8    assumption[s]" that fail to consider a species' actual dispersal or migratory patterns "is rational

9    or scientifically defensible." Pls. Mot. at 30. Plaintiffs are wrong. "Where more life history

10   information was available for a species, it allowed [FWS] to make fewer assumptions about how

11   the species may be exposed to malathion." AR-12472. For example, where FWS knew the types

12   of habitats used either by a species or individual groups, or their tendency to be found near use

13   sites, FWS could better predict that species' exposure to malathion. *Id.* While FWS generally

14   assumed an individual would remain exposed only at one location at one time, this assumption

15   did not apply to migratory birds, mammals, and fish, "where additional exposure could be realized

16   along a migratory path (e.g., whooping crane, Gulf sturgeon, some bat species)." *Id.*

17         For example, Plaintiffs argue that the Appendix K analysis of the Cape Sable seaside

18   sparrow does not discuss species distribution. Pls. Mot. at 30. But the Appendix K analysis notes

19   individuals are "area-sensitive," stating that "[t]hey most consistently occur and are most

20   abundant near the center of the patch of habitat in which they occur. Within a patch of occupied

21   suitable habitat, sparrow breeding territories do not generally saturate the entire area, even where

22   sparrows occur at high densities." AR-27669. FWS considered this dispersal and the indirect

23

24   [11] Plaintiffs briefly accuse FWS of failing to address recovery. Pls. Mot. at 48–49. But FWS

25   incorporated recovery into each species-specific jeopardy analysis. *See, e.g.*, AR-12306 (noting
     jeopardy analysis considers effects on the "range wide survival and recovery of the listed

26   species"); AR-26819–30762 (Appendix K, which includes recovery analysis for each species);
     AR-12307 (noting analysis of "value of the critical habitat overall for the conservation/recovery

27   of the listed species"); AR-12508 (discussion of "Recovery Considerations" through review of
     available recovery plans and other FWS documentation). FWS's approach was appropriate, as

28   survival and recovery are "intertwined needs." *See Nat'l Wildlife Fed'n*, 524 F.3d at 932–33.

effects from spray drift, as "individuals tend to avoid edge areas and most consistently/abundantly occur near the center of the habitat patch in which they occur." *Id.* FWS explicitly included actual dispersal in this analysis. And Plaintiffs overlook the species-specific analysis of the blue-tailed mole skink, asserting FWS did not consider its distribution. Pls. Mot. at 30. But Appendix K specifically notes that the species "tend to be clumped in distribution" based on "the distribution of surface litter and, in turn, suitable microhabitat sites." AR-29687–88. Their "habitat preferences and low abundance on use sites" likely overestimate the anticipated loss of prey resources. AR-29691. And despite Plaintiffs' assertion that there is "no analysis focused on" the Least Bell vireo's "uneven distribution" in Southern California, Pls. Mot. at 31, FWS fully considered this dispersion in detail. FWS found that, although "most least Bell's vireos are located in the southern portion of its range, . . . only a subset of use sites are expected to contain riparian habitat that is suitable for the least Bell's vireo. For these reasons, mortality is expected to be less than that predicted by the MagTool." AR-27723. Thus, Plaintiffs are wrong that FWS did not consider species-specific facts on dispersal and migration.

Next, Plaintiffs suggest that because FWS organized the BiOp by grouping together certain taxa, FWS did not analyze each species individually. Pls. Mot. at 31. This, again, is inaccurate. For example, FWS assessed the more than 900 individual plant species, which it first organized in groupings based on a species' taxonomy and reproductive strategy. AR-12380–83. Even so, each species was given a species-specific analysis, discussing known considerations and nuances relevant to the inquiry. *See generally* Appendix K-9. Likewise, fish were also organized "by order or family and all species within the group were analyzed using the R-Plot tool." AR-12451. FWS elaborated on these groupings in its integration and synthesis summary. AR-28457–58. Nothing in the ESA required FWS to organize its analysis in a certain way. *See Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059, 1066-67 (9th Cir. 2004) ("[T]he ESA does not prescribe how the jeopardy prong is to be determined.").

