Stephanie Parent (OR Bar No. 925908)*
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
(503) 320-3235
sparent@biologicaldiversity.org

John William ("J.W.") Glass (DC Bar No. 1780210)*
Center for Biological Diversity
1411 K St. NW, Suite 1300
Washington, DC 20005
(813) 833-5301
JWGlass@biologicaldiversity.org

Additional Counsel in signature block

Counsel for Plaintiffs
*Admitted *pro hac vice*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| PESTICIDE ACTION NETWORK NORTH AMERICA, et al., | Case No. 3:24-cv-06324-JSC |
| Plaintiffs, | PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' AND INTERVENOR-DEFENDANTS' CROSS-MOTIONS FOR SUMMARY AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| PAUL SOUZA, et al., | |
| Defendants, and | Date: January 9, 2025 Time: 10:00 am |
| CROPLIFE AMERICA, | Place: Courtroom 8 |
| Intervenor-Defendant. | Honorable Jacqueline Scott Corley |

TABLE OF CONTENTS

**INTRODUCTION**................................................................................................1

**ARGUMENT**....................................................................................................2

    I.    THE BIOP IS ARBITRARY BECAUSE USAGE OVERLAP WAS THE
        DETERMINATIVE FACTOR IN REACHING NO JEOPARDY
        CONCLUSIONS REGARDLESS OF SPECIES' VULNERABILITY OR
        RISK ....................................................................................................2

        A.    FWS's range maps are systematically overbroad and arbitrary .................3

        B.    The percent usage overlap underrepresents potential effects on
                species ...........................................................................................8

        C.    FWS does not have a rational basis for its outsized reliance on
                usage information...........................................................................11

    II.    FWS'S JEOPARDY ASSESSMENT IS ARBITRARY .......................................12

    III.    THE BIOP ASSESSMENT OF INCIDENTAL TAKE IS ARBITRARY ..........14

        A.    FWS Must Minimize the Impact of Take Caused by Malathion's
                Registration ...................................................................................14

        B.    The sole RPM does not minimize take and has no reinitiation
                trigger ...........................................................................................16

    IV.    THE NO ADVERSE MODIFICATION OF CRITICAL HABITAT
        DETERMINATIONS ARE UNSUPPORTED ........................................................18

    V.    FWS FAILED TO ADDRESS RECOVERY IN THE BIOP..............................20

    VI.    PLAINTIFFS HAVE DEMONSTRATED STANDING .......................................21

        A.    Plaintiffs' claims that FWS's BiOp is arbitrary are procedural, not
                substantive...................................................................................21

        B.    Plaintiffs have demonstrated concrete, particularized injuries to
                challenge the entire BiOp .............................................................22

        C.    CLA's remaining arguments are unrelated to standing .........................24

    VII.    REMEDY ...........................................................................................25

**CONCLUSION** ................................................................................................28

TABLE OF AUTHORITIES

**Cases**

*Alaska Ctr. for the Envt. v. Browner*, 20 F.3d 981 (9th Cir. 1994)........................................ 21, 23

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998) ............................................. 11

*Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001)...................................... 24, 27

*Am. Motorcycle Ass'n Dist. 37 v. Norton*, Nos. C 03-03807 SI, C 03-02509 SI, 2004 U.S. Dist.
LEXIS 15662 (N.D. Cal. Aug. 3, 2004) ......................................................... 23, 24

*Am. Rivers & Ala. Rivers Alliance v. FERC*, 895 F.3d 32 (D.C. Cir. 2018) ............................... 17

*Bundorf v. Jewell*, 142 F. Supp. 3d 1133 (N.D. Cal. 2015) ........................................................ 24

*CBD v. BLM*, 833 F.3d 1136 (9th Cir. 2016)........................................................................ 17

*Cent. Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002) ............................... 22

*Cook Inletkeeper v. Raimondo*, 541 F. Supp. 3d 987 (D. Alaska 2021)...................................... 25

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799 (2024)............... 23, 24

*Ctr. for Biological Diversity v. Culver*, No. 21-cv-07171-SI, 2024 U.S. Dist. LEXIS 187610
(N.D. Cal. Oct. 15, 2024) .......................................................................... 14

*Ctr. for Biological Diversity v. FWS*, 807 F.3d 1031 (9th Cir. 2015)........................................... 20

*Ctr. for Biological Diversity v. FWS*, No. CV 24-86-M-DWM, 2025 U.S. Dist. LEXIS 150500
(D. Mont. Aug. 5, 2025) .............................................................................. 11

*Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980 (9th Cir. 2023) ................................... 24

*Ctr. for Biological Diversity v. NOAA Fisheries*, 644 F. Supp. 3d 574 (N.D. Cal. 2022)............ 24

*Ctr. for Biological Diversity v. Ross*, No. 4:19-cv-03135-KAW, 2019 U.S. Dist. LEXIS 220065
(N.D. Cal. Dec. 20, 2019) ........................................................................... 24

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976 (9th Cir. 2025)....... 14

*Ctr. for Biological Diversity v. United States BLM*, 698 F.3d 1101 (9th Cir. 2012)................... 24

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, No. 2:21-cv-01527-DJC-
DMC, 2025 U.S. Dist. LEXIS 136827 (E.D. Cal. July 17, 2025) .................................... 24

*Ctr. for Env't Health v. Regan*, No. 4:18-cv-03197-SBA (N.D. Cal. Jan. 4, 2022) ............... 25, 26

*Ctr. for Envtl. Health v. Vilsack*, No. 15-cv-01690-JSC, 2015 U.S. Dist. LEXIS 131773 (N.D. Cal. June 20, 2016) .......................................................................................... 22, 25

*Ctr. For Food Safety v. Regan*, 56 F.4th 648 (9th Cir. 2022)..................................................... 26

*Def'rs of Wildlife v. EPA*, 420 F.3d 946 (9th Cir. 2005) ........................................................... 21

*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000) ............................. 22

*Env't Prot. Info. Ctr. v. Atta*, 692 F. Supp. 3d 879 (N.D. Cal. 2023)........................................ 24

*Forest Serv. Emples. v. United States Forest Serv.*, 726 F. Supp. 2d 1195 (D. Mont. 2010)......... 8

*Friends of the Clearwater v. Higgins*, 523 F. Supp. 3d 1213 (D. Idaho, 2021) ............................ 4

*Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059 (9th Cir. 2004)........................................... 19

*Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011).................... 9, 19

*Helena Hunters & Anglers Ass'n v. Marten*, 470 F. Supp. 3d 1151 (D. Mont. 2020) ................. 24

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238 (N.D. Cal. 2015) ............................................................ 24, 25

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................................... 13

*Lujan v. Def'rs of Wildlife*, 504 U.S. 555 (1992).................................................................... 22

*Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257 (11th Cir. 2009)........................ 18

*Michigan v. EPA*, 576 U.S. 743 (2015) ............................................................................ 10, 13

*Ministerio Roca Solida, Inc. v. United States*, 145 Fed. Cl. 756 (2016)...................................... 6

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).......................................... 24, 25, 27

*Mont. Wildlife Fedn v. Haaland*, 127 F.4th 1 (9th Cir. Jan. 17, 2025)...................................... 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................................................................................................ 10, 11

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007)............................... 13, 21

*Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893 (9th Cir. 2020) ...................................... 22, 23, 25

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917 (9th Cir. 2008)................... 20

*NRDC v. Kempthorne*, No. 1:05-cv-1207 OWW GSA, 2007 U.S. Dist. LEXIS 101940 (E.D. Cal. Dec. 14, 2007)............................................................................................... 27

*NRDC v. Rodgers*, 381 F. Supp. 2d 1212 (E.D. Cal. 2005)....................................................... 19

*NRDC v. U.S. Envtl. Prot. Agency*, 798 F.3d 809 (9th. Cir. 2015)...............................16

*Or. Nat. Res. Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007)....................................15

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082

    (9th Cir. 2005)...............................................................................18

*Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520 (9th Cir. 2015)..............................25

*Reed v. Salazar*, 744 F. Supp. 2d 98 (D.D.C. 2009)........................................24

*Salmon Spawning & Recovery Alliance v. Gutierrez*, 45 F.3d 1220 (9th Cir. 2008) ............. 20, 21

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497 (2025) ...................................12

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739

    (D. Alaska 2021) ...........................................................................24

*Survivors v. United States DOI*, 336 F. Supp. 3d 1131 (N.D. Cal. 2018) ...................................23

*Trump v. CASA, Inc., 606 U.S. 831 (2025)* .........................................27

*Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564 (D.C. Cir. 2016) ....................................15

*W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29 (D.D.C. 2020) ...................................15

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011).......................................26

*Welchert v. Am. Cyanamid, Inc.*, 59 F.3d 69 (8th Cir. 1995) .........................................16

*Westlands Water Dist. v. United States DOI*, No. CIV F-00-7124 OWW DLB, 2005 U.S. Dist.

