ADAM R.F. GUSTAFSON, Principal Deputy Assistant Attorney General
MEREDITH FLAX, Deputy Section Chief
ELIZABETH KIRBY (TX Bar # 24104199)
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Tel | (202) 353-5588; Fax | (202) 305-0275
Email: elizabeth.kirby@usdoj.gov

*Counsel for Federal Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| PESTICIDE ACTION NETWORK NORTH AMERICA; CENTER FOR BIOLOGICAL DIVERSITY; and CENTER FOR FOOD SAFETY,<br><br>*Plaintiffs,*<br><br>v.<br><br>PAUL SOUZA, Regional Director, Region 8, exercising the delegated authority of the Director of the Fish and Wildlife Service; and UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>*Federal Defendants*,<br><br>and<br><br>CROPLIFE AMERICA, Inc.,<br><br>*Defendant-Intervenors.* | Case No. 3:24-cv-6324-JSC<br><br>**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date: January 8, 2026<br>Time: 10:00 AM<br>Place: Courtroom 8<br>      450 Golden Gate Ave.<br>      San Francisco, California<br><br>Honorable Jacqueline Scott Corley |

# TABLE OF CONTENTS

**PAGE**

ARGUMENT ........................................................................................................................ 2

   I. FWS rationally and appropriately considered range data as part of its broader expert analysis. ................................................................................................. 2

   II. FWS's use of usage data employed the best information available, while appropriately considering uncertainty. .......................................................... 3

   III. FWS's jeopardy determinations are rational and appropriate. ............................... 5

   IV. FWS carefully analyzed each designated critical habitat. ...................................... 7

   V. FWS issued an appropriate Incidental Take Statement ("ITS"). ............................ 7

   VI. Consideration of remedy is premature at this stage. ............................................. 11

CONCLUSION .................................................................................................................. 12

**TABLE OF AUTHORITIES**

**CASE**                                                                                           **PAGE(S)**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................................................. 11

*American Rivers & Alabama Rivers Alliance v. FERC*,
  895 F.3d 32 (D.C. Cir. 2018) ................................................................................................. 10

*Ariz. Cattle Growers' Ass'n v. Salazar*,
  606 F.3d 1160 (9th Cir. 2010) ................................................................................................. 4

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ................................................................................................. 11

*Conservation Law Found. v. Ross*,
  374 F. Supp. 3d 77 (D.D.C. 2019) ........................................................................................... 5

*Ctr. for Biological Diversity v. Culver*,
  No. 21-CV-07171-SI, 2024 WL 4505468 (N.D. Cal. Oct. 15, 2024) ...................................... 8

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  No. 23-2882, 2025 WL 586358 (9th Cir. Feb. 24, 2025) ........................................................ 2

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................................................................................... 11

*Defs. of Wildlife v. Zinke*,
  856 F.3d 1248 (9th Cir. 2017) ................................................................................................. 7

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*,
  529 F. Supp. 2d 1110 (N.D. Cal. 2007) ................................................................................... 2

*Immigrant Defs. Law Ctr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ................................................................................................ 11

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ................................................................................................... 7

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ................................................................................................................. 8

*N. Alaska Env't Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ................................................................................................... 4

*Pollinator Stewardship Council v. EPA*,
  806 F.3d 520 (9th Cir. 2015) ............................................................................................. 11

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ............................................................................................... 1

*Wild Fish Conservancy v. Salazar*,
  628 F.3d 513 (9th Cir. 2010) ............................................................................................... 9

**Statutes**

16 U.S.C. § 1536(a) ................................................................................................................. 10

16 U.S.C. § 1536(a)(2) ............................................................................................................. 10

16 U.S.C. § 1536(b)(4)(C)(ii) .................................................................................................... 8

**Regulations**

50 C.F.R. § 402.02 ..................................................................................................................... 7

50 C.F.R. § 402.14 ................................................................................................................... 10

50 C.F.R. § 402.14(i)(1)(iv) ....................................................................................................... 8

50 C.F.R. § 402.14(i)(3) ............................................................................................................. 9

50 C.F.R. § 402.16 ................................................................................................................... 10

50 C.F.R. § 402.16(a) ........................................................................................................... 9, 10