Plaintiffs also assert that FWS "is depriving [species] of the species-specific analysis that the ESA requires." Pls. Mot. at 33. This claim fails on the record, as FWS analyzed each individual species. And Plaintiffs undercut their own assertion by pointing out the differences in

species-specific measures between supposedly "similarly situated species." *See* Pls. Mot. at 34–35 (comparing the analyses of the Audubon's crested caracara with that of the Florida grasshopper sparrow; comparing the Everglades snail kite, the Florida scrub jay, and the Cape Sable seaside sparrow). By asserting that species with the same risk, vulnerability, and overlap scores needed to have the same applicable label changes to reach a no-jeopardy finding, Plaintiffs ask for the "unvarying" and "mechanistic" analyses they wrongly accuse FWS of conducting.

FWS addressed vulnerability, risk, usage, and applicable conservation measures for each species as an organizational starting point before conducting its required analyses and reaching its ultimate conclusions, noting where in the BiOp a reader can find specific analyses. AR-26821–23. FWS gave each species individual consideration. *See* AR-12516 (explaining how it incorporated listing and recovery documents from ECOS and captured species-specific information in Appendices C and K). The Santa Cruz tarplant, for instance, is one species that Plaintiffs claim lacked a species-specific narrative, asserting that its jeopardy finding is based on "reasons entirely unknown and not articulated." Pls. Mot. at 32. But FWS detailed the background data that it considered for the Santa Cruz tarplant in Appendix C.AR-22047–22059; *see*AR-12551. It also noted only a 5.2 percent usage overlap, all in California, AR-30105, and FWS has "a higher level of confidence in usage data available in California," AR-12514. FWS considered this confidence in analyzing jeopardy. *Id.* And, the conservation measures laid out in AR-30111 are expected to further reduce anticipated exposure to malathion. *See* AR-12550–51. Between the robust data specific to usage in California where the species is found, and the way the conservation measures connect to some of the main risks of the species, FWS fully explained its no-jeopardy finding. Plaintiffs do not find this to be detailed enough, yet do not give legal context for what they see as lacking. *See Native Ecosystems Council v. Marten*, No. CV 17-47-M-DLC-JCL, 2018 WL 3630132, at *9 (D. Mont. July 31, 2018) (adopting finding that the BiOp's "two-sentence conclusory treatment of forest cover was adequately detailed").

Finally, Plaintiffs reiterate complaints with FWS's "overlap" determinations, reminiscent of complaints also raised with the effects analysis. But the "[o]verall rankings for each factor were used as a starting point" from which FWS conducted detailed, species-specific analyses. *See* AR-

1   12511. Plaintiffs' cited cases are inapposite. For example, FWS did not fail to fully evaluate

2   whether the proposed action is likely to jeopardize any species at issue. *Cf. Regan*, 734 F. Supp.

3   3d at 42–43 (concluding that FWS failed to meet its statutory requirements because it "did not

4   endeavor to address species-specific considerations, opting instead to defer analysis" to a later

5   time, noting that "the BiOp names just a handful and, even for those, offers little analysis"); *Nw.*

6   *Env't Advocs. v. EPA*, 855 F. Supp. 2d 1199, 1222–23 (D. Or. 2012) (rejecting agency's single

7   analysis covering fourteen distinct species, which considered the species' one common trait, but

8   not how they would be individually affected). Nor did FWS simply state no threats exist "because

9   there was no data confirming a threat." *Cf. Defs. of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 1006

10  (D. Mont. 2016). Instead, Plaintiffs simply disagree with FWS's framing of its analyses and with

11  its conclusions, which does not present grounds to overturn FWS's expert judgments.

12          c.   The record supports the BiOp's rational critical habitat analysis and conclusions.

13          The ESA defines critical habitat to mean the "specific areas within the geographic area

14  occupied by the species" which contain "those [PBFs] (I) essential to the conservation of the

15  species and (II) which may require special management considerations or protection" as well as

16  other unoccupied areas "upon a determination by the Secretary that such areas are essential for

17  the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). "Critical habitats are comprised of

18  [PBFs[12]], which are listed in the critical habitat designations." *Zinke*, 856 F.3d at 1260 (citing 50

19  C.F.R. § 424.12(b)). Thus, in determining whether an action will adversely modify or destroy

20  habitat during consultation per 16 U.S.C. § 1536(a)(2), FWS focuses on effects to the "essential

21  [PBFs] of designated critical habitat." *Zinke*, 856 F.3d at 1261–62 (citing 81 Fed. Reg. 7214-01,

22  7216 (Feb. 11, 2016)). In this way, the critical habitat analysis is distinct from the jeopardy

23  analysis, which considers effects to the species. *See id.* at 1262 (because "reduced connectivity"

24  would not affect any PBF, it was "an alteration to the species, not its critical habitat").