    LEXIS 24864 (E.D. Cal. June 30, 2005*)* .........................................25

Wild Fish Conservancy v. United States EPA, No. C08-0156-JCC, 2010 U.S. Dist. LEXIS 41838

    (W.D. Wash. Apr. 28, 2010)...........................................................12

*WildEarth Guardians v. U.S. Dept. of Agriculture*, 795 F.3d 1148 (9th Cir. 1994)....................21

**Statutes**

5 U.S.C. § 706(2) .................................................................................. 23, 24

16 U.S.C. § 1531(b) .............................................................................. 13, 14

16 U.S.C. § 1532(3) .............................................................................. 13, 14

16 U.S.C. § 1536(4) ..................................................................................16

16 U.S.C. § 1536(a)(1) ........................................................................... 13, 14

16 U.S.C. § 1536(a)(2) ...............................................................................21

16 U.S.C. § 1536(b)(2) ................................................................................................. 4

16 U.S.C. § 1536(b)(3) ............................................................................................... 24

16 U.S.C. § 1536(b)(3)(A) .......................................................................................... 21

16 U.S.C. § 1536(b)(4) ..................................................................................... 13, 16, 24

16 U.S.C. § 1536(b)(4)(A) .......................................................................................... 14

16 U.S.C. § 1536(b)(4)(ii) ................................................................................. 13, 14, 15

**Other Authorities**

S. Rept. 106-126 (1999) .............................................................................................. 17

**Regulations**

43 Fed. Reg. 870 (Jan. 4, 1978) .................................................................................. 17

50 C.F.R. § 402.14(i) .................................................................................................. 17

50 C.F.R. § 402.14(i)(2) .............................................................................................. 16

50 C.F.R. 402.02 ......................................................................................................... 10

80 Fed. Reg. 59,277 (Oct. 1, 2015) .............................................................................. 6

81 Fed. Reg. 7,414 (Feb. 11, 2016) ............................................................................. 17

## INTRODUCTION

This Court, and many others, have reviewed biological opinions for many years. This U.S. Fish and Wildlife Service's (FWS) Biological Opinion must adhere to the same familiar standards of administrative law. FWS cannot take shortcuts simply because it involves nearly every species that is supposed to be protected by the Endangered Species Act (ESA). Plaintiffs do not contend that malathion jeopardizes every threatened and endangered species. FWS's conclusions that malathion does not jeopardize a single species, regardless of how vulnerable or at risk they are, is equally implausible. The record shows that FWS's approach leading to its no jeopardy conclusions and failure to minimize take is fundamentally flawed.

First, FWS does not attempt to rationally explain why it relied on enormous species ranges in its jeopardy analysis that the record shows have no connection to where species do or are most likely to occur in small, isolated, scattered, remaining habitats. FWS would like the Court to believe it "considered" this information because it is in the record. This is not the case. The vulnerability factor addresses the status of the species, environmental baseline and cumulative effects. This information, in Appendix C and summarized in Appendix K under vulnerability, paints a bleak picture of how limited the range is for most species. FWS ranked these species vulnerability "high." But when FWS assessed the usage overlap factor, inexplicably, FWS uses ranges that encompass sometimes millions of acres in which the species does not, cannot, and maybe never did exist. This is important because when FWS synthesized the factors, even though species had high vulnerability and risk, FWS determined no jeopardy based on likelihood of exposure to malathion being low because past usage of malathion overlaps only a small portion of the range. If FWS had used the realistic ranges described in Appendix C, then conducted its usage overlap analysis, the likelihood of exposure would be much different. There is no connection between the facts of small species ranges and FWS's no jeopardy conclusions based on overbroad ranges.

Second, while a pesticide biological opinion that covers all uses nationwide of a chemical may involve similar inquiries for every species, but at its core FWS does not explain why the same uniform assumptions, approaches, and biases are appropriate for each species, despite the

widely varying conservation status, life history, and unique circumstances that each species faces on its road to recovery. Indeed, FWS mostly contends that as long as every box is checked, no matter how cursorily, they have met the demanding standards of the endangered species act.

Third, Defendants assert that plaintiffs have failed to correctly explicate the Section 7 to "minimize the impact of such taking" with respect to FWS's obligations in the reasonable and prudent measures required for the incidental take statement. Whether there is a meaningful difference between FWS's obligation to minimize the impact or to minimize take under the statute, is a task for this Court to decide and FWS is entitled to know deference. The ordinary and best meaning of the phrase "minimize the impact of such take" must be viewed in the context of the Act itself. The impact of take that is relevant in a biological opinion must be to a species' survival and recovery. But in order to assess that impact, FWS must meaningfully assess how much take has occurred, where such take occurs, the current conservation status of the species, and the population consequences to that species. These are the normal components of a take analysis that FWS did not undertake here. Instead, the BiOp relies on cookie cutter, boiler plate, and mechanistic choices that have the effect of systemically, ignoring and discounting the real harms to each individual species in its unique circumstances.

It may be the case that for some species FWS did indeed accurately assess the harm and take the correct steps required by the ESA. Plaintiffs concede that for the 67 species that received individual conservation measures that is likely the case. It may also be true that, by lucky happenstance, for some species the limited generic conservation measures do in fact "minimize the impact of such take." But the record makes clear, and FWS fails to rebut, the numerous instances where the determinations for particular species are clearly contrary to the record.

## ARGUMENT

I.    THE BIOP IS ARBITRARY BECAUSE USAGE OVERLAP WAS THE DETERMINATIVE FACTOR IN REACHING NO JEOPARDY CONCLUSIONS REGARDLESS OF SPECIES' VULNERABILITY OR RISK

FWS assessed three factors to determine whether EPA's action is likely to jeopardize ESA-protected species: vulnerability, risk, and usage. Usage is the estimated number of acres on which malathion is anticipated to be used within a species' range (based on past usage) divided

by the total acres in the species' range, expressed as a percentage.[1] AR-12514; AR-26809. FWS does not explain how it weighs these three factors, but the record shows that usage overlap is the deciding factor in FWS's no jeopardy conclusions even when species are highly vulnerable and at risk. This is problematic for several reasons. First, FWS uses inflated species' ranges that do not reflect FWS information in the record describing smaller or more precise areas where species are most likely to occur. Because the range is the denominator in the percentage calculation, holding other things equal, a larger range acreage will skew the usage overlap percentage to a lower value. Second, the usage data that FWS uses in the numerator may inform an effects analysis, but it is not suitable to drive the effects determinations as FWS has applied it here. Past usage data does not determine where malathion will be used in the future in relation to where species occur. Worse, since FWS's usage overlap is expressed as a percentage of a species' entire range, it suggests that the potential impact of anticipated use would be approximately evenly distributed across that range and thus minimal, when, in the real world, malathion applications will likely cluster around certain use sites, with 100% use in some areas and none at all in others. Indeed, species themselves are often not uniformly distributed even within their ranges, and applications in the vicinity of where key populations occur will have a disproportionate impact compared to what the diluted usage overlap percentage portrays. These issues are not simply flaws that can be easily dismissed. FWS made the usage overlap factor the underpinning of its jeopardy analyses, overriding any amount of vulnerability and risk. Accordingly, FWS's BiOp is arbitrary.

## A. FWS's range maps are systematically overbroad and arbitrary

FWS errs by using species ranges that include far more acreage than its own information supports. The record shows these inflated ranges are not tethered to the reality on the ground. Because the range is the denominator in the percentage calculation, the overly large ranges almost guarantee a "low" ranking for the usage overlap factor even when using California usage data. This is arbitrary because there is no rational connection between the facts of limited areas where species exist, as FWS summarizes in its vulnerability narratives in Appendix K, and the

---

[1] Plaintiffs referred to the usage factor as "overlap" in its Motion. To indicate that usage and overlap are the same, Plaintiffs refer to it as "usage overlap" in this document.

1    overbroad ranges FWS uses to determine percent usage overlap. FWS has no excuse for not

2    using its own available information for species' known locations, rendering the BiOp arbitrary

3    and in violation of the ESA mandate to use the best available information. 16 U.S.C. §

4    1536(b)(2).

5        FWS assessed "larger range estimates" that in many cases do not "actually show[] the

6    'current range'" of a species when it knows, based on recovery documents cited in the BiOp,

7    where that species specifically occurs. *Friends of the Clearwater v. Higgins*, 523 F. Supp. 3d

8    1213, 1224 (D. Idaho, 2021) (Defendant disputed that a printout of FWS's ECOS range map

9    actually shows current range). FWS systematically chose to rely on overbroad range maps that

10   inflated the denominator of the usage overlap calculation by orders of magnitude, even though

11   record evidence supports using a much smaller area to accurately reflect the impacts to species.

12   AR-16811. In doing so, the percent usage overlap is dramatically lowered, making the risk to the

13   species appear insignificant, affecting the overall jeopardy assessment, and allowing FWS to

14   ignore the necessity to minimize the impact of malathion.

15       FWS's citations do not support the proposition that it assessed specific species locations.

16   CITE ECF 70. *See* AR-563, AR-580, AR-582 (requesting critical habitat documents); AR-1147,

17   AR-1162 (PowerPoint slides with range maps downloaded from ECOS); AR-12516, AR-12692

18   (describing process for compiling information from ECOS); AR-26822, AR-29995–96, AR-

19   30210, AR-30303 (listing recovery documents available on ECOS). And it does not matter if

20   FWS "refined" the range map, ECF 70 at 16, when that range map conflicts with a much smaller

21   description of the area where the species remains in the record. AR-12743, AR-12743. Indeed,

22   FWS's arguments regarding its assessment of the valley elderberry longhorn beetle, Ohlone tiger

23   beetle, Poweshiek skipperling, blunt-nosed leopard lizard, and Ash Meadows naucorid further

24   illustrate the arbitrary application of range maps in conflict with record evidence. See e.g., AR-

25   16811, AR-17473, AR-29114, AR-29128, AR-29628.