**Other Authorities**

50 Fed. Reg. 24649 (June 12, 1985) .......................................................................................... 7

Federal Defendants' Cross-Motion for Summary Judgment summarizes the U.S. Fish and Wildlife Service's ("FWS") thorough expert analysis on how the Environmental Protection Agency's ("EPA") nationwide registration of malathion affects endangered and threatened species and their critical habitat. ECF No. 70.[1] In response, Plaintiffs rehash failing arguments from their opening summary judgment brief that seek to substitute their views for FWS's expert opinions. *See generally* Plaintiffs' Opposition & Reply, ECF No. 75 ("Pls. Opp."). Plaintiffs' response lays bare the central premise of their challenge—that FWS's analysis allegedly must be arbitrary simply because it did not conclude the action jeopardizes any listed species. *Id.* at 7. From this starting point, Plaintiffs probe FWS's methodological choices, suggesting without evidence that something must be wrong—all the while ignoring the full scope of FWS's actual analysis.

This challenge fails. Judicial review is based on the facts and the record, not Plaintiffs' intuition. And the reviewing court's job under the Administrative Procedure Act ("APA") is not to "task the FWS with filling the gaps in the scientific evidence" or require it to use different methodologies. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 633 (9th Cir. 2014). Rather, when the agency considers the relevant factors and performs a reasoned analysis, courts "must respect the agency's judgment even in the face of uncertainty." *Id.* That deference is warranted here, as FWS did exactly what the Endangered Species Act ("ESA") requires: it used reasonable assumptions and the best available scientific data to evaluate how the nationwide registration of malathion affects ESA-listed species and critical habitat.

For the reasons set forth in Federal Defendants' Cross-Motion, and because FWS's Biological Opinion ("BiOp") complies with the ESA and APA, this Court should grant Federal Defendants' motion for summary judgment and deny Plaintiffs' motion.

---

[1] Federal Defendants cite the Electronic Case File ("ECF")-generated page numbers throughout this brief.

**ARGUMENT**

**I.  FWS rationally and appropriately considered range data as part of its broader expert analysis.**

Despite specific evidence to the contrary, Plaintiffs again assert that FWS inflated the species' ranges. Pls. Opp. at 10. This argument, addressed more fully in Federal Defendants' cross-motion, ECF No. 70 at 24–27, lacks merit.

To fully capture each species' range, FWS *initially* used broader maps. But it went on to incorporate specific data to pinpoint distribution where possible. ECF No. 70 at 16–19. FWS, in fact, "requested from the species experts in their Regional and Field Offices the most refined range data (e.g., sub-county level data where possible) for all listed species under their jurisdiction [and] NMFS provided Geographic Information System (GIS) maps for its species." AR-42668. GIS data is often used for these types of determinations. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 23-2882, 2025 WL 586358, at *3 (9th Cir. Feb. 24, 2025) (GIS calculation satisfied methodology requirements under the National Environmental Policy Act); *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 529 F. Supp. 2d 1110, 1118–19 (N.D. Cal. 2007) (GIS data used in ESA listing decision). Moreover, "species ranges that do not overlap with the action area will be included in the analysis if those species are dependent on a species that is in the action area." AR-42662. FWS used these map and GIS ranges as the first step; it then brought in other available information for a more qualitative determination. AR-12392–93. While Plaintiffs disagree with this methodology, they fail to specifically cite any example to support their contentions and seem to ignore evidence to the contrary. Instead, they cherry-pick data points found in the record and claim that those data points are the full picture. As noted, they are not.