25          FWS's critical habitat analysis was properly structured around assessing whether

---

[12] Critical habitat rules referred to PBFs by a variety of different names through the years—including "primary constituent elements"—before settling on PBFs in 2016. AR-12490.

designated or proposed critical habitat contained four types of PBFs (outlined above) that FWS determined "may be negatively affected by the Action." AR-12491. Category 1 critical habitats were those containing only "generalized, non-specific PBFs." AR-12499.[13] Category 2 critical habitats were those that have "specific PBFs, but none that would be affected by malathion." *Id.* Category 3 contains critical habitats with "those with PBFs that would be affected by malathion." *Id.* For Category 3—as well as a subset of Category 1 for which FWS identified "habitat elements constituting PBFs that could be affected by malathion"—FWS assessed the overlap of that habitat with malathion's labeled uses and anticipated usage and then assessed impacts to the critical habitual as a whole for the conservation and recovery of the species. *Id.*; AR-12491.

Without disputing that FWS's four PBF types capture possible effects to critical habitats, Plaintiffs vaguely assert that FWS must conduct a "life cycle and behavior pattern" analysis. Pls. Mot. at 46. Their cited case rejected an alternative action identified to avoid jeopardizing listed species, as the alternative action did not account for a species' "short life cycle." *See Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005). This case identified flaws with a jeopardy analysis; it does not create a free-standing obligation for FWS to assess effects to critical habitat apart from effects to PBFs. *Zinke* rejected a similar argument—that FWS must broadly assess the "recovery value" of critical habitat—and held that the inquiry should focus on effects to the habitat itself, i.e., to PBFs. *See* 856 F.3d at 1261–62.

Plaintiffs also broadly assail FWS's methodology, claiming that it avoided "species-specific" analyses. Pls. Mot. at 44. But FWS specifically analyzed whether adverse effects would occur to the PBFs in each designation or proposal, which is nothing like analyzing critical habitats "only at the 'taxonomic group-level,'" as Plaintiffs claim. *Id.* (citing *Regan*, 734 F. Supp. 3d at 14). Plaintiffs' specific complaints each lack merit.

---

[13] These are designations which "predate the requirement" for identifying PBFs, and which require FWS to use the best available data to "determine and document those characteristics of the designated critical habitat that support the species' survival and recovery." *See* ESA Consultation Handbook, Procedures for Conducting Consultation and Conference under Section 7, at 4-41, available at: https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

1    For example, Plaintiffs argue that the Niangua Darter's designation contains two of the

2    four PBF types that may be adversely affected by malathion—(1) water quality and habitat

3    function, and (2) arthropods as prey. Pls. Mot. at 46. They are wrong on both counts. Niangua

4    Darter's critical habitat has two PBFs: "medium-sized creeks with silt-free pools and riffles and

5    moderately clear water draining hilly areas underlain by chert and dolomite" and "water ranges

6    from 8 to 46 inches in depth over gravel with scattered rubble." AR-15941. Based on the PBFs,

7    FWS noted "erosion and siltation" may affect the critical habitat. *Id.* While these PBFs indeed

8    relate to water, malathion contamination would not affect water clarity or contribute to erosion or

9    siltation. Plaintiffs do not argue otherwise. FWS reasonably concluded that these PBFs were

10   unlikely to be affected by malathion. *See* AR-12494 (explaining that in assessing effects to water

11   quality/habitat function PBFs, FWS generally looked to whether malathion usage would

12   "introduc[e] contaminants into the habitat"). This highlights the granular, specific nature of

13   FWS's critical habitat analysis—it did not simply include any PBFs related to water but rather

14   considered whether a specific water-related PBF would be affected by malathion usage. Plaintiffs'

15   arthropod argument fares even worse. While arthropods may be prey for the Niangua Darter, the

16   critical habitat listing contains only the two PBFs noted above, and neither concern availability

17   of arthropods as prey. Indeed, the listing does not contain the words arthropods, invertivore, or

18   invertebrates. *See* 50 Fed. Reg. 24,653 (June 12, 1985).