26       Most species do not decline to a single remaining population, rather they fragment across the

27   range and dwindle down over time, which makes consideration of individual population

28   locations even more important when assessing threats from pesticides. However, even though the

valley elderberry longhorn beetle persists only in isolated populations and only disperses a mere 50 meters from its host elderberry in riparian areas, AR-16864, FWS chose a range that encompasses the entirety of California's Central Valley, including millions of acres of unoccupied, urban, agricultural, and unsuitable areas where valley elderberry longhorn beetle has never been found. AR-29114. Of course, the valley elderberry longhorn beetle is found within the Central Valley, but the actual areas where it occurs are highly fragmented and dependent on the presence of riparian forests. AR-16865. The BiOp estimates remaining riparian forest at 102,000 acres, with "pre-settlement riparian forest area" consisting of 921,600 acres, AR-29109. Moreover, valley elderberry longhorn beetle has never been found in northern Mexico, and it is nonsensical to suggest that a species the BiOp itself says is "[r]estricted to the Central Valley of California," may persist in Mexico due to the presence of elderberry. ECF-70 at 17, 18; AR-16862. Nevertheless, FWS disregards its own record on the valley elderberry longhorn beetle and instead assesses an area of 9,450,948 acres that is nearly ten times larger than the beetle's habitat before European settlement of California. AR-29114. In arbitrarily choosing to assess the overbroad range instead of the locations where the beetle is known or likely to occur, the denominator of the usage overlap assessment becomes so vastly inflated that the percentage of malathion usage appears marginal. In fact, FWS determine the usage overlap is 3.76%, considered "low." AR-29114-15.

FWS attempts to defend its assessments of the Ohlone tiger beetle and the Poweshiek skipperling by claiming, without evidence, that assessing location information means "the analysis would not include other areas where the species occupy [sic]." ECF 70 at 18. However, FWS's defense merely illustrates the importance of incorporating species specific information cited in the BiOp. For Ohlone tiger beetle, it is the BiOp itself that states "an estimate of known, recently occupied grassland and trail habitats is 6.88 ha (17.0 ac.) in Santa Cruz County" with additional estimates claiming that that "suitable habitat for the Ohlone tiger beetle is estimated at 81 to 279 ha (200 to 687 ac.)." *See* AR-16811 (102,828 acres assessed for the Ohlone tiger beetle). Assessing the 17 acres of habitat where the tiger beetle remains, according to the record, would account for all known populations. *Id.*. However, even assuming that FWS should have

assessed the outer bound of potential suitable habitat (687 acres), that is still far less than the

102,828-acre range that FWS used. AR-29245-46 (estimating usage overlap as 1.41%, or "low").

Similarly, it is the BiOp itself that states that Poweshiek skipperling "is considered to be present

at a few native prairie remnants in two States. AR-17473 The critical habitat designation cited by

the BiOp further clarifies that FWS sought to "designate[] critical habitat in areas within the

geographical area occupied by the … Poweshiek skipperling at the time of listing" 80 Fed Reg

59277 (Oct. 1, 2015). If FWS were to refer to the record instead of arbitrarily assessing range, it

may have been able to assess a more accurate acreage of the species location. The record shows

Poweshiek skipperling's range is substantially reduced, it is restricted to small patches of

fragmented habitat, and currently there are 7 sites where it is considered present, yet FWS used a

range of 11,769 acres. AR-29355, 29358.

Even assuming *arguendo* that the establishment of Ash Meadows National Wildlife Refuge

accounts for an inflated range assessment of the Ash Meadows naucorid, ECF 70 at 18, the

logical conclusion is that FWS would have assessed only 24,000 acres, not millions of acres.

*Ministerio Roca Solida, Inc. v. United States*, 145 Fed. Cl. 756, 761 (2016) ("The Ash Meadows

NWR . . . encompasses approximately 24,000 acres."). Indeed, the BiOp itself states that "[a]ll of

the remaining habitat of this species occurs within land purchased to established (sic) the Ash

Meadows National Wildlife Refuge." AR-29128. However, FWS ignores the record and claims

that an insect "restricted to several stream channels less than 0.3 m wide and 10 m long" should

be assessed over an area roughly 415 times larger than the 24,000-acre refuge. See AR-29128-31

(9,952,763 acres assessed for the Ash Meadows naucorid).

FWS makes the same arbitrary choice to use vastly inflated range maps for many other Ash

Meadows species in confined areas. *See* AR-30066, AR-30104 (1,447,310 acres assessed for Ash

meadows sunray); AR-30,127, AR-30151 (1,434,546.70 acres assessed for Ash meadows milk-

vetch); AR-28847 (9,864,452 acres assessed for Ash meadows speckled dace). However, this

error is not confined to Ash Meadows, as most species the BiOp cites as having "small, endemic,

constrained" distributions are instead assessed over millions of acres. *See* AR-29012 (Karner

blue butterfly assessed over 19,841,209 acres); AR-29037 (Mitchell's Satyr butterfly assessed

over 6,694,881 acres); AR-11372 (Bartram's scrub-hairstreak butterfly assessed over 7,794,473 acres); AR-26859 (frosted flatwood salamander assessed over 13,652,156 acres); AR-27271 (Florida scrub jay assessed over 5,158,349 acres); AR-28510 (Zuni bluehead sucker assessed over 19,509,139 acres); AR-28677 (Barrens topminnow, restricted to streams on Tennessee's Barrens Plateau, assessed over 30,323,427 acres, larger than Tennessee itself); *compare* AR-29309 (Salt Creek tiger beetle, with one of the most restricted ranges of any U.S. insect, assessed over 1,027,342 acres) *with* AR-29151 (Northeastern beach tiger beetle, which occupies the west and east shore of the Chesapeake Bay and parts of Massachusetts, assessed over 36,251 acres). This is a clear and systematic error that undermines the overlap analysis and renders the BiOp arbitrary.

FWS seems to insist on this approach in its defense of blunt-nosed leopard lizard. ECF 70 at 18. Here, FWS insists that it is required to assess the "range" in its usage overlap analysis, and that is completely estopped from considering species-specific information including "suitable habitat" even when that information is readily available. *Id.* This is simply not that case. In the same way FWS has chosen to perform an overlap analysis to screen out species, it is FWS's arbitrary choice to use overbroad range maps as the basis for the denominator in those overlap analysis. The record shows that the lizard, at the time of listing, was limited to scattered locations in 15% of its historic range, yet FWS used a 12,536,694-acre range, resulting in 0.07% usage overlap. AR-29626, AR-29628. This is a clear and systematic error that consistently undermines the overlap analysis and renders the BiOp arbitrary.

The bottom line is that FWS has more detailed information in the record showing much smaller, and sometimes specific, geographic areas where species are likely to occur. FWS summarizes this information in the "vulnerability" section for each species in Appendix K. For example, the El Segundo blue butterfly is found only in three disjunct locations—Airport Dunes, Chevron Preserve, and the beach bluffs between Malaga Cove and Rodondo Beach. AR-29003. It has only 451 acres of habitat that is suitable for long-term conservation. *Id*. FWS ranked the butterfly "high" for vulnerability. Yet in the "usage" section for countless species, FWS

calculates percent usage overlap based on ranges that don't come close to representing the current situation on the ground.

The inflation of range is not limited to the species described thus far. Plaintiffs have reviewed Appendix K and compiled record citations for most species that FWS determined had "high" vulnerability, "high" risk, but "low" percent usage overlap. A comparison of FWS's description in the vulnerability section, which includes information on the limited area where the species are known to exist, limited number or distribution of populations, and/or specific geographic locations, with the extensive number of acres FWS uses as the species range in the usage overlap section demonstrates that FWS's reliance on overbroad ranges is systemic and arbitrary because it fails to make a rational connection between the facts of limited ranges and conclusions of massive ranges causing low usage overlap. Due to the extensive number of such species, Plaintiffs provide the record citations in an addendum. *See Forest Serv. Emples. v. United States Forest Serv.*, 726 F. Supp. 2d 1195, 1222 (D. Mont. 2010) (where agency chose to take a nationwide approach in a BiOp, covering 400 species, plaintiff "may use examples of specific species to illustrate its claims without forfeiting its claims as to all other species.").

B.  The percent usage overlap underrepresents potential effects on species

Usage overlap does not accurately reflect the potential effects on the species. Again, usage is the estimated number of acres on which malathion is anticipated to be used within a species' range (based on past usage) divided by the total acres in the species' range, expressed as a percentage. Percent usage overlap diminishes assessment of the potential that species will be exposed by the legally authorized use of malathion. Nor does a percentage across a range predict where within a species range malathion will be used in the future. As a result, FWS does not have a rational basis to reach its no jeopardy conclusions.

Expressing usage overlap as a percentage dilutes the real impact to species when malathion is applied where the species occur. For most species, the usage overlap is less than 5%. But this does not mean that <5% of individuals in the species will be affected if exposed to malathion or that there is a <5% chance malathion will be applied in the species' range. Setting aside that the percentage is skewed low, it generally means that FWS anticipates malathion to be used

somewhere within of the species' range covering acreage that is somewhere around 5% of it. But if the location of malathion use coincides with the location of species populations, the consequences can be drastic. For insects in particular, in assessing risk, FWS anticipates that individual insects exposed to malathion would be at high risk of mortality. *See, e.g.* AR-29004. The risk of lethal effects is so great that FWS does not assess sublethal effects. *Id.* Thus, the percent usage overlap fails to consider an important aspect of the problem—whether it is likely that certain species will be exposed to malathion in the future and the consequences of that.