Plaintiffs similarly misconstrue FWS's consideration of usage data. Pls. Opp. at 14–17. At the outset of its jeopardy analysis for each listed species, FWS ranked each considered factor, including usage, as high, medium, and low. AR-12510–11. It should not be a surprise that FWS initially ranked many species—species already listed as endangered or threatened—as highly vulnerable and at risk if exposed to malathion. Nor should it be surprising that FWS ranked many of those species as having low overlap with areas in which malathion may be used, given they are

located primarily in areas with existing federal protections. *See, e.g.*, AR-12315. Yet, Plaintiffs are surprised. They contend with fervor that these initial, organizational rankings prove that FWS's analyses are arbitrary and capricious. Pls. Opp. at 13–14. As evidence of their misguided point, Plaintiffs again cherry-pick data to create their own determinations. *See* ECF No. 75-1. But unlike FWS's analysis, these Plaintiff-created blurbs do not provide the entire assessment for any species, nor do they convey any information that indicates FWS's full analyses and determinations were inadequate. *Compare, e.g.*, ECF No. 75-1 Plaintiffs' "Karner blue butterfly" blurb *with* FWS's AR-29009–14 assessment. While Plaintiffs nitpick certain factors of the analyses without considering the full context of each assessment, FWS conducted each separate species analyses considering all of the best available information.

## II. FWS's use of usage data employed the best information available, while appropriately considering uncertainty.

FWS utilized usage data as one part of its analysis in considering the effects on listed species. *See* ECF No. 70 at 11–13, 27–31. In response, Plaintiffs repeat their assertion that FWS has "no rational basis" to rely on usage data because (1) it cannot predict where malathion will be used in the future, and (2) it failed to consider a species' distribution in its overlap analysis. Pls. Opp. at 15–16. Both arguments fail as they, again, are not indicative of FWS's analysis.

First, Plaintiffs argue that FWS cannot rely on usage data because it cannot predict where malathion will be used in the future. *Id.* at 15. They thus fault FWS for allegedly failing to recognize that "malathion will be used where it is authorized to be used, not everywhere, but somewhere." *Id.* at 16. This critique is illustrative of Plaintiffs' overall challenge—it states the obvious, while also saying nothing about what FWS did or what it should have done. For good reason: FWS rationally used the usage data.

In its opinion, FWS found that usage data provides a prediction on future use. AR-12408. And FWS used the data in a manner that reflected its uncertainty. *See* AR-12297–98. In fact, FWS consistently adopted assumptions about usage to ensure that the data were being used in a manner intended to best capture future usage in the face of this uncertainty (i.e., employing maximum values, assuming all usage within a state occurred within a species' range, assuming

municipalities that purchased malathion used it all in one year on the maximum number of acres possible). *See* AR-12406–31. "[W]hile knowledge of past usage patterns and locations may be helpful in providing context for where some uses are likely to occur, the past does not necessarily predict future pest pressures, management, or pesticide uses." AR-12297. FWS thus employed a reasoned analysis by using usage data as just one factor considered in determining effects of the action. *See id.* Plaintiffs' contrary argument —that Federal Defendants cannot use usage data because it is somewhat uncertain—has no merit. Just as FWS cannot dismiss available biological information, FWS cannot fail to develop assumptions and projections of proposed actions based on the best available science. *See, e.g.*, *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 981 (9th Cir. 2006) (affirming determination that FWS "properly relied on a reasonable and foreseeable oil development scenario" despite lacking information to precisely determine the location and extent of future oil activities).

Second, Plaintiffs mistakenly assert that FWS failed to consider distribution as part of its usage analysis. Pls. Opp. at 17. FWS's discussion of the El Segundo blue butterfly is illustrative. There, FWS specifically explained how "past malathion usage overlaps a small portion of the non-Federal species range." AR-29007. Digging deeper into known distribution, FWS acknowledged that the species "exists mainly in Los Angeles County, thus putting it in close proximity to residential and other developed areas." *Id.* It also described how the action's limitations on residential uses of malathion are to such extent that FWS anticipates a reduced likelihood of exposure. *Id.* FWS thus specifically discussed the species' distribution on federal lands and in Los Angeles County to reach its conclusions, belying Plaintiffs' claims that FWS simply ignored distributional data throughout its analysis.

In short, Plaintiffs repeatedly rely on examples wherein they cherry-pick specific lines or data while ignoring the full context of the analysis. Other times, Plaintiffs conclude that FWS's determinations were improper without explaining what exactly is unsatisfactory. *See, e.g.*, Pls. Opp. at 17 (asserting that FWS should have used a "more limited application of [usage] data" without further explanation). In an APA challenge, it is not enough to second-guess FWS's analysis. The ESA, after all, "accepts agency decisions in the face of uncertainty." *Ariz. Cattle*

*Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2010). What matters here is that FWS performed a reasoned analysis based on the data before it. In this situation, the "myriad 'line-drawing decisions' and 'endless series of judgment calls' inherent these actions are left to the agency." *Conservation Law Found. v. Ross*, 374 F. Supp. 3d 77, 114 (D.D.C. 2019).