19   Plaintiffs also complain that different populations of the same species were placed into

20   different categories. Pls. Mot. at 47. Plaintiffs' attempt to find an inconsistency again backfires,

21   as FWS's different treatment of these populations reflects the specificity of FWS's analysis. The

22   critical habitat designation for the Great Lakes distinct population segment ("DPS") of piping

23   plovers contains no PBFs that FWS expected to be adversely affected by malathion. *See* 66 Fed.

24   Reg. 22,938, 22,941–42 (May 7, 2001) (PBFs focusing on habitat size, structure, physical

25   elements, protective cover, and dynamic ecological processes). The separate critical habitat

26   designations for the rest of the species, by contrast, contain specific PBFs relating to water quality

27   and availability of arthropod prey. AR-30836–39; *see* 67 Fed. Reg. 57,638, 57,643–44 (Sept. 11,

28   2002) (Great Plains Breeding Population designation PBFs); 66 Fed. Reg. 36,038, 36,064–65

1    (July 10, 2001) (Wintering Population designation PBFs).[14] Thus, FWS reasonably found that

2    these designations—but not the Great Lakes DPS's—could be affected by malathion.

3        Finally, Plaintiffs recycle some of their usage data arguments, broadly attacking FWS's

4    reliance on usage data to help predict where effects are reasonably certain to occur, without

5    identifying any better available information. Pls. Mot. at 48. Plaintiffs also continue to

6    mischaracterize FWS's analysis by arguing that FWS "did not engage in further analysis" when

7    usage data revealed an overlap below 5%. *Id.* at 47. The 5% threshold was used to determine a

8    "preliminary concern level," after which FWS continued the analysis by "considering all relevant

9    PBFs and any other relevant factors." AR-31311. For instance, while the non-Great Lakes piping

10   plover critical habitat was below 5% and received a preliminary "low" concern level, FWS

11   continued to analyze effects to the relevant PBFs and explain how the conservation measures

12   would further reduce effects to PBFs. AR-30838. Plaintiffs pluck seemingly random usage data

13   points from the record without disputing FWS's usage overlap percentages. Pls. Mot. at 48–49.

14   Plaintiffs also repeat their arguments about effects to the whooping crane's winter nesting

15   grounds, without acknowledging that there are no PBFs likely to be adversely affected on this

16   point. *Id.* at 48. Finally, as to American crocodile, Plaintiffs incorrectly claim that FWS relied

17   solely on rain restrictions. *Id.* at 49. FWS found that 77.88% of the species' critical habitat is on

18   federal lands, where malathion usage is likely to be "extremely low and carried out with avoidance

19   and minimization measures." AR-31144. Moreover, while American crocodiles consume "high-

20   risk non-arthropod prey," FWS found that the species "has a varied diet that includes a number

21   of taxa not sensitive to malathion exposure," and thus even with high usage, impacts to the "non-

22   arthropod prey PBF would be small." *Id.* FWS explained how rain restrictions, as well as aquatic

23   buffers, would further reduce effects to the relevant PBFs. *Id.*

24       In short, FWS's critical habitat analysis correctly focused on effects to PBFs that may be

25

26   ───────────────

27   [14] In Appendix C, FWS incorrectly copied the critical habitat information for the non-Great Lakes
     entity into the Great Lakes DPS section. *Compare* AR-13638–79 (describing non-Great Lakes
     critical habitat), *with* AR-13581–623 (same). But FWS based its analysis on the correct PBFs in

28   the respective listings, rendering this error inconsequential. *See* AR-12493 (noting "details of
     species-specific PBFs for critical habitats can be located in the proposed and final rules").

1    adversely affected, and Plaintiffs' attempts to undermine FWS's expert judgments fail.

2    **II.    FWS's ITS rationally minimizes the impact of incidental take to listed animals.**

3         Acknowledging that incidental take of listed animal species was reasonably certain to

4    occur from malathion's registration, FWS used the best available science to develop a surrogate

5    for take, and included an RPM and terms and conditions it considered necessary and appropriate

6    to minimize the impact of any incidental take. AR-12581–90. Plaintiffs' attempts to undermine

7    the ITS are confused on the law and muddled on the facts.