In reaching no jeopardy, FWS acknowledges high vulnerability and high risk "posed by labeled uses across the range," but, based on low percent usage overlap, concludes, "[h]owever, we do not expect usage on all use sites nor at the maximum rates allowed by the labels wherever used each year." *See, e.g.* AR-29007 (El Segundo blue butterfly conclusion) (emphasis added); AR-29013-14 (same for Karner blue butterfly).[2] This is the problem with usage. It cannot predict where malathion may be used in the future vis-à-vis the most likely location of a species. Malathion can be used anywhere EPA has authorized it for use. The percent overlap of acres where it can lawfully be used in the range is generally significant.[3] FWS cannot accurately predict the effects on species by relying on usage data that only shows malathion will be used somewhere within the use areas, as authorized by the label. In other words, even if usage overlap is "low" as a percentage across a species broad range, all or some of the use could lawfully occur in the same areas where the species are most likely to exist. EPA sets forth in its risk analyses in Appendix K the adverse consequences—mortality, sublethal effects, and effects on food and other needs—if species are located where malathion is actually used.[4] FWS has no rational basis to rely on low percent usage overlap because it fails to account for potentially catastrophic effects to key species populations that are exposed because it cannot predict where malathion will be used in the future.

---

[2] This language is repeated throughout the Appendix K conclusions. *See* Addendum for record cites to FWS's jeopardy conclusion for the species include therein.

[3] In Appendix K, under the "usage" heading, FWS includes a table that includes mosquito and agricultural uses. The middle two columns show the number of acres where malathion can be used as authorized on the labels within a species range and calculates a percent overlap. Plaintiffs provide record cites in the Addendum for the percent of the range where malathion is legally authorized for use for the species included therein.

[4] *See* Addendum for record cites to risk sections for the species included therein.

1      Because the percent usage overlap does not take geographic location or distribution into

2  account, it rests on an assumption that the low usage is uniform across the overbroad species

3  range, despite clear record evidence to the contrary. AR-13401, AR-13736, AR-16130, AR-

4  18647 (BiOp findings that species are sporadically, sparsely, or patchily distributed, or otherwise

5  not uniformly distributed). FWS claims that it "looked at" distribution, but critically, it does not

6  consider distribution as part of the overlap analysis. ECF-70 at 23. FWS considered distribution

7  only in the context of vulnerability, in that narrow endemics or sparsely distributed species may

8  be considered highly vulnerable to stochastic events. AR-12512. However, FWS erred in not

9  incorporating species-distribution into the overlap analysis. FWS may have "looked at" the

10  distribution of Fender's blue butterfly, but that information did not meaningfully inform the

11  overlap analysis where it is most relevant. *Greater Yellowstone Coalition, Inc. v. Servheen*, 665

12  F.3d 1015, 1030 (9th Cir. 2011) (citing scientific concerns on food shortages that were not

13  incorporated into the ultimate analysis of grizzly listing). Clearly, FWS was aware that in certain

14  circumstances, it could "look at" a more limited, occupied area within the range. In fact, it did so

15  in the development of conservation measures for the Buena Vista Lake ornate shrew, where

16  FWS incorporated species-specific mapping from a 2020 Species Status Assessment to create

17  pesticide use limitation areas. AR-12678. However, its decision to ignore that information and

18  instead systematically rely on usage data divided by overbroad range maps is arbitrary and

19  capricious. *Michigan*, 576 U.S. at 750.

20      FWS justifies using past usage data, despite the fact that it cannot predict location of future

21  malathion use vis-à-vis species locations, based on its regulatory definition of "effects of the

22  action." ECF 70, at 19. Effects of the action are consequences to species or critical habitat caused

23  by EPA's action that are "reasonably certain to occur." 50 C.F.R. 402.02. Yet, FWS has not

24  determined what effects are reasonably certain to occur to each individual species. It is

25  reasonably certain that malathion will be used where it is authorized to be used, not everywhere,

26  but somewhere. FWS has avoided determining whether the authorized uses are reasonably

27  certain to occur by hiding behind a smokescreen of low usage overlap. Usage data cannot predict

28  where malathion will be used in the future. If FWS had used its own information in Appendix C

to draw narrower bounds of where species are known to occur, FWS could better assess whether it is reasonably certain that these species will feel the consequences of malathion. FWS's approach flips the definition of effects of the action on its head. It failed to take into account the relevant factors of where the species are most likely to be found and the likelihood that malathion could be used in those same areas. There is nothing rational about the basis for FWS's conclusions of no jeopardy.

As a result of its arbitrary decisionmaking, the record shows that for numerous species FWS ranked both the species' vulnerability and risk as "high," but then concluded no jeopardy because the usage overlap percentage was low. Plaintiffs provide record citations to Appendix K in the Addendum to demonstrate this is a systemic problem, not limited to a few species. This is arbitrary because FWS fails to make a rational connection between the facts that the species have high vulnerability and high risk with its conclusions of no jeopardy. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

C.  FWS does not have a rational basis for its outsized reliance on usage information

Plaintiffs do not argue that FWS needed to ignore the usage data, despite its extensive deficiencies as chronicled in the BiOp. AR-12409, 12415. There are plenty of restrained ways in which it may have been appropriate to carefully consider the usage data, for example, as one input for analyzing species' baseline exposure to malathion, or to inform predictions about their vulnerability to further exposure. The explanations cited by Defendants might have justified such limited uses. ECF No. 70 at 30–31; AR-12408 (past usage data can inform where future usage is expected and provide context for assumptions about uncertainty). But FWS's discussion of its approach to the usage data doesn't recognize that a more limited application of those data was ever possible, let alone explain why it went further in making usage data the centerpiece of its analysis. ECF No. 58 at 23. FWS argues it tried to mitigate the poor quality of the EPA data, ECF No. 70 at 30–31, but such measures do not explain why FWS decided to base its approach on EPA's unreliable data set to begin with. *Id.*

Notably, this is not a "best-available-science claim" arguing that FWS failed to consider better data or needs to acquire new data, as FWS appears to mistakenly suggest. ECF 70 at 15.

1  *Contra* ECF No. 70 at 28–29. Instead, Plaintiffs argue that FWS used incomplete and unreliable

2  usage data in an impermissible way. FWS does not have free license to apply the weak usage

3  data in whatever manner it wants; it is bound to reasoned decision-making under the APA.

4  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). It must "articulate a

5  satisfactory explanation for its" manner of applying the usage data, "including a rational

6  connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State*

7  *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Ctr. for Biological Diversity v. FWS*,

8  No. CV 24-86-M-DWM, 2025 U.S. Dist. LEXIS 150500, at *72-73 (D. Mont. Aug. 5, 2025)

9  ("While the Service is indeed correct that the ESA permits reliance on less than perfect data . . .

10 and does not require the Service to generate its own data, . . . the Service must meaningfully

11 account for uncertainty and address substantive criticism . . . The failure to do so was arbitrary

12 and capricious."). FWS's failure to explain why it chose to design its effects analyses to rely so

13 heavily on the EPA usage data, despite its known flaws, was arbitrary and capricious. *State*

14 *Farm*, 463 U.S. at 43.

15     II.    FWS'S JEOPARDY ASSESSMENT IS ARBITRARY

16     Both CLA and FWS appear to conflate the length of the BiOp with the substance of its

17 analysis. ECF 70 at 29; ECF 73 at 9. In the same way that "[b]revity should not be mistaken for

18 lack of detail," jeopardy is not adequately assessed simply because a BiOp "meander[s] on for

19 hundreds or thousands of pages." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct.

20 1497, 1512 (2025). And despite a record that "spans thousands of pages," the plain fact of the

21 matter is that for certain species, FWS arbitrarily ignored information in its own recovery

22 documents on specific threats from malathion when assessing jeopardy. *See Wild Fish*

23 *Conservancy v. U.S. EPA*, 2010 U.S. Dist. LEXIS 41838, *15 (W.D. Wash. 2010) (setting aside

24 a BiOp that ignored recovery plans for orca and salmon despite a voluminous administrative

25 record.)

26     It is not, as CLA implies, that all species "exist in a state of jeopardy." ECF 73 at 9. The fact

27 that malathion causes significant take of listed species does not mean that every single one of

28 these species faces extinction from its continued use. However, for many listed species, recovery

documents that FWS references demonstrate that harms from malathion are so significant that they may result in jeopardy if FWS conducted an analysis based on its own documents. *See* AR-14580. And even though FWS claims it "gave each species individual consideration" by incorporating recovery documents, it is clear that in many cases it either ignored relevant facts or failed to incorporate them. ECF 70 at 28.

For instance, FWS does not rebut that it ignored the Cumberlandian combshell's recovery plan, despite relevant information that continued use of malathion posed a continuing threat. Hartl Decl. Ex. 8 at 2 (internal citations omitted); see also *Wild Fish Conservancy*, 2010 U.S. Dist. LEXIS 41838 at *15. In fact, even though much of the information pertaining to this mussel is copied verbatim into Appendix C, the discussion of pesticides abruptly stops mid-sentence and includes no mention of malathion. See AR-14592 ("[s]econdly, pesticides, primarily from row c" [sic]). A BiOp that conveniently excludes relevant facts in this manner is not "a product of careful analysis," ECF 73 at 9, but one that falls short of rational decision making. *Michigan*, 576 U.S. at 750.