### III.  FWS's jeopardy determinations are rational and appropriate.

Turning to the BiOp's jeopardy determination, Plaintiffs again argue that "FWS arbitrarily ignored information in its own recovery documents on specific threats from malathion." Pls. Opp. at 18. Plaintiffs' arguments are flawed, as shown by their reference to FWS's analysis of the Cumberlandian combshell, a mussel. They accuse FWS of ignoring the species' 2004 Recovery Plan, which identified malathion as a pesticide used in cotton farming that "may pose a continuing threat to the very localized population of the Cumberlandian combshell in the Bear Creek system." *See* Exhibit A at 49; ECF No. 60-1 at 92 (same). But by 2020, FWS had more data to consider, including the 2019 5-Year Review, which updated information about the Bear Creek area and distribution of the species as a whole. *See* AR-28207–08. Moreover, FWS considered factors that it expects will lower usage of malathion in cotton. These factors include the reduction in scope of the Boll Weevil eradication program (one of the primary uses of malathion on cotton) to geographic areas outside of the range of this species, AR-12311, and the reduction in the allowable yearly number of applications, AR-12300. Further, cotton usage is only expected within 0.07% of the species' range. AR-28291. FWS incorporated this updated information about the Bear Creek area as part of its analysis of the best available science, which includes evolving information on pesticide usage.

FWS also looked at malathion usage and its effects to the species as a whole. Given the proposed label instructions and restrictions in place in 2020, FWS did not expect direct effects to the species, as mussels are not sensitive to malathion at estimated environmental concentrations. AR-12485. But FWS also considered effects of the action to their host fish, which exhibit greater sensitivity to malathion, with mortality expected at certain environmental concentrations. *Id.* FWS thus considered the most recent toxicity data for malathion for both the species and the host fish, combined with the anticipated concentrations of malathion in the range of the species. AR-12485;

1   AR-31734. FWS not only considered information from its recovery documents, but also fully
2   explained how circumstances evolved from those documents.

3         In other examples, Plaintiffs offer unexplained conclusions about why they feel FWS's
4   analysis was unsatisfactory. For example, Plaintiffs assert that FWS failed to consider survival
5   and recovery of the Delhi Sands flower-loving fly because it concluded that malathion will not
6   appreciably reduce recovery despite diminishing conservation areas. Pls. Opp. at 27 (citing
7   AR-17593; AR-29213). But they do not tie their conclusion to specific data or even explain how
8   FWS allegedly failed, other than the fact that Plaintiffs have a different opinion. Unlike Plaintiffs,
9   FWS conducted a thorough analysis of the Delhi Sands flower-loving fly's status, behaviors,
10  threats and stressors, and recovery actions and conservation measures. AR-17585–95. With this
11  background, FWS determined that virtually all of the minimal expected malathion exposure for
12  this species was from uses in developed or open-space developed areas. AR-29211; *see* AR-29213
13  (placing the species "mainly in San Bernardino and Riverside Counties, California, thus putting
14  it in proximity to residential and other developed areas in portion of its range"). FWS went on to
15  describe how the label restrictions to the method and frequency of malathion use would
16  "substantially reduce exposure to species that overlap with developed and open space developed
17  areas." AR-29212–13. Specifically, the label restrictions would limit residential use to spot
18  treatments, in turn limiting the potential of spray drift and reducing the extent of the treatment
19  area by as much as 75%. AR-29212. The label restrictions would also reduce the number of
20  applications per year. *Id.* FWS thoroughly considered conservation measures described in the
21  BiOp, even though "[p]esticides are not a known threat to this species." AR-29213. This robust
22  discussion refutes Plaintiffs' unsubstantiated claims that FWS's analyses merely paid "lip
23  service" to species' survival and recovery. Pls. Opp. at 27.