8         a.    The ITS is separate from the jeopardy analysis and FWS has significant discretion
              in deciding which RPMs and terms and conditions are necessary and appropriate
9             to minimize the impact of incidental take.

10        "[A]n ITS is not part of the jeopardy analysis, but instead provides an exemption from

11   liability under Section 9 of the ESA." *CBD v. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1120

12   (N.D. Cal. 2009). In formal consultation, FWS first completes the jeopardy analysis, which

13   considers how a proposed "agency action affects the species or its critical habitat." *See id.*; 16

14   U.S.C. § 1536(b)(3)(A), (b)(4). If "after consultation," FWS reaches a no-jeopardy determination,

15   it issues an ITS including any RPMs it "considers necessary or appropriate to minimize [the]

16   impact" of incidental take and implementing terms and conditions. 16 U.S.C. § 1536(b)(4)(i–iv).

17        The ESA does not provide that an ITS must "minimize take," as Plaintiffs assert. Pls. Mot.

18   at 37. Rather, it requires an ITS to minimize the "impact" of the incidental take estimated to occur.

19   16 U.S.C. § 1536(b)(4)(ii); *see CBD v. Salazar*, 695 F.3d 893, 909 (9th Cir. 2012) (noting that an

20   ITS "contains terms and conditions designed to minimize the impact" of take). This may seem

21   like a trivial difference, but Plaintiffs use it to distort the statute to impose a roving duty on FWS

22   to extinguish the possibility of take. *See* Pls. Mot. at 38 (arguing FWS cannot "heedlessly allow

23   incidental take; it must minimize it"). This has no basis in the ESA, which is focused on avoiding

24   the likelihood of jeopardizing the continued existence of listed species. 16 U.S.C. § 1536(a)(2).

25   The ESA expressly permits incidental take to occur so long as the level does not exceed that

26   estimated in the ITS—i.e., an amount of take which is unlikely to result in jeopardy, *id.*

27   § 1536(b)(4)(B)—and the action agency complies with the RPM and terms and conditions. And

28   FWS, as the consulting agency, has no "substantive" duties past issuing the ITS. Pls. Mot. at 39.

1    Instead, it is the action agency (EPA) which must ensure it complies with terms and conditions to
2    avoid take liability, 16 U.S.C. § 1536(o)(2), and which has a duty to reinitiate if the ITS is
3    exceeded, 50 C.F.R. § 402.14(i)(5); 50 C.F.R. 402.16.[15]

4         As to the content of RPMs and terms and conditions, FWS has significant discretion,
5    which Plaintiffs ignore. In *Loper Bright Enterprises v. Raimondo*, the Court held that questions
6    of statutory interpretation are for the courts to decide. 603 U.S. at 400, 412–13 (2024). But within
7    that framework, the Court also identified a category of statutory enactments that "delegate[]
8    discretionary authority to an agency." *Id*. at 395. The Court cited as examples statutes that
9    empower an agency to regulate to "appropriate" or "reasonable" limits. *Id*. at 395 & n.6. These
10   statutory commands authorize an agency to "exercise a degree of discretion," where judicial
11   review then turns—at least in part—on whether the "agency has engaged in 'reasoned
12   decisionmaking.'" *Id*. at 394–95 (cleaned up). The Ninth Circuit has also explained that "where
13   Congress has not directly said what 'necessary or appropriate' means," it has "left the complex
14   policy decision" up to the "discretion of the agency." *Bear Lake Watch, Inc. v. FERC*, 324 F.3d
15   1071, 1074 (9th Cir. 2003) (collecting authorities); *see also Frontier State Bank Oklahoma City,*
16   *Okla. v. FDIC*, 702 F.3d 588, 595 (10th Cir. 2012) ("necessary or appropriate" language shows
17   Congress' intent to commit a "decision to an agency's sole discretion").