To the extent the FWS points to the general conservation measures to support its no jeopardy determinations, they may reduce risk in some instances. But for many species, the conservation measures are not sufficiently specific to support a no jeopardy determination. Often, the conservation measures don't consider the lifecycle of the species. For example, FWS explains in its risk analysis, under "risk modifiers," the El Segundo blue butterfly is more vulnerable to the effects of malathion mid-June through early September during the height of feeding and reproductive activities, however, it is potentially exposed throughout its lifecycle. AR-29004; AR-29011 (Karner blue butterfly more vulnerable April through July during larval and adult stages, however, it is potentially exposed throughout its lifecycle). Bloom restrictions on some crops three days prior to tree bloom, during bloom, and until petal fall is complete in certain crops may reduce exposure for a short period of time. But butterflies and other species that are vulnerable at all times, and especially at risk for four months, a short window of reduced risk, without assessment of specific to a species needs and lifecycle, is not enough to support no jeopardy determinations. *See also, e.g.,* AR-29011(Karner blue butterfly at risk through out is

lifecycle, at greater risk April through July); AR-290-25 (same for Lotis blue butterfly); AR-29030 (Mission blue butterfly at risk throughout lifecycle, greater risk March through June).

III.    THE BIOP ASSESSMENT OF INCIDENTAL TAKE IS ARBITRARY

A.    <u>FWS Must Minimize the Impact of Take Caused by Malathion's Registration</u>

As FWS acknowledges, "[t]he ESA requires an ITS to minimize the 'impact' of the incidental take estimated to occur." ECF No. 70 at 42; *see* 16 U.S.C. § 1536(b)(4) (FWS is required to "provide . . . a written statement that . . . specifies the impact of such incidental taking on the species . . . [and] those [reasonable and prudent measures] that the Secretary considers necessary or appropriate to minimize such impact.").[5] What it means to minimize the impact of incidental take is a matter of statutory interpretation for the Court to decide. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400, 412–13 (2024). The ordinary understanding of minimize is to reduce to the greatest possible degree. *See* ECF No. 58 at 38. This is supported by the ESA's comprehensive scheme to "provide a program for the conservation of" listed species, 16 U.S.C. § 1531(b), meaning "the use of *all methods and procedures which are necessary* to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," *id.* § 1532(3) (emphasis added). *See also id.* § 1536(a)(1) (federal agencies must utilize their authorities in furtherance of the ESA's conservation purpose).

This any-means-necessary language conveys Congress's intent for agencies to give the highest priority to the conservation of listed species. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 699 (2007) (It is "beyond doubt that Congress intended endangered species to be afforded the highest priorities . . . over the primary missions of federal agencies."). It also illuminates how the phrases "considers necessary or appropriate" and "to minimize such impact" interact in 16 U.S.C. § 1536(b)(4)(ii). In both instances, the ESA dictates an objective—the recovery of each listed species, or the minimization of incidental take's impacts on those species—and directs agencies to select the means required to achieve it.

---

[5] CLA misses the mark in arguing that "FWS must include one or more reasonable and prudent measures *intended to reduce* the impacts of incidental take." ECF No. 73 at 18 (emphasis added). FWS must do more than 'intend to reduce' the impact of take; it must minimize it. ECF NO. 58 at 38–39.

CLA's comparison to *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1003 (9th Cir. 2025), is instructive on this point. *See* ECF No. 72 at 24. That case discussed the Reserves Act, which imposes on BLM a duty to take "such measures as BLM deems necessary or appropriate *to mitigate* adverse environmental impacts," or reduce them in some part. *Id.* (emphasis added). By contrast, the ESA requires FWS "to minimize," or reduce to the greatest possible extent, the impact of incidental taking on listed species. 16 U.S.C. § 1536(b)(4)(ii). The term 'mitigate' in the Reserves Act gives BLM expansive discretion in deciding what is necessary or appropriate, since any reduction will do. The term 'minimize' in the ESA does not afford the same leeway to FWS, since it dictates that the impacts of incidental take on listed species must be reduced as much as possible. As explained in *Ctr. for Biological Diversity v. Culver*:

> While the language of the statute confers discretion on FWS to determine what the RPMs and terms and conditions are . . .
>
>             * * *
>
> FWS is required to issue a written statement specifying the impact of incidental take on the species and measures "to minimize such impact" and the terms and conditions to implement those measures.

No. 21-cv-07171-SI, 2024 U.S. Dist. LEXIS 187610, at *202-03, *206 (N.D. Cal. Oct. 15, 2024).

Defendants argue that FWS is technically required to minimize the *impact* of incidental take, not incidental take itself. ECF No. 70 at 42. But to the extent that these duties are distinct, the duty to minimize the impact of take would seem to give FWS more responsibility, not less. After all, while a duty to minimize take measures only the quantity of take that occurs, a duty to minimize the impact of take requires FWS to go further and address incidental take's *effects*. *See* 16 U.S.C. § 1536(b)(4)(ii) This is not the same as the duty to avoid the likelihood of jeopardy, which is addressed separately by reasonable and prudent alternatives. *See id.* §§ 1536(b)(4)(A); *contra* ECF No. 70 at 34. It is necessarily more expansive and must be informed by the ESA's directive that agencies shall advance the statute's purpose of conserving listed species, i.e., using all means necessary to recover them to the point that ESA protection is no longer required. 16 U.S.C. §§ 1531(b), 1532(3), 1536(a)(1). If anything, minimizing take alone may be inadequate if FWS does not also minimize the impact of the incidental take it does allow to occur.

1    In many cases, FWS seeks to minimize the impacts of incidental take by minimizing

2  incidental take, perhaps resulting in some interchangeable use of the terms in this BiOp and

3  judicial opinions. *See* AR-12590 ("EPA may elect to adopt any of the recommendations provided

4  by the Service, including any of the reasonable and prudent measures to minimize incidental

5  take."); *see also Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1039 n.7 (9th Cir. 2007) ("Here,

6  the [ITS] sets out only one [RPM] . . . to minimize take"); *Union Neighbors United, Inc. v.*

7  *Jewell*, 425 U.S. App. D.C. 95, 109, 831 F.3d 564, 578 (2016) ("the Service reasoned that

8  Buckeye's approach 'applies a biologically-based approach to minimizing take using avoidance

9  measures'"); *W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 38 (D.D.C. 2020) ("The

10  [ITS] . . . terms and conditions require: . . . the Forest will contact the Service to . . . discuss the

11  adequacy of existing mechanisms to minimize take.").

12    Indeed, FWS's own 1998 ESA Section 7 Consultation Handbook says action agencies must

13  follow the terms and conditions of an ITS "to minimize incidental take," which only makes sense

14  if the ITS itself must minimize incidental take. Final ESA Section 7 Consultation Handbook, 2-

15  12 (March 1998), https://www.fws.gov/sites/default/files/documents/endangered-species-

16  consultation-handbook.pdf; *see also id.* at E-21 ("[P]ermits for the incidental take of listed

17  species . . . must include appropriate conditions to avoid or minimize incidental take."); *id.* at B-

18  11, 20, 39 (The "standardized introductory paragraph for [reasonable and prudent measures] for

19  species other than marine mammals and migratory birds" reads: "The Service believes the

20  following [reasonable and prudent measures] are necessary and appropriate *to minimize take* of

21  [species].") (emphasis added).

22    Plaintiffs are not asking FWS to "extinguish the possibility of take." *Contra* ECF No. 70 at

23  42. The ESA does not require that incidental take's impacts on endangered and threatened

24  species be eradicated, but they must be minimized. 16 U.S.C. § 1536(b)(4)(ii).

25    B.  The sole RPM does not minimize take and has no reinitiation trigger

26    FWS includes a single Reasonable and Prudent Measure ("RPM") to minimize take: "EPA

27  shall use its authorities under FIFRA to minimize impacts of incidental take to the listed species

28  addressed in this Incidental Take Statement." AR-12586. The RPM relies on a flawed premise,

as EPA cannot simply "use its authorities" to ensure timely label modifications. ECF-70 at 38. FIFRA is a "complex process of EPA review that culminates in the approval of a label under which a product may be marketed." *Welchert v. Am. Cyanamid, Inc.*, 59 F.3d 69, 71 (8th Cir, 1995). However, EPA claims it cannot utilize its authorities under FIFRA to unilaterally require label changes over a wide swath of pesticide products. ECF 58 at 32-33. To that end, specific deadlines hold little weight, especially in light of the EPA's "significant history of missing the deadlines" in the context of pesticides. *NRDC v. U.S. Envtl. Prot. Agency*, 798 F.3d 809, 814 (9th. Cir. 2015).

FWS also argues that it cannot unilaterally impose additional label changes to minimize take. ECF 70 at 37. FWS misinterprets and arbitrarily constrains its statutory authority, thus, it fails to minimize take as Congress required. First, the ESA mandates that FWS "shall" provide both the Federal agency *and the applicant* with a statement that specifies reasonable and prudent measures and the terms and conditions to implement those measures "that must be complied with by the Federal agency *or applicant* (if any), or both, to implement" the RPMs. 16 U.S.C. § 1536(b)(4) (emphasis added). Hence, FWS has the authority to require both EPA and the chemical companies that are "applicants" for continued registration of these malathion products to implement additional measures to minimize take. The avenue is through label changes; however, because Congress gave FWS the authority to direct that both EPA and the applicants take action to minimize take, FWS's argument that *it* doesn't have the authority to make a label change is a red herring. If the RPM and mandatory terms and conditions are clearly directed at both EPA and the applicants, they both must work to implement them by registrants proposing the necessary label changes and EPA reviewing and approving them. Then, EPA cannot continue to argue that it is helpless to implement label changes to minimize take, if required to do so by a BiOp's RPMs and terms and conditions. *Cf. Ctr. for Env't Health v. Regan*, No. 4:18-cv-03197-SBA (N.D. Cal. Jan. 4, 2022); *Id.* Order on Second Stipulated Partial Settlement, ECF 125 (April 13, 2022) (in this settlement, EPA agreed that it would implement the Malathion Final Biological Opinion, including notifying registrants of any necessary modifications to labels to comply).