24        Finally, Plaintiffs assert that FWS's conservation measures often fail to consider the
25  lifecycle of the species. Pls. Opp. at 19. But Plaintiffs go on to specifically cite FWS's discussions
26  of lifecycles as evidence that lifecycles were not considered. *Id.* Again, Plaintiffs do not show
27  where FWS allegedly failed in its analysis, arguing only FWS did not do "enough to support no
28  jeopardy determinations." *Id.* Plaintiffs' dissatisfaction with FWS's framing of its analysis and

with its conclusions does not present grounds to overturn FWS's expert judgments. *Lands Council v. McNair*, 537 F.3d 981, 991 (9th Cir. 2008) (en banc) (reaffirming high degree of deference to agencies and "their methodological choices").

### IV.    FWS carefully analyzed each designated critical habitat.

Plaintiffs next reiterate their vague criticisms of FWS's critical habitat analysis, claiming that FWS relied on critical habitat designations without any additional context and, instead, "arbitrarily categorized critical habitats to streamline the assessment." Pls. Opp. at 25. But in explaining this "additional context," Plaintiffs describe details that are important to species' analyses—not critical habitat analyses. For example, Plaintiffs argue that the critical habitat designated for the Niangua darter should consider arthropod prey in its analysis, *id.* at 26, even though arthropod prey is not a physical and biological feature identified in the critical habitat designation. *See Endangered and Threatened Wildlife and Plants; Determination of Threatened Status and Critical Habitat for the Niangua Darter (Etheostoma Nianguae)*, 50 Fed. Reg. 24649 (June 12, 1985). Unlike Plaintiffs, FWS distinguished its assessment of the species from the assessment of critical habitat, focusing on relevant species-specific details as appropriate. *See, e.g.*, AR-15940–46. While Plaintiffs may not agree with the way in which FWS must assess critical habitat, they do not show that FWS's lawful assessment was arbitrary or capricious.

Finally, Plaintiffs misstate Federal Defendants' briefing and the BiOp as to FWS's recovery analysis. Pls. Opp. at 26. In its BiOp, FWS explains its determination on adverse modification for each critical habitat. It includes an assessment of the critical habitat's relationship to the overall conservation (i.e., recovery) of listed species. AR-12306–07. The considerations of each species are detailed in Exhibit K to the BiOp, AR-26819–30762. FWS thus correctly focused on analyzing effects to physical or biological features and how those effects impact recovery, which is precisely the inquiry mandated by the ESA. 50 C.F.R. § 402.02; *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1261–62 (9th Cir. 2017).

### V.    FWS issued an appropriate Incidental Take Statement ("ITS").

Plaintiffs continue to argue that FWS must minimize the impact (or numbers) of incidental take, to some undefined high degree, in every ITS. Pls. Opp. at 21–22. This argument leaps over

Fed. Defendants' Summary Judg. Reply
Case No. 3:24-cv-6324-JSC

7

key statutory text—that Congress delegated to FWS the option, not duty, to specify reasonable and prudent measures ("RPM") in an ITS. 16 U.S.C. § 1536(b)(4)(C)(ii) (an ITS includes measures FWS "considers necessary or appropriate to minimize such impact" of incidental take); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 381 (2024) (holding this statutory "necessary and appropriate" language specifically delegates the task to the agency's judgment). It follows, then, that FWS has no duty to specify the particular types of RPMs that Plaintiffs prefer—a fact they reinforce by glossing over the relevant statutory text entirely.