18        This case implicates a similar discretionary statutory command. The ESA authorizes FWS
19   to specify "reasonable and prudent measures" that it deems to be "necessary or appropriate." 16
20   U.S.C. § 1536(b)(4)(C)(ii). This "necessary or appropriate" statutory command commits the
21   decision to FWS's discretion and expresses Congress's intent to broadly defer to FWS's
22   judgment. *See Loper Bright*, 603 U.S. at 394–95; *see also Culver*, 2024 WL 4505468, at *65
23   (noting ESA "confers discretion on FWS" to determine RPMs and terms and conditions).

24

25   _____

26   [15] Nor do the cases on which Plaintiffs rely support their interpretation that FWS must "minimize
     take." Each merely states that FWS must include RPMs and terms and conditions in an ITS. *See*
     *CBD v. Culver*, No. 21-CV-07171-SI, 2024 WL 4505468, at *65 (N.D. Cal. Oct. 15, 2024)
27   (finding ITS arbitrary and capricious because it "lack[ed] RPMs and terms and conditions"); *CBD*
     *v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1141 (N.D. Cal. 2006) (finding "failure to include
28   any" terms and conditions implementing RPM unlawful).

1          With the law—and the significant discretion it affords FWS—properly understood,

2   Plaintiffs' arguments seeking to undermine the ITS each fail.

3               b.   Plaintiffs' focus on the proposed action's incorporated label changes is misplaced.

4          Plaintiffs principally argue that for the 1,534 species that do not have applicable "species-

5   specific" label changes, the ITS is unlawful. Pls. Mot. at 37–42. Plaintiffs confuse the issues.

6          At the outset, an ITS is not required for plant species. *CBD v. BLM*, 833 F.3d 1136, 1145

7   (9th Cir. 2016) ("Because [ESA] section 9 applies to animals only, it follows that one can neither

8   'take' nor 'incidentally take' a plant," and therefore that ITS "provisions apply to animals only.").

9   Thus, the ITS here does not apply to the more than 900 plants at issue. *See* AR-12582 (describing

10  incidental take to animals); AR-30700 (Appendix K-E noting anticipated incidental take to

11  animals). Plaintiffs' argument that FWS failed to "minimize take" for plants that lack species-

12  specific label changes is therefore fundamentally flawed. This error also infects their requested

13  remedy. *See* Pls. Mot. at 49 (seeking vacatur of ITS as to 1,534 species, including plants).

14         More broadly, the generally applicable and species-specific label changes are not part of

15  the ITS—they are part of the proposed action analyzed by the BiOp. The BiOp explains that the

16  measures were "incorporated into" malathion labels and altered the proposed action from what

17  was initially analyzed in the draft BiOp. *See* AR-12299 & n.5; AR-12514. FWS properly assessed

18  the extent to which the measures would minimize effects as part of rendering its no-jeopardy

19  conclusions and no destruction or adverse modification determinations. *See* AR-12514 (the BiOp

20  discusses the measures "in the context of how we anticipate[d] they would avoid, minimize, or

21  reduce exposure and effects"); 50 C.F.R. § 402.14(g)(8) (explaining that measures "included in

22  the proposed action . . . that are intended to avoid, minimize, or offset the effects of an action"

23  should be considered by FWS "like other portions of the action"). After reaching the no-jeopardy

24  determinations in the BiOp, FWS issued the ITS and included an RPM with terms and conditions

25  to minimize the impact of incidental take. AR-12581–90.

26         In short, FWS analyzed the conservation measures as part of the proposed action and

27  considered whether they reduced or minimized effects in rendering its no-jeopardy determination.

28  Plaintiffs' arguments disparaging FWS for not explaining how the generally applicable label

changes will "minimize take" are thus misplaced. Pls. Mot. at 38. Plaintiffs' tact is confusing because they acknowledge that the label changes modified the proposed action, and they cite nothing tying them to the ITS. *Id.* at 39 (noting "label changes" are "already part of the proposed action").[16] In any event, because Plaintiffs do not argue that FWS improperly found that the generally applicable label changes would reduce effects as part of its jeopardy analysis, but instead criticize their failure to "minimize take," Plaintiffs' arguments all fail.[17]

Indeed, Plaintiffs' chief complaint—that FWS should have added species-specific measures for all species, Pls. Mot. at 41—underscores their confusion of the issues. While the label changes came about through discussions between FWS and EPA, the technical registrants ultimately agreed to adopt them which changed *EPA's* proposed action. *See, e.g.*, AR-12299 n.5; AR-12514. As the consulting agency, FWS "must analyze the project as presented." *Nat. Res. Def. Council*, 102 F.4th at 1073. FWS did not have the ability to unilaterally impose additional label changes in its BiOp, as Plaintiffs appear to suggest. Nor could FWS have done this through the ITS. *See* 50 C.F.R. § 402.14(i)(2) (RPMs and terms and conditions in ITS "cannot alter the basic design, location, scope, duration, or timing of the action").