In addition, FWS's argument that it can only require minor changes to the agency action to minimize take is contrary to the ESA. ECF 70 at 37 citing 50 C.F.R. § 402.14(i)(2). FWS relies on its own regulation to argue basically that it cannot impose any RPM or term and condition beyond what is already required on the label. *Id.* Nothing in the ESA imposes such limitations. *See* 16 U.S.C. § 1536(4). Moreover, even if the Court accepts FWS's interpretation of the ESA, targeted terms and conditions to avoid exposing endangered species, especially those that are narrow endemics or have small populations, would not run afoul of FWS's regulation in the context of the scope of the action. EPA proposes to continue to allow the use of malathion anywhere in the country. AR-12303 (labeled uses of malathion cover the entirety of the United States and its territories). Targeted measures to avoid the geographic locations where endangered species are most likely to be present is only a small fraction of the agency action.

The reinitiation "trigger" in the BiOp is also arbitrary. The inadequacy of the reinitiation trigger is not based on its "two-part assessment" of both changes in usage and toxicity of malathion, but the fact that even if this information were compiled, no consultation is triggered. ECF-70 at 39. Instead, EPA and FWS are only required to meet at an unidentified time and discuss whether to reinitiate consultation based on undefined parameters. AR-12581. The "two-part assessment" triggers nothing more than an inter-agency conversation, not the required consultation, rendering the BiOp unlawful. *See Am. Rivers & Ala. Rivers Alliance v. FERC*, 895 F.3d 32, 48-49 (D.C. Cir. 2018) ("The requirement to include a trigger for reinitiation of consultation necessitates more than lip service. The lack of a clear trigger point to reinitiate consultation renders the Opinion unlawful.").

IV.    THE NO ADVERSE MODIFICATION OF CRITICAL HABITAT
         DETERMINATIONS ARE UNSUPPORTED

FWS has arbitrarily limited its review of critical habitat, using a lack of detail in critical habitat rules as a shield to evade the rigorous assessment that the ESA requires. *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005). FWS has promulgated hundreds of critical habitat designations that vary in terms of descriptiveness and identification of physical and biological features. S. Rept. 106-126 (1999). Critical habitat designation historically required only "maps and/or geographical descriptions."

43 Fed. Reg. 870 (Jan. 4, 1978). In 2016, FWS clarified its rules to emphasize the importance of specifically naming "physical and biological features" in critical habitat designations. 81 Fed. Reg. 7414 (Feb. 11, 2016). FWS acknowledges historical deficiencies, noting that "primarily older critical habitat rules" may not list specific physical or biological features. AR-30765. Regardless of the adequacy of the description in the critical habitat designation rule, FWS is required to engage in a rational analysis of the life cycle and behavioral patterns of the species when assessing critical habitat. *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005); *see also Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1271 (11th Cir. 2009) ("The point of the two *Pacific Coast* decisions is that adverse modification must be measured by taking into account the life cycle and behavioral pattern of the endangered species in question.").

FWS claims to have "reviewed available information about the species' biology and habitat requirements" to remedy historical deficiencies, and it should follow that this review would consider all information available to assess adverse modification. *Id.* However, instead of a meaningful assessment required under the ESA, the record shows that FWS arbitrarily categorized critical habitats to streamline the assessment, to the detriment of the species. Hundreds of species with critical habitat designations promulgated before 2016 with limited descriptions were placed in Category 2—meaning they have no relevant or biological features— without any assessment of the life cycle of the species in question. AR-30765–66. FWS insists that reliance on the critical habitat designations alone, without any additional context, is sufficient to comply with the ESA. However, this myopic review is not what the law requires. *Pac. Coast Fed'n of Fishermen's Ass'ns*, 426 F.3d at 1094.

This narrow approach also fails to ensure against adverse modification as a cost of streamlining the assessment. For example, Plaintiff does not allege that all aquatic critical habitat designations are automatically adversely modified by malathion. ECF-70 at 32. But if FWS were to actually engage in a "granular, species specific" assessment instead of simply noting depth and size of potential creek habitat for the Niangua darter, it would have further found that the habitat of the darter consists of fluctuating flows, prolonged periods of low flow, and low-level

stream crossings present throughout its habitat. AR-15945; Hartl Decl. Ex. 13 at 2. And while a listing decision from 1985—over four decades ago—may not have mentioned that the Niangua darter rely on arthropod prey, it is now well documented that the darter is an insectivore. AR-15941. Finally, under FWS's own assessment, rivers with depths between "8 and 46 inches," ECF-70 at 32, are considered "[m]oderate volume" and at risk of "high or medium effects from exposure based on habitat type," which FWS summarily ignores. AR-31311-12. FWS has taken an improper, arbitrary, and severely limited review to bypass the rigorous analysis of critical habitat required by the ESA, and in doing so, has rendered its no adverse modification determinations arbitrary.

FWS also mischaracterizes assertions as to its assessment of the critical habitat of American crocodile and whooping crane. ECF 70 at 33. A portion of critical habitat for the American crocodile is found on federal lands, but the threat from malathion comes from high usage outside the critical habitat. AR-31145. A rain restriction does not address the adverse effects, which are compounded by the significant—not "random"—malathion usage in the counties where the American crocodile remains. ECF 70 at 33; AR-52342 –43. Additionally, FWS cannot use the opportunistic feeding habits of the crocodile as a shield against a thorough discussion as to the specific risks posed by malathion. *Greater Yellowstone Coalition, Inc*, 665 F.3d at 1026 ("That the bears are likely to seek alternate foods in the face of whitebark pine decline is a part of the problem, not an answer to it."). And while the American crocodile analysis at least includes mention of prey, that of the whooping crane, which winters in a county with some of the highest malathion usage in Texas, includes "no discussion whatsoever" on the impacts to the nesting grounds and prey for this species. *Rodgers*, 381 F. Supp. 2d at 1231; AR-30846; AR-52326–27.

V.    FWS FAILED TO ADDRESS RECOVERY IN THE BIOP

FWS does not rebut that its recovery analysis amounts to a single conclusory paragraph in its assessment of critical habitat. ECF 70 at 27 fn.11. FWS instead defends its approach of mentioning recovery in the context of jeopardy only, even though "the purpose of critical habitat is to preserve recovery options" and a biological opinion must include "discussion or analysis on the lost recovery value of critical habitat." *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059,

1074 (9th Cir. 2004). More importantly, FWS does not address the 482 species that were

excluded from *any* analysis. See ECF 58 at 39. FWS thus erred in "conclud[ing] that the species'

critical habitat was sufficient for recovery without adequate information to make that

determination," rendering the BiOp arbitrary and capricious. *Nat'l Wildlife Fed'n*, 524 F.3d at

934.

Assessing whether the agency action reduces the likelihood of both survival and recovery

require more than just lip service. For example, the Delhi Sands flower-loving fly's valuable

conservation areas are diminishing, making it all more important to ensure that malathion is not

diminishing the distribution of the species by use of malathion. AR-17593; 50 C.F.R. § 402.02

(definition of jeopardize and conservation). Yet, FWS summarily concludes that use of

malathion will not appreciably reduce recovery of the butterfly in the wild. AR-29213. The same

can be said of the El Segundo butterfly, which is limited to 451 acres for its long-term

conservation, but FWS again simply states the action will not diminish the likelihood of its

recovery. AR-29003; AR-29007. Like with many aspects of the BiOp, FWS concludes that it is

meeting the standard for no jeopardy, but the record doesn't support that it assessed recovery.

VI.     PLAINTIFFS HAVE DEMONSTRATED STANDING

Plaintiffs have demonstrated standing to challenge the entire BiOp. Challenges to BiOps are

procedural. CLA's arguments (FWS makes none) are not supported by case law or the facts.

A.    Plaintiffs' claims that FWS's BiOp is arbitrary are procedural, not substantive.

Binding precedent establishes that challenges to biological opinions are procedural in nature.

ECF 58 at 8, citing *Salmon Spawning & Recovery Alliance v. Gutierrez*, 45 F.3d 1220, 1226 (9th

Cir. 2008) (plaintiffs "correctly allege that they have a right to a procedurally sound

consultation"); *Ctr. for Biological Diversity v. FWS*, 807 F.3d 1031, 1043-44 (9th Cir. 2015).

CLA ignores these cases, which are decisive authority that Plaintiffs' challenges to the BiOp

here are procedural for purposes of standing. ECF 73 at iv-v and 21-27.