Against this statutory backdrop, FWS's consideration of RPMs falls comfortably within the discretion Congress delegated to it. Federal Defendants explained that the voluntary label changes incorporated additional measures into the proposed action to minimize the effects of incidental take. By incorporating the voluntary label changes as part of the proposed action, it minimized the overall adverse effects of the action. FWS then reasonably determined that the proposed action was not likely to jeopardize any listed species or result in the destruction or adverse modification of critical habitat. FWS's practice is to incorporate as many mitigations as possible up front to minimize adverse effects to species, which streamlines the overall analysis. Accordingly, FWS developed the ITS, associated RPM, and numerous terms and conditions to implement the RPM. The Service determined that it was reasonable to require that EPA minimize the impacts of incidental take to the listed species addressed in the ITS in accordance with its authority under the Federal Insecticide, Fungicide, and Rodenticide Act, in carrying out the proposed action, which included implementing the label changes. This RPM is implemented by a vast list of comprehensive terms and conditions that EPA is required to comply with, pursuant to 50 C.F.R. § 402.14(i)(1)(iv) (e.g., educate malathion users and stakeholders, compile data to validate assumptions regarding use and usage, improve incident reporting, pursue additional spatial and usage datasets, improve coordination with vector control operators, vector control operators to obtain more refined and regular data on malathion usage). AR-0012586-90; *see Loper Bright*, 603 U.S. at 394–95; *see also Ctr. for Biological Diversity v. Culver*, No. 21-CV-07171-SI, 2024 WL 4505468, at *64 (N.D. Cal. Oct. 15, 2024) (noting ESA "confers discretion on FWS" to determine RPMs and terms and conditions).

Relatedly, Plaintiffs assert that the ITS fails to provide a "trigger" to reinitiate consultation if take is exceeded. Pls. Opp. at 24. In addressing reinitiation, the BiOp begins by stating:

> As explained in more detail below, if the specific value pertaining to usage is exceeded during the course of this Action, EPA and the Service will coordinate to determine if additional incidental take is occurring and whether the consultation should be re-initiated pursuant to ESA section 7 implementing regulations at 50 C.F.R. 402.16 (a).

AR-12581. The subsequent pages detail how take shall be measured, evaluated, and reported. AR-12581–90. Plaintiffs do not find issue with how incidental take is measured or qualified. Their concern is not that the ITS lacks guidance from which to measure incidental take. Their concern, instead, is "even if this information were compiled, no consultation is triggered." Pls. Opp. at 24. But Plaintiffs miss the reporting and monitoring requirements detailed in the BiOp, which require the action agency to compile and evaluate specific data (i.e., usage data, water quality monitoring data, ecological incident data, use data), and annually report this to FWS. AR-12587–89. Moreover, FWS contemplated both annual meetings, AR-12586, and ongoing coordination, AR-12584–85, with the EPA.

To the extent that Plaintiffs are impliedly taking issue with the reporting and monitoring requirements, they have not shown that FWS failed to meet its duty. Under the ESA's implementing regulations, FWS must specify within the ITS "how the action agency is to monitor and report the effects of the action on listed species." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531–32 (9th Cir. 2010) (quoting 50 C.F.R. § 402.14(i)(3)). Here, FWS requires EPA to complete annual reports and provide those reports to FWS beginning March 1, 2023. AR-12586–90. FWS explains in detail the data that is to be included in the reports, with additional data requirements beginning in subsequent years. *Id.* FWS also requires EPA to set annual meetings with FWS to review those reports. AR-12586. Moreover, FWS intends to monitor the information itself, also in accordance with 50 C.F.R. § 402.16(a). *See* AR-12583–84.

1     On the other hand, Plaintiffs' issues with the ITS may simply be disagreement with reinitiation itself, as they seem to view this as "nothing more than an inter-agency conversation." Pls. Opp. at 24. But all ESA consultations—whether as part of the ITS or in reinitiation—*are* interagency conversations. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. That is the very point of the ESA's consultation procedures—that FWS's expertise is brought to bear on the questions as they arise, to facilitate EPA's compliance with the ESA. In any event, as clear from the detailed reporting requirements described above, outlined in AR-12586–90, the ITS requires far more than simple "conversations."