Even if the Court overlooks these deficiencies, Plaintiffs' arguments lack merit. For example, Plaintiffs note that some species of beach mice have a species-specific label change related to mosquito spraying, while two other species of beach mice do not. Pls. Mot. at 39–40. Plaintiffs claim that because each species "received identical assessments of high vulnerability" and "medium risk," they warranted the same label changes. *Id.* (complaining that 15 other species received the same rankings but only nine had species-specific measures). But, as explained above, these rankings were just "starting point[s]" from which FWS conducted species-specific analyses.

---

[16] Plaintiffs' framing may stem from their misreading of the BiOp as stating that FWS "relied on the general label changes" as "equivalent measures sufficient to minimize take for all but 64 listed species." Pls. Mot. at 38. The cited footnote merely states that the label changes were "changes to the *Description of the Action*." AR-12299 n.5.

[17] That said, by reducing adverse effects to species, the conservation measures will result in less incidental take of species from malathion's registration than if they were not included in the proposed action. Plaintiffs do not argue otherwise.

AR-12511. For example, the Perdido Key beach mouse is a "narrow endemic" and FWS had specific information concerning "mosquito control efforts" in the county in which it resides. *See* AR-29469. FWS found that "based on information about the pesticides that used by the County, we expect it is unlikely that malathion will be the product used." *Id.* Based on this and other information, FWS found that the proposed action—which included the general label changes— was not likely to jeopardize this species. AR-29469–70. By contrast, for the Alabama Beach Mouse, FWS did not possess similar species-specific information concerning mosquito control efforts, and thus a species-specific measure restricting application within its range was incorporated into the proposed action, supporting FWS's no-jeopardy conclusion. AR-29498. Again, Plaintiffs' argument—that the raw rankings should have determined label changes— would skirt these species-specific analyses.

In short, Plaintiffs' arguments regarding the conservation measures fail.

c.   Consistent with the ESA, FWS included an RPM and terms and conditions that it found "necessary and appropriate" to minimize the impact of incidental take.

Plaintiffs devote only a few paragraphs to the RPMs and terms and conditions that FWS included in the ITS. Pls. Mot. at 42–43. Plaintiffs misrepresent or ignore what the ITS requires, and they provide no basis to second-guess FWS's substantial discretion in determining what RPMs and terms and conditions are "necessary and appropriate." 16 U.S.C. § 1536(b)(4)(C)(ii).

FWS included one RPM, which requires EPA to "use its authorities under FIFRA to minimize impacts of incidental take to the listed species addressed" in the ITS. AR-12586. Plaintiffs misread the RPM as asking EPA to make more label modifications and accuse FWS of "pass[ing] the buck back to EPA." Pls. Mot. at 42–43. What the RPM requires is elucidated through the terms and conditions. EPA must: (1) provide FWS with monitoring and annual reporting; (2) ensure label changes are implemented within a specified timeframe; (3) compile and evaluate available data to detect changes in estimations of malathion exposure to listed and proposed species and designated and proposed critical habitats in the BiOp and (4) provide training and education to pesticide users and applicators. *See* AR-12585–90.

These terms and conditions are reasonably designed to minimize the impact of incidental

take in compliance with the ESA. For example, monitoring, reporting, and analyses of potential changes in usage, as well as changes in exposure, will ensure that new data is consistent with information and assumptions relied on in the BiOp, and that levels of adverse effects and take are not at higher levels than anticipated. This will permit FWS to assess whether it properly resolved the uncertainties and gaps in available data on these issues in the BiOp. *See* AR-12584 (noting usage data monitoring will allow FWS to "monitor and test" its "overarching assumptions"). The ITS thus properly "serves as a check" on FWS's "original decision that the incidental take of listed species resulting from the proposed action will not jeopardize the continued existence of the species." *Salazar*, F.3d at 911 (citation modified). Moreover, by imposing specified deadlines for implementing label changes and requiring EPA to create trainings for users and applicators regarding specific malathion ESA requirements, the terms and conditions are appropriately designed to minimize the impact of incidental take. *See* AR-12589–90.