CLA's argument that challenges to "FWS's (the consulting agency's) species-by-species

jeopardy analysis and determinations" in the BiOp are substantive, rather than procedural, are

not warranted by existing law. *Id.* at 22-23. In *Salmon Spawning*, plaintiffs challenged a 1999

BiOp on the effects of the United States entering a treaty with Canada to manage fisheries. 45 F.3d at 1225. Plaintiffs alleged the BiOp was arbitrary because it improperly compared effects of different treaty harvest rates, rather than aggregate all impacts; failed to evaluate the effects on survival and recovery of salmon; evaluated only a fraction of certain populations; studied harvest impact only on strong components of a population, but not the weaker ones; and failed to propose appropriate RPMs. *Id.* The Ninth Circuit found these "consultation procedures in question" are procedural injuries and relax the burden on causation and redressability.[6] *Id,* at 1225-26. Here, Plaintiffs argue the BiOp is arbitrary on some of the same grounds, like failure to evaluate recovery and propose necessary RPMs, and similarly detailed factual grounds, such as estimating overlap based on large species ranges. These are procedural claims,[7] producing a procedural injury in accordance with *Salmon Spawning*. CLA's argument to the contrary is unavailing.[8]

B.  Plaintiffs have demonstrated concrete, particularized injuries to challenge the entire BiOp

CLA's argument that Plaintiffs must demonstrate interests in every species to challenge the arbitrary processes in the BiOp also ignores binding precedent that holds standing may be established to challenge the agency action covering expansive areas through representative injuries. Over thirty years ago, the Ninth Circuit held that plaintiffs demonstrated standing to challenge EPA's failure to comply with the Clean Water Act with respect to all waterways in Alaska by showing injury related to "a representative number" of waterways. *Alaska Ctr. for the Envt. v. Browner*, 20 F.3d 981, 985 (9th Cir. 1994). Recently, the Ninth Circuit held that plaintiffs had standing to challenge five lease sales across Wyoming, Nevada, and Utah by showing members use and enjoy some areas affected by the challenged actions. *Mont. Wildlife*

---

[6] Ultimately, the court held it could not redress these procedural injuries because even if plaintiffs "were successful in establishing that NMFS failed to comply with the procedural requirements," the court could set aside "the procedurally flawed consultation and defective BiOp," but it could not set aside the treaty. *Salmon Spawning*, 45 F.3d at 1226-27.

[7] CLA points to the procedural nature of the claims: Plaintiffs "do not assert that a jeopardy or critical habitat determination was incorrect." ECF 73 at 25. True, Plaintiffs argue that the BiOp is arbitrary for various procedural reasons, including grouping species and critical habitats and failure to adequately explain. *Id.*

[8] CLA's attempt to distinguish challenges to BiOps by pointing to two cases that also involved procedural injuries on different facts is unavailing under of *Salmon Spawning*. ECF 73 at 21-22.

*Fed'n v. Haaland*, 127 F.4th 1, 35 (9th Cir. Jan. 17, 2025).[9] Plaintiffs here have demonstrated injury to their interests in a representative subset of the species covered by the challenged BiOp.[10]

Nor are Plaintiffs required to show that "any specific use pattern of malathion causes harm to a specific species in a particular location . . . ." ECF 73 at 26-27. The Ninth Circuit only requires "'a credible threat of harm,'" not the specificity CLA expects. *Nat'l Family Farm Coal. v. EPA,* 966 F.3d 893, 910 (9th Cir. 2020) (rejecting intervenor's argument that plaintiff must prove that a pesticide caused a decline in the monarch butterfly) (quoting *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002)). In that case, the court held plaintiff NRDC had standing to challenge EPA's registration of the pesticide Enlist Duo based on injury to members' enjoyment of watching the monarch butterfly migrate where they live, that Enlist Duo is approved for use in their states, and that they are concerned they will no longer be able to enjoy observing monarch butterflies because of Enlist Duo's effects on milkweed. *Id.* at 909. *See also Ctr. for Envtl. Health v. Vilsack*, No. 15-cv-01690-JSC, 2015 U.S. Dist. LEXIS 131773, at *25-261 (N.D. Cal. June 20, 2016) (plaintiffs are not required to show the agency action causes environmental harm) (citations omitted). Moreover, the <u>record</u> establishes risk to specific species from registered uses of malathion—1,778 species and 784 critical habitats are likely adversely affected by EPA's action—the reason for formal consultation in the first instance and the reason the BiOp covers an expansive area and most ESA-protected species. AR-430222.

Finally, CLA denigrates Plaintiffs' members' injuries as "ideological and policy-based" (ECF 73 at 4), vague (*id.* at 20) and generalized fears (*id.* at 19). Nothing could be further from the truth. *See generally* ECF 58-1. Christina Celano is a wildlife photographer with professional,

---

[9] *See also Def'rs of Wildlife v. EPA*, 420 F.3d 946, 950, 957 (9th Cir. 2005) (plaintiffs established injury to challenge EPA's action covering Arizona based on interests in specific species in subareas of the state), rev'd on other grounds, *Nat'l Ass'n of Home Builders v. Def'rs of Wildlife*, 551 U.S. 644 (2007); *WildEarth Guardians v. U.S. Dept. of Agriculture*, 795 F.3d 1148, 1155 (9th Cir. 1994) (plaintiff had standing to challenge use of old NEPA document that covered multiple states by showing injury in one state).

[10] CLA's suggestion that FWS could have issued 1,778 separate BiOps is absurd. ECF 73 at 23. FWS can only issue a BiOp on the agency action being consulted upon, here, EPA's continued registration of malathion used across the United States. 16 U.S.C. § 1536(a)(2) (consultation is on the "agency action"); *Id.* § 1536(b)(3)(A) (FWS provides opinion "detailing how the agency action affects the species or its critical habitat."); AR-12293 (describing the agency action).

1    economic, and other interests in twelve specific Florida species. ECF 58-1 at ADD21-30. Bill

2    Haskins has recreational and aesthetic interests in the Salt Creek tiger beetle north of Lincoln,

3    Nebraska and attempts to see one of the estimated 275 beetles left in the 1,100 acres of critical

4    habitat where nearly all occur. *Id* at ADD61-64. James Wood is a PhD biologist who has

5    researched in the field, discovered and named species, published scientific papers on, and

6    worked to conserve many ESA species for more than 50 years, including with FWS earlier in his

7    career. *Id.* at ADD115-17. He details his concrete scientific, professional, and aesthetic interest

8    in six fish and seventeen mussels in the southeastern United States. *Id*. at ADD115-19. These are

9    interests recognized by the courts. *See, e.g.*, *Lujan v. Def'rs of Wildlife*, 504 U.S. 555, 562-63

10   (1992) ("Of course, the desire to use or observe an animal species, even for purely esthetic

11   purposes, is undeniably a cognizable interest for purpose[s] of standing."); *Desert Citizens*

12   *Against Pollution v. Bisson*, 231 F.3d 1172, 1176 (9th Cir. 2000) (collecting cases in which the

13   diminished opportunity for the plaintiffs to observe or study an animal species provided the basis

14   for standing).

15       C.   CLA's remaining arguments are unrelated to standing

16       CLA's argument that Plaintiffs' claims are limited to species in standing declarations fails

17   because, as discussed above, Plaintiffs have standing by demonstrating representative injury

18   within the area covered by a broad action. ECF 73 at 24-26. Plaintiffs' arguments that the BiOp

19   is arbitrary because it systemically relies on flawed information or processes, as demonstrated in

20   part through specific species examples, are questions for the merits.

21       The relief the court may grant is also a question for the merits. ECF 73 at 26-27. *See*

22   *Browner*, 20 F.3d at 985 (details on remedy go to the merits, not standing). In the context of

23   standing, in the Enlist Duo case, the Ninth Circuit held that plaintiff NRDC had standing to

24   broadly "seek vacatur of the [pesticide] registration decisions" even though its standing was

25   based on harm to one species, the monarch butterfly. *Nat'l Family Farm Coal.,* 966 F.3d at 910.

26   In other words, remedy addresses the agency action; it is not limited to injury to specific species

27   that establish standing. 5 U.S.C. § 706(2) (court shall "set aside agency action . . . ."); *Corner*

28   *Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J.

1    concurring) (APA vacatur acts directly on the agency action); *Survivors v. United States DOI*,

2    336 F. Supp. 3d 1131, 1136 (N.D. Cal. 2018) (rejecting argument that there should be a

3    geographical limitation on the vacatur the agency action based on standing) (citations omitted);

4    VII.    REMEDY

5    Plaintiffs understand the Court indicated there would be a separate remedy phase.[11] ECF 69

6    at 8. However, a full round of further briefing is not necessary because Plaintiffs are entitled to

7    vacatur as a matter of law. Moreover, while evidence outside the record is permissible for

8    purposes of remedy, little to none is required here.[12]

9    No party disputes that judicial review of the BiOp is pursuant to the Administrative

10    Procedure Act (APA), which mandates that the Court "shall . . . hold unlawful and set aside

11    agency action" found to be arbitrary or otherwise not in accordance with law. 5 U.S.C. § 706(2).

12    "When a federal court sets aside an agency action, the federal court vacates that order—in much

13    the same way that an appellate court vacates the judgment of a trial court." *Corner Post, Inc. v.*

14    *Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 830 (Kavanaugh, J. concurring).

15    Courts have variously described APA vacatur as the "usual," "normal," "standard," or

16    "default" remedy. *Corner Post*, 603 U.S. 603 U.S. at 831 (Kavanaugh, J. concurring) (vacatur

17    long recognized "as the usual relief" in APA cases); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d

18    1077, 1084 (D.C. Cir. 2001) (APA relief is "normally" vacatur); *Klamath-Siskiyou Wildlands*

19    *Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238,

20    1241 (N.D. Cal. 2015) ("vacatur is the standard remedy"); *Reed v. Salazar*, 744 F. Supp. 2d 98,

21    119, 120 (D.D.C. 2009) (default remedy is to set aside the agency action). *See also Monsanto*

22    *Co. v. Geertson Seed Farms,* 561 U.S. 139, 165-66 (2010) (vacatur is the "less drastic remedy" if

23    sufficient to redress the injury). In other words, vacatur is the presumptive remedy.

24    The Ninth Circuit and courts within it, including this Court, routinely vacate arbitrary or

25    unlawful BiOps. *See, e.g.*, *Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 992 (9th Cir.

26

27    [11] *See*, *e.g.*, *Am. Motorcycle Ass'n Dist. 37 v. Norton*, 2004 U.S. Dist. LEXIS 15662, *35 n. 8
(N.D. Cal. 2004) (declining to order further briefing on whether to vacate the BiOp).