Finally, Plaintiffs' comparison to *American Rivers & Alabama Rivers Alliance v. FERC*, 895 F.3d 32, 48–49 (D.C. Cir. 2018), is misplaced. In that case, the court found that the ITS did not contain adequate guidance to determine whether the amount of incidental take was exceeded. *Id.* at 48. The court noted that it explored these issues during oral argument, and that the ITS in question was known to have no guidance or measurement that would practically trigger reinitiation. *Id.* Reliance here is thus misplaced, as FWS's malathion BiOp includes specific guidance on take surrogates, where the BiOp in *American Rivers* had none. Despite Plaintiffs' contentions, the agencies here are not "only required to meet at an unidentified time . . . based on undefined parameters." Pls. Opp. at 24. These parameters are spelled out in the ITS, AR-12581–90, and in the implementing regulations, 50 C.F.R. § 402.16. The BiOp acknowledges that the measures for incidental take, including usage data, will be regularly reviewed to ensure compliance with 50 C.F.R. § 402.16(a). AR-12583–85. Specific monitoring and review procedures are also clearly described. *See* AR-12583–90. And the ITS includes the reinitiation notice, outlining the legal triggers for reinitiation. AR-12593. At that point, the agencies are required to coordinate and discuss reinitiation, just as the ESA's implementing regulations require. As a complicated consultation with many different species, it is important for FWS and EPA to have an initial conversation about whether reinitiation is required pursuant to 50 C.F.R. § 402.16. Plaintiffs do not articulate how this process is insufficient and patently different than the statutory requirements for consultation. *See, e.g.*, 16 U.S.C. § 1536(a). As such, Plaintiffs' dissatisfaction with the reinitiation procedures is not a basis to toss aside FWS's expert analysis.

**VI. Consideration of remedy is premature at this stage.**

Plaintiffs contend that remedy questions require no further briefing. They are right in one respect—FWS satisfied its obligations under the APA and the ESA, and no remedy is warranted. But, should this Court disagree, a separate remedy phase is necessary to consider Plaintiffs' request for "a more tailored remedy." Plaintiffs' Motion for Summary Judgment, ECF No. 58 at 50.

First, while vacatur might be an available remedy, it is not the only remedy. "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). This determination first requires an assessment of the seriousness of the legal violations. Id. at 993. That information is not present now, which precludes the parties' ability to address the relevant legal issues. The determination then requires a balance of equities. *Id.* at 993; *see Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). Despite Plaintiffs' claim to the contrary, FWS would face massive disruption to its other important work if it were ordered to reconduct the thorough analyses done just a few years ago. A determination on remedy would require the Court to have facts relevant to the equities at balance. Federal Defendants should be permitted to develop that evidence through remedy briefing, as the Court previously acknowledged. ECF No. 59 at 8.

Second, any remedy must be narrowly tailored to redressing the harm to Plaintiffs. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (remedies are limited to the injury in fact which a plaintiff has established). Plaintiffs here correctly concede that vacating the BiOp outright is overbroad and unnecessary.[2] In doing so, Plaintiffs recognize that any remedy must be targeted; here, to the specific harms alleged by Plaintiffs' members. *See Immigrant Defs. Law*

---

[2] Plaintiffs also argue that vacating the ITS is appropriate because defendants and intervenors need not be concerned with potential civil or criminal enforcement. Pls. Opp. at 33 (supporting its proposed remedy by arguing that activities occurred in the past without a valid ITS). This cuts both ways. If Plaintiffs are unconcerned with the lack of enforcement if the ITS is vacated, then it follows that the presence of an ITS should not injure them.

*Ctr. v. Noem*, 145 F.4th 972, 995–96 (9th Cir. 2025) (applying narrow tailoring principles to APA relief). Plaintiffs have not performed that inquiry or shown why the specific relief they request is necessary to redressing some concrete, non-speculative injury in fact to their members. This failure of proof reinforces why further remedy proceedings are warranted, should the Court find an ESA violation. Accordingly, if the Court determines the BiOp is arbitrary or capricious, a separate remedy phase would be necessary.

## CONCLUSION

For the reasons above and detailed more thoroughly in Federal Defendants' Cross-Motion for Summary Judgment, ECF No. 70, the Court should grant Federal Defendants' motion, deny Plaintiffs' motion, and enter judgment for Federal Defendants.

Dated: November 26, 2025                     Respectfully submitted,

ADAM R.F. GUSTAFSON,
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
MEREDITH FLAX, Deputy Section Chief

*/s/ Elizabeth Kirby*
ELIZABETH KIRBY, Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Tel | (202) 353-5588; Fax | (202) 305-0275
Email: elizabeth.kirby@usdoj.gov

*Attorneys for Federal Defendants*