Plaintiffs' short, conclusory paragraph criticizing the terms and conditions does not engage with what they require of EPA and instead resorts to misrepresenting them. Pls. Mot. at 43. For example, Term and Condition 3 does not merely require EPA to "provide a phone number to report ecological incidents." *Id.* It imposes deadlines and requirements on EPA to collect, analyze, and report on water quality monitoring data, ecological incidents, malathion use, and malathion usage to assess any changes in malathion exposures and responses. AR-12587–88. And contrary to Plaintiffs' claim that "most" reports are required "every five years," Pls. Mot. at 43, Term 1 requires *annual* reports and meetings regarding everything required by the other three terms, and Term 3 requires initial reports of most data within *12 months*. AR-12587–88. In short, Plaintiffs' cursory, misplaced objections do not provide any basis to second-guess FWS's discretion concerning which RPMs and terms and conditions are necessary and appropriate.

Finally, Plaintiffs claim that the ITS does not "contain an adequate" reinitiation trigger. Pls. Mot. at 43. Plaintiffs do not challenge FWS's decision to employ usage data as surrogate for estimating the level of incidental take. AR-12581–88. Instead, they object to FWS's delineation of a "two-part assessment" for determining whether reinitiation is warranted based on that data. Pls. Mot. at 43. But Plaintiffs' vague objection fails to grapple with FWS's reasoned explanation

of why this process is appropriate. FWS explained that the level of incidental take is "linked, in part, to the level of usage," but that changes in usage data may not always be a concern necessitating reinitiation. AR-12583. FWS found a species-specific analysis, including analyzing conservation measures and a species' particular risk and exposure pathways, was necessary before determining whether usage levels indicate an exceedance of the ITS. *Id.* As such—rather than apply a wooden test for reinitiation based only on usage levels—FWS found it appropriate to consider "both the risk to the species based on [its] understanding of the toxicity of malathion and the level of exposure based upon the usage of malathion in the habitat of the species." *Id.* This approach was more than reasonable, and it reconciled the need to have a trigger for reinitiation with the uncertainties of estimating take given the scope, duration, and nature of a nationwide pesticide registration. Plaintiffs' perfunctory attempt to undermine this approach fails.

For all these reasons, FWS's ITS, RPM, and terms and conditions comply with the ESA and Plaintiffs' arguments should be rejected.

## III.    No remedy is warranted, and consideration of remedy is premature at this stage.

Plaintiffs ask the Court to "vacate the portions of the ITS regarding the 1,534 species" for which no species-specific label changes were included, and to "remand the remainder of the BiOp to FWS." Pls. Mot. at 49–50. No remedy is appropriate because FWS's analysis was neither arbitrary nor capricious. In any event, remedy arguments are premature. ECF No. 69 at 8 (noting a separate "remedy phase" will occur if necessary after ruling on merits). Separate remedy briefing is particularly appropriate because Plaintiffs have conceded that something less than full vacatur would redress their injuries, Pls. Mot. at 49–50, and "[c]ourts 'should aim to ensure the framing of relief no broader than required by the precise facts.'" *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1158 (D. Mont. 2019) (citation modified).

## CONCLUSION

For all these reasons, the Court should grant this motion, deny Plaintiffs' motion, and enter judgment for Federal Defendants.

Dated: July 28, 2025                         Respectfully submitted,

ADAM R.F. GUSTAFSON,
Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
MEREDITH FLAX, Deputy Section Chief

*/s / Elizabeth Kirby*
ELIZABETH KIRBY, Trial Attorney
JOSEPH W. CRUSHAM, Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Tel | (202) 307-1145; (202) 305-0339 Fax | (202) 305-0275
Email: joseph.crusham@usdoj.gov; elizabeth.kirby@usdoj.gov

*Attorneys for Federal Defendants*