28    [12] In addition, Plaintiffs raised vacatur as an issue on the merits in their Motion for Summary
Judgment and want to ensure they don't waive any argument with respect to remedy.

2023) (vacating FWS BiOp on effects of pumping water from the San Pedro River).[13] Courts

have also vacated the ITS, which is a separate requirement of the ESA[14] that agencies often

include in BiOps. *Klamath-Siskiyou Wildlands,* 109 F. Supp. 3d at 1247 (vacating NMFS ITS

and BiOp separately). And, partial vacatur is also an acceptable form of relief under the APA.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) ("If a less drastic remedy

(such as partial or complete vacatur of [agency action] was sufficient to redress respondents'

injury," injunctive relief is not warranted). Courts have partially vacated BiOps. *Westlands

Water Dist. v. United States DOI*, 2005 U.S. Dist. LEXIS 24864, *4-5 (E.D. Cal. 2005) (partial

vacatur of BiOp); *Cook Inletkeeper v. Raimondo*, 541 F. Supp. 3d 987, 996 (D. Alaska 2021)

(partial vacatur of BiOp and Incidental Take Regulation under Marine Mammal Protection Act,

similar to ITS).

Plaintiffs request partial vacatur of the ITS for species that did not receive additional

mitigation measures as part of the agency action for two reasons. During remand, it reduces the

risk to species where FWS is allowing more incidental take than if it had conducted a proper

analysis to arrive at its no-jeopardy determinations and had minimized take impacts. And, it may

motivate FWS to cure the flaws in the BiOp and ITS in a timely manner. After all, it took FWS

five years and a court order to complete the BiOp at issue. Order on Stipulated Party Settlement,

*Ctr. for Env't Health v. Regan*, No. 4:18-cv-03197-SBA (N.D. Cal. Jan. 4, 2022); AR-12289-90.

---

[13] *See also Ctr. for Biological Diversity v. United States BLM*, 698 F.3d 1101, 1128 (9th Cir. 2012) (vacating FWS BiOp on the Ruby Pipeline Project); *Env't Prot. Info. Ctr. v. Atta*, 692 F. Supp. 3d 879, 903-904 (N.D. Cal. 2023) (vacating NMFS BiOp on NMFS take permits); *Ctr. for Biological Diversity v. NOAA Fisheries*, 644 F. Supp. 3d 574, 589 (N.D. Cal. 2022) (vacating BiOp on vessel strikes in shipping lanes without discussion of equitable factors); *Ctr. for Biological Diversity v. Ross*, 2019 U.S. Dist. LEXIS 220065, *21 (N.D. Cal. 2019) (vacating BiOp on effects of longline fishing permit without discussion of equitable factors); *Bundorf v. Jewell*, 142 F. Supp. 3d 1133, 1137 (N.D. Cal. 2015) (vacating FWS BiOp on effects of wind energy project without discussion of equitable factors); *Am. Motorcycle Ass'n Dist. 37 v. Norton*, 2004 U.S. Dist. LEXIS 15662, *35 (N.D. Cal. 2004) (vacating FWS BiOp on effects of conservation plan); *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.,* 2025 U.S. Dist. LEXIS 136827, *60 (E.D. Cal. 2025) (vacating BiOp on Army Corps of Engineers permit for a development project); *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 805 (D. Alaska 2021) (vacating FWS BiOp on effects of approval of oil and gas project); *Helena Hunters & Anglers Ass'n v. Marten*, 470 F. Supp. 3d 1151, 1181 (D. Mont. 2020) (vacating BiOp on effects of trail construction with instructions).

[14] *Compare* 16 U.S.C. § 1536(b)(3) ("written statement setting forth the [FWS's] opinion") *with* 16 U.S.C. § 1536(b)(4) ("after consultation" provide a "written statement" specifying the impact of incidental taking, RPMs, and terms and conditions).

1    Courts in the Ninth Circuit decline to vacate only in limited circumstances considering the

2    seriousness and nature of the agency's error and the potential for disruptive consequences or

3    environmental harm. *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir.

4    2015) (vacating EPA registration of pesticide sulfoxaflor); *Nat'l Family Farm Coal. v. United*

5    *States EPA*, 960 F.3d 1120, 1144-1145 (9th Cir. 2020) (vacating EPA registration of pesticide

6    dicamba). No unusual circumstances exist for this Court to decline to vacate the ITS. It is

7    Defendants' burden to show otherwise. *Ctr. for Envtl. Health v. Vilsack*, No. 15-cv-01690-JSC,

8    2016 U.S. Dist. LEXIS 79984, at *41 (N.D. Cal. June 20, 2016).

9    FWS's errors are serious. The BiOp has multiple, compounding errors that crack the

10    foundation of FWS's analyses, as discussed in Plaintiffs' summary judgment briefs. These errors

11    are more than technical errors that FWS can easily cure. *Klamath-Siskiyou Wildlands*., 109 F. at

12    1244-45 (ESA errors included "the very factors FWS chose to use as the basis for its

13    conservation-value calculations for 82 [northern spotted] owl circles."). Section 7 consultation is

14    the heart of the ESA scheme, warranting vacatur. *W. Watersheds Project v. Kraayenbrink*, 632

15    F.3d 472, 495 (9th Cir. 2011)). Courts have generally agreed vacatur is appropriate for flawed

16    BiOps. *See supra* at 26, n.13.

17    Vacatur will not cause disruptive consequences. FWS cannot claim disruption when vacatur

18    of the ITS (and remand of the BiOp) will only reinstate the status quo and require FWS to

19    produce a non-arbitrary BiOp and ITS, as it is required by law to do. CLA cannot claim its

20    members or growers who use malathion will suffer any disruption or economic consequences

21    because vacating the ITS does not remove malathion products from the market. CLA will argue,

22    as it did in seeking intervention, that its members will be exposed to potential liability for an

23    unlawful take of endangered species or injunctions restricting use of malathion. Motion to

24    Intervene, ECF 26 at 12. It is true that Plaintiffs seek to vacate the ITS as a deterrent so that users

25    may think twice before applying malathion to better protect species. However, potential liability

26    should not carry much weight, assuming that FWS will timely complete a supportable BiOp and

27    ITS. Moreover, there was no ITS prior to February 2022, even though malathion has been on the

28

market since before the ESA was enacted.[15] Yet, CLA pointed to no enforcement actions or injunctive limitations on malathion prior to 2022. Indeed, the case that led to completion of the BiOp was the ideal opportunity, yet the court-ordered settlements were limited to a deadline for FWS to complete the BiOp and for EPA to implement the BiOp by a date certain. Order on Stipulated Party Settlement, ECF 112, *Ctr. for Env't Health v. Regan*, No. 4:18-cv-03197-SBA (N.D. Cal. Jan. 4, 2022); *Id.* Order on Second Stipulated Partial Settlement, ECF 125 (April 13, 2022).

To be clear, Plaintiffs need not show irreparable harm, as they would if seeking an injunction. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (vacatur is the normal APA remedy, "whether or not appellant has suffered irreparable injury . . .".). FWS may attempt to argue that the Supreme Court's decision in *Trump v. CASA, Inc.* requires more or otherwise limits Plaintiffs' relief. In *CASA*, the Court partially stayed preliminary injunctions that were universal (nationwide) to the extent they were broader than necessary to provide complete relief to each plaintiff. 606 U.S. 831, 145 S.Ct. 2540, *2562-63, 222 L.Ed.2d, 2025 U.S. LEXIS 2501 (2025). The Court maintained the difference between an injunction and vacatur, expressly stating that its decision does not resolve the distinct question concerning vacatur under the APA. *Id.* at 2554, n. 10. The Court's decision in *Monsanto* is still the law. *Monsanto Co.*, 561 U.S. at 165-66 (vacating agency action is the appropriate APA remedy).

The usual, statutory remedy under the APA is to vacate the agency action. The Court should decline to vacate only if Defendants can show disruption from vacatur that outweighs serious errors and environmental benefits. As discussed, it is hard to imagine any disruption to FWS or CLA that could defeat partial vacatur. Accordingly, there is no need for separate briefing.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' Motion for Summary Judgment, declare that the Malathion Biological Opinion and Incidental Take Statement are arbitrary or otherwise unlawful, remand the Biological Opinion to Defendants to develop a new Biological Opinion that is consistent with the Court's opinion, and vacate the Incidental Take Statement.

---

[15] AR-12310 (malathion used since the 1950s); https://www.epa.gov/mosquitocontrol/malathion

Respectfully submitted this 24 September 2025,

/s/ *Stephanie M. Parent*
Stephanie M. Parent (OR Bar No. 925908)*
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
(503) 320-3235
sparent@biologicaldiversity.org

John William ("J.W.") Glass (DC Bar No. 1780210)*
Center for Biological Diversity
1411 K St. NW, Suite 1300
Washington, DC 20005
(813) 833-5301
JWGlass@biologicaldiversity.org

Jonathan Evans (CA Bar No. 247376)
Center for Biological Diversity
1212 Broadway Street, Suite 800
Oakland, CA 94612
(510) 844-7100 ext. 318
jevans@biologicaldiversity.org

George Andreas Kimbrell (OR Bar No. 171767)*
Center for Food Safety
2900 NE Alberta St., Suite 207
Portland, OR 97211
(971) 271-7372
gkimbrell@centerforfoodsafety.org

Counsel for Plaintiffs

1

CERTIFICATE OF SERVICE

2

I hereby certify that a true copy of the above document was served upon counsel of

3

record using the CM/ECF system on September 24, 2025.

4

*/s/ Stephanie Parent*